ORIGINAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

FILED
FEB 13 2025
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JOHN CESARIO Pro Se and
DAVID PREKA Pro Se
Plaintiffs

Vs.

VISTAGEN THERAPEUTICS, INC., SHAWN S. SINGH, JOHN S. SAXE, JERRY GIN, MARY ROTUNDO, ANN CUNNINGHAM, MAGGIE FITZPATRICK, JOANNE CURLEY, MARK McPARTLAND, REID ADLER, WITHUM SMITH & BROWN PC, JEFFRIES LLC. WILLIAM BLAIR & CO, LATHUM & WATKINS LLP, MAXIM GROUP, ANDREW TSAI, MYLES MINTER, TIM LUGO, JASON MCCARTHY, RALPH SNODGRASS, JEROLD DOTSON,MARK A. SMITH, LOUIS MONTI, CINDY ANDERSON, MICHAEL LEIBOWITZ, JOSHUA PRINCE, COLLEEN SMITH

Defendants.

Case No. CV25 1510 DMR

**Jury Trial Requested**

---

# VERIFIED COMPLAINT

# I. NATURE OF THE ACTION

## A. Misleading Statements and Omissions and a Billion Dollar Pump-and-Dump

1. This action arises from Vistagen Therapeutics Inc. ("Vistagen"), Vistagen's CEO Shaw K. Singh, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, and Vistagen's executive management team made intentional, fraudulent, misleading statements and material omissions in SEC disclosures and press releases regarding its flagship drug, Fasedienol ("PH94B")

Additionally, Vistagen's board of directors ("Director Defendants"), executive management team ("Executive Defendants"), and CEO Singh were grossly negligent and reckless in initiating a Phase 3 trial for PH94B for the non-Covid-19 related indication of acute social anxiety disorder during the peak of the COVID-19 pandemic. Plaintiffs allege that Vistagen, its directors, and its executive management team are repeat, habitual, and serial perpetrators of fraud and securities law violations.

2. CEO Singh and Saxe have completely controlled Vistagen for the last ten years and have wasted nearly $400,000,000 million without one successful drug trial published on ClinicalTrials.gov. The incompetence of Vistagen's board of directors and executive management team almost rises to the level of the 6-year spree of fraud and security law violations they have perpetrated. For example, Vistagen, all five clinical drug trials submitted to ClinicalTrials.gov for PH94B's indication for social anxiety disorder have been returned and were not published on ClinicalTrials.gov following a limited quality control review. A sixth PH94B clinical trial, done under the guise of a COVID-19 therapy for "adjustment disorder," was completed in July 2022. Vistagen has yet to submit the results to ClinicalTrials.gov.

3. Vistagen's violations of federal and state securities laws and fraudulent acts were not limited to Vistagen's board of directors and executive management team; Vistagen's independent auditor Withum Smith + Brown, PC ("Withum"), three investment banks, and their analysts became active participants in the security law violations and fraudulent acts described herein. Maxim

Group LLC, Jefferies LLC ("Jefferies"), William Blair & Company ("William Bair"), and their analysts actively joined Vistagen's board of directors and executive management team in perpetrating violations of securities laws and fraud described herein. Jefferies was the worst of the lot, as they knowingly, willfully, maliciously, and directly facilitated Vistagen's criminal pump and dump on August 7th, 2023. That pump and dump scheme **defrauded the public by nearly 1 billion dollars,** ultimately receiving upwards of $135,000,000, ensuring Singh's continued salary and bonuses. To illustrate the gravity of the fraud perpetrated by Vistagen,

4. Vistagen's Director Defendants, and Jefferies on August 7th, 2023, after Vistagen issued an unlawful and misleading press release, Vistagen's share price EXPLODED from $1.92 to $71 on record heavy trading volume in less than an hour and a half. By Thursday, August 10th, 2023, Vistagen's shares were selling for less than $5.00 and now traded under $3.00. In addition to Jefferies, Maxim and William Blair were secondary actors and active participants who conspired with, aided, and abetted the unlawful conduct alleged herein. Withum, by their position as Vistagen's external auditor, knew or should have known about the illegal conduct yet stood silent.

5. This case arises from fraud, violations of Securities and Exchange Commission ("SEC") laws, gross negligence, breaches of fiduciary duties, rule violations, and the reckless and intentional abandonment of audits performed to PCAOB rules and standards.

6. The Plaintiffs' claims arise under (i) Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 promulgated thereunder, (ii) Section 17(a)(1)-(3) of the Securities Act, (iii) Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, (iv) The Private Securities Litigation Reform Act ("PSLRA"), (v) common law fraud, (v) constructive fraud, (iv) violations of California Corporations Code § 25400 and § 25401, (v) Negligence, (vi) Negligent Misrepresentation, (vii) aiding and abetting, (viii) conspiracy, (ix) Intentional Misrepresentation and fraudulent concealment; (x) breach of fiduciary duty; (xii) breach of the implied covenant of good faith and fair dealing; and (xiii) reckless and intentional abandonment of audits performed to PCAOB rules and standards.

7. The Plaintiffs' claims arise under (i) Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 promulgated thereunder, (ii) Section 17(a)(1)-(3) of the

Securities Act, (iii) Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, (iv) The Private Securities Litigation Reform Act ("PSLRA"), (v) common law fraud, (v) constructive fraud, (iv) violations of California Corporations Code § 25400 and § 25401, (v) Negligence, (vi) Negligent Misrepresentation, (vii) aiding and abetting, (viii) conspiracy, (ix) Intentional Misrepresentation and fraudulent concealment; (x) breach of fiduciary duty; (xii) breach of the implied covenant of good faith and fair dealing; and (xiii) reckless and intentional abandonment of audits standards and violations of the rules and standards of Public Company Accounting Oversight Board (herein "PCAOB") and SEC rules and laws.

8. Plaintiffs John Cesario and David Preka, individually, bring this federal action against Defendants Vistagen, Shawn K. Singh, Jon S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, Mark McPartland, Reid G. Adler, Joshua S. Prince, Withum Smith + Brown, PC, Jefferies LLC, Andrew Tsai, William Blair & Company, Myles Minter, Tim Lugo, Latham & Watkins, Colleen Smith, Maxim Group, Jason McCarthy, Ralph Snodgrass, Jerold Dotson, Mark A. Smith, Louis Monti, Cindy Anderson and Michael Leibowitz.

9. The Plaintiffs purchased, acquired, or otherwise held, or sold, the publicly traded common stock of Vistagen between January 2017 and December 2024. The Plaintiffs paid inflated prices for Vistagen's common stock during that time. Additionally, the Plaintiffs were induced by certain Defendants to hold those shares when they could have sold them for profit. The Plaintiffs were unaware that Vistagen's CEO, director, and executive management team materially made fraudulent statements and intentionally omitted adverse facts described below to artificially inflate Vistagen's share price. The Plaintiffs relied on Vistagen's public disclosures and conversations with Singh and McPartland when purchasing stock. Moreover, the Plaintiffs relied upon Jefferies and William Blair's December 2020 financing of $100 million and analysts' price targets. Once the Plaintiffs realized that Vistagen and Jefferies committed a massive pump and dump on August 7th, 2023, which defrauded the public of upwards of $1 billion, the Plaintiffs began a thorough investigation.

10. Plaintiffs allegations are based on incontrovertible evidence after an extensive and lengthy investigation which included, among other things, the review and analysis of: (i)

Vistagen's public quarterly reports filed with the Securities and Exchange Commission (herein "SEC"); (ii) Form 8-K's filed with the SEC with attached press releases (iii) research reports issued by financial analysts concerning Vistagen stock; (iv) Form 8-K corporate updates filed with the SEC; (v) prospectuses filed with the SEC; (vi) audited annual reports signed CEO; (vii) news articles about Vistagen; (viii) text messages and phone calls with Vistagen's CEO Shawn K. Singh and Senior Vice-President Mark McPartland; (iv) personal meetings with Vistagen's CEO Shawn K. Singh and Senior Vice-President Mark McPartland; (x) records from the National Library of Medicine ("NLM") and its website ClinicalTrials.gov; (xi) Vistagen's earnings calls; and (xiii) a letter dated November 27th2023 from Vistagen's outside counsel, Latham & Watkins.

11. The FDA relies on ClinicalTrials.gov because it ensures transparency, promotes scientific advancement and protects the public by providing a central repository of information about clinical trials and their results. This transparency is vital for informed decision-making by researchers, healthcare providers, and the public, and it helps to ensure that clinical trials are conducted ethically and responsibly. [1]Federal law requires responsible parties to register with and submit results information to the ClinicalTrials.gov data bank for certain applicable clinical trials. Transparency of clinical trial information is vital to scientific advancement.

See;
https://www.fda.gov/science-research/clinical-trials-and-human-subject-protection/fdas-role-clinicaltrialsgov-information#:~:text=Federal%20law%20requires%20responsible%20parties,is%20important%20to%20scientific%20advancement.

## I. SUMMARY OF ALLEGATIONS PER RULE 8

12. Given the substantial number of parties, the Plaintiffs categorize (1) Vistagen's Board of Directors as the ("Director Defendants"), (2) Vistagen's executive management team and

---

[1] Plaintiffs emphasize that transparency speaks to materiality. Moreover, The Banking Defendants and Banking Defendants knew that Vistagen, the Director Defendants, and the Executive Defendants were violating federal and state security laws and committing fraud, concealing that the Phase 2 and Pilot Phase 3 trials were rejected for publication by ClinicalTrials.gov after a QC review. Accordingly, the Defendant Bankers and Defendant analysts also knew that (a) the prospectuses contained fraud and(b) the analyst's research reports and price targets were intentionally fraudulent.

Leibowitz will be the ("Executive Defendants"), (3) when referenced as a collective Jefferies, Maxim, and William Blair will be the ("Banking Defendants."), and when referenced as a collective, Andrew Tsai, Jason McCarthy, Lugo, and Myles Minter analysts will be the ("Analyst Defendants").

13. The complaint includes evidence of the Director and Executive Defendant's wrongdoing, including misleading statements and omissions alleged herein, which are in twenty quarterly reports, six annual reports, five prospectuses, three corporate presentations, and twelve earnings calls. Cesario states that McPartland and Singh made the same misleading statements and material omissions in personal conversations.

14. Vistagen, the Director Defendants, and the Executive Defendants violated federal and state security laws and committed fraud by making intentionally misleading statements and material omissions in Vistagen's SEC filings, press releases, and securities offerings. Additionally, they violated fiduciary duties. The Director Defendants and the Executive Defendants knew that clinicaltrails.gov rejected publishing the PH94B Phase 2 and Pilot Phase 3 trials for social anxiety disorder after a limited quality control review ("QC").

15. Vistagen and the Director Defendants were grossly negligent in initiating a Phase 3 social anxiety trial during peak COVID-19. Vistagen intentionally designed and initiated the Phase 3 trial based on a decade-old Phase 2 trial that ClinicalTrials.gov rejected based on a QC review. Moreover, even the general public knew that COVID-19 adversely affected the nasal passageway, and PH94B was delivered intranasally. Additionally, the Director and Executive Defendants were grossly negligent in initiating the Phase 3 trial and then terminating it because they allocated the budget for the trial to salaries, bonuses, and other expenses. Terminating a Phase 3 trial was due to the Board and Executive Defendants being negligent in spending funds budgeted for the Phase 3 trial elsewhere. Still, the Board and Executive Defendants were also highly unethical. Over 100 trial participants braved joining the PALISADE-2 trial during peak COVID-19, only to have the trial terminated because Vistagen's Director Defendants and Executive Defendants misspent the budget and then lied about why they terminated the trial in SEC filings, prospectuses, corporate presentations, press releases, and earnings calls.

15. While engaged as Vistagen's external auditor from 2018 through 2014, [2]Withum Smith + Brown, PC ("Withum") Withum ignored glaring red flags regarding Vistagen's disclosures regarding its flagship drug, PH94B and assisted Vistagen in drafting SEC filings and public disclosures. Withum acted as a secondary actor with Vistagen in its wrongful conduct. Plaintiffs allege Withum aided and abetted Vistagen, the Director Defendants, and the Executive Defendants were secondary actors, conspired with, aided, and abetted Vistagan in perpetrating fraud and federal and state disclosure violations alleged herein. Additionally, Withum's audits and opinions were reckless, intentionally, and deliberately abandoned audit standards and violated the rules and standards of the Public Company Accounting Oversight Board (herein "PCAOB") and SEC rules and laws.

16. While engaged as Vistagen's external SEC attorney, Latham & Watkins, and Smith reviewed, edited, and approved Vistagen's SEC disclosures, prospectuses, and press releases for dissemination, knowing they contained material misstatements and omissions of material facts. Latham & Watkins, and Smith conspired with, aided, and abetted Vistagan in perpetrating fraud and federal and state disclosure violations alleged herein. Additionally, Latham & Watkins, and Smith aided and abetted the Director Defendants and Executive Defendants in breaching their fiduciary duties.

17. Banking Defendants and Analyst Defendants were secondary actors and conspired with, aided, and abetted Vistagan in perpetrating fraud and federal and state disclosure violations alleged herein. Additionally, the Banking Defendants and Analyst Defendants aided and abetted the Director Defendants and Executive Defendants in breaching their fiduciary duties.

## III. JURIDICTION AND VENUE

**Jurisdiction** - This Court has jurisdiction over the subject of this action under 28 U.S.C. §1331, §27 of the Exchange Act, and § 22 of the Securities Act. The claims asserted herein arise

---

[2] *Withum was fired by Vistagen in 2024.*
*sec.gov/ix?doc=/Archives/edgar/data/0001411685/000143774924022667/vtgn20240711_8k.htm*

under but are not limited to §§10(b), 20(a), 20(b), and 20A of the Exchange Act (15 U.S.C. §78j(b), §78t(a) and §78t(b)), and 78t-l, Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R. §240.10b-5) and California tort violations including CA Civ Code § 3294_ Cal. Civ. Pro. Code § 338(d) common law fraud, aiding, abetting, and breaching fiduciary responsibility; Cal. Civ. Pro. Code § 343 Cal. Corp. Code § 25506 securities law violations Catchall Provision, California fraud, conspiracy, and aiding and abetting causes of action allowed in California.

**Venue - This** Court has jurisdiction under *28 U.S.C.A.* § 1332, applies to civil actions over $75,000, and involves people from different states. Both Plaintiffs in this matter have realized losses of over $75,000.00

## IV. PARTIES

Plaintiffs

A. **John Cesario** ("Cesario") was an investor in Vistagen between 2016 and 2023. Cesario resides in Connecticut. He introduced Singh and McPartland to high- net worth individuals to assist Vistagen in raising capital. He was a consultant for a short time.

B. **David Preka** ("Preka") is a businessman who owns construction companies, hotels, and restaurants. Preka resides in East Lyme, Connecticut.

Defendants

C. **Vistagen Therapeutics Inc.** ("Vistagen") is a late clinical-stage neuroscience-focused biopharmaceutical company incorporated in Nevada. Vistagen's primary headquarters is 343 Allerton Avenue, South San Francisco, CA 94080. Vistagen common stock is publicly traded on the NASDAQ exchange under the symbol VTGN. Vistagen is a penny stock with accumulated losses of approximately $338.5 million, as reported in its 10-Q filing for September 30th, 2024.

D. **Shawn K. Singh** ("Singh") is Vistagen's long-standing CEO and a long-standing member of its Board of Directors. Singh is an attorney who has stated that he previously served as an attorney at the Securities and Exchange Commission.

E. **John S. Saxe** ("Saxe") is a long-standing Vistagen Board member. His biography states that he "served as Chair of our Board of Directors from 2000 until October 2023." Saxe stepped down from his post as chairman after being notified that he would be sued. He is also a member of the Audit Committee.

F. **Jerry Gin** ("Gin") is a long-standing Vistagen's Board of Directors and Audit Committee member.

G. **Mary L. Rotundo** ("Rotundo") is a long-standing Vistagen's Board of Directors member and was appointed in 2021. Rotundo is an attorney and is a member of the Audit Committee. Rotundo's bio states, "Ms. Rotunno advises life sciences and health care startup companies.

H. **Ann Cunningham** ("Cunningham") is a long-standing member of Vistagen's Board of Directors and was appointed in 2019. Her Bio states that Cunningham has over 25 years of commercial experience in the pharmaceutical industry. She is the Founder and Chief Executive Officer of Strategy Partners, a pharmaceutical consulting group

I. **Maggie Fitzpatrick** ("Fitzpatrick") was appointed to Vistagen's Board of Directors in 2021 and sits on the Corporate Governance Committee.

J. **JoAnne Curley** ("Curley") is a 2021-appointed member of Vistagen's Board of Directors and sits on the Corporate Governance Committee. Curley sits on the Corporate Governance Committee. Curley's bio states that she joined Vistagen's Board of Directors and our **Corporate Governance** and Nominating Committee. Dr. Curley has more than 25 years of experience in the development and commercialization of pharmaceutical products

K. **Mark McPartland** ("McPartland") joined Vistagen in September 2016 as Senior Vice President of Investor Relations. Mr. McPartland has over 28 years of experience in corporate development, investor relations, and capital markets, working with private and public biotechnology, healthcare, and technology companies.

L. **Reid G. Adler** ("Adler") joined Vistagen as our General Counsel in May 2022 after serving as outside counsel for several years. He recently also became the head of business

development. During his extensive career in the biopharma sector, Mr. Adler was a senior partner at two international law firms.

M. **Mark Flather** ("Flather") is a Senior Vice President of Corporate Strategy and Capital Markets. Mr. Flather has more than 25 years of capital markets experience in various capacities on both the buy-side and sell-side. Before joining Vistagen in March 2021, Mr. Flather managed Investor Relations and Corporate Communications for Adamis Pharmaceuticals (Nasdaq: ADMP), a specialty biopharmaceutical company primarily focused on developing and commercializing products in various therapeutic areas, including allergy, opioid overdose, respiratory, and inflammatory disease.

N. **Joshua S. Prince** ("Prince") joined the Vistagen team in November 2021 and currently serves as Chief Operating Officer.

O. **Withum Smith + Brown PC** ("Withum") is a professional corporation headquartered in Princeton, New Jersey. Withum is licensed by the New Jersey State Board of Accountancy (License No. 20CB00149600) and operates in California. Withum served as Vistagen's external independent auditor between 2019 and 2024.

P. **Jefferies LLC** ("Jefferies") is a Limited Liability Company formed in Delaware and headquartered in New York, New York; Jefferies is registered with the Securities and Exchange Commission as a broker-dealer. Jefferies served as one of Vistagen's investment bankers and provided analyst coverage for Vistagen's stock.

Q. **Andrew Lin Tsai** ("Tsai") is an analyst at Jefferies LLC, and he provides price targets and issues research reports on Vistagen stock.

R. **William Blair & Company, LLC** ("William Blair") is a Delaware-based limited Liability Company that claims to be the premier global boutique with expertise in investment banking, investment management, and private wealth management. William Blair acted as a book runner for Vistagen's equity offering and provided analyst coverage for Vistagen's stock.

S. **Myles Minter** ("Minter") is a biotechnologies analyst for William Blair & Company, LLC, covering Vistagen's stock.

T. **Maxim Group, LLC** ("Maxim") is a Limited Liability Company headquartered in New York, New York.

U. **Jason McCarthy** ("McCarthy") is a biotechnologies analyst for Maxim Group, covering Vistagen's stock.

V. **Ralph Snodgrass** ("Snodgrass") was the founder of Vistagen and served as a former Board member and President until he was fired in 2022.

X. [3]**Michael Liebowitz** ("Liebowitz") is a non-employee of Vistagen. Still, Liebowitz is grouped with the Executive Defendants. He is on Vistagen's Board of Advisors and was the Primary Investigator on all five PH94B trials rejected for publication by the National Library of Medicines website, ClinicalTrials.gov, after ClinicalTrials,gov conducted a quality review.

Y. **Louis Monti** ("CEO Monti") joined Vistagen as Vice President of translational Medicine in December 2020. Before joining Vistagen, Monti served in multiple leadership roles at [2]Pherin Pharmaceuticals ("Pherin") since its founding in 1991, including President and CEO from July 2018 through November 2020

Z. **Jerrold D. Dotson** ("Dotson") is Vistagen's former chief financial officer. Dotson retired in 2024. Dotson signed off on Vistagen's noncompliant annual reports for 2019, 2020, 2021, 2022, and 2023.

AA. **Cindy L. Anderson** ("Anderson") is Vistagen's current Chief Financial Officer and has been with Vistagen since August 3rd, 2023. Anderson signed off on the non-compliant 2024 annual report.

BB. **Tim Lugo** ("Lugo") was a Former William Blair partner and group head who provided analyst coverage on Vistagen.

CC. Latham & Watkins LLP ("Lathan & Watkins") is a Limited Liability Partnership and global law firm representing Vistagen.

---

[3] Leibowitz is grouped with the executive management team because he designed and ran the PH94B trials and has been quoted in multiple misleading press releases.

DD. Colleen Smith ("Smith") Smith is an attorney at Latham & Watkins. Smith represents Vistagen.

## V. HISTORICAL BACKGROUND AND ALLEGATIONS

18. Plaintiff Cesario was introduced to Vistagen's Shawn Singh in the summer of 2016. Vistagen had just been listed on the NASDAQ exchange, and its stock price was trading at [4]$135.00 ($4.50 actual price) a share. Singh is a con man who is pretty convincing when weaving a story about his life's mission to find a cure for depression because he stated his father suffered from it; in reality, Singh's motive is self-enrichment, and he will lie, cheat, and defraud investors, as a means to enriching himself. Vistagen has accumulated deficits of hundreds of millions of dollars through Saxe and Singh's corrupt leadership. Both Singh and Saxe are stock market savvy.

### A. <u>Vistagen Bets Everything On PH94B, And The Omissions Begin</u>

19. On September 13th 2018, Vistagen announced they acquired the worldwide rights to the drug from PH94B from Pherin Therapeutics. Vistagen, Singh, and McPartland stated that PH94B had previous successful drug trials to treat Social Anxiety Disorder

> *https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-acquires-worldwide-license-phase-3-ready*

> The September 13th, 2018, press release made the following misleading statement in the heading;

> Novel PH94B nasal spray **expected to enter pivotal Phase 3 development for as-needed (PRN) treatment of Social Anxiety Disorder (SAD) in the first half of 2019**; positioned to drive a paradigm shift towards rapid-acting treatment of SAD, without risk of addiction

20. When Vistagen issued the press release, Vistagen did <u>not have the capital to</u> start a Phase 3 trial, as they reported a cash position of approximately $8 million, according to Vistagen's SEC

---

[4] In 2023, as part of Vistagen's pump and dump scheme, Vistagen executed a 1/30 reverse split, which effectively multiplies the price by 30-fold while reducing the common shares owned by 30-fold. Vistagen's real-time price was $4.50 in 2016

filings. Therefore, Vistagen did not begin the Phase 3 trial in the first half of 2019, as they stated they would.

21. On April 1st, 2019, Vistagen filed an 8-K with the SEC and issued a false and misleading press release titled;

**Positive Pilot Phase 3 Data Position VistaGen's PH94B Neuroactive Nasal Spray for Pivotal Phase 3 Development as a Novel, As-Needed Treatment for Social Anxiety Disorder**

***New Findings Presented at the 2019 Anxiety and Depression Association of America Annual Conference***

*See;*
*https://www.vistagen.com/news-releases/news-release-details/positive-pilot-phase-3-data-position-vistagens-ph94b-neuroactive*

22. The [5]press release was Vistagen's initial kickoff, beginning years of intentional disclosure laws and fraud; it was materially misleading and omitted disclosing material facts for the following reasons;

- The press release was pure hype. Vistagen did not have a **triggering event** to Vistagen to file an 8-K and press release; the press releases regurgitated Vistagen's previous press release dated September 13th, 2018.
- The press release falsely claimed that Vistagen had *"NEW FINDINGS."* They did not. The Positive Pilot Phase 3 referenced in the press release was conducted by Pherin Therapeutics five years earlier. According to ClinicalTrials.gov., the trial began in March 2014 and was completed in October 2014.

*See; https://ClinicalTrials.gov/study/NCT02622958*

23. The Director Defendants intentionally omitted to disclose that after the trial was submitted to ClinicalTrials.gov, the trial wasrejected for publication following a limited QC review.

5 *https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-acquires-worldwide-license-phase-3-ready*

*See; https://ClinicalTrials.gov/study/NCT02622958?tab=results*

**Study Overview**

**Brief Summary**

The purpose of the study is to determine whether the PH94B nasal spray is effective for Acute Treatment of the symptoms of Social Anxiety Disorder (SAD) in adult men and women. The hypothesis is that PH94B nasal spray (.8 micrograms) has a rapid onset of efficacy to improve performance and interaction anxiety in patients with diagnosed Social Anxiety Disorder (SAD).

**Detailed Description**

The study is a randomized, double-blind, placebo-controlled, 2-way crossover trial of the efficacy and safety of PH94B in the treatment of subjects diagnosed with Social Anxiety Disorder as defined by the Diagnostic and Statistical Manual IV and confirmed by the MINI (5.0.0). The study is intended to serve as a feasibility trial of a multi-center phase 3 study protocol of similar design.

The primary objective of this study is to evaluate design features for a larger Phase 3 study that will evaluate the safety and efficacy of PH94B for the acute management of symptoms in subjects with Social Anxiety Disorder. Careful review of diary entries and measurement of study medication compliance each week will be used to determine the feasibility of using the study medication on an "as needed" basis for anxiety-provoking social events. Specifically, the frequency of use, variability of SUDS ratings, effect size of differences in average peak SUDS ratings during treatment with PH94B and placebo, and general reliability of the diary recording method will be evaluated and used to refine inclusion and exclusion criteria as well as provide guidance for designing a larger multi-site study.

The study will last a total of 6-8 weeks. The randomized double-blind treatment period will last a total of four weeks for all subjects.

**Study Start**
2014-03

**Primary Completion (Actual)**
2014-10

**Study Completion (Actual)**
2015-03

**Enrollment (Actual)**
23

**Study Type**
Interventional

**Phase**
Phase 3

## Results Overview

### Results Submitted - Not Posted on ClinicalTrials.gov

Results information has been submitted to ClinicalTrials.gov by the sponsor or investigator, but is not yet publicly available (or "posted") on ClinicalTrials.gov. The submitted information may not be available if it is pending Quality Control (QC) Review by the National Library of Medicine (NLM) or if issues identified during QC review are being addressed or corrected by the sponsor or investigator. NLM's limited QC review assesses for apparent errors, deficiencies, or inconsistencies. NLM staff do not verify the scientific validity or relevance of the submitted information.

| Recruitment Status | Actual Primary Completion Date | Actual Study Completion Date |
|---|---|---|
| Completed | 2014-10 | 2015-03 |

| Submission Cycle | Results Submitted to ClinicalTrials.gov | Results Returned After Quality Control Review |
|---|---|---|
| 1 | 2015-12-29 | 2016-02-01 |
| 2 | 2022-04-04 | 2022-05-02 |

24. The ClinicalTrials.gov website states;

> National Library of Medicine **(NLM) (ClinicalTrials.gov) staff perform a limited review of submitted study records for apparent errors, deficiencies, or**

> **inconsistencies.** NLM staff identify potential major and advisory issues and provide comments directly to the study sponsor or investigator. Major issues identified in the QC review must be addressed or corrected (see First submitted that met QC criteria and Results first submitted that met QC criteria). Advisory issues are suggestions to help improve the clarity of the record. NLM staff do not verify the scientific validity or relevance of the submitted information. The study sponsor or investigator is responsible for ensuring that the studies follow all applicable laws and regulations.

25. Notably, Vistagen's PH94B Phase 2 trial began in 2009, and the Pilot Phase 3 trial was conducted in 2014. Vistagen modeled the Phase 3 trials after the single-dose Phase 2 trial. In the Pilot Phase 3 trial, the subjects were allowed to self-administer the drug up to four times a day for four weeks before being tested. The Pilot Phase 3 study only included 22 subjects and was done at a single location in New York.

26. The Director Defendants intentionally omitted to disclose that PH94B's patent runway for social anxiety disorder was nearly expiring. Drug patents generally run for 20 years. Extensions are possible, but this was a material omission.

**B. <u>AV-101 Trial Fails To Meet Its Endpoint</u>**

27. On May 2nd, 2019, Vistagen announced that AV-101 failed its Phase 2 trial. See,

*https://www.vistagen.com/news-releases/news-release-details/vistagen-reports-top-line-results-nimhs-exploratory-study-av-101*

28. The announcement caused Vistagen's stock price to crash 80%, as Vistagen's stock price dropped from $1.00 a share to $0.23 in real-time prices (or $30.00 to $6.90 adjusted for the 2023- 1/30 reverse split). See;

*https://www.vistagen.com/news-releases/news-release-details/vistagen-announces-stockholder-approved-reverse-stock-split#:~:text=As%20previously%20disclosed%2C%20at%20the,%2Dfor%2Dthirty%2C%20with%20the*

*ttps://www.fiercebiotech.com/biotech/vistagen-fails-phase-2-depression-trial-sparking-stock-rout*

29. Despite suffering financial losses after AV-101's failure, the Plaintiffs still believed in Singh and supported Vistagen. Vistagen's stock price crashed to $0.23; as previously reported, Vistagen's cash position was terrible, and then came COVID-19.

## C. The COVID-19 Pandemic Begins

30. On March 11th, 2020, the World Health Organization declared COVID-19 a pandemic. In the United States, schools were forced to close, businesses across the country were shut down, and families were not allowed to visit loved ones in hospitals and nursing homes. Pharmaceutical companies postponed or paused drug trials that were not developing testing devices, vaccines, or therapeutics for COVID-19.

31. Vistagen never completed a successful Phase 2 trial, let alone a Phase 3 trial. Phase 2 trials generally include a small number of subjects to test efficacy and safety. They are a key factor in whether a company should run a more extensive and expensive Phase 3 trial. Assuming a company has a successful Phase 3 trial and wants to attempt to get a drug approved for commercial use, Phase 3 results are attached to an Investigational New Drug ("IND") application to the FDA. The FDA's website clearly states that the FDA does not design study designs for pharmaceutical companies. However, they will approve designs that, if successful, will move the drug forward in the application process.

## D. Singh Positions PH94B As A COVID-19 Therapy

32. Even for the world's largest and most experienced pharmaceutical companies, running a drug trial during COVID-19 was extremely challenging. Vistagen was nearing bankruptcy after AV-101 failed and was having difficulty raising capital. The Plaintiff's contacts bought private placements. Ever the opportunist, Singh seized upon the COVID-19 pandemic to raise capital by positioning PH94B as a COVID-19 anxiety disorder therapy, which was a completely different indication than acute social anxiety disorder.

33. On May 18$^{th.}$ 2020, Vistagen issued a press release titled;

> **VistaGen Submits PH94B Phase 2A Study Protocol for Treatment of Adjustment Disorder with Anxiety Related to the COVID-19 Pandemic through U.S. FDA's Coronavirus Treatment Acceleration Program**

**https://www.vistagen.com/news-releases/news-release-details/vistagen-submits-ph94b-phase-2a-study-protocol-treatment**

34. The press release made this statement, a half-truth that concealed that ClinicalTrials rejected the Phase 2 trial for publication by ClinicalTrials.gov after a limited QC review.

> *With successful Phase 2 development of PH94B for social anxiety disorder completed and preparations for Phase 3 development underway, we now look forward to Phase 2 development of PH94B for adjustment order, with the goal of achieving similarly positive treatment outcomes for individuals struggling to cope with difficulties related to COVID-19, as well as a wide range of other anxiety-provoking mental health stressors."*

**E. Vistagen Reports Meeting With The FDA Regarding The PH94B Study**

35. On June 23rd, 2020, Vistagen issued a press release with the heading;

> "VistaGen Therapeutics Announces Positive Meeting with FDA Regarding Pivotal Phase 3 Study of PH94B for Acute Treatment of Anxiety in Patients with Social Anxiety Disorder" *"Notably, the FDA concurred that our initial pivotal Phase 3 efficacy study may be conducted in a manner substantially similar to the highly statistically significant Phase 2 study of PH94B, which study involved a single event, laboratory-simulated public speaking challenge in adult patients with SAD." See;*

*https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-announces-positive-meeting-fda-regarding*

36. The FDA approves the trial designs as standard practice. Companies seek approval because if their trial is successful, the FDA reviews the prosecution, and the study design would be included in the FDA approval process. Once again, Vistagen, the Director Defendants, and Executive Defendants made misleading statements and intentionally and fraudulently omitted to disclose to the public and shareholders the material facts that the Phase 2 study of PH94B were not published on ClinicalTrials.gov after a limited quality review.

## Results Overview

### Results Submitted - Not Posted on ClinicalTrials.gov

Results information has been submitted to ClinicalTrials.gov by the sponsor or investigator, but is not yet publicly available (or "posted") on ClinicalTrials.gov. The submitted information may not be available if it is pending Quality Control (QC) Review by the National Library of Medicine (NLM) or if issues identified during QC review are being addressed or corrected by the sponsor or investigator. NLM's limited QC review assesses for apparent errors, deficiencies, or inconsistencies. NLM staff do not verify the scientific validity or relevance of the submitted information.

| Recruitment Status | Actual Primary Completion Date | Actual Study Completion Date |
|---|---|---|
| Completed | 2011-02 | 2011-03 |

| Submission Cycle | Results Submitted to ClinicalTrials.gov | Results Returned After Quality Control Review |
|---|---|---|
| 1 | 2015-12-29 | 2016-02-01 |
| 2 | 2019-08-27<br>(Canceled on 2019-08-27)<br>2022-04-04 | 2022-05-02 |

***See*: *https://ClinicalTrials.gov/study/NCT01217788?a=2&tab=results***

37. The screenshot from ClinicalTrials.gov provides court evidence of the Director and Executive Defendants' intentionality and scienter. The Director Defendants and Executive Defendants knew the omission of ClinicalTrials.gov rejecting the early Phase 2 PH94B trials was material, so they attempted to get the trials published in 2019 and again in 2022. The June 23rd, 2020, press release also intentionally made material omissions.

- the date of the Phase 2 trial,
- that the Phase 2 trial was conducted by Pherin and not Vistagen,
- that the Phase 2 trial design only included women,
- that according to ClinicalTrials.gov, the Phase 2 trial consisting of only 88 female participants took 3 years to complete (start date of February 2008 - finish date of February 2011)
- the first time purported results of the Phase 2 trial were not even submitted to ClinicalTrials.gov until December 2015
- that the FDA had never approved a social anxiety drug based on the Subjective Units of Distress Scale (SUDS) study.

38. After the WHO declared COVID-19 a pandemic, stock markets crashed worldwide. Brokerage firms that funded small-cap companies paused most financings, except if they were COVID-19 related, including vaccines, testing equipment, and therapies. Vistagen's cash position stood at approximately 1 million dollars on March 31st, 2020.

*https://www.statista.com/statistics/1175227/s-and-p-500-major-crashes-change/*

39. In May 2020, Vistagen's stock price increased to the $0.40 cent range based on Vistagen's attempt to position PH94B as a COVID-19-related therapy. On May 13th, 2020, Vistagen raised $0.42 through a placement that included shares and warrants.

40. [6]The prospectus filed with the SEC omitted material facts and made the following statement;

> "We plan to submit our proposed protocol for an exploratory Phase 2a study of PH94B for the treatment of **adjustment disorder due to stressors related to the COVID-19 pandemic to the FDA through the Coronavirus Treatment Acceleration Program (*CTAP*)**. The proposed Phase 2 study will be conducted in New York City on an open-label basis and involve approximately 30 subjects suffering from adjustment disorder with anxiety from stressors related to the pandemic."

> "Based on its novel mechanism of pharmacological action, **rapid onset of therapeutic effects and exceptional safety and tolerability profile in Phase 2 and pilot Phase 3 clinical trials to date**,"

41. On [7]August 2nd and August 5th 2020, Maxim raised $25,000,000 for Vistagen through two 12.5-million-dollar financings at $0.80. Once again, the two prospectuses omitted material facts and made misleading statements.

42. In December 2020, Vistagen engaged Jefferies and William Blair as its bankers. Jefferies is not known for financing failing microcap penny stock companies but saw an opportunity to generate fees because Vistagen positioned PH94B as a COVID-19 anxiety therapy. During 2020 and 2021, many microcap companies saw substantial price increases in share prices simply by adding COVID-19 to the titles of press releases in 2020 and 2021. The plethora of hype-filled COVID-19 press releases was so pervasive that the SEC and DOJ issued notices to be aware of pump-and-dumps schemes in microcaps stocks. Vistagen didn't waste time jumping on the

[6] *See,* https://www.sec.gov/Archives/edgar/data/1411685/000165495420005649/vtgn424b3_may2020.htm

[7] *See; Maxim financings,* *https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-announces-pricing-125-million-underwritten*

*https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-announces-closing-125-million-underwritten*

bandwagon exploiting COVID-19 to stave off bankruptcy. Vistagen was quickly able to raise $125,000,000. Shortly after Vistagen's record-setting $25,000,000 raise share offering through Maxim, Jefferies and William Blair raised $100,000,000 through a share offering on December 22nd, 2020.

*https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-announces-closing-100-million-underwritten*

43. According to the prospectus, the underwriting was done at $0.92 a share ($27.6 equivalent post the 2023 1/30 reverse split). Jefferies netted approximately $7.5 million in fees. Jefferies and William Blair knew that ClinicalTrials.gov had rejected the Phase 2 and Pilot Phase 3 trials after a QC review, so those trials were not mentioned in the prospectus. However, the prospectus made the following statements, which were half-truths, because the prospectus still omitted to disclose that the Phase 2 and Pilot Phase 3 trials were rejected by ClinicalTrials.gov after a QC review.

which were half-truths, as the prospectus still omitted to disclose that the Phase 2 and Pilot Phase 3 trials were rejected by ClinicalTrials.gov after a QC review.

> *"We are currently preparing PH94B for a pivotal Phase 3 clinical study as a potential acute treatment of anxiety in adults with a social anxiety disorder ("SAD")"*
>
> *"**Our Product Candidates***
>
> *"We believe that PH94B has the potential to be a novel, first-in-class neuroactive steroid nasal spray for use in a wide range of indications involving anxiety or phobia. Designed to be self-administered in microgram doses, PH94B is designed to not require systemic uptake and distribution to produce rapid-onset anti-anxiety effects. We are initially developing PH94B as a potential fast-acting, non-sedating, non-addictive, new generation acute treatment of anxiety in adults with SAD. With its rapid-onset pharmacology, potential lack of systemic exposure, and favorable safety results observed in clinical studies to date, we believe that PH94B also has potential to be developed as a novel treatment for a broad range of anxiety disorders, including AjDA, postpartum anxiety, post-traumatic stress disorder, preprocedural anxiety, panic and others."*

44. Besides raising capital for Vistagen, Jefferies and Willaim Blair provided analyst coverage, including research reports supporting price targets for Vistagen's stock. Micro-cap share offerings usually limit any risk of Rule 11 lawsuits because the underwriters, in this case, Jefferies and William Blair, only offer them to their institutional clients, who then dump the shares to retail targets after the analysts issue research reports with inflated price targets. This

method makes it very difficult for a retail purchaser of a stock to trace their purchase back to the prospectus, which protects the issuer and underwriter from lawsuits.

39(a). Within weeks of Jefferies and William Blair raising Vistagen $100,000,00, Jefferies analyst Tsai Jefferies issued a [8]$6.00 price target on Vistagen's stock price, or over a 600% increase. Willliam Blair analyst Minter and [9]Maxim's analyst [10]Jason McCarthy also issued $6 price targets. The main goal of the absurd price targets is to have retail stock buyers purchase the stock they sold to their clients at higher prices. Another reason for these ridiculous price targets is to pump the stock higher so their customers can short-sale it. For example, the SEC fined Maxim 800,000.00 for facilitating short illegal sales in companies for which it raised capital. The Analyst Defendants knew that the PH94B Phase 2 trial, and Pilot Phase 3 trial were rejected due to QC issues; therefore, they knew that Vistagen was violating federal and state securities laws and were committing fraud (*emphasis added*)

45. Not surprisingly, Vistagen's stock price began to climb after the analyst reports were issued. Vistagen will be added to the Russell 2000 index in 2021. On June 16th, 2021, Vistagen announced it was being added to the Russell 2000 index. Had the Plaintiffs known that Vistagen was concealing the material information regarding PH94B alleged herein, they would have sold most of their holdings (emphasis added). The stock price at the time was trading between $2.50 and $3.10 actual prices ($75 to $103 post 1/30 reverse split)

**F. <u>Vistagen Initiates PH94B Phase 3 Trial Called PALISADE-1</u>**

46. On May 26th, 2021, Vistagen's Director Defendants and Executive Defendants recklessly initiated the Phase 3 PH94B trial called PALISADE-1 despite knowing (a) the previous trials failed ClinicalTrials.gov quality control reviews and (b) COVID-19 affected the nasal passageway, negligently and recklessly initiated the Phase 3 trials of PH94B. Vistagen filed a Form 8-K with the SEC with an attached press release announcing the initiation of the first arm of the Phase 3 trial, which was called PALISADE-1. *See,*

---

[8] $6.00 is the equivalent of $180 adjusted for the 1/30 reverse split

[9] *https://www.sec.gov/enforcement-litigation/administrative-proceedings/34-98605-s*

[10] McCarthy is also a defendant in Cesario v Biocept et al., filed in the Southern District of California, for his participation in a pump-and-dump scheme and market manipulation

*https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-initiates-PALISADE-phase-3-trial-ph94b*

47. The press release quoted Singh.

> *"The trial is an essential next step in our efforts to **confirm the positive efficacy and safety results we have seen in all PH94B Phase 2 trials to date,**"*

48. Again, Vistagen intentionally concealed disclosing that the previous PH94B trials were rejected for publication by ClinicalTrials.gov. The Form 8-K filed with the SEC, and the press release deliberately omitted the following material facts about the Phase 2 trial.

(1) The Phase 2 trial results were rejected for publication by ClinicalTrials.gov following a quality control review.

(2) The Phase 2 had only 88 female subjects in the Phase 2 trial.

(3) The Phase 2 began in 2008 and did not finish until 2011

(4) The Phase 2 PH94B trial results were not submitted to ClinicalTrials.gov until 2015

(5) Vistagen **attempted to submit the Phase 2 trial results** to ClinicalTrials.gov in 2019 and withdrew the submission.

## G. Vistagen Initiates Phase 3 PH94B Trial Called PALISADE-2

49. In September of 2021, Vistagen's Director Defendants and Executive Defendants negligently and recklessly initiated the Phase 3 trials of PH94B. Vistagen filed a Form 8-K with the SEC with an attached press release announcing the initiation of the first arm of the Phase 3 trial called PALISADE-2. Once again, Vistagen concealed and omitted that the PH94B Phase 2 trial was rejected for publication by ClinicalTrials.gov. They also concealed made additional misstatements and material omissions.

> *"Both studies are designed in a manner that is substantially similar to the public speaking component of a peer-reviewed published Phase 2 study of PH94B for the acute treatment of anxiety in adults with SAD. In that Phase 2 study…"*

> *"In that Phase 2 study, PH94B was observed to have rapid reduction in anxiety (within 15 minutes) in response to a public speaking challenge (p=0.002).*

*See,*
*https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-further-advances-PALISADE-phase-3-program*

**H. The PALISADE-1 Trial Fails To Meet Its Endpoint**

50. On July 22nd, 2022, Vistagen filed an 8-K and issued a press release announcing that PALISADE-1 failed. Vistagen issued a press release titled.

> *"VistaGen Announces Topline Results from PALISADE-1 Phase 3 Clinical Trial for Investigational Drug PH94B"*
>
> *https://www.vistagen.com/news-releases/news-release-details/vistagen-announces-topline-results-PALISADE-1-phase-3-clinical*

51. Again, Vistagen concealed that ClinicalTrials.gov rejected the Phase 2 PH94B trial for Social Anxiety Disorder. Singh stated,

> *"The demand for new treatment options for anxiety disorders is large and growing. While the results of PALISADE-1 are not consistent with prior positive results from Phase 2 trials of PH94B in social anxiety disorder, we remain committed to transforming the treatment landscape for those living with anxiety, depression, and other central nervous system disorders," said Shawn Singh, Chief Executive Officer of VistaGen."*

**I. Vistagen's Stock Price Collapses And Singh Calls Cesario and Preka**

52. After the PALISADE-1 trial failed, Singh and McPartland immediately scheduled a phone call to discuss the trial with the Plaintiffs. Singh seemed unsure if they had the correct protocols in place for COVID-19. Singh said he needed to visit the sites and add new protocols for Palisade-2, but that trial had already started. Singh and McPartland again referenced the Phase 2 and Pilot Phase 3 trials without disclosing that ClinicalTrials.gov rejected those trials. Singh made the absurd comment that the FDA made Vistagen due to the single-dose trial design. The FDA does not make any company do a particular trial design, and the FDA did not make Vistagen start the Phase 3 trials during peak COVID-19. Additionally, the FDA did not make Vistagen allow the Principal Investigator to be the same person responsible for the Phase 2 and Pilot Phase 3 trials being rejected for publication by clinicaltrails.gov

53. Vistagen did not submit the results of the PALISADE-1 trial to ClinicalTrials.gov until June 2024. In July 2024, after a limited QC review, ClinicalTrials.gov rejected publishing the trial results. ClinicalTrials.gov rejected the trial results after a QC review and added negative comments for the primary and secondary outcomes.

**Quality Control Review Has Not Concluded**

Note: The results information displayed below has not completed the quality control (QC) review process. ClinicalTrials.gov must post results information for applicable clinical trials (ACTs) within 30 days of submission, even if the submission has not completed the QC review process. The study sponsor or investigator is responsible for ensuring the results information meets the QC review criteria.

This submission includes brief standardized QC review comments added by the National Library of Medicine (NLM). These comments indicate the location of apparent errors, deficiencies, or inconsistencies. For more information, see the Record Review section on the PRS Help Resources page.

## Study Details

### Study Identification

| | |
|---|---|
| **Unique Protocol ID** | PH94B-CL026 |
| **Brief Title** | PH94B Nasal Spray for Anxiety Induced by a Public Speaking Challenge |
| **Official Title** | A Phase 3 Multicenter, Randomized, Double-blind, Placebo-controlled Clinical Trial of PH94B Nasal Spray for the Acute Treatment of Anxiety Induced by a Public Speaking Challenge in Adult Subjects With Social Anxiety Disorder |

## Outcome Measures

| | |
|---|---|
| Primary Outcome Measures | 1. Subjective Units of Distress Scale (SUDS) Score<br>The SUDS is a patient self-rated scale that is scored in the range of 0 to 100 (operationalized for participants in this study as 0=totally relaxed or no anxiety and 100=highest distress or anxiety ever felt<br>[Time Frame: Visit 2 to Visit 3]<br>**Quality Control Review Comment provided by the National Library of Medicine:**<br>1. There does not appear to be sufficient information to understand the Time Frame. |
| Secondary Outcome Measures | 1. Difference Between Proportions of PH94B- and Placebo-treated Groups in CGI-I Scores<br>The CGI-I scale is a clinician-rated scale to assess illness improvement. The CGI-I scale includes one item scored from 1 (best outcome) to 7 (worst outcome) with 4 being no change.<br>[Time Frame: Visit 2 to Visit 3]<br>**Quality Control Review Comment provided by the National Library of Medicine:**<br>1. The measure does not appear to include sufficient information to understand how outcomes are measured and reported.<br>2. There does not appear to be sufficient information to understand the Time Frame. |

## Study Status

| | |
|---|---|
| Record Verification | 2024-06 |
| Overall Status | Completed |
| Study Start | 2021-05-24 [Actual] |
| Primary Completion | 2022-06-22 [Actual] |
| Study Completion | 2022-06-22 [Actual] |
| First Submitted | 2021-02-10 |
| First Submitted that Met QC Criteria | 2021-02-10 |
| First Posted | 2021-02-15 [Actual] |
| Results First Submitted | 2024-06-13 |
| Last Update Submitted that Met QC Criteria | 2024-06-13 |
| Last Update Posted | 2024-07-09 [Actual] |

## Sponsor/Collaborators

| | |
|---|---|
| Sponsor | VistaGen Therapeutics, Inc. |
| Responsible Party | Sponsor |

*See, https://ClinicalTrials.gov/study/NCT04754802?tab=history&a=7#version-content-panel*

**J. Vistagen's Corporate Update Pausing The PALISADE-2 Trial**

54. On August 11th, 2022, Vistagen filed a Form 8-K with the SEC, which included an attached Corporate update.

> *https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-reports-first-quarter-financial-results*

53. Oncagain, Vistagen cited the Phase 2 studies, but this time, it also cited the Pilot Phase 3 trial. The update conceals that ClinicalTrials.gov rejected the Phase 2 and Pilot Phase 3 trials for publication.

> *"We are further encouraged by preliminary data from a cohort of nearly 200 patients in our PALISADE open-label safety study who have completed three months of acute, as-needed use of PH94B. These preliminary data suggest that repeated acute, as-needed use of PH94B over an extended period of time has the potential to increasingly relieve symptoms of social anxiety disorder, as measured by the Liebowitz Social Anxiety Scale, or LSAS, which historically has been the diagnostic gold standard for clinical assessment of social anxiety disorder.* ***Taken together with encouraging published results from a prior Phase 2 study in social anxiety disorder*** *which involved multiple administration assessment of PH94B over a two-week period measured by the LSAS, these preliminary data support the published findings and give us confidence in PH94B's potential to reduce the severity of social anxiety on an acute, as-needed basis, while also achieving cumulative improvement in everyday social functioning, with continued use in a real-world environment."*

> ***"the Company has paused enrollment in PALISADE-2, a replicate Phase 3 clinical study in our PALISADE clinical development program, while an independent third-party biostatistician*** *conducts an interim analysis of available data from PALISADE-2."*

> *"Given these data, along with* ***positive indications from the prior Phase 2 studies****, the Company believes that continued Phase 3 clinical development of PH94B as a potential treatment for SAD is appropriate, particularly with repeated and longer-term use of PH94B evaluated by multiple administration assessments using the LSAS as the primary endpoint and SUDS as the secondary endpoint."*

> *"While we examine the results of our PALISADE-1 Phase 3 study in social anxiety disorder, we have paused enrollment in our PALISADE-2 Phase 3 study and have*

*engaged an independent biostatistician to conduct an interim analysis of data collected to date. We then plan to meet with the FDA to pursue a consensus path forward for further Phase 3 development of PH94B in social anxiety disorder."*

55. Vistagen did not disclose who the biostatisticians were. Singh and McPartland told Cesario that after the biostatisticians unblinding and analyzed the PALISADE-2, they were only allowed to give three recommendations to Vistagen;

1. Cancel the Phase 3 trial.
2. Continue the Phase 3 trial but add additional patients.
3. **Continue the Phase 3 trial as designed.**

56. A recommendation to continue the trial as designed would be the best positive outcome. Paragraph three of the press release was misleading. Singh and McPartland concealed that Vistagen was meeting with the FDA to discuss a new trial using the Leibowitz scale instead of the SUDS scale to determine the subjects' outcomes. The Corporate update made this statement.

*"In addition, the Company is encouraged by preliminary data from a cohort of nearly 200 subjects in its **PALISADE open-label safety study** which suggest an excellent safety profile for PH94B consistent with all previous studies, as well as cumulative functional improvement as measured by the Liebowitz Social Anxiety Scale (LSAS). In this study, which mirrors real world use, this cohort of study participants has used PH94B acutely, as-needed, multiple times for three months. Given these data, along with positive indications from the prior Phase 2 studies"*

Vistagen's open-label PALISADE study

57. Besides the Phase 3 PALISADE PH94B trials for social anxiety, Vistagen initiated a PALISADE open-label study on October 1st, 2021. ClinicalTrials.gov shows that on September 23rd, 2022, **Vistagen terminated the open-label study for business reasons**. The only business reason for terminating the trial was that Vistagen did not have the money. Moreover, ClinicalTrial.gov rejected publishing that trial after conducting a limited QC review. See screenshot and link.

**Quality Control Review Comment provided by the National Library of Medicine:**

**1. The description of the scale or categories does not include sufficient information to understand the results reported.**

*See;*

*https://ClinicalTrials.gov/study/NCT05030350?tab=history&a=6#version-content-panel*

*https://ClinicalTrials.gov/study/NCT05030350?tab=results&a=6*

58. The open-label trial was the fourth PH94B trial ClinicalTrials.gov rejected for publication following a limited QC review. Vistagen was legally obligated to disclose that ClinicalTrials.gov rejected publishing the results of the PALISADE open-label submission; they did not.

Terminated

**Study stopped by the sponsor for business reasons and not due to any safety concerns with PH94B**

**Open-label Safety Trial of PH94B in Social Anxiety Disorder (SAD)**

**ClinicalTrials.gov ID** NCT05030350

**Sponsor** VistaGen Therapeutics, Inc.

**Information provided by** VistaGen Therapeutics, Inc. (Responsible Party)

**Last Update Posted** 2023-09-21

| Arms | Assigned Interventions |
|---|---|
| Experimental: PH94B 3.2 micrograms<br><br>100 microliter nasal spray to each nostril up to four times a day as needed for acute anxiety | Drug: PH94B<br><br>• Nasal spray |

**Outcome Measures**

| | |
|---|---|
| **Primary Outcome Measures** | 1. Adverse Events and Other Safety Measures<br>Incidence and severity of TEAEs, TEAEs leading to discontinuation, and SAEs<br>[Time Frame: 12 months] |
| **Other Outcome Measures** | 1. Change in Total Liebowitz Social Anxiety Scale (LSAS) Scores Over Time With Use of PH94B<br>The LSAS is a clinician-rated scale that has been shown to be sensitive to treatment-related change in social anxiety symptoms. The scale consists of 24 items. Each item is given 2 ratings: fear or anxiety on scale of 0 to 3 and avoidance on a scale of 0 to 3, with a total overall score of 144<br>[Time Frame: 12 months]<br><br>**Quality Control Review Comment provided by the National Library of Medicine:**<br>1. The description of the scale or categories does not include sufficient information to understand the results reported. |

## K. Vistagen to Proceed with PALISADE-2 Phase 3 Clinical Trial of PH94B

59. On September 22nd. 2022, Vistagen filed an [11]8-K with the SEC with an attached press release titled. *See; "Vistagen to Proceed with PALISADE-2 Phase 3 Clinical Trial of PH94B in Social Anxiety Disorder following Interim Analysis"*

> ***Independent biostatisticians recommend continuing PALISADE-2 without any changes after conducting interim analysis of 140 completed subjects Topline data for PALISADE-2 trial expected in the first half of 2023***

*https://www.vistagen.com/news-releases/news-release-details/vistagen-proceed-PALISADE-2-phase-3-clinical-trial-ph94b-social*

60. Paragraph two of the press release made this **definitive statement** {emphasis added};

> *"Vistagen **will continue PALISADE-2 as planned to the full enrollment of 208 subjects, without any adjustment to the size of the study"**. {emphasis added}*

[11] See; https://www.sec.gov/ix?doc=/Archives/edgar/data/0001411685/000185173422000549/vtgn20220907_8k.htm

> *"**We are encouraged by the recommendation to continue PALISADE-2 to full enrollment as originally planned,**" said Shawn Singh, Chief Executive Officer of Vistagen. "Following the results of PALISADE-1, we had independent biostatisticians conduct the interim analysis to gain insight on the best course of action for PALISADE-2, including possibly expanding the number of subjects in the study, significantly amending the study protocol or halting the study altogether. We believe that the recommendation resulting from the interim analysis to resume PALISADE-2 is the best course of action. While we further evaluate the results of PALISADE-1, building on both the continuation of PALISADE-2 and preliminary data from our open label safety study of PH94B, we are also preparing to meet with the FDA later this year to discuss our plans for further Phase 3 development of PH94B in Social Anxiety Disorder."*

61. On November 10th, 2022, Vistagen filed a quarterly report with the SEC that also stated, on page 5, that Vistagen was resuming PALISADE-2 to full enrollment.

> *"Although we did not and do not have access to any unblinded data from PALISADE-2, **based on the outcome of the interim analysis and the recommendation from the independent biostatisticians, we are preparing to restart PALISADE-2 as soon as practicable and continue the study to full targeted enrollment of 208 subjects**. In addition to preparing to restart PALISADE-2, we are planning to meet with the FDA as soon as possible in the near term to discuss and reach a consensus with the FDA on the next step in our Phase 3 development program for PH94B as a potential treatment for adults with SAD."*

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001411685/000185173422000662/vtgn20220930_10q.htm

## L. Cesario Meets Singh In New York

62. On February 10th, 2023, Cesario met with Singh in New York. Singh told Cesario Vistagen had the funds and was ready to start. Singh also stated he wanted to pursue a trial using the Liebowitz scale. He again said that was the trial he wanted, but the FDA made him do the SUDS trial.

63. During the next few months, McPartland repeatedly told Cesario that Vistagen needed to raise capital but were not succeeding. He stated that they were trying to form partnerships and do

equity financings. Finally, McPartland told Cesario that Singh had taken too long to take the necessary measures to preserve the budget for PALISADE-2.

**M. Vistagen Terminates The PALISADE-2 Trial**

64. On March 30th, 2023, Vistagen filed a Form [12]8-K with an attached press release titled;

> **"FDA Provides Positive Feedback to Vistagen Regarding Use of the Liebowitz Social Anxiety Scale (LSAS) as an Endpoint in Phase 3 Development of Fasedienol (PH94B) for Treatment of Social Anxiety Disorder"**
>
> See; *https://www.sec.gov/ix?doc=/Archives/edgar/data/0001411685/000143774923007585/vtgn20230322_8k.htm*

65. Vistagen's Form 8-K made the following statement.

> "On March 30, 2023, Vistagen Therapeutics, Inc. (the "Company") issued a press release regarding positive feedback from the U.S. Food and Drug Administration ("FDA") about the Company's use of the Liebowitz Social Anxiety scale as an endpoint in future clinical studies of fasedienol (PH94B) for the treatment of social anxiety disorder ("*SAD*").
>
> **The Company also announced its plans to close PALISADE-2**, its Phase 3 single administration assessment public speaking challenge clinical study of fasedienol for the acute treatment of SAD, as well as topline results from the Company's exploratory Phase 2A study of fasedienol for the treatment of adjustment disorder with anxiety." A copy of the press release is attached to this Current Report on Form 8-K as Exhibit 99.1.

66. Vistagen spent the money budgeted for PALISADE-2 and could not raise additional funds except on predatory terms. Vistagen lied as to why they terminated PALISADE-2. In the middle of the press release, Vistagen made this nonsensical statement;

> "Although the results of the interim analysis of PALISADE-2 **indicated that continuation of the study would not be futile, Vistagen has determined the best course of action is to close the PALISADE-2 study given the expense,**

---

[12] *See;* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001411685/000143774923008628/vtgn20230329_8k.htm

> **time, and methodological complexities involved in resuming PALISADE-2, including consistently administering the protocol for the single-dose, clinic-based public speaking challenge study across numerous sites.** Considering the recent feedback from the FDA regarding use of the LSAS in future clinical studies, Vistagen will focus resources primarily on the planning and preparation for FEARLESS-1, a LSAS-based Phase 3 study of fasedienol for the treatment of SAD. Topline results from the 140 subjects who completed PALISADE-2 are expected in the second half of 2023."

*https://www.vistagen.com/news-releases/news-release-details/fda-provides-positive-feedback-vistagen-regarding-use-liebowitz*

67. The press release further made this false statement,

> "Dr. Liebowitz was among the clinical investigators involved in the registrational efficacy trials for all of these drugs, **and all of such registrational trials were positive."**

> "However, for business reasons, we elected to extend our pause of PALISADE-2 pending our assessment of the then impending top-line results of the PALISADE-2, **the results of two SAD public speaking challenge studies, each with Subjective Units of Distress Scale (SUDS) as the primary efficacy endpoint, being conducted by two peer companies,** discussions with the FDA regarding the continuing acceptability of the LSAS as a primary efficacy endpoint in Phase 3 studies for the treatment of SAD, as well as a comprehensive assessment of the expense, time, statistical and regulatory implications and logistical challenges associated with resuming PALISADE-2."

68. According to Vistagen's quarterly report, by June 2023, Vistagen's cash position was down to 9 million with over $4 million in current liabilities according to Vistagen's quarterly report filed with the SEC in June 2023.

Vistagen's lies regarding why the terminated PALISADE-2 were broadcasted in financial publications;

*https://www.fiercebiotech.com/biotech/vistagen-jittery-after-seeing-rivals-fail-pauses-plan-restart-phase-3-anxiety-trial-pending*

69. Mark McPartland specifically told Cesario on several calls that unless Vistagen raised money, they did not have the funds to restart PALISADE-2. McPartland also told Preka that Vistagen terminated the PALISADE-2 trial because they didn't have the money.

70. The companies Vistagen referenced, [13]Vanda Pharmaceuticals Inc. and [14]Neuphoria Therapeutics, had nothing to do with Vistagen's SUDS trial. One company met the trial endpoint, and one barely missed meeting its endpoint. Both companies are proceeding with their trials. Vanda Pharmaceuticals and the Neuphoria Therapeutics drugs were also in Phase 2 trials. Those drugs' medicines and delivery mechanisms have nothing in common with PH94B. Vistagen and Singh's lilies are nonsensical! Vistagen knew that the FDA had not approved any social anxiety trial based on the SUDS scale before they began the trial. Vistagen, Singh, and Vistagen's Board intentionally lied about why they terminated PALISADE-2 to cover up their gross negligence for not having the funds to finish the trial.

## N. <u>Singh Plots the Illegal Pump and Dump Scheme</u>

71. On March 7th, 2023, Nasdaq granted Vistagen an extension to cure the minimum bid requirement until September 2023. Based on their recommendation, everyone expected the interim report by the biostatisticians to be positive. The Director Defendants knew they did not have to rush executing a reverse split. The Director Defendants and Jefferies plotted the biggest microcap stock pump-and-dump of 2023.

- On March 17th, 2023, Vistagen updated its shelf registration to sell 12,410,100 shares through Jefferies through a Prospectus Supplement. **Vistagen requested the SEC approve the registration on an expedited basis.**
- The prospectus stated, "*Our common stock is listed on the Nasdaq Capital Market under the symbol "VTGN." On **March 16, 2023**, the closing price of our common stock on the Nasdaq Capital Market was **$0.14 per share***

[13] *See Vanda; https://www.prnewswire.com/news-releases/vanda-pharmaceuticals-reports-results-in-a-phase-ii-clinical-study-of-vqw-765-in-the-treatment-of-acute-performance-anxiety-301692285.html*

[14] *See Nuephorraiiatx; https://www.neuphoriatx.com/pipeline*

- On June 6th, 2023, Vistagen announced a 1/30 reverse split.
- On June 30th, 2023, Vistagen issued a Prospectus Supplement to the May 21st, 2021 Supplemental Prospectus 2021 registration, offering to sell up to $10,500.00 worth of stock with Jefferies as the banker.

72. On June 30th, **just weeks before Vistagen announced the recommendation of the biostatisticians,** Vistagen issued a Prospectus Supplement seeking to sell up to $58,000,000 worth of stock with Jefferies as the banker. The prospectus reported, *"Our common stock is listed on the Nasdaq Capital Market under the symbol "VTGN." On June 29, 2023, the last reported sale price of our common stock on the Nasdaq Capital Market was $1.80 per share."* * *($1.80 is actually $0.06 adjusted for the reverse split*

73. McPartland told Cesario and others he was looking for a new job because Vistagen wasn't raising capital. On July 14th, 2023, Cesario texted McParland that he could raise 5 million dollars or more on favorable terms. McPartland's strange response was this emoji. 🤔 McPartland did not contact Cesario again until August 7th, the day of the pump and dump.

https://www.sec.gov/Archives/edgar/data/1411685/000143774923019024/vtgn20230629_424b5.htm

**O. Vistagen Executes The Illegal Pump and Dump Scam**

74. At 8:00 AM on August 7, 2023, McPartland contacted Cesario to inform him of Vistagen's press release. McPartland was excited and told Cesario he was the first person he called. The Director Defendants and Vistagen's external SEC attorney reviewed and approved the press release. The press release had a false and misleading title and false and deceptive headings designed to have stock trading algorithms pick up on specific keywords.

> **Vistagen Announces Positive Top-Line Results from Phase 3 PALISADE-2 Trial of Fasedienol (PH94B) Nasal Spray in Social Anxiety Disorder**
>
> ***First positive U.S. Phase 3* study of an investigational therapy for social anxiety disorder in over 15 years**

See,
https://www.vistagen.com/news-releases/news-release-details/vistagen-announces-positive-top-line-results-phase-3-palisade-2

75. **Vistagen did not have the First Positive Phase 3 study because they terminated the PALISADE-2 before it was fully enrolled.** Vistagen strategically used the fraudulent title and heading to pump its stock price higher and dump its shares on the duped public. By 9:28 AM, Vistagen's stock price exploded from $1.92 to $71.00 on historical trading volume. Vistagen began dumping shares on the public at 9:30 AM, lowering the sock price to $25.00. Vistagen continued to dump shares on the public as the stock price dropped.

76. By the end of August 7th, Vistagen's closing stock price was $13.05, and Vistagen had dumped over 16 million dollars of its stock on the public. By the end of August 9th, Vistagen's closing stock price was $7.42. After Singh gave his corporate update on the 10th Vistagen's stock price, Vistagen's stock price has only deteriorated further. On February 10th, 2025, Vistagen's closing stock price was $2.76.

77. Vistagen's daily dollar volume of shares traded saw a once-in-a-lifetime upsurge from **$250,000 on the previous day's trading to 1 billion dollars!** Vistagen's daily number of shares also exploded, from **146,000** on Friday, August 4th, to 53,900,000 million on Monday, August 7th, 2023, which was approximately a 400-fold increase (emphasis added). Adjusted for the 2023 1/30 reverse split, $1.83 was the equivalent of $0.06 a share, and $71 was the equivalent of $2.36.

78. On August 8th, 2023, McPartland informed Cesario that Singh would hold an investor conference call after the market closed on August 10th, 2023. Vistagen's stock price collapsed to the $8.00 range. Shortly after Singh's conference, the stock dropped another 40% and currently trades in the $3.00 range. Singh postponed the conference call until he finished dumping $38 million of stock on duped investors.

80. After the conference call, Cesario began to inform McPartand that the press release seemed like a pump and dump because it was so misleading. McParland's response to Cesario was, ***"key here is we raised almost $30 million at over $7.50 a share vs $1.85 per share like we had in line with Maxim"***. Moreover, McPartland told Cesario that Vistagen could start **selling shares as high as $25.00**. Cesario told McParland that Vistagen intentionally deceived investors

because these were not topline results from a completed trial. That quote by McPartland sums up Vistagen's motive for perpetrating the biggest pump-and-dump of 2023: raising cash at all costs. The truth be damned.

81. The Director Defendants, Executive Defendants, and Jefferies knew the misleading press release misled the public, but they continued to dump shares illegally. Jefferies facilitated the trades. Vistagen issued another prospectus, which informed investors that it could sell the balance of 75 million dollars without issuing any further prospectuses. The [15]prospectus further disclosed that;

> *"Through August 7, 2023, we have sold 1,373,318 shares of our common stock for aggregate gross proceeds of approximately **$16.1 million** by the Sale Agreement under the Prospectus".*

82. Vistagen's annual report discloses that it dumped another $20 million worth of shares between August 8th and August 10th, driving Vistagen's price down to the $7.00 and $8.00 range (approximately $0.25 adjusted for the 1/30 reverse split). In total, Vistagen dumped 35.9 million dollars worth of stock on the public through its Open Market Sales registration.

76. At 8 AM on August 8th, Vistagen filed a supplemental prospectus with the SEC, which in part stated,

> *"We are filing this prospectus supplement to amend the Prospectus because we are no longer subject to General Instruction I.B.6. of Form S-3, which limits the amounts that we may sell under the registration statement of which this prospectus supplement and the Prospectus are a part. Through August 7, 2023, we have sold 1,373,318 shares of our common stock for aggregate gross proceeds of approximately $16.1 million in accordance with the Sale Agreement under the Prospectus. Under this prospectus supplement, we may offer and sell shares of our common stock having an aggregate offering price of up to $58,800,000. If we become subject to the offering limits of General Instruction I.B.6 in the future, we will file another prospectus supplement".*

83. This filing allowed Vistagen to sell up to $58,800,000 of stock without filing an additional prospectus. Vistagen continued to dump stock through Jefferies. Between August 8th, 9th, and 10th, Vistagen dumped another $20,000,000 of its stock, driving the price down to

---

[15] *See*; https://www.vistagen.com/node/13656/html Page 89 - Financing Activities;

$8.00. Finally, at the market close on August 10th, 2023, Singh did an investor update call. Vistagen's stock price dropped another 40%, below $5.00 a share in the following days. Vistagen's Director Defendants and Executive Defendants, in cahoots with Jefferies, were not done defrauding the public. The Defendant Directors and Jefferies knew the press release issued on August 7th was unlawful. They also knew that the market misinterpreted the press release, and they were violating the law by selling Vistagen's shares. Before any press release about the PALISADE-2 interim results, the Director Defendants should have halted trading in Vistagen's shares and disclosed that while the results were encouraging, it was not a Phase 3 trial. Vistagen issued the fraudulent press release because they were getting close to bankruptcy and needed to raise capital.

84. Both Singh and McPartland stated they were surprised that Vistagen's stock price did not increase after the biostatisticians told them to continue the trial as designed. Investors are not interested in interim results but in top-line completed trial results. If Vistagen issued a press release stating the truth, and they had to go back to the drawing board and start the PALISADE trials all over again, the stock would not have reacted positively. Additionally, it would have evidenced how incompetent the Vistagen employees who ran the trials were. The illegal pump-and-dump scheme, which caused the investing public to lose upwards of 1 billion dollars in three days, deceived the general public and snagged one fund that could have lost tens of millions of dollars.

**P. <u>Vistagen Did Not Have A Successful Phase 3 Study</u>**

85. The PALISADE-2 was not a successful Phase 3 trial. According to the FDA's website and published rules, to qualify as a Phase 3, a trial must have a minimum number of subjects. Vistagen's Palasade-2 trial was unsuccessful, and it wasn't even a legitimate Phase 3 trial.

86. Apparently, the Defendants believe they can trick the public that because they misallocated the budgeted funds to complete the trial design agreed upon with the FDA, they can self-terminate the trial and then call it a Phase 3 trial. As it turned out, PALISDAE-2 was not even a successful Phase-2 trial.

Phase 3

**Study Participants:** 300 to 3,000 volunteers who have the disease or condition

**Length of Study:** 1 to 4 years

**Purpose:** Efficacy and monitoring of adverse reactions

**Approximately 25-30% of drugs move to the next phase**

87. Certain Vistagen Defendants, including Singh, who is one of the dirtiest CEOs in the biotech industry, met with the FDA and agreed upon a trial design. The trial design agreed to explicitly called for 472 trial participants. The 472 trial participants were then divided into two groups of 236 in each arm, PALISADE-1 and PALISADE-2.

88. After the PALISADE-1 trial failed. Vistagen (a) paused the PALISADE-2 trial; (b) falsely stated they were completing the trial to full enrollment; and (c) voluntarily terminated the trial with only 50% enrollment, disqualifying it as a Phase 3 trial.

89. Vistagen did not submit the trial data to ClinicalTrials.gov until they (a) completed the unlawful pump and dump between August 7th and 10th and (b) dumped another $100 million of Vistagen's shares using a prospectus known to have misleading statements, material omissions and incorporated an unclean audited annual report. Vistagen waited a year to submit the trial results to ClinicalTrials.gov because they needed to wait until they launched the PALISADE-3 and PALISADE-4 trials. Singh and the Vistagen Defendants are some of the dirtiest players in the biotech industry.

ClinicalTrials.gov also rejected publishing PALISADE -2 after conducting a limited QC review. Shockingly, ClinicalTrials.gov also rejected the publication of PALISADE -1, PALISADE -2, and the PALISADE open-label trials after a QC review.

*See; https://ClinicalTrials.gov/study/NCT05011396?a=5&tab=history*



**Outcome Measures**

| | |
|---|---|
| **Primary Outcome Measures** | 1. **Subjective Units of Distress Scale (SUDS) Score**<br>The SUDS is a patient self-rated scale that is scored in the range of 0 to 100 (operationalized for participants in this study as 0=totally relaxed or no anxiety and 100=highest distress or anxiety ever felt<br>[Time Frame: Visit 2 to Visit 3]<br>**Quality Control Review Comment provided by the National Library of Medicine:**<br>1. There does not appear to be sufficient information to understand the Time Frame. |
| **Secondary Outcome Measures** | 1. **Difference Between Proportions of PH94B- and Placebo-treated Groups in CGI-I Scores**<br>The CGI-I scale is a clinician-rated scale to assess illness improvement. The CGI-I scale includes one item scored from 1 (best outcome) to 7 (worst outcome) with 4 being no change.<br>[Time Frame: Visit 2 to Visit 3]<br>**Quality Control Review Comment provided by the National Library of Medicine:**<br>1. The measure does not appear to include sufficient information to understand how outcomes are measured and reported.<br>2. There does not appear to be sufficient information to understand the Time Frame. |

90. The FDA did not give Vistagen credit for the PALISADE -2 trial. Vistagen announced they were doing the same trial design as PALISADE -1 and PALISADE -2, this time called PALISADE-3 and PALISADE-4. Moreover, Vistagen is using the same Contract Research Organizations ("CROs"), so evidently, the quality control issues were with Vistagen and not the CROs. It would be nonsensical for the FDA to give any weight to PALISADE-2 because the trial was intentionally self-terminated. After all, the Director Defendants foolishly wasted the money budgeted for PALISADE-2 on salaries, bonuses, and other non-essential and controllable expenses.

91. Drug companies are constantly announcing topline results from Phase 3 trials. The Plaintiffs have searched the internet for similarly worded headings and subheadings similar to Vistagen's August 7th, 2023, press release. Below are examples, including Vistagen's PALISADE-1 trial. The common denominator in the above releases announcing Topline results is that they were completed trials, and all of the below linked trials were accepted for publication on ClinicalTrials.gov except Vistagen's.

https://www.pfizer.com/news/press-release/press-release-detail/pfizer-announces-positive-topline-results-phase-3-study

https://news.abbvie.com/2024-09-26-AbbVie-Announces-Positive-Topline-Results-from-Phase-3-TEMPO-1-Trial-Evaluating-Tavapadon-as-a-Monotherapy-for-Parkinsons-Disease

*https://www.novocure.com/novocure-announces-positive-topline-results-from-phase-3-panova-3-clinical-trial-of-tumor-treating-fields-ttfields-therapy-for-pancreatic-cancer/*

*https://ir.lenz-tx.com/news-events/press-releases/detail/11/lenz-therapeutics-announces-positive-topline-data-from-phase-3-clarity-presbyopia-trials*

*https://www.vistagen.com/news-releases/news-release-details/vistagen-announces-topline-results-PALISADE-1-phase-3-clinical*

## Q. Commodore Capital Was Duped 30 Million Dollars In Vistagen and Jefferies Billion Dollar Pump and Dump

92. On August 7th, 2023, Commodore Capital ("Commodore"), a fund managing more than 1 Billion dollars, immediately bought Vistagen shares. SEC filings show that Commodore **purchased 1,575,000 shares at an average price of $23.15 for $36,461,250. By the end of the day, Commodore owned 19.74 percent of Vistagen's outstanding stock.** After searching Commodore's SEC's 13D filings, the Plaintiffs could not find a single company that Commodore purchased a 19% stake or risk allocating over 5% of its entire capital. Generally, fund managers do not want to have a 5% or more stake in a public company because of the increased reporting requirements. SEC filings show that Commodore sold those shares at a staggering loss before the quarter ended. Unlike the public bag holders, Commodore was bought into a sweetheart deal offered by Vistagen and Jefferies. From [16]Yahoo financial news;

> On August 7, 2023, COMMODORE CAPITAL LP (Trades, Portfolio) purchased 1,575,000 shares of Vistagen Therapeutics Inc. at a price of $23.15 per share. This new holding now represents 5.26% of the firm's portfolio and 19.74% of the total shares of Vistagen Therapeutics Inc. The transaction is significant as it indicates the firm's confidence in the potential growth and profitability of Vistagen Therapeutics Inc. On August 7, 2023, Commodore Capital LP purchased **1,575,000** shares of Vistagen Therapeutics Inc. for $23.15 per share. This new holding now represents 5.26% of the firm's portfolio and **19.74%** of the total shares of Vistagen Therapeutics Inc. The transaction is significant as it indicates

[16] *See, https://finance.yahoo.com/news/commodore-capital-lp-acquires-stake-143138185.html*

the firm's confidence in the potential growth and profitability of Vistagen Therapeutics Inc.

Vistagen's Rewards Jefferies With A Sweetheart Deal For Partnering In The Pump and Dump

93. Commodore was one of the institutions offering a sweetheart deal after suffering a massive loss buying Vistagen shares during the August 7th, 2023, illegal pump-and-dump perpetrated by Vistagen, the Director Defendants, and Jefferies. Soon after the unlawful pump-and-dump, Jefferies and Vistagen conspired to develop a plan to dump by dumping another $100,000,000 million of Vistagen's stock on the public. **Vistagen's December 2020 $100,000,000 dump of Vistagen's stock was priced at [17]27.60 a share,** without any warrants, giving the buyers the option to buy additional shares. That share offering was before Vistagen's fraudulent press release claiming to have had the first successful Phase 3 trial for social anxiety disorder.

94. Vistgen and Jefferies put another equity offering together. In October 2023, Vistagen filed a [18]prospectus filed with the SEC to dump another $100,000,000 of Vistagen's stock on the public. The cleverly packaged **funding allowed Jefferies to sell common stock to institutions at $5.38 a share with warrants. The first pre-funded warrant was priced at $0.01, the second pre-funded warrant was priced at $5.38, and the third warrant was priced at $8.88.** The equity offering was packaged in this manner to (a) confuse the public and (b) keep the institutions from owning less than 5% of the common stock for reporting purposes. Commodore's 13D filing with the SEC proves that Commodore participated in this offering As previously discussed, Jefferies sells Vistagen's stock to institutions, and the institutions then sell the stock to the public.

95. The October 5th prospectus contained numerous material omissions and misleading statements.

---

[17] Price has been adjusted for the 1/30 reverse split of Vistagen's common stock in 2023
[18] See; *https://www.sec.gov/Archives/edgar/data/1411685/000143774923027529/vtgn20230921_424b5.htm*

1. The prospectus falsely stated, "*We believe the unexpected outcome in PALISADE-1, which was **inconsistent with positive placebo-controlled Phase 2 studies** and the statistically significant results of our PALISADE-2 Phase 3 clinical trial*"

   a. *The prospectus failed to disclose that the Phase-2 trials ClinicalTrials.gov rejected for publishing the trial after a QC review.*

   b. *The prospectus falsely claimed that Vistagen PALISISADE-2 was a Phase 3 trial or that the results from that trial were interim.*

2. The prospectus mentions a worldwide open-label study but intentionally omits to disclose that Vistagen terminated the PALISADE open-label study for "business reasons."

   a. *"we elected to extend our pause of PALISADE-2 pending our assessment of the then impending top-line results of the [19]PALISADE OLS*"

1. The prospectus lied about Vistagen's reason for terminating PALISADE-2 and omitted disclosing that they did not have the money to complete the trial. As stated in 2a above, Vistagen terminated the PALISADE OLS, and the trial was rejected for publication by ClinicalTrials.gov following a QC review.

2. The prospectus intentionally omits disclosing or referencing the failed COVID-19 anxiety disorder Phase 2 trial. The trial concluded mid-2022, and the results have not been submitted to CliicalTrials.gov. The cockamamie COVID-19 anxiety therapy is the reason Vistagen was able to raise $125 million in 2020.

96. While not germane to the Plaintiff's claims, the prospectus also has additional material omissions and misleading statements. ClinicalTrials.gov website does not have any records of successful Phase 2 trials for;

- AV-101 for neurological disorders

---

[19] PALISADE OLS is the PALISADE open-label study Vistagen knew was terminated for "business reasons"

- PH80 Nasal Spray for Women's Health Disorders and Migraine
- Itruvone Nasal Spray for Major Depressive Disorder
- PH284 Nasal Spray for Cachexia
  - ClinicalTrials.gov does show a submission, but it was never enrolled.
  - Vistagen issued this obscene [20]press release on January 14th. 2025, in an attempt to garner interest in its stock,

**Vistagen Announces Positive Results from Exploratory Phase 2A Study of PH284 in Cancer Cachexia**

97. Jefferies completed the 100-million-dollar equity offering overnight. It was a sweetheart deal for the purchasers because they could sell their stock and have the right to buy up to three times the shares if Vistagen is successful. The offering was a no-risk, high-potential return deal. Once again, like trained seals, the Defendant Analysts issue new price targets on Vistagen that are up to 300% higher than the price of the equity offering. The Defendant Analysts issued price targets between $12 and $15, then broadcast over internet channels..

98. William Blair's website dedicates an entire page to Vistagen and fails to disclose that every PH94B trial that ClinicalTrials.gov rejected accepted the trial for publication after a QC review. Despite William Blair knowing that Vistagen violated security disclosure laws and committed fraud, intentionally concealing that the PH94B trials failed ClinicalTrials.gov, William Blair allowed Benzinga to publish this article.

*https://www.benzinga.com/analyst-ratings/analyst-color/23/12/36075808/undervalued-vistagen-therapeutics-analyst-highlights-potential-in-anxiety-treatment*

**William Blair** initiated coverage on **VistaGen Therapeutics Inc** (NASDAQ:VTGN), a clinical-stage biopharmaceutical company focused on developing next-generation treatment options for social anxiety disorder (SAD)

---

[20] *See;* *https://www.vistagen.com/news-releases/news-release-details/vistagen-announces-positive-results-exploratory-phase-2a-study-1*

and other mental health conditions. The lead product Fasedienol (PH94B), is an intranasal pherine and is in late-stage development for SAD, which affects about 10% of the U.S. population, with 6 million adults being treated by a physician.

> ***Related Content:*** *Anxiety-Focused Stock Vistagen Therapeutics Is An Undervalued Late-Stage Neurology Player: Analyst.*

**Aside from one negative Phase 3 study, PALISADE-1,** which was impacted by the pandemic, William Blair says fasedienol has shown strong proof of concept.

The analysts Tim Lugo, Lachlan Hanbury-Brown, and John Boyle note that the market underappreciates the FDA's concerns about benzodiazepine abuse, and the lack of abuse potential for fasedienol in the large anxiety market suggests that even a small penetration into this large market would lead to a blockbuster product. The analyst initiates with an Outperform rating and estimates a fair value for shares of $14. VistaGen remains an overlooked, undervalued name with differentiated assets in large mood disorder markets, William Blair writes.

Fasedienol, itruvone, and VistaGen's other pherines (PH80, PH15, and PH284) address major markets across mental health crisis to women's health.

**Price Action:** VTGN shares are up 13.42% at $4.14 on the last check Monday.

99. In the weeks following Vistagen's pump and dump press release, it became apparent that the news in the press release was a scam. On or about August 17th Preka had a phone call with McPartland. Preka states that when he asked McPartland why they terminated PALISADE-2, McPartland told him they didn't have the money to finish the trial. McPartland had previously told Cesario that Vistagen did not have money to complete the PALISADE-2 trial.

100. On August 18th, 2023, Cesario had a text exchange with McPartland. Cesario and McParland text exchange;

Cesario: - "*You told David that Shawn stopped the PALISADE 2*

*because he didn't have the money to finish it. Now he is telling everyone."*

101. McPartland waited a half hour to reply and texted to give this canned response directly from the press release;

McPartland: - *"john, I could barely get a word in with David. He ranted for 30 mins about many things. What I told him was in line with what we reported, that we determined the best course of action was to close the PAL2 study given the expense, time and methodological complexities involved in resuming the study".*

Cesario: - *"I bet market manipulation and illegal pump and dump Saxe and Singh were not even on your radar. I told you nobody was impressed with Singh's speech, the market tanked even more after it.*

*Singh should have halted stock and fully explained that this was not a completed phase 3 trial. Instead Vistagen and Singh duped investors to buy stock on a manipulative misleading press release. Hundreds of millions of dollars were lost a week ago Monday while Singh sold into the pump."*

McPartland also texted;

McPartland: - *John, I am not sure what was deceptive but it was fully vetted by legal. The disclosures were updated as we reviewed more data and our peers had similar results with their studies.*

102. Cesario also began texting Singh and McPartland, informing them that what they did was criminal. Cesario sent Vistagen a request to review the time stamps and sales from Vistagen's

pump and dump from August 8th, 2023, through August 10th, 2023. Lathum & Watkins's attorney Smith responded by denying Cesario's request. Preka and Cesario sent notices to Vistagen to preserve evidence in this matter.

103. In October 2023, after a quick preliminary investigation, Cesario sent Vistagen another letter (See EXHIBIT A) detailing the securities violations and the laws Vistagen, the Director Defendants, and the Executive Defendants committed.

## R. Vistagen Sends a Response Letter To Cesario

104. Latham Watkins's attorney Smith responded to Cesario on November 23rd, 2023 ("Vistagen's Response Letter") (See EXHIBIT - B). Vistagen's Response Letter admits that the Director Defendants reviewed Cesario's letter. The letter also stated that **the Board invited you to submit additional information supporting your purported shareholder demands. To date, you have failed to do so.** Cesario did not make any financial settlement demands; the letter was to put Vistagen on notice of the laws they violated and see if they rectified their mistakes, but they did not.

105. The error-filled Response Letter ignored addressing the primary unlawful act that caused the Plaintiffs financial losses: Vistagen's materially misleading statements and omissions of material fact relating to the PH94B Phase 2 and Pilot Phase 3 trials. Vistagen intentionally concealed that ClinicalTrials.gov rejected publishing the trials after conducting a QC review. The Plaintiffs have already addressed the importance and materiality of ClinicalTrials.gov. The FDA depends on the published trials, and federal law requires drug trial results to be submitted to ClinicalTrials.gov.

106. Vistagen's Response Letter failed to address the six annual reports, dozens of press releases, 22 quarterly reports, five corporate updates, six prospectuses, and over a dozen earnings call transcripts that contained acts of fraud and SEC disclosure violations, whether through material omissions or misleading statements concerning their drug candidate PH94B. Smith acknowledges that the Vistagen Board reads Cesario's letter.

107. Vistagen's Response Letter either intentionally or mistakenly misstates facts while never responding to why Vistagen concealed clincaltrials.gov rejecting publishing the PH94B trials results despite;

- Vistagen submitted the Phase 2 trial twice
- Vistagen submitted the Pilot Phase 3 trial twice
- Vistagen submitting the PALISADE -1 trial
- Vistagen submitting the PALISADE-2 trial
- Vistagen submitting the PALISADE open-label study

108. Vistagen's Response Letter failed to address why Vistagen has not submitted the results of its COVID-19 anxiety disorder study to ClinicalTrials.gov since the trial concluded in mid-2022 and is now in 2025.

109. On Page two, Vistagen's Response Letter cites the FDA Rules regarding Phase 3 trials. As previously noted, the FDA does not design trials, nor can it make a company perform a particular trial design. As this company has indicated multiple times, Vistagen, Singh, and Vistagen's board of directors blatantly lied on the August 7th, 2023, press release. They blatantly lied to perpetrate an illegal pump and dump on the public. The fourth paragraph of the FDA rules states explicitly that "*a Phase 3 trial should include sufficient numbers of study participants*".

110. Vistagen terminated the PALISADE-2 trial without enough study participants per the design they presented to the FDA. PALISADE-2 was a Phase 2 trial. Further, ClinicalTrials.gov rejected the half-enrolled terminated trial for publication after a quality control review because of Vistagen's negligence.

> "As an initial matter, the FDA allows wide latitude in clinical trial design, and a Phase 3
>
> trial should include sufficient numbers of study participants "to demonstrate whether or not a product offers a treatment benefit to a specific population." See, e.g., "Step 3. Clinical Research" on the FDA's website. FDA guidelines contemplate that an interim analysis may be conducted "prior to formal completion of a trial." See "Guidance for

Industry, E9 Statistical Principles for Clinical Trials" at p. 25 (FDA, September 1998). Early termination of clinical trials is not uncommon or forbidden, whether based on reasons of safety, efficacy, futility, or other concerns. And a trial's completion date is when the "final subject was examined or received an intervention for the purposes of final collection of data for the primary outcome, whether the clinical trial concluded according to the pre-specified protocol or was terminated." 42 C.F.R. § 11.10(a)."

111. The FDA uses the word interim for a reason; interim means incomplete or until something is finished. Vistagen's Phase 3 PALISADE-2 trial was not a completed Phase 3 trial; the trial was not fully enrolled. The FDA does not view a self-terminated trial as complete, as a Phase 3 drug trial. Moreover, when Cesario received the Vistagen Response Letter, Vistagen had not even sent the partially completed trial results to ClinicalTrials.gov for publication. The Plaintiffs have already provided links to ClinicalTrials.gov, rejecting the submission with negative comments after a limited QC review. Vistagen waited a year to submit the Phase 3 PALISADE-2 trial results to ClinicalTrials.gov, until (i) they perpetrated a pump-and-dump, (ii) they issued an unlawful prospectus and dumped another $100 million of its stock on the public, and (iii) they set in motion with the FDA PALISADE-3 and PALISADE-4. ClinicalTrials.gov made this comment supporting rejecting the PALISADE-2 trial;

[21]**"The measure does not appear to include sufficient information to understand how outcomes are measured and reported."**

112. If PALISADE-2 were a Phase 3 trial, Vistagen would not have to repeat it. Vistagen had to start the Phase 3 process from scratch. PALISADE-3 and PALISADE 4 are identical to PALISADE-1 and PALISADE-2. Contrary to the statements of the incompetent Director Defendants, it would have been quicker, cost less, and required half the enrollees to finish PALISADE-2 than to start a brand-new trial. On page two, paragraph four, Vistagen's Response Letter writes.

"In light of this regulatory authority, your central allegation of fraud—that PALISADE-2 was incomplete because it ended before enrolling the full number of originally

---

[21] *See,*

*https://clinicaltrials.gov/study/NCT05011396?tab=history&a=5#version-content-panel*

contemplated participants—is wrong. Your Letters also incorrectly asserts that "no endpoints were reached," which disregards the statistically significant findings of clinical efficacy accurately reported by Vistagen for multiple therapeutic endpoints, including the primary efficacy endpoint of the trial."

113. An endpoint is only achieved when a trial is completed according to the agreed-upon trial design and with the correct number of subjects or if the FDA stops it. Per the FDA, "a trial's completion date is when the final subject was examined or received an intervention for final collection of data for the primary outcome."

- Final subject means final subject as agreed upon per the study plan. Otherwise, every biotech CEO could scam the system like Vistagen tried to do.

- The FDA uses the word "Intervention," which would be by a third party, like the FDA. PALISADE-2 did not have an intervention termination. The PALISADE-2 trial was self-terminated for business reasons. The business reason was that Vistagen did not have the money to finish the trial. There was no intervention; it was a voluntary termination for "business purposes," which means they did not have the funds. Vistagen also terminated the open-label study for "business purposes."

> "With the results of PALISADE-1 in hand and after careful consideration, and inaccordance with its business judgment, Vistagen's management determined to pause PALISADE-2 rather than continue to invest substantial additional resources in the study at that time. Vistagen promptly disclosed this decision to investors. See, e.g., Press Release dated August 11, 2022."

114. As referenced herein, on September 8th, 2022, Vistagen filed a Form 8-K with the SEC and issued a press release stating that Vistagen was resuming the PALISADE-2 trial to "full enrollment." Vistagen also filed a quarterly report with the SEC on October 2022 stating that Vistagen was resuming the PALISADE-2 trial to full enrollment as they agreed with the FDA before beginning the plan.

115. On page four, paragraph four of Vistagen's Response Letter writes what can only be described as a bald-faced lie;

> "Subsequently, Vistagen did exactly that—i.e., continued preparations for the resumption of PALISADE-2, while submitting material necessary to engage with the FDA on potential future Phase 3 development of fasedienol. In addition, at that time, Vistagen also monitored the progress of two ongoing Phase 2 clinical trials in SAD being conducted by peer companies that were expected to read out before the end of 2022. Significantly, like PALISADE-2, both of these trials involved a public speaking challenge design and used the SUDS as the measurement of their primary efficacy endpoint. In December 2022, both peer companies announced unsuccessful study results from their Phase 2 studies, raising significant new and additional important considerations for the Company in its ongoing assessment of potential next steps with respect to the Phase 3 development program for fasedienol, including with respect to resuming PALISADE-2." Thereafter, Vistagen once again proceeded precisely as it publicly indicated—i.e., the Company engaged with the FDA in further discussions concerning its potential future Phase 3 development plan for fasedienol as a treatment for SAD, while continuing to assess the potential impact of the proposed adjustments to the PALISADE-2 study protocol and the results of the two unsuccessful Phase 2 SAD public speaking challenge studies by two peer companies.

116. Vistagen did not need to meet with the FDA to restart PALISADE-2. Vistagen met with the FDA to change the testing from SUDS to the Liebowitz Scale. Vistagen's Response Letter writes on page five, paragraph two;

> "Vistagen proceeded as indicated, and on August 7, 2023, it disclosed topline results from the 141 subjects who were randomized and completed PALISADE-2 in both a press release and on Form 8-K. See August 7, 2023, 8-K & Press Release. **The market (unsurprisingly) reacted positively to this important milestone.** The favorable interest in Vistagen and its development of fasedienol has only continued since then, with a leading CNS securities analyst Paul Matteis of Stiffel, recently initiating coverage of Vistagen on November 13, 2023, as a "buy rating and $12 target Price."

117. Stiefel participated in the October financing, so it is unsurprising that Matteis played follow-the-leader and put a $12 target on Vistagen. The Plaintiffs don't have enough evidence to add Matteis as a defendant. Matteis, like the other Analyst Defendants, knew that Vistagen committed fraud and violated disclosure laws. Matteis's $12 target seems brilliant because a year and a half later, the stock price only dropped to sub $3.00.

118. As the Plaintiffs have detailed above, Vistagen did not have a successful trial, and the results were not Top-Line; they were interim results. The pump-and-dump scheme has all the elements the U.S. Supreme Court cited in Vistagen knew before they issued that press release,

such as how the market would react to a fraudulently titled press release and begin illegally dumping their shares on the duped public. They had their stock explode almost 50-fold in two hours and traded **1 billion dollars** when they typically averaged $200.000.00.

- Their share price increased from $1.68 to $71, but it dropped back to $8 on the same day. The following day, Vistagen's stock price was in the $5 range after CEO Singh gave a late corporate update.

- Their trading volume increased from an average of 100,000 to over 53 million shares on August 7th. Vistagen had less than 6 million shares outstanding.

119. Regarding Cesario's claims that Vistagen perpetrated a pump-and-dump, Vistagen's Response Letter incorrectly equates what Vistagen did, to an ethical and common use of an ATM.

> "Your Letters also claim that Vistagen's decision to raise capital after its positive August 7, 2023, press release was somehow fraudulent. Not so. As is well known, clinical stage biopharmaceutical companies like Vistagen routinely raise substantial amounts of capital, including primarily through sales of their securities, to continue to fund their operations *i*n line with their mission, including clinical trials and many other non-clinical drug development activities. To do so, in 2021, as is common practice, Vistagen entered into an industry standard agreement with Jefferies LLC ("Jefferies") relating to the potential sale, from time to time, of up to $75 million worth of shares of Vistagen's common stock in an at-the-market, or "ATM" offering. See, e.g., June 23, 2022, 10-K (disclosing ATM). ATM offerings allow companies to raise capital over time by making a pre-specified amount of stock available for sale. To execute an ATM offering, Vistagen was required to certify that it did not have any material, non-public information prior to selling its stock under the ATM agreement with Jefferies. In compliance with this requirement, on Monday, August 7, 2023, Vistagen publicly disclosed the material non-public information in its possession – that the topline results of PALISADE-2 were positive – and then elected to raise capital via the ATM, which also accurately and timely disclosed. Vistagen's aggregate ATM sales of common stock during the week of August 7, 2023 represented less than 3% of its total trading volume on the Nasdaq Capital Market during that week, negating any allegation it indiscriminately "dumped" stock."

120. Companies utilize at-the-money offerings legally and efficiently every day. Vistagen issued a misleading and fraudulent press release and then dumped stock the investing public.

> "Pump and dump" schemes "involve the touting of a company's stock (typically microcap companies) through false and misleading statements to the marketplace. After pumping the stock, fraudsters make huge profits by selling their cheap stock into the market." U.S. Securities and Exchange Commission

121. On page five, paragraph five, Vistagen's Response Letter makes the following erroneous claim:

> "Furthermore, Vistagen accurately and timely disclosed its financial condition and risk factors to investors and explicitly warned in its press releases that it may not be able to raise funds to continue its clinical trials."

122. That safe harbor claim applies to future clinical trials. Prior to beginning PALISADE-2, Vistagen had budgeted for the trial. On page six, paragraph four, Vistagen's Response Letter writes;

> "Your Letters also claims that Vistagen hid certain information regarding the earlier PH94B Phase 2 results – a claim which is belied by the plain language of the April 1, 2019 press release, which explicitly noted and linked to a peer-reviewed publication discussing the Phase 2 PH94B study results—the American Journal of Psychiatry—which likewise disclosed extensive detail for the Phase 2 PH94B public speaking challenge study and the study results. See April 1, 2019, Press Release at note 2."

123. Peer-reviewed published papers are irrelevant in clinical studies. Furthermore, Monti and Leibowitz are biased. Vistagen's SEC disclosures and press releases cite the Phase 2 and Pilot Phase 3 clinical trials. Relying on a peer-reviewed article as a clinical trial is as nonsensical as asking a federal judge to use a law school student's paper as an authority over the U.S. Supreme Court rulings. Relying on that as an authority speaks volumes to the untrustworthy, unethical culture at Vistagen. Moreover, Vistagen's Response Letter references the misleading Pilot Phase 3 trial, not the Phase 2 trial that the Phase 3 trials modeled after.

## S. <u>Allegations Against Withum</u>

124. Withum's reckless and intentional abandonment of PCAOB rules and standards during Vistagen audits and quarterly reviews is astounding. Withum refused to see or even investigate the fraudulent nature of Vistagen's disclosures in quarterly and annual reports, prospectus filings, proxy filings, and corporate updates relating to the PH94B trials identified herein. Withum stood silent, allowing Vistagen's Director and Executive Defendants to defraud investors of billions of dollars. Withum intentionally stood silent while Vistagen;

- Filed fourteen quarterly reports with the SEC that contained misleading statements and material omissions
- Filed six annual reports with the SEC that contained misleading statements and material omissions
- Filed four corporate updates with the SEC that contained misleading statements and material omissions
- Filed five prospectuses with the SEC that contained misleading statements and material omissions
- Filed three corporate presentations with the SEC that contained misleading statements and material omissions

THE ROLE OF THE INDEPENDENT EXTERNAL AUDITOR

125. Withum either negligently or intentionally refused to see the red flags and investigated the repeated fraud and violations of security laws in Vistagen's disclosures, including press releases, quarterly and annual reports, prospectus filings, proxy filings, and corporate updates relating to PH94B. Red Flags glared from Vistagen's acquisition of PH94B. Vistagen's first press release on PH94B was in 2018.

1. Vistagen's first press release on PH94B in 2018 claimed they would begin a Phase 3 trial within six months, but Vistagen did not have the funds. Additionally, the patent life for PH94B for social anxiety disorder was suspect.
2. **Vistagen's April Fools Day [22]press release in 2019 stated that Vistagen was very misleading**. Vistagen claimed to have "New Findings" on PH94B, but to have new findings, Vistagen would have had to run a trial or study. A new study would have expenditures that should have been accounted for. Vistagen did not have any new data.

[22] See, https://www.vistagen.com/news-releases/news-release-details/positive-pilot-phase-3-data-position-vistagens-ph94b-neuroactive

3. Withum should have had a high degree of skepticism regarding Leibowitz and Snodgrass, as they had a vested interest in PH94B. Withum should have checked ClinicalTrials.gov to verify that the Phase 2 trials were successful.

126. Since the inception of Withum's engagement, Vistagen has not generated any revenue. To fund Vistagen's massive losses each quarter, Vistagen sold its shares to the public. Vistagen's internal accounting department handled the booking tasks every business had. Vistagen's management prepares and is responsible for a company's financial statements and disclosures. After AV-101 failed, Withum should have been highly skeptical of Vistagen's claims about PH94B in SEC filings and press releases. Vistagen's repeated references to the two previous PH94 Phase 2 and Vistagen's desperate need to raise capital by selling its shares should prompted Withum to verify that the PH94B Phase 2 and Pilot Phase 3 trials were successful. As Vistagen falsely claimed. Withum either negligently failed to check ClinicalTrials.gov to support Vistagen's claims or did so and ignored the fact that ClinicalTrials.gov rejected the PH94B trials after a QC review. Additionally, had Withum checked ClinicalTrials.gov, they would have spotted all the other anomalies regarding those trials. Withum's website claims that one of the fields in which they excel is biotechnology; see screenshot




127. According to SEC records, Vistagen engaged Withum as its independent auditor in 2014. Thus, the Withum engagement team assigned to provide audit services to Vistagen was very familiar with Singh and the Vistagen Audit Committee, who are also Director Defendants. Withum's website states that it has expertise in public company compliance and SEC reporting.




[23]

128. Public companies engage independent certified public accountants to address the credibility of a company's financial statements. Auditors, in turn, are required to review quarterly filings with the SEC and issue qualified opinions on a company's annual report. Independent certified public auditors opine on whether a company's financial statements are prepared in accordance with GAAP, the rules of the American Institute of Certified Public Accountants ("AICPA") and the PCAOB, as well as the laws SEC and the PSLRA that was passed by Congress in 1994.

130. Auditors should raise questions regarding the reliability of financial statements, which may reflect on management's competence and stewardship. An audit is conducted for the benefit of the company's stakeholders. The objective of an audit is to provide the users of the financial statements with reasonable assurance that the financial statements are presented correctly. Audit reports contain the words reasonable assurance. Investors shouldn't expect auditors to be bloodhounds but must maintain high skepticism when performing audits. Vistagen was not

---

[23] See, *https://www.withum.com/service/audit/public-company-sec-compliance-reporting/*

booking revenue or running hundreds of drug trials with different compounds like Lilly, Pfizer, or other large pharmaceutical companies. Vistagen had one flagship drug, PH94B, to raise capital around. AV-101 was irrelevant after 2019, but even before that, the AV-101 trial was fully funded and run by the NIH.

131. The Plaintiffs do not speculate whether Withum's regulatory issues were a factor in its gross negligence. Still, it is noteworthy that the $2,000,000 fine and sanctions the [24]PCAOB leveled on Withum partly due to Withum's lack of adequate staffing.

132. The Director Defendants and Latham & Watkins should have noticed Withum about Cesario's letter to Vistagen. Even if Withum were given the benefit of the doubt that Withum was not an active actor in the fraudulent acts the Plaintiffs have identified herein and were only negligent, they were active in covering up the fraud and security law violations alleged herein. Withum and Latham & Watkins knew that Vistagen was legally obligated to file an 8-K informing the investing public that their financials could not be relied upon. Omitting disclosing that ClinicalTrials.gov rejected the PH94B trials could not be any more material. As previously stated, the FDA relies on ClinicalTrials.gov, and federal law requires study results to be submitted to Clinicaltrials.gov. To compound Withum's wrongdoing, they agreed with [25]Vistagen's 8-K filing that [26]Withum did not have any issues with Vistagen before their firing. Agreeing with Vistagen's firing leaves Vistagen's new auditor, KPMG, blindsided. The evidence collected by the Plaintiffs indicates that Withum was more than just negligent. Discovery in this matter will reveal what Withum knew, and they knew it.

133. Withum [27]legal obligation and duty when discovering fraud and/or violations of security laws, whether done mistakenly or intentionally, is straightforward. Withum had a duty to inform

---

[24] *See;* *https://pcaobus.org/news-events/news-releases/news-release-detail/imposing-2-million-fines-pcaob-sanctions-withumsmith-brown-pc-pervasive-quality-control-violations-involving-spac-audits*

[25] *https://www.sec.gov/Archives/edgar/data/1411685/000143774924022667/vtgn20240711_8k.htm*

[26] *https://www.sec.gov/Archives/edgar/data/1411685/000143774924022667/ex_697397.htm*

[27] *https://www.sec.gov/interps/account/sab99.htm*

*https://www.govinfo.gov/content/pkg/CFR-2014-title17-vol3/pdf/CFR-2014-title17-vol3-sec210-1-02.pdf*

134. Vistagen should have issued an 8-K stating that Vistagen's financials should not be relied upon. At that point, Vistagen had a legal obligation to correct the record. If Vistagen fails to correct the mistakes, Withum must resign and cite the reasons. In the case of securities fraud, they would report the fraud to the SEC.

135. Withum's audit fees were $540,000, which certainly motivates Withum to be a secondary actor and aid and abet Vistagen and the Director Defendants in committing the fraud identified herein. Vistagen's latest proxy filing includes fees billed for the annual audit of the Company's financial statements and quarterly reviews for Fiscal 2024 and Fiscal 2023 and for services normally provided by Withum in connection with routine statutory and regulatory filings or engagements, as well as the issuance of consents and comfort letters in connection with registration statements, including the filing of our registration statements on Form S-3 and Form S-8.

136. PCAOB Standards note, "Risks of material misstatement at the financial statement level relate pervasively to the financial statements and potentially affect many assertions. Risks of material misstatement at the financial statement level may be especially relevant to the auditor's consideration of the risk of material misstatement due to fraud. For example, an ineffective control environment, a lack of sufficient capital to continue operations, and declining conditions affecting the company's industry might create pressures or opportunities for management to manipulate the financial statements, leading to a higher risk of material misstatement." *See*;

*https://pcaobus.org/oversight/standards/archived-standards/pre-reorganized-auditing-sta n dards-interpretations/details/auditing-standard-no-8*

137. Accordingly, Withum's quarterly reviews and noncompliant audit reports on Vistagen and Vistagen's disclosures and internal control over financial reporting as of June 28th, 2018, 2019, 2020, 2021, 2022, and 2023, respectively, were knowingly or recklessly false and misleading when made.

138. By the foregoing Withum, (i) violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (ii) committed common law fraud; (iii) aided and abetted Vistagen and its Directors defrauding the Plaintiffs; (iv) aided and abetted Vistagen's Directors and executive management team in committing constructive fraud; (v) aided and abetted Vistagen's Directors and executive management team in breaching their fiduciary duties; (vi) became an active

participant in the scheme to defraud the Plaintiff's and investors; (vii) and was grossly negligent in its engagement.

## T. Allegations Against Banker Defendants and the Analyst Defendants

**Banker Defendants**

139. By their positions, the Banker Defendants knew that Vistagen and Vistagen's Director Defendants were violating federal and state securities laws in each prospectus because of the misleading statements and omissions of material facts about the Phase 2 PH94B trials. These prospectuses include;

- Maxim's two equity offerings in 2020
- Jefferies and William Blair's equity offering in 2020
- Jefferies equity offering in 2020.

140, Additionally, the Banker Defendants' active roles in disseminating the prospectuses to the investing public violated federal and state security laws. The Banker Defendants knew that by selling Vistagen's stock to its institutional clients, those institutions would quickly resell those shares to the investing public at higher prices.

141. Moreover, the circumstances surrounding those offerings make the crimes alleged herein even more obscene.

1. The 2020 offerings would not have happened if not for Vistagen's misleading COVID-19 press release
2. The 2023 offering would not have happened if not for Vistagen's misleading and fraudulent press release that stated Vistagen had the first successful Phase 3 trial for social anxiety disorder

142. Jefferies knew Vistagen's August 7$^{th,}$ 2023, press release was misleading but became an active partner in the biggest illegal microcap pump-and-dump in 2023.

**Analyst Defendants**

143. By their positions, the Analyst Defendants knew prior that Vistagen and Vistagen's Director Defendants were violating federal and state securities laws. They knew every prospectus, press release, quarterly report, annual report, and corporate update that referenced Phase 2 PH94B contained misleading statements and omissions of material facts about the Phase 2 PH94B trials.

144. Despite knowing that, and in violation of federal security laws, the Analyst Defendants disseminated to the investing public research reports and price targets that they knew to be intentionally misleading and fraudulent. The Analyst Defendants, like the Banker Analysts, are trained to do research, and one of the first things they would have done is review the data on PH94B on ClinicalTrials.gov. Notably, the Plaintiffs have submitted Vistagen's earnings calls for Judicial Notice, and not one analyst ever asked about why the trials were rejected for publication on ClinmicalTrials.gov or if Vistagen has determined the specific mistakes they have made running the PH94B trials.

145. The Plaintiffs have characterized the Analyst Defendants as trained seals; here are examples of how they are in lockstep after each offering. From 2020; - a 600% increase as a price target.



The Motley Fool.

**Why VistaGen Therapeutics Stock Is Soaring Today**

February 18, 2021 — 12:00 pm EST

Written by Keith Speights for The Motley Fool →

The $6.00 target is the equialent of $180.00 factoring in the 1/30 reverse split Vistgen executed in 2023

**What happened**

Shares of VistaGen Therapeutics (NASDAQ: VTGN) were soaring 22.1% as of 11:27 a.m. EST on Thursday. The big jump came after Jefferies analyst Andrew Tsai initiated coverage on the stock with a buy recommendation. Tsai also set a one-year price target of $6, nearly three times the price of VistaGen's shares at the market close on Wednesday.

QUICK LINKS : Goldman Sachs Conviction Buy List | Warren Buffett News | Elliott Management News | Follow

Analyst Comments

# William Blair Reiterates Outperform Rating on VistaGen Therapeutics (VTGN)

July 13, 2022 4:08 PM EDT X Post Like 0 Send to a Friend

William Blair analyst Tim Lugo reiterated an Outperform rating on VistaGen Therapeutics (NASDAQ: VTGN). The analyst comments: "We rate shares ...

**This is a premium only article. To continue reading this and other premium stock market news articles please sign-in or upgrade to StreetInsider.com Premium below (Free Trial) LEARN MORE**

| SHARES OUTSTANDING | PUBLIC FLOAT |
|---|---|
| 27.84M | 25.09M |
| BETA | REV. PER EMPLOYEE |
| 1.52 | $22.45K |

**VistaGen Therapeutics stock price target raised to $3 from $2 at Maxim Group**
Jul. 23, 2020 at 9:21 a.m. ET by Tomi Kilgore

146. The Analyst Defendants expect a 300% to 500% increase in Vitagen's stock after Jefferies makes the $100,000,000 offering with warrants. The Analyst Defendants know Vistagen has been committing disclosure violations and fraud for years. Analysts research drug market share, life cycle peak sales potential, and possible alternatives. The first action they would take is to go to ClinicalTrials.gov.

FUTUBULL Investing Markets News & Community Pricing Promotions Blog About Us Supp

**Jefferies Upgrades Vistagen Therapeutics to Buy, Raises Price Target to $15**

Benzinga · Dec 7, 2023 05:35

VTGN -1.01%

Jefferies analyst Andrew Tsai upgrades Vistagen Therapeutics (NASDAQ:VTGN) from Hold to Buy and raises the price target from $0.2 to $15.

The above content is for informational or educational purposes only and does not constitute any investment advice related to Futu. Although we strive to ensure the truthfulness, accuracy, and originality of all such content, we cannot guarantee it.

147. William Blair, Tim Lugo
https://markets.businessinsider.com/news/stocks/undervalued-vistagen-therapeutics-analyst-highlights-potential-in-anxiety-treatment-1032871807

MarketScreener Symbol or Keyword(s)

Markets News Analysis Our Shows Stock Picks Portfo

**Maxim Cuts Price Target on VistaGen Therapeutics to $12 From $30, Maintains Buy Rating**

October 17, 2023 at 01:44 pm EDT Share

148. Singh and Tsai's interaction during Vistagen's November 2023 [28]earnings call. The conference call transcript (Exhibit C) amplifies the analysts' deceit. In this exchange, Tsai knew ClinicalTrials.gov had already rejected the PALISADE-2 trial results after a QC review.

[28] See earnings call transcript; https://capedge.com/transcript/1411685/2025Q1/VTGN

**Lin Tsai;** Great. Last question is, what's the latest on the PALISADE-2 publication as well as a potential Breakthrough Designation filing?

**Shawn Singh;** Andrew, look, we know obviously what we achieved in PALISADE-2 is historic. No one's ever done it. And so that's given rise to interest in terms of manuscript that we will be **submitting to a journal that we believe is the best fit for that.** That's in a very nice, mature stage of development. The other part of it is, look, as you know, we've achieved Fast Track designation already. That's a serious and life-threatening indication. There's no question about that. What we achieved in PALISADE-2 is a very significant differentiator. So -- and we'll see how it goes. There's never any guarantee you can make about any activity with the agency, but I like the chances that we have in fitting the profile that's typically associated with moving beyond Fast Track.

149. Singh also made this statement on the November 2023 earnings call despite knowing that ClinicalTrials.gov rejected publishing the PALISADE-2 trial;

> "Last year with our PALISADE-2 Phase III trial of fasedienol, we reported the **first ever positive Phase III trial of a drug candidate for the acute treatment of SAD."**

150. This exchange between Tsai and Singh is even further evidence that Vistagen terminated the PALISADE-2 trial because they misallocated the budgeted funds. Singh states that even if PALISADE-3 fails, he will continue with PALISADE-4 because Vistagen is fully funded. Vistagen was fully funded before PALISADE-1 and PALISADE-2 began.

**Lin Tsai;** Makes sense. **And in the unfortunate circumstance should PALISADE-3 not hit stats, do you still -- would you still plan to move forward and complete PALISADE-4**, just given the turn of events that happened last time with PALISADE-1 and 2?

**Shawn Singh;** Yes, 100%. No question about it, Andrew. The whole program continues. **That's what's the benefit of having a fully-funded program.** So we're in a spot now where in the very short order here, we will have initiated

everything in '24 that we think we need to read out in '25 and that if positive, would support our NDA in the early part of '26 for fasedienol.

**So yes, absolutely 100%, regardless, both studies will be run to completion.**

## V. Allegations Against Snodgrass, Smith, and Monti

151. Dr. Ralph Snodgrass was Vistagen's by his position as founder and was a key player between 2018 and 2022 when Vistagen was issuing false and misleading SEC disclosures and press releases. According to McPartland, Snodgrass was terminated for sexual harassment or deviancy. The Director Defendants appear to have standards; it seems OK to knowingly, willingly, and maliciously defraud the investing public out of billions of dollars, but flirty behavior is punishable.

152. Mark A. Smith, M.D., Ph.D, by his position as founder and was a key player between 2018 and 2022 when Vistagen was issuing false and misleading SEC disclosures and press releases.

153. Louis Monti, M.D., PHD, serves as Vistagen's Senior Vice President of Translational Neuroscience. Monti was a key player and formerly affiliated with Pherin. By his past and present position, Monti was a key player in Vistagen's violations of security laws and fraud.

## X. Allegations Against Vistagen's Directors and Officers

### CEO Singh and The Board Defendants

154. According to their biographies, the Director Defendants are all experienced in public markets and the biotech industry. Whether independent or active in the day-to-day business, they are responsible to the stakeholders. They are not paid to sit around, drink coffee, and eat donuts while approving Singh and Saxe's unlawful schemes. The Plaintiffs, while not required to at this stage of litigation, have provided incontrovertible evidence of violations of security laws and fraud. In anticipation of the Defendants accusing the Plaintiffs of making legal conclusions, the disclosure and fraud laws are crystal clear and unambiguous.

155. Mark McPartland and Reid Adler, Mark Flather, and Joshua S. Prince are all executives at Vistage. Their knowledge made them aware that the public disclosures were concealing material facts. They were legally obligated to report the fraud. By their silence, they were active participants in common law fraud claims, they breached their fiduciary duties, aided and abetted board members in breaching their fiduciary duties, and committed negligent misrepresentation.

156. By virtue of their positions, the Executive Defendants aided and abetted the Director Defendants in committing the wrongful conduct identified herein.

157. The Director and Executive Defendants willingly, knowingly, and maliciously violated Vistagen's [29]Code of Business Conduct, specifically the section on Code of Integrity requiring Compliance with the Law and Regulations to obtain financial benefits.

158. By the foregoing, the Vistagen Directors and executives (i) committed common law fraud through misstatements and material omissions; (ii) conspired and aided and abetted each other in defrauding the public; (iii) committed constructive fraud; (iv) breached their fiduciary duties; (v) committed negligent misrepresentation; (v) committed negligence by (a) starting the Phase 3 PH94B trials during peak COVID; (b) having inadequate protocols set up to run the trials, and (c) mismanaging the budget to finish the trials; (vi) committed negligent misrepresentation; (vii) violated California Corporation Codes § 25400 and 25401; and (viii) violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

## Y. <u>**Allegations Against Latham &Watkins and Attorney Colleen Smith**</u>

159. McPartland informed Cesario that Vistagen's press releases and SEC filings were reviewed, edited, and approved for distribution by Latham & Watkins. As exhibited above, Latham & Watkins attorney Colleen Smith contacted Cesario in late 2023, responding to Cesario's allegations. As the Plaintiffs have already identified, Smith's letter was not only full of errors but nonsensical. Smith tap-danced around and completely ignored Cesario's claim that Vistagen committed fraud and violated federal and state securities disclosure laws by omitting material facts, specifically ClinicalTrials.gov rejecting the Phase 2 and Pilot Phase PH94B trials after a QC review.

---

[29] See; *https://www.vistagen.com/static-files/42c25675-489e-42c2-adb9-9c405464a90f*

160. By the foregoing evidence contained herein, the Plaintiffs allege Lathum & Watkins and Smith (i) conspired with the Director Defendants to defraud the Plaintiffs and investing public; (ii) aided and abetted the Director Defendants in defrauding the Plaintiffs and the investing public; (iii) aided and abetted the Director Defendants in committing common law fraud and constructive fraud; (iv) aided and abetted the Director Defendants in committing in breaching their fiduciary duties; (v) ) aided and abetted the Director Defendants in committing negligent misrepresentation; (vi) ) aided and abetted the Director Defendants in violating California Corporation Codes § 25400 and 25401; (vii) was a secondary actor with Vistagen in violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

## VI. INAPPLICABILITY OF SAFE HARBOR DEFENSE

161. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to intentionally false or misleading statements. The Defendants were notified of the allegations in this complaint over a year ago; they have not corrected the filings with the SEC as they are legally obligated to do. Instead, they have continued violating security laws and committed fraud. Vistagen has not disclosed that the PALISADE-1, PALISDAE-2, and PALISADE open-label studies were rejected for publication by ClinicalTrials.gov even though they are legally obligated to. Vistagen's January press release should shock the court. Now, Vistagen is hyping up a cancer remedy even though ClinicalTrials.gov does not show any successful trials. The only trial that shows on ClinicalTrials.gov was never even enrolled from years ago.

## VII. PRESUMPTION OF RELIANCE

162. The Plaintiffs are entitled to a presumption of reliance under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose. The Plaintiffs are also entitled to a presumption of reliance based on the Defendants' material misrepresentations and omissions under the fraud-on-the-market doctrine because Vistagen's common stock was actively traded on the NASDAQ Exchange. Vistagen is a regulated issuer

and is subject to filing periodic public disclosures and reports with the SEC, including but not limited to quarterly and annual reports, Form 8-K's, Registration statements, and prospectuses.

163. Vistagen communicated regularly with the public and its investors regarding PH94B. Many of Vistagen's communications regarding PH94B were reported and broadcast to the public, financial news services, and stock message boards. Moreover, Cesario spoke with McPartland and Singh, and they never disclosed that the Phase 2 and Pilot Phase 3 PH94 trials were rejected for publication. Jefferies's price targets analyst reports were similarly reported and broadcasted to the public financial news services and message boards. McPartland shared other analyst reports with Vistagen shareholders. The market reacted promptly to public information disseminated by Vistagen and Jefferies price targets.

## VIII. STATUTE OF LIMITATIONS

164. The Plaintiff's claims arising from the Exchange Act were discovered within five years of the alleged acts and two years of discovery.

165. The Plaintiff's negligence claims are within the statutory 5 years and 3 years of discovery.

166. The Plaintiff's state fraud-based claims were discovered within two years.

## IX. SCIENTER

167. By failing to disclose the adverse facts detailed herein to the Plaintiffs and the investing public, the Director and Executive Defendants, Lathum & Watkins, the Banking Defendants, and the Analyst Defendants presented a misleading picture of PH94B and Vistagen's business and prospects. The Defendants' false and misleading statements had the intended effect and caused Vistagen stock to trade at artificially inflated levels throughout the period. As a direct result of the disclosures identified herein, the price of Vistagen's stock fell precipitously after the initiation of PALISADE-1. Vistagen's stock price collapsed after PALISADE-1 failed to meet its endpoint to an all-time low of [30]$0.06 real-time price.

[30] [1] $0.06 equates to $1.80 today after the 2023 1/30 reverse split.

168. Moreover, the complaint provides evidence that the Defendants knew the failure to disclose the failed PH94B Phase 2 studies was material. The trials were resubmitted to ClinicalTrials.gov in 2019 and 2022. The Defendants were notified over a year ago of security laws and fraud violations and haven't taken the legally obligated steps to inform the investing public. As identified above, the wrongful conduct continues.

## X. PUNITIVE DAMAGE DEMANDS

169. The extensive punitive damage awards the plaintiffs seek will put micro-cap CEOs, board members, bankers, and auditors on notice that they could occasionally incur severe penalties for violating securities laws and defrauding investors. The evidence contained in this complaint demonstrates a very long history of fraud, fiduciary breaches, and violations of federal and state securities laws, whether through intentional misrepresentation or material omissions. Vistagen raised over $250 million through fraud and securities law violations. Despite being notified, they have not corrected the securities law violations. They continue the violations to this day. Investors trading in Vistagen's stock have lost over 1 billion dollars based on their intentional fraud and violations of security laws.

170. The defendant's conduct was egregious, self-serving, and heinous. The defendants exploited and knowingly and maliciously exploited the public for their self-enrichment. California does not limit the amount a jury could award punitive damages for fraud and the other state claims in this complaint. While the Exchange Act generally limits punitive damages paid to Plaintiffs, it does not restrict punitive damages federal courts can impose on the defendants. For example, punitive damage may be possible if the defendants are found guilty after a jury trial.

171. The Defendants continue to violate securities laws; Vistagen has not disclosed that the three Palisade trials were rejected for publication by ClinicalTrials.gov in 2024 after a QC review.

172. As previously evidenced herein, during an earnings call, Singh Tsai asked Singh a direct question regarding when the trial results would be published. At the time of the November 2023 earnings call, Singh knew that ClinicalTrials.gov rejected all three Palisade trials performed by Vistagen for publication after a limited quality review.

173. As previously evidenced herein, Vistagen, Vistagen's board members, and the executive management team failed to disclose that in July 2024, ClinicalTrials.gov rejected the three Palisade PH94B trials after a limited quality review. Vistagen did not adjust its 2024 [31]corporate presentation filed with the SEC to reflect that all the Palisade PH94B trials were rejected for publication by clinicaltrialsgov.

174. Recently, to pump Vistagen's stock price higher, Vistagen has expanded its violations of securities laws to misleading statements regarding potential cancer treatments. On January 14th, 2025, Vistagen filed an obscene, misleading Form 8-K with the SEC, which stated;

- *On January 14, 2025, Vistagen Therapeutics, Inc. (the "Company") issued a press release* ***to announce positive results from an exploratory Phase 2A study of its investigational pherine nasal spray, PH284, in cancer cachexia****. In the study, PH284 demonstrated higher mean subjective feeling of hunger as compared to placebo and appeared safe and well-tolerated with an adverse event profile similar to placebo in a population compromised by terminal cancer. A copy of the press release is attached to this Current Report on Form 8-K as Exhibit 99.1.*
- A search of clinicaltrials.com for PH284 and ***cancer cachexia*** does not show a recent Phase 2A or any study published study by Vistagen or Pherin for cancer cachexia.
- Vistagen makes similar claims for PH80 Intranasal PH80 Spray for Acute Management of the Symptoms of Premenstrual Dysphoric Disorder. A search of PH80 brings up this one trial that was not submitted.
    - See, https://ClinicalTrials.gov/study/NCT01217775?cond=depression&term=PH80&rank=1&tab=results
- Vistagen makes similar claims for PH10 Itruvone for the management of Major Depressive Disorder. Vistagen's press releases, corporate presentations, and annual reports make identical claims about PH10's successful Phase 2 studies. A search on clinicaltrial.gov does not support Vistagen's claims.

175. The 2024 Corporate Presentation is laughable because ClinicalTrials.gov any of Vistagen's claims below. The only experience Vistagen's neuroscience team has is having a

[31] https://www.sec.gov/Archives/edgar/data/1411685/000143774924000902/vtgn20240108_8k.htm

record number of trials rejected for publication after a quality review, including the following trials;

- The Phase 2 PH94B
- The Pilot Phase
- The PALISADE open-label study
- The PALISADE-1
- The PALISADE-2 - it appears that the Vistagen Covid scam adjustment disorder trial completed in 2022 has never been submitted to ClinicalTrials.gov.

---




176. Plaintiffs are not drawing legal conclusions; the law is clear. Vistagen, Vistagen's directors and executive management team had an absolute duty to disclose all of the results from relating to the PH94B trials they attempted to publish on ClinicalTrials.gov, and they intentionally did not.

- CEO Singh, the Board, and the Executives of Vistagen could be ordered to pay Vistagen back all the salaries, stipends, and benefits from Vistagen from 2019 to date.

- Jefferies could be ordered to pay Vistagen back all the commissions from Vistagen's ATM sales and fees from the two $100,000,000 financings, which would be well over 10 million dollars.
- Withum could be ordered to pay Vistagen back all the fees it collected from Vistagen from 2019 to 2024.

177. The SEC fined accounting firms $100,000,000 for a cheating scandal involving tests that did not cause a penny of financial damage. Here, Vistagen's Directors, executive management team, and Jefferies defrauded investors up to $1 billion, not once, but on three premeditated occasions.

178. Plaintiffs do not thinka jury will think the punitive damage requests are high at all. In fact, considering some Defendant's extraordinarily high revenues, a jury might find the Plaintiffs' damage requests low by a jury, given the number of years and the amount of money the defendants scammed the public.

179. Regarding punitive damages against Vistagen, Singh and McPartland have stated that when PH94B is approved Vistagen would be worth over $2 billion.

## IX. LOSS CAUSATION

180. Cesario began purchasing Vistagen shares in 2016 through 2023. Preka began purchasing Vistagen shares in 2019. The Plaintiff's losses are only calculated based on shares purchased after Vistagen began issuing public disclosures related to PH94B. Cesario's losses are more than $900,000. Preka's losses are more than $1,000,000. Cesario and Preka claim lost opportunity to be determined at trial. Cesario and Preka's losses originate primarily from the defendant's fraud, deceit, fiduciary breaches, and security law violations, whether through misrepresentation or material omissions.

181. Before purchasing Vistagen shares, and when the Plaintiffs held Vistagen's shares, the Plaintiffs relied on the integrity of the markets and the integrity of Vistagen's public disclosures. The Plaintiffs paid artificially high prices for Vistagen's stock. For example, in early 2020, before Vistagen's directors and executive management team positioned Vistagen as a "COVID-19" therapy, the total number of shares outstanding stood at 49,938,042 (actual count

as of 2020). Vistagen's common stock was trading at a low of **$0.23** a share (actual price as of 2020), which put a market cap value of Vistagen's stock at about **$12 million**. As previously evidenced, in May 2020, Vistagen issued a false and misleading press release that announced that Vistagen positioned PH94B as a potential therapy for COVID-19 anxiety relief. As previously described, Vistagen raised $25 million through Maxim and $100 million through Jefferies and William Blair, which brought Vistagen's total number of shares outstanding to slightly over 200 million. Shortly after those financings, Vistagen's share price rose to **$3.50**, and Vistagen's market **cap was $750 million**.

182. As the complaint alleges, by virtue of theirr positions, the capital markets team and analysts at Maxim, Jefferies, and William Blair knew that Vistagen's previous PH94B trials failed the ClinicalTrials.gov quality review. Those firms pumped higher stock prices to lay the stock purchased for clients onto the public. Broker-dealers like Maxim, Jefferies, and William Blair tend to sell issuers' stock offerings to institutions, who then resell the stock to the public as a means of insulating themselves from Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, and 15 U.S. Code § 77q - Fraudulent interstate transactions lawsuits.

183 The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Vistagen's securities; and without knowledge of the misrepresented or omitted material facts alleged herein, the Plaintiff s and the investing public would have sold Vistagen's shares when they announced that they were initiating the Phase 3 trial named Palisade-1, or in the alternative, would not have purchased the securities at all.

## XIII. CAUSES OF ACTION

184. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein into the following section called Counts

### Count I. Common Law Fraud California Civil Code CIV § 1572

**Fraud - California Civil Code CIV § 1572** states in part; Defines actual fraud as any act intended to deceive, such as; making a false statement and suppressing a true statement;

185. *See; Hardisty v. Moore, 6 F.Supp. 3d 1044, 1052 (S.D. Cal. 2014) (quoting Small v. Fritz Cos., Inc., 30 Cal.4th 167, 173, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (Cal.2003)), as well as constructive fraud, which arises on a breach of a duty by one in a confidential or fiduciary relationship to another and which induces justifiable reliance by the latter to his prejudice. See Tyler v. Children's Home Soc'y, 29 Cal.App.4th 511, 548, 35 Cal.Rptr.2d 291 (Cal.Ct.App.1994); In re Harmon, 250 F.3d 1240, 1249 (9th Cir.2001)*

*Greenfield V. Fritz Companies, Inc, Court of Appeal, First District, Division 4, California, "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose."*

186. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, Leibowitz, Jefferies, Tsai, William Blair, Lugo, Minter, Maxim, McCarthy, Lathum &Watkins, Withum and Smith knowinglyand intentionally defrauded the Plaintiffs by their actions described herin, including;

(1) disseminating misleading statements

(ii) omitting material facts

(iii) artifiacially inflating the price of Vistagen's stock price

(iv) inducing the Plaintiffs to not sell Vistagen's stock

**Count II. Ca. Civ. Code § 1711 Deceit**

187. **Deceit is** (i) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (ii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Plaintiffs.

188. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, Leibowitz, Jefferies, Tsai. William Blair, Lugo, Minter, Maxim, McCarthy, Lathum & Watkins, Withum and Smith, by their actions described herein, perpetrated deceit on the Plaintiffs.

**Count III. Constructive Fraud Civ. Code, § 1573**

189. *"In its generic sense, constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust, or confidence, and resulting in damages to another. [Citations.] Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated - that is, in which such conduct is a constructive or quasi fraud, having all the actual consequences and all the legal effects of actual fraud."(Prakashpalan, supra, 223 Cal.App.4th at p. 1131.)*

190. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, and Leibowitz committed perpetrated constructive fraud against the Plaintiffs by their actions described herin,

**Count IV. Concealment. Civil Code section 1710**

191. *[T]he rule has long been settled in this state that although one may be under no duty to speak as to a matter, "if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure." ' " (Marketing West, Inc. v. Sanyo Fisher (USA) Corp. (1992) 6Cal.App.4th 603, 613 [7 Cal.Rptr.2d 859 " '*

192. *[F]alse representations made recklessly and without regard for their truth to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered.' " (Engalla, supra, 15 Cal.4th at p. 974, quoting Yellow Creek Logging Corp. v. Dare (1963) 216 Cal.App.2d 50, 55 [30Cal.Rptr. 629].*

193. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, Leibowitz, Jefferies, Tsai. William Blair, Lugo, Minter, Maxim, McCarthy, Lathum &Watkins, Withum and Smith knowinglyand intentionally concealed negative material facts from the Plaintiffs relating to the ClinicalTrials.gov PH94B trials.

**Count VI. Intentional Misrepresentation. Civil Code section 1710(1)**

194. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Leibowitz, Jefferies, Tsai, William Blair, Lugo, Minter, Maxim, McCarthy, Lathum & Watkins, Withum and Smith

intentionally misrepresented material facts that were publicly disseminated and relied upon by the Plaintiffs and ultimately harmed the Plaintiffs

**Count VII. Civil Conspiracy**

195. *Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share withthe immediate tortfeasors a common plan or design in its perpetration. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." (Applied Equipment Corp. v. Litton Saudi Arabia Ltd. (1994) 7Cal.4th 503, 510-511 [28 Cal.Rptr.2d 475, 869 P.2d 454],*

196. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, Leibowitz, Jefferies, Tsai, William Blair, Lugo, Minter, Maxim, McCarthy, Lathum &Watkins, Withum and Smith by their actions described herein, conspired to defraud the Plaintiffs, violated federal and state disclosure laws by making intentionally misleading statements or material omissions. The conspiracy allegations are against all defendants, as they were active actors or stood silent while having a legal obligation to disclose or halt the wrongdoing, which continues to this day.The motive for all was self-enrichment and financial gain.

**Count VIII. Aiding and Abetting**

197. *"As noted, some cases suggest that a plaintiff also must plead specific intent to facilitate the underlying tort. We need not decide whether specific intent is a required element because, read liberally, the fifth amended complaint alleges that defendant] intended to assist the Association in breaching its fiduciary duties. In particular, plaintiffs allege that, with knowledge of the Association's breaches, [defendant] 'gave substantial encouragement and assistance to [the Association] to breach its fiduciary duties.' Fairly read, that allegation indicates intent to participate in tortious activity." (Nasrawi, supra, 231 Cal.App.4th at p. 345, original italics, internal citations omitted.)*

*Persons who aid and abet the above violations are equally at fault if they know ofthat other person's conduct breached a duty and the person rendered encouragement or substantialassistance. See. eg., Schultz v. Neovi Data Corp., 152 Cal.App.4th 86, 93, 60 Cal.Rptr.3d 810 (2007).*

198. Defendants McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, Leibowitz, Jefferies, Tsai, William Blair, Lugo, Minter, Maxim, McCarthy, Lathum & Watkins, Withum and Smith aided and abetted the Director Defendants in;

1. Committing fraud upon the Plaintiffs
2. Committing constructive fraud upon the Plaintiffs,
3. Committing Intentional Misrepresentation upon the Plaintiffs
4. Violating federal disclosure laws
5. Violating California Corporation Codes

**Count IX. Negligence**

199. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, Leibowitz, and Snodgrass were grossly negligent initiating the PH94B trials during peak COVID-19. The Defendants knew that;

1. The WHO declared a worldwide pandemic, mask wearing and social distancing were the norm
2. Pharmacuetical companies suspended existing drug trials, or postponed initiating new trials with the exception of COVID-19 indications for vaccines, therapies and medical devices.
3. PH94B's social anxiety indication was not COVID-19 related. As Singh stated numerous times, an example of acute social anxiety would be someone about to give a speech, Not one of Vistagen's SEC disclosures or press releases positioned the Phase 3 trial as COVID-19 related.
4. PH94 was delivered intranasaly, and COVID-19 was known to have negative effects in the nasal passageways
5. Vistagen had never conducted a Phase 3 trial
6. The previous PH94B trolls were rejected after a QC review

200. The following exchange is from Vistagen's November 2023 [32]earnings call. It is a question from Tsai about the trials quality control. CEO Singh and VP Prince answer with a few differences between conducting a trial during and post COVID-19.

**Lin Tsai;**

*"Maybe a tangential question from before that was just asked. But for these Phase III studies, both of them that are underway, what are you seeing on the front lines that gives you the confidence it's definitely different this time for fasedienol? Maybe talk about how sites are operating, the rigor of these study protocols, whether public speaking challenge is being done correctly and so forth."*

**Shawn Singh;**

*"Thanks, Andrew. Appreciate the question. One thing, of course, is significantly different now than where we were even during PALISADE-2, let alone earlier than that during the pandemic is just the ability to have person-to-person contact, to have n-person training, like Josh mentioned. In-person investigators meetings mean a tremendous amount to be able to regularly and predictably have site visits and also have subjects schedule each phase and each visit during their challenge sequence.*

*It is all different. It is just fundamentally different. The attrition rates that we typically saw before at sites with site staff, we're just not seeing. Same thing with CROs.*

*You're not seeing the kinds of things that would have been frustrating variability coming into a protocol that the recipe is pretty clear. And when it's followed, it helps tremendously.*

*So that plus things that you -- that we've talked about before, right? No masks involved, no COVID-related potential with the subjects in the study.*

*So there's just fundamental things that are different on a macro basis and then site by site on a micro basis. And just having the ability for the protocol to not be novel. This is something, of course, now that's on the third and the fourth lapse within the research community.*

*So the study design isn't new, the endpoint isn't new."*

***Joshua Prince;***

---

[32] *See;* https://capedge.com/transcript/1411685/2025Q2/VTGN

*"Sure. We could add to what you said, and it kind of builds on the in-person piece.*

*In addition to the in-person investigator meetings, we've had an in-person site initiation visit for every site, right? So it's kind of the double reinforcement of training at an investigator meeting and then a good 3 to 4 hours with the study staff in their site location, again, hitting all the key details and pieces and components of what it takes to properly execute a public speaking challenge.*

*And then through the monitoring that Shawn mentioned, there have been specific examples where we've identified something that wasn't being done quite right. And the next day, there's an intervention or a discussion or a retraining or a reminder.*

*So those are the kinds of things that could not happen in our prior PALISADE studies and are happening now, which gives us, again, that confidence that we're getting the right patients and that we're reducing variability as much as possible across sites for the public speaking challenge."*

**Count X Violations of California Corporation Code § 25400**

201. *"Corporations Code section 25400 provides that it is unlawful in [California] to make false statements or engage in specified fraudulent transactions which affect the market for a security when done [for specified purposes]." Diamond Multimedia Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036, 1040, 80 Cal.Rptr.2d 828, 968 P.2d 539. "In short, it prohibits market manipulation." Id. Section 25500, in turn, "creates a civil remedy for buyers or sellers of stock the price of which has been affected by the forms of market manipulation proscribed by section 25400." Id. A more general prohibition exits under 25400 (d), which provides that it is unlawful for a person selling or offering for sale securities "to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact." Proving actual reliance and privity to establish liability under 25400 is not required. Colman v. Theranos, Inc., 325 F.R.D. 629, 647 (N.D. Cal. 2018) (citing RLI Ins. Co., 94 Cal. App. 4th 102, 109, 113 Cal.Rptr.2d 915 (2001).*

202. During the Period, Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, and Leibowitz, (i) disseminated or approved the false statements and (ii) concealed the material facts set forth above which they knew or deliberately disregarded were false andmisleading in that they contained misrepresentations and (iii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases. By virtue of their positions, the Defendants named

above knew of the false and misleading statements and material omissions alleged herein.They intended thereby to deceive the Plaintiffs, or, in the alternative, the Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts.

203. The Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive the Plaintiffs and the public, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control, each defendant was knowledgable regarding SEC laws and rules.

**Count XI Violations of California Corporation Code § 25401**

*California Corporations Code Section 25401 replicates the provisions of Rule 10b-5, 17C.F.R. 240.10b-5. However, unlike Rule 10b-5, a plaintiff need not prove reliance or that the misrepresentation or omission caused plaintiffs loss under this provision of the California Corporations Code. Lynch v. Cook, 148 Cal. App. 3d 1072, 1087-88 (1983).*

204. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, Leibowitz, Jefferies, Tsai. William Blair, Lugo, Minter, Maxim, McCarthy, Lathum & Watkins, Withum and Smith, by their actions described herein (i) disseminated or approved the false statements and (ii) concealed the material facts set forth above which they knew or deliberately disregarded were false andmisleading in that they contained misrepresentations and (iii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases. By virtue of their positions, the Defendants named above knew of the false and misleading statements and material omissions alleged herein.They intended thereby to deceive the Plaintiffs, or, in the alternative, the Defendants acted

with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts.

205. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive the Plaintiffs and the public, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control, each defendant was knowledgable regarding SEC laws and rules.

**Count XII. Violations of Section 10(b) of the Exchange Act And Rule 10b-5**

206. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, Leibowitz, Jefferies, Tsai. William Blair, Lugo, Minter, Maxim, McCarthy, Lathum & Watkins, Withum and Smith, by their actions described herein (i) disseminated or approved the false statements and (ii) concealed the material facts set forth above which they knew or deliberately disregarded were false andmisleading in that they contained misrepresentations, and (iii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases By virtue of their positions,

207 Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive the Plaintiffs and the public, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Information showing that Defendants acted

knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control, each defendant was knowledgable regarding SEC laws and rules.

208. Additionally, as detailed herein, the Defendant Withum conducted audits for the years 2018, 2019, 2020. 2021, 2022, 2023 and 2024 recklessly in violation pf the standards set by the PCAOB. Withum ignored glaring red flags and failed to train and supervise its auditing team.in, Rotundo, Cunningham.

**Count XII Breach of Fiduciary Duties**

During the Period, Defendants Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, and Leibowitz owed a fiduciary duty to the Plaintiffs and investing public. By the foregoing acts described herein, including making material misleading statements, concealing material facts, or standing silent while having a duty to act to correct, expose or stop the unlawful conduct the individual Defendants named above breached their Fiduciary duties, which harmed the Plaintiffs and investing public financially.

**XIII. PRAYER FOR RELIEF**

**WHEREFORE, the Plaintiffs pray for judgment as follows:**

A. Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

B. Awarding the Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and the Plaintiffs recover all expenses of this suit, including reasonable future attorney's fees, as provided by law;

C. Awarding the Plaintiffs punitive damages in this action against each defendant in the following amounts, or the alternative, whatever amount a jury determines after a trial;

1. Punitive damages against Vistagen; $100,000,000
2. Punitive damages against Jefferies: $100,000,000
3. Punitive damages against Withum: $20,000,000
4. Punitive damages against CEO Singh: $30,000,000
5. Punitive damages against Lathum & Watkins: $25,000,000
6. Punitive damages against Maxim: $25,000,000
7. Punitive damages against William Blair: $50,000,000
8. Punitive damages against Saxe: $5,000,000
9. Punitive damages against Leibowitz: $5,000,000
10. Punitive damages against Monti: $5,000,000
11. Punitive damages against Gin: $5,000,000
12. Punitive damages against Rotundo: $5,000,000
13. Punitive damages against Fitzpatrick: $5,000,000
14. Punitive damages against Curley: $5,000,000
15. Punitive damages against Cunningham: $5,000,000
16. Punitive damages against Adler: $5,000,000
17. Punitive damages against Prince: $5,000,000
18. Punitive damages against McPartland: $5,000,000
19. Punitive damages against Smith: $5,000,000
20. Punitive damages against Dotson: $5,000,000

21. Punitive damages against Tsai: $5,000,000

22. Punitive damages against Lugo: $5,000,000

23. Punitive damages against Minter: $5,000,000

24. Punitive damages against Smith: $5,000,000

D. Vistagen, its respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on its behalf be permanently enjoined and restrained from continuing and maintaining the conduct alleged herein;

E. Vistagen must amend its deceitful 8-K's, quarterly reports, annual reports, and corporate updates filed with the SEC to conform with the law.

F. Vistagen's respective officers and directors, defendants in this matter, be restrained and enjoined from squandering Vistgaen's cash position on legal fees defending the allegations herein. The allegations, including fraud and breach of fiduciary duties, are exempt from indemnification according to Vistagen's Charter; or, in the alternative, Vistagen's respective officers and directors named as defendants be ordered to pay Vistagen back any fees paid to attorneys if the defendants are found guilty of violating the terms of said indemnification agreement.

G. Because of the extraordinary financial damages caused to the public, the plaintiffs seek additional punitive damages against Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Snodgrass, Dotson, Smith, Monti, Anderson, Leibowitz be imposed to include disgorgement of all equity and option grants, salaries, bonuses and stipends paid during the period of the alleged violations; with the disgorgement to be returned to Vistagen.

## XIX. Jury Trial Demand

The Plaintiffs respectfully demand a jury trial.

The Plaintiffs are planning at retaining legal council at some in the future.

Respectfully submitted, this 11th day of February 2025.

John Cesario 2/11/2025

John Cesario Pro Se

15 Darrows Ridge East Lyme, CT 06333

Mailing Address PO BX 655 East Lyme CT 063333

Phone 860-333-4300

johncesario9@gmail.com

2/11/25

David Preka Pro Se

298 Boston Post Road East Lyme, CT 06333

Mailing Address PO BX 297 Waterford CT 06385

Phone 860-365-9041

david@advimpllc.com