**ORIGINAL**

FILED
MAR 10 2025
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN CESARIO Pro Se and
DAVID PREKA Pro Se
Plaintiffs

Vs.

VISTAGEN THERAPEUTICS, INC., SHAWN S. SINGH, JOHN S. SAXE, JERRY GIN, MARY ROTUNDO, ANN CUNNINGHAM, MAGGIE FITZPATRICK, JOANNE CURLEY, MARK McPARTLAND, WITHUM SMITH & BROWN PC, JEFFERIES LLC. ANDREW TSAI, RALPH SNODGRASS, ,MARK A. SMITH, LOUIS MONTI, MICHAEL LEIBOWITZ

Defendants.

Case No: 4:25-cv-01510-DMR

Judge: Hon. Donna M. Ryu

Courtroom 4

**Jury Trial Requested**

---

**VERIFIED AMENDED COMPLAINT**

## TABLE OF CONTENTS


I. NATURE OF ACTION ....................................................................2

II. JURISDICTION AND VENUE ....................................................4

III. PARTIES.........................................................................................5

Plaintiffs

A. John Cesario
B. David Preka

Defendants

C. Vistagen Therapeutics Inc.
D. Shawn K. Singh
E. John S. Saxe
F. Jerry Gin,
G. Mary L. Rotundo
H. Ann Cunningham
I. Maggie Fitzpatrick
J. JoAnne Curley
K. Mark McPartland
L. Mark Flather
M. Withum Smith + Brown PC
N. Jefferies, LLC
O. Andrew Tsai
P. Ralph Snodgrass
Q. Michael Liebowitz
R. Louis Monti

IV. HISTORY.................................................................................4

A. Pump and Dump Scheme ................................................16

B. Clinical Trials Rejects all Five PH94B Trials t..........................21

C. Vistagen's Response Letter.............................................. 22

D. Allegations Against Vistagen's Directors and Executives...............23

E. Allegations Against Withum ............................................26

F. Allegations Against Jefferies...............................................37

VI. INAPPLICABILITY OF SAFE HARBOR……..………..………..…………..40

VII. PRESUMPTION OF RELIANCE ……………….………….…,,,,…...….42

VIII. STATUTE OF LIMITATIONS………...……………….……………….………… 42

IX. SCIENTER..………………………………………….……….……..…… 43

X. PUNITIVE DAMAGE DEMAND……..……...…………………..……………..44

XI. LOSS CAUSATION ……………………………………….……………… …..48

XII. CAUSES OF ACTION……………..……………………..…………….....…49

A. Count I - Common Law Fraud………………………………….……….49

B. Count II - Deceit…………………………………………………….…..…50

C. Count III - Constructive Fraud Civ. Code, § 1573…,,,,,....................……52

D. Count IV - Concealement Civil Code section 1710………………………52

E. Count V - Intentional Misrepresentation. Civil Code Section 1710(1)…………………..…………………………..……...53

F. Count VI - Civil Conspiracy……………………..….,,,,,,,,,,.........………53

G. Count VII - Aiding and Abetting……………………………..………………54

H. Count VII - Gross Negligence……………………………………………….55

I. Count IX - California Corporation Code § 25400 ……...…….……………55

J. Count X. - California Corporation Code § 25401………..….......................56

K Count XI - Violations of Section 10(b) of the Exchange Act And Rule 10b-5…………………………………….………………....57

L. Count XII - Breach Of Fiduciary Duties……………………………..……58

XII. PRAYER FOR RELIEF…………………………….………..……………………..59

Plaintiffs John Cesario and David Preka, individually bring this federal action against Defendants Vistagen, Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, Mark McPartland, Withum Smith + Brown, PC, Jefferies LLC, Andrew Tsai, Dr. Ralph Snodgrass, Mark A. Smith, Louis Monti, and Michael Leibowitz. The Plaintiffs purchased, acquired, or otherwise held, or sold, the publicly traded securities of Vistagen between January 2017 and December 2024. The Plaintiffs each suffered financial damages of over $75,000.00 due to the defendant's wrongful conduct alleged in this complaint.

The genesis of the complaint arises from violations of federal laws and state laws and statues; including but not limited to violations of (i) Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, and Section 17(a)(1)-(3) of the Securities Act.1 (herein "The Act"); (ii) The Private Securities Litigation Reform Act (herein ("PSLRA"). State violations include certain (iii) common law fraud; (v) constructive fraud; (iv) violations of California Corporations Code § 25400 and § 25401; (v) Negligence; (vi) Negligent Misrepresentation; (vii) aiding and abetting; (viii) conspiracy, (ix) intentional misrepresentation and fraudulent concealment; (x) breach of fiduciary duty; (xii) breach of the implied covenant of good faith and fair dealing; and (xiii) violations and the reckless and intentional abandonment of audits being performed to Public Company Accounting Oversight Board standards ("PCAOB") rules standards and SEC rules and laws..

Plaintiffs allegations are based on incontrovertible evidence after an extensive and lengthy investigation which included, among other things, the review and analysis of: (i) Vistagen's public quarterly reports filed with the Securities and Exchange Commission (herein "SEC"); (ii) Form 8-K's filed with the SEC with attached press releases (iii) research reports issued by financial analysts concerning Vistagen stock; (iv) Form 8-K corporate updates filed with the SEC; (v) prospectuses filed with the SEC; (vi) audited annual reports signed CEO; (vii) news articles about Vistagen; (viii) text messages and phone calls with Vistagen's CEO Shawn K. Singh and Senior Vice-President Mark McPartland; (iv) personal meetings with Vistagen's CEO Shawn K. Singh and Senior Vice-President Mark McPartland; (x) records from the National Library of Medicine (herin "NLM") and its website clinicaltrials.gov; (xi) and a letter dated November 27th2023 from Vistagen's outside counsel, Latham & Watkins LLP.

## I. Summary of the Action

1. Vistagen is a biotech company headquartered in San Fransisco. Beginning in 2020, Vistagen began a fraud on the market scheme that resulted in the company netting nearly a quarter billion dollars in ill-gotten gains. Since at least 2019 Vistagen and its Board of Directors have concealed material facts regarding its lead drug candidate, PH94B. Vistagen has intentionally failed to disclose that the only two Phase 2 PH94B trials for social anxiety disease registered with ClinicalTrials.gov were rejected for publication after a quality control review. Vistagen has repeatedly falsely stated in SEC disclosures, annual reports, corporate presentations and press releases that the Phase 2 trials were successful.

2. In 2020, Vistagen claimed that the Phase 2 trials were successful and that they were seeking a new indication called anxiety disorder for COVID-19 anxiety relief. Vistagen was in dire financial condition and used this press release to raise over $125 million dollars.

3. During the peak of COVID-19, Vistagen initiated a was grossly negligent and reckless initiating a Phase 3 social anxiety disoreder drug trial. The social anxiety indication was not for COVID-19 relief, but was more for short term anxiety. As an example, a patient would take the drug intranasally right before giving a speech.

4. Vistagen designed the Phase 3 study on the failed Phase 2 trial that ClinicalTrials rejected. The first leg of the Phase 3 trial failed, causing Vistagen's stock price to drop dranmatically. Vistagen terminated the second leg of the trial because they did not have the funds to continue the trial.

5. In August of 2023 Vistagen was desperate for cash, so Vistagen's board of directors issued a fraudulent and misleading press release, as part of an illegal pump and dump. Vistagen falsely claimed that the second leg of the Phase 3 trial was the first successful Phase 3 trial for social anxiety disorder in 15 years. That false press release caused Vistagen's stock price to explode from $1.92 to $71 in less than an hour and half. Vistagen defrauded investors upwards of 1 billion dollars through the pump and dump. Vistagen's stock price quickly fell back after investors realized the truth. But Vistagen was able to dump almost $40 million dollars of its stock on the duped public.

6. Vistagen's Sr VP McPartland told Plaintiff Cesario that Vistagen went for broke and recklessly initiated the Phase 3 trial duuring COVID-19 because the patent was running out. Vistagen registered 2 Phase 3 trials and an open label trial for social anxiety disorder with ClinicalTrials.gov. In 2024 Vistagen submitted the three trial results, two of which Vistagen terminated, to ClinicalTrials.gov and all three were rejected for quality control reasons. Vistagen registered a COVID-19 Anxiety disorder trial with ClinicalTrials.gov and has not submitted the results yet, even though the trial was completed in 2022. Vistagen's Directors and executive management long running scam of fraud through intentional concealment has been ongoing for years.

7. "Fraud vitiates everything" is a legal principle frequently cited by the 9th Circuit Court of Appeals and the U.S. Supreme Court, meaning that anything obtained through fraudulent means is considered void and can be set aside, nullifying the entire transaction due to the deceptive actions involved. The 2020 reverse split vote, and the 2020 reverse split are not just voidable, **they are void**. "*There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents, and even judgments" (United States v. Throckmorton, 98 US 61(1878). See Civ. Code, § 1710(3) The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact;* **Vistagen, its Directors and executive management team concealing disclosing that ClinicalTrials.gov rejected the PH94B's submitted results after conducting a limited quality control review is fraud.** The fraudulent misleading statements and material omissions can be found in press release, annual reports and corporate presentations.

8. The Plaintiffs allege scheme liablity and provide specific examples of fraud and deceptive practices throughout the complaint. Examples are found herein and include Vistagen's press releases, quarterly and annual filings, corporate presentations and prospectuses. Vistagen, and the Defendants had the intent to defraud investors by concealing negative material facts regarding the PH94B trials. Vistagen's auditor was grossly negligent because they have uncovered the fraud, because there were plenty of red flags. Vistagen issued several false and misleading press releases stating that they were presenting new findings even though they did not have anything new. The auditors would have seen invoices from any "new" activities.

9. Furthermore, the U.S Supreme Court has long settled the issue of materiality in

Securities; *TSC Industries, Inc v. Northway, Inc 426 U. S. 438,whereby an omitted fact is material if there is a substantial likelihood that its disclosure would have been considered significant by a reasonable investor, is expressly adopted for the §10(b) and Rule 10b-5 context. Pp. 485 U. S. 230-232.* Vistagen repeatedly references the PH94B Phase 2 trials without disclosing that the trials were rejected for publication by ClinicalTrials.gov for quality control reasons.

10. Jefferies and Jefferies analyst Tsai committed the pump and dump with Vistagen. Jefferies knew that Vistagen's claim that they had a successful Phase 3 trial was false, Jefferies also knew that the investing public was fooled by the press release, yet they facilitated stock sales for Vistagen for several days.

11. Plaintiff Cesario incurred over $600,000 in losses from stock purchases and sales made from 2020 to 2022. McPartland even induced Cesario to exercise nearly $200,000 of warrants and hold them until the Phase 3 trial results were published. Plaintiff Preka has over $700,000 in losses from purchases from 2020 on. The Plaintiffs would have never purchased Vistagen's stock had they known the Vistagen directors and executive management team were running this long term scam.

12. Plaintiff Preka bought over $800,000.00 of stock beginning in late 2019 after Vistagen announced that PH94B was Phase 3 ready and had successful Phase 2 trials. Plaintiff Preka has incurred financial losses over $500,000 based on Vistagen's long running fraudulent scheme.

## II. JURIDICTION AND VENUE

13. **Jurisdiction** - This Court has jurisdiction over the subject of this action under 28 U.S.C. §1331, §27 of the Exchange Act, and § 22 of the Securities Act. The claims asserted herein arise under, but are not limited to; §§10(b), 20(a), 20(b), and 20A of the Exchange Act (15 U.S.C. §78j(b), §78t(a) and §78t(b)), and 78t-l, Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R. §240.10b-5) and California tort violations including CA Civ Code § 3294_ Cal. Civ. Pro. Code § 338(d) common law fraud, aiding and abetting and breach of fiduciary responsibility; Cal. Civ. Pro. Code § 343 Cal. Corp. Code § 25506 securities law violations Catchall Provision, California fraud, conspiracy, and aiding and abetting causes of action allowed in the State of California.

14. **Venue** - This Court has jurisdiction under *28 U.S.C.A.* § 1332 applies to civil actions with an amount over $75,000 and involves people from different states. Both Plaintiffs in this matter have realized losses in excess of $75,000.00

## III. PARTIES

Plaintiffs

A. **John Cesario** ("Cesario") was an investor in Vistagen between 2016 and 2023. Cesario resides in Connecticut. He intrioduced Singh and McPartlend to high net with individuals to assist Vistagen in raising capital. He was a consultant for a short time.

B. **David Preka** ("Preka") is a businessman who owns construction companies, hotels, and restaurants. Preka resides in Connecticut.

Defendants

C. **Vistagen Therapeutics Inc.** (hereinafter also "Vistagen") is a late clinical-stage neuroscience-focused biopharmaceutical company incorporated in Nevada. Vistagen's primary headquarters is at 343 Allerton Avenue, South San Francisco, CA 94080. Vistagen common stock is publicly traded on the NASDAQ exchange under the symbol VTGN. Vistagen is a penny stock with accumulated losses of approximately $338.5 million, as reported in its 10-Q filing for September 30th 2024.

D. **Shawn K. Singh** ( "Singh" ) is Vistagen's long-standing CEO. He is also a long-standing member of Vistagen's Board of Directors.

E. **John S. Saxe** ("Saxe") is a long-standing member of Vistagen's Board of Directors. Saxe's bio states that he "served as Chair of our Board of Directors from 2000 until October 2023". Saxe is a member of the Audit Committee.

F. **Jerry Gin** ("Gin") is a long-standing member of Vistagen's Board of Directors. Gin is a member of the Audit Committee.

G. **Mary L. Rotundo** ("Rotundo") serves on Vistagen's Board of Directors, appointed in 2021. Rotundo is an attorney and is a member of the Audit Committee

H. **Ann Cunningham** ("Cunningham") Serves on Vistagen's Board of Directors and was appointed in 2019. Her Bio states that Cunningham brings over 25 years of commercial experience in the pharmaceutical industry.

I. **Maggie Fitzpatrick** ("Fitzpatrick") is a Vistagen Board of Directors appointed in 2021. Fitzpatrick sits on the Corporate Governance Committee.

J. **JoAnne Curley** ("Curley") is a Vistagen Board of Directors appointed in 2021. Curley sits on the Corporate Governance Committee.

K. **Mark McPartland** ("McPartland") joined Vistagen in September 2016 as Senior Vice President of Investor Relations. Mr. McPartland has over 28 years of corporate development, investor relations, and capital markets experience working with private and public biotechnology, healthcare, and technology companies.

L. **Mark Flather** ("Flather") serves as Senior Vice President of Corporate Strategy and Capital Markets. Mr. Flather has more than 25 years of capital markets experience in various capacities on both the buy-side and sell-side. Before joining Vistagen in March 2021.

M. **Withum Smith + Brown PC** ( "Withum") is a professional corporation headquartered in Princeton, New Jersey. Withum is licensed by the New Jersey State Board of Accountancy (License No. 20CB00149600) and several other states. Withum is, and at all relevant times was, registered with the PCAOB, pursuant to Section 102 of the Act and PCAOB rules. Withum served as Vistagen's auditor between 2019 and 2024.

N. **Jefferies LLC** ("Jefferies") is one of the world's leading full-service investment banking and capital markets firms. Jefferies facilitated trading for two Vistagen 100 million dollar financings and the August 7th, 2023, pump and dump.

O. **Andrew Lin Tsai** ("CEO Tsai") is an analyst at Jefferies that provides price targets and researche reports on Vistagen stock.

P. **Ralph Snodgrass** (hereinafter also ("Snodgrass") was the founder of Vistagen and remained as Vistagen's President until 202,2 when he purportedly was fired.

Q. **Michael Liebowitz** ("Liebowitz") is on Vistagen's Board of Advisors and was the Primary Investigator on all five PH94B trials that were rejected for publication by the National Library of Medicines website, clinicaltrials.gov after a quality review of the trials were done.

R. **Louis Monti** ("Monti") joined Vistagen as Vice President, Translational Medicine in December 2020. Prior to joining Vistagen, Monti served in multiple leadership roles at Pherin Pharmaceuticals since its founding in 1991, including President and CEO from July 2018 through November 2020,

## IV. History

15. Beginning in 2020, Vistagen was facing potential bankruptcy. Vistagen's CEO, Shawn Singh, and its board of directors engaged in a long-running fraud-on-the-market scheme to inflate Vistagen's stock price and raise capital through intentional misleading statements, material omissions, and fraud. At the beginning of 2020, Vistagen leadership that perpetuated this long-running scheme consisted of CEO Singh, former Chairms Saxe, former President Snoddgrass, and board member Gin. Vistagen financed its massive deficits, which were in the hundreds of millions of dollars, by selling equity. Vistagen common shares are publicly traded on NASDAQ under the symbol VTGN. A review on ClinicalTrials.gov indicates that Vistagen has never run a successful drug trial. Pharmaceutical companies are legally required to post the results of their trials on ClinicalTrials.gov.

16. Vistagen found itself in dire financial straits in early 2020 because one of its drug candidates, AV-101, failed a Phase 2 trial funded and administered by the NIH. Vistagen's stock price dropped to a low of $0.23, and its cash position was down to approximately $1 million.

17. In March 2020, COVID-19 was causing panic in the financial markets worldwide. On March 11, 2020, the World Health Organization declared the novel coronavirus (COVID-19) outbreak a global pandemic. Singh and the other members of Vistagen's Board schemed to raise capital by positioning one of Vistagen's drugs that they acquired the rights to as a COVID-19 anxiety therapy. istagen's drposition a Stock markets worldwide crashed, and financing for microcap stocks virtually dried up, except for companies in the COVID-19 space. In April 2020, Vistagen raised approximately $4 million through an equity ale with Lincoln Park.

18. On May 18th, 2020, Vistagen filed a false and misleading Form 8-K with an accompanying press release titled;

**VistaGen Submits PH94B Phase 2A Study Protocol for Treatment of Adjustment Disorder with Anxiety Related to the COVID-19 Pandemic through U.S. FDA's Coronavirus Treatment Acceleration Program (CTAP)**

19. The press release made this intentional fraudulent statement attributed to Singh;

> *"With **successful Phase 2 development** of PH94B for social anxiety disorder completed and preparations for Phase 3 development underway, we now look forward to Phase 2 development of PH94B for adjustment order"*

20. ClinicalTrials.gov records have two registered Phase 2 PH94B trials. Both trials failed to pass ClinicalTrials.gov's limited quality review and were not published. Vistagen CEO Singh intentionally committed fraud by stating that the Phase 2 trials were successful.

See; *https://www.sec.gov/Archives/edgar/data/1411685/000165495420005728/vtgn8k_may182020.htm*

*https://www.sec.gov/Archives/edgar/data/1411685/000165495420005728/ex99-1.htm*

21. On July 31st and August 4th, Maxim did two financings for Vistagen, each worth $12,500,00. Page 3 of each prospectus **intentionally omitted disclosing material facts** that the Phase 2 trials were rejected for publication by ClinicalTrials.gov after a limited quality control review. Page 3 of the prospectus stated;

> *"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B neuroactive nasal spray was significantly more effective than placebo in reducing public-speaking and social interaction anxiety on laboratory challenges of individuals with SAD within 10 to 15 minutes of self-administration".*

22. After Maxim funded Vistagen, analyst Jason McCarthy issued a price target of $6.00 on Vistagen. Maxim's banking division and analyst Jason McCarthy knew the Phase 2 trials were rejected for quality control issues. Maxim's funding and McCarthy's price target induced the Plaintiffs to buy and hold Vistagen stock. See Page 3, Vistagen's August 4th prospectus.

*https://www.sec.gov/Archives/edgar/data/1411685/000165495420008335/vtgn424b5_082020.htm*

23. On December 21st, Jeffereies and William Blair were joint book runners on a $100,000,000 financing for Vistagen. On Page 3 of the Prospectus, Vistagen again **intentionally omitted disclosing material facts.**

*"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B neuroactive nasal spray was significantly more effective than placebo in reducing public-speaking and social interaction anxiety on laboratory challenges of individuals with SAD within 10 to 15 minutes of self-administration".*

24. The above statement was a half-truth and fraudulent because it concealed the fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

25. The fact that Jefferies and William Blair would finance Vistagen with a $100 million loan inspired investor confidence. At the time of the funding, the plaintiffs did not know that the Jefferies and William Bair bankers knew that the prospectus contained material misstatements and omissions.

> *https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-announces-pricing-underwritten-public*

26. In the first quarter of 2021, William Blair and Jeffereies analysts and Andrew Tsai issued reports with $6 price targets on Vistagen's stock, which was trading at roughly $1.00.

27. On March 31st, 2021, page 3 of Vistagegan's annual report made this intentionally misleading statement and omitted disclosing that ClinicalTrials.gov rejected the Phase 2 trials.

> **In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz**, the creator of the Liebowitz Social Anxiety Scale (*LSAS*), as principal investigator, PH94B was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using patient-reported anxiety ratings on the Subjective Units of Distress Scale (*SUDS*) within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B.

28. The above statement was a half-truth and was fraudulent because it concealed the fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review. The bBiased Defendants Leibowitz and Monti appeared to have published the peer-reviewed paper. The Plaintiffs issued the peer-reviewed paper irrelevant to clinical trials and the FDA.

29. On May 26th, 2021, Vistagen filed a Form 8-K with a press release. Defendant Singh was quoted in the press release;

> *"The trial is an essential next step in our efforts to confirm the positive efficacy and safety results we have seen in all PH94B Phase 2 trials to date," stated Shawn Singh, Chief Executive Officer of VistaGen.*

30. The above statement was a half-truth and was fraudulent because it concealed the fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

Singh and the Director Defendants again made materially misleading statements and material omissions. Additionally, the Director Defendant was reckless and grossly negligent initiating a

Phase 3 trial; (a) during peak COVID-19; (b) knowing that the previous Phase 2 trials had quality control issues; and (c) using the same Phase 2 design.

31. On May 13th, 2020, Vistagen filed a Form 8-K with the SEC with an accompanying press release announcing that PALISADE-2 was initiated. Singh was quoted in the press release;

> *"Following the successful initiation of PALISADE-1 last quarter, we are excited to be further advancing our PALISADE Phase 3 Program this quarter with the initiation of PALISADE-2,* ***an essential next step in our efforts to further demonstrate the reduction in anxiety observed in PH94B's Phase 2 clinical trials to date,*** *" stated Shawn Singh, Chief Executive Officer of VistaGen. "If successful, these Phase 3 clinical trials, along with the other planned clinical trials in our PALISADE Phase 3 Program, are intended to support the potential submission of a New Drug Application to the FDA in 2023. Our team continues to make progress towards that core objective. PH94B has the potential to be a life-changing acute, as-needed treatment of anxiety for adults with SAD, similar to how a rescue inhaler is used on demand to acutely treat an asthma attack."*

32. The above statement was a half-truth and was fraudulent because it concealed the fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

33. Once again, Vistagen and the Director Defendants intentionally omitted discussing that both PH94 Phase 2 trials registered with ClinicalTrials.gov were rejected due to quality control concerns.

34. Vistagen registered an open-label study with ClinicalTrials.gov on August 26th, 2021, and terminated the trial in September 2022. ClinicalTrials.gov rejected publishing the trial's results for quality control reasons. Vistagen intentionally failed to announce that they had terminated the trial.

35. On October 14th, 2021, Vistagen filed a Form 8-K with the SEC with an attached press release;

> Singh was quoted as saying;
>
> *"There has been a significant shift in mental health since early last year. Emotional stress and impaired functioning as a result of anxiety-provoking stressors brought on by sudden changes in health, safety, economic and social circumstances, including the* ***diverse impacts of the COVID-19 pandemic, have directly or indirectly affected hundreds of millions of individuals around the world and may have led to a considerable increase in the prevalence of Adjustment Disorder with Anxiety****. We believe the impact of the*

> *pandemic on mental health will be long-term and varied across a wide range of anxiety disorders, and we are committed to becoming part of the solution for people who need to find help. Expanding on our ongoing efforts to address the alarming prevalence of Social Anxiety Disorder, the initiation of this exploratory Phase 2A study in Adjustment* Disorder *with Anxiety is an exciting next step toward our goal."*

36. The above statement was a half-truth and was fraudulent because it concealed that ClinicalTrials.gov rejected publishing the trial results after a quality control review. Vistagen correctly registered this Phase 2 trial on ClinicalTrials.gov and provided a link to the trial. **The trial concluded in 2022**, and Vistagen still has not posted the results as legally required. This Phase 2a trial purportedly was to help society with COVID-19 anxiety, and only 41 participants were enrolled, yet Vistagen still has not reported results.

37. The above statement was a half-truth and was fraudulent because it concealed the fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

38. On February 10th, 2022, and on June 23rd, Vistagen filed a Form 8-K Corporate Update with the SEC with an attached press release;

> *Both studies are structured in a manner substantially similar to the public speaking component of a statistically significant peer-reviewed published Phase 2 study of PH94B in which researchers observed a rapid reduction in anxiety in individuals (within 15 minutes) in response to a public speaking challenge (p=0.002).*

39. In both Corporate updates, Vistagen fraudulently concealed that ClinicalTrials rejected the Phase 2 trials for publication.

40. On April 4th, 2022, Vistagen resubmitted the Phase 2 trial to ClinicalTrials.gov, but it was once again rejected for quality control reasons. See;

> *https://clinicaltrials.gov/study/NCT01217788?a=2&tab=results*

**Results Submitted - Not Posted on ClinicalTrials.gov**

Results information has been submitted to ClinicalTrials.gov by the sponsor or investigator, but is not yet publicly available (or "posted") on ClinicalTrials.gov. The submitted information may not be available if it is pending Quality Control (QC) Review by the National Library of Medicine (NLM) or if issues identified during QC review are being addressed or corrected by the sponsor or investigator. NLM's limited QC review assesses for apparent errors, deficiencies, or inconsistencies. NLM staff do not verify the scientific validity or relevance of the submitted information.

Vistagen Resubmits the trial on April ,4th 2022 and it was rejected for Quality Control Reasons Again!

| Recruitment Status | Actual Primary Completion Date | Actual Study Completion Date |
|---|---|---|
| Completed | 2011-02 | 2011-03 |

| Submission Cycle | Results Submitted to ClinicalTrials.gov | Results Returned After Quality Control Review |
|---|---|---|
| 1 | 2015-12-29 | 2016-02-01 |
| 2 | 2019-08-27<br>(Canceled on 2019-08-27)<br>2022-04-04 | 2022-05-02 |

41. On June 6th, 2022, Vistagen filed its annual report. On page 8, the report contained this following paragraph;

> In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz, the innovator of the "Liebowitz Social Anxiety Scale (*LSAS*), as principal investigator, PH94B was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using patient-reported anxiety ratings on the Subjective Units of Distress Scale (*SUDS*) within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B."

42. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

See Page 8,

*https://www.sec.gov/Archives/edgar/data/1411685/000185173422000349/vtgn20220331_10k.htm*

43. On June 9th, 2022, Vistagen filed an 8-K for its updated Corporate Presentation. Pages 19-22 were dedicated to the Phase 2 PH94B SAD trials. Vistagen fraudulently concealed that the Phase 2 trials were rejected for publication by ClinicalTrials.gov. See;

*https://www.sec.gov/Archives/edgar/data/1411685/000185173422000316/ex_385260.htm*

44. On June 23rd, 2022, Vistagen filed a Corporate Update with the SEC with an attached press release. Vistagen intentionally concealed disclosing that the Phase 2 trials failed quality control reviews. The press release stated;

> "Both Phase 3 studies are structured in a manner substantially similar to the public speaking component of a peer-reviewed Phase 2 study of PH94B in which researchers observed a statistically significant, rapid reduction in anxiety in individuals (within 15 minutes) in response to a public speaking challenge (p=0.002)."

45. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

> *https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-reports-fiscal-year-2022-financial-results*

46. On July 22nd, 2022, Vistagen filed a Form 8-K with the SEC with an attached press release. Once again, Vistagen intentionally concealed disclosing that the Phase 2 trials failed quality control reviews. Singh was quoted in the press release;

> *"While the results of PALISADE-1 are not consistent with prior positive results from Phase 2 trials of PH94B in social anxiety disorder, we remain committed to transforming the treatment landscape for those living with anxiety, depression, and other central nervous system disorders," said Shawn Singh, Chief Executive Officer of VistaGen."*

47. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

48. On January 10th, 2023, Vistagen filed a Form 8-K with the SEC with an attached press release titled;

> Vistagen Announces Completion of Last Patient, Last Visit in Phase 2 Clinical Trial of PH94B for the Treatment of Adjustment Disorder with Anxiety

The heading in the press release stated;

> ***"Topline results of the exploratory Phase 2 clinical study anticipated in Q1 2023"***

49. As previously stated, the Director Defendants and Singh did not release the top-line results of the trial in Q1 2023 and have not submitted them to ClinicalTrials.gov. Indeed, they have gone silent on this small 40-participant trial.

50. On August 7th, 2023, at 9:30 AM, Jefferies started dumping millions of dollars of Vistagen's shares, and the stock price immediately dropped to $25.00. Jefferies knew the press release was misleading, but it continued to dump shares.

On August 8th, 2023, Vistagen issued another prospectus, which informed investors that it could sell the balance of the 75 million dollars without issuing any further prospectuses. The prospectus further disclosed that;

> *"Through August 7, 2023, we have sold 1,373,318 shares of our common stock for aggregate gross proceeds of approximately **$16.1 million** in accordance with the Sale Agreement under the Prospectus".*

51. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

52. Vistagen continued to dump another $20 million of shares between August 8th and August 10th, 2023, further driving the stock price down to the $7.00 and $8.00 range (approximately $0.25 adjusted for the 1/30 reverse split). The additional 20 million dollar figure is based on [1]Vistagen's 2024 annual report, stating that **35.9 million dollars** were sold in the pump and dump via their Open Market Sales, which is the ATM. This statement can be found on page 89 of the audited annual report under the section called Financing Activities;

See; *https://www.vistagen.com/node/13656/html*

> In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz, the innovator of the Liebowitz Social Anxiety Scale (*LSAS*), as principal investigator, PH94B was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using patient-reported anxiety ratings on the Subjective Units of Distress Scale (*SUDS*) within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B.

53. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

54. Vistagen continued its intentional deceptive pattern of failing to disclose that ClinicalTrials.gov rejected both PH94B trials after a quality control review.

---

[1] *See*; https://www.sec.gov/ix?doc=/Archives/edgar/data/0001411685/000141168524000022/vtgn-20240331.htm

55. On August 11th, 2022, Vistagen filed a Form 8-K with the SEC with an attached press release; the press release contained the following statement;

> *"Given these data, along with positive indications from the prior Phase 2 studies, the Company believes that continued Phase 3 clinical development of PH94B as a potential treatment for SAD is appropriate."*

56. Vistagen also announced that it was pausing PALISADE-2 and hiring a team of biostatisticians to evaluate the data and recommend a course of action.

57. On September 22nd, 2022, Vistagen filed a Form 8-K with the SEC with an attached press release, stating that they would proceed with Palisade-2. Singh was quoted in the press release;

> *"We are encouraged by the recommendation to continue PALISADE-2 to full enrollment as originally planned," said Shawn Singh, Chief Executive Officer of Vistagen.*

58. Vistagen did not finish PALISADE-2. Six months after this announcement, Vistagen terminated the trial and used the interim results as the basis for an illegal pump-and-dump.

59. Vistagen did not have the funds to finish the PALISADE-2 trial. McPartland informed both Plaintiffs that Vistagen did not have the money to finish the trial. McPartland told Cesario that Vistagen was desperately trying to raise funds, and according to McPartland, they could not.

60. On July 28th, 2022, Vistagen filed a Corporate update with the SEC with an attached press release. The release referenced the Pilot Phase 3 trial and intentionally failed to disclose that ClinicalTrials.gov rejected it for publication due to quality control failures. See;

*https://clinicaltrials.gov/study/NCT02622958?tab=results*

## Results Overview

### Results Submitted - Not Posted on ClinicalTrials.gov

Results information has been submitted to ClinicalTrials.gov by the sponsor or investigator, but is not yet publicly available (or "posted") on ClinicalTrials.gov. The submitted information may not be available if it is pending Quality Control (QC) Review by the National Library of Medicine (NLM) or if issues identified during QC review are being addressed or corrected by the sponsor or investigator. NLM's limited QC review assesses for apparent errors, deficiencies, or inconsistencies. NLM staff do not verify the scientific validity or relevance of the submitted information.

| Recruitment Status | Actual Primary Completion Date | Actual Study Completion Date |
|---|---|---|
| Completed | 2014-10 | 2015-03 |

| Submission Cycle | Results Submitted to ClinicalTrials.gov | Results Returned After Quality Control Review |
|---|---|---|
| 1 | 2015-12-29 | 2016-02-01 |
| 2 | 2022-04-04 | 2022-05-02 |

**AUGUST 7th, 2023 PUMP AND DUMP**

61. Since Vistagen could not raise enough capital to finish the PALISADE-2 trial, Singh and the Director Defendants schemed a plan to release the interim results as a successful Phase 3 trial. On August 7th, 2023, Vistagen filed a Form 8-K with a misleading press release. The press release was titled;

> **Vistagen Announces Positive Top-Line Results from Phase 3 PALISADE-2 Trial of Fasedienol (PH94B) Nasal Spray in Social Anxiety Disorder**
>
> ***<u>First positive U.S. Phase 3</u> study of an investigational therapy for social anxiety disorder in over 15 years***

62. The heading and subheading of the press release were so misleading that they caused **Vistagen's stock price to explode from $1.83 to a high of $71** before 9:30 AM. Vistagen's daily dollar volume of shares traded saw a once-in-a-lifetime upsurge from **$250,000 on the previous day's trading to $1 billion!** Vistagen's daily number of shares also exploded, from **146,000 on Friday, August 4th, to 53,900,000 million** on Monday, August 7th, 2023, which was approximately a 400-fold increase {emphasis added}. Adjusted for the 2023 1/30 reverse split, $1.83 was the equivalent of $0.06 a share, and $71 was the equivalent of $2.36.

63. Vistagen intentionally used misleading information in the press to dupe the public into thinking the PALISADE-2 trial was a successful Phase 3 trial. Singh knew that trading algorithms and early morning stock market traders would react quickly to words and phrases

such as positive topline results from Phase 3 trials and the first positive U.S. Phase 3 study. The trial was neither a Phase 3 trial nor a successful trial.

Once again, Singh was quoted in the press release;

*"We are thrilled that these compelling top-line results from the Phase 3 PALISADE-2 trial confirm what was seen in the* ***Phase 2 studies in social anxiety disorder and highlight the potential for fasedienol,*** *with its novel and unique proposed mechanism of action, to transform what is possible for more than 25 million people living with social anxiety in the U.S. and millions more affected worldwide," stated Shawn Singh, Chief Executive Officer of Vistagen.*

64. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

65. Singh, the Director Defendants, and Jefferies schemed the pump and dump in advance. To accomplish the pump and dump, Vistagen needed to do the following: (i) do a 1/30 reverse split, (ii) issue a prospectus to sell shares, (iii) issue a fraudulent press release announcing Vistagen had a successful Phase 3 trial, (iv) instruct Jefferies to start dumping Vistagen's shares on the news.

66. On August 7th, 2023, at 9:30 AM, Jefferies started dumping millions of dollars of Vistagen's shares, and the stock price immediately dropped to $25.00. Jefferies knew the press release was misleading, but it continued to dump shares.

67. On August 8th, 2023, Vistagen issued another prospectus, which informed investors that it could sell the balance of the 75 million dollars without issuing any further prospectuses. The prospectus further disclosed that;

*"Through August 7, 2023, we have sold 1,373,318 shares of our common stock for aggregate gross proceeds of approximately* ***$16.1 million*** *in accordance with the Sale Agreement under the Prospectus".*

68. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

69. Vistagen continued to dump another $20 million of shares between August 8th and August 10th, 2023, further driving the stock price down to the $7.00 and $8.00 range (approximately $0.25 adjusted for the 1/30 reverse split). The 20 million dollar figure is based on

70. Vistagen's 2024 annual report, stating that **35.9 million dollars** were 0 through Vistagen's pump and dump via their Open Market Sales, which is the ATM. This statement can be found on page 89 of the audited annual report under the section called Financing Activities.

See; *https://www.vistagen.com/node/13656/html*

71. The S-3 Registration Statement Vistagen filed to sell shares into the pump-and-dump contained this false and misleading statement, once again omitting the material fact that the Phase 2 trials were rejected for quality control reasons.

> The proposed MOA of PH94B is fundamentally differentiated from all currently approved anti-anxiety medications, including the three antidepressants approved by the FDA for the treatment of SAD, as well as all benzodiazepines and beta blockers, which, although not FDA-approved for treatment of SAD, are prescribed for treatment of SAD on an off-label basis. Pre-clinical and **Phase 2 clinical data to date suggest that PH94B has the potential to achieve rapid-onset anti-anxiety effects** without systemic uptake or transport into the brain, significantly reducing the risk of side effects and other safety concerns such as potential abuse, misuse and addiction associated with certain other pharmaceuticals that act directly on the CNS and are sometimes prescribed for anxiety disorders.

72. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

73. Moreover, the Top-Line results were only from **an interim trial.** Vistagen self-terminated the trial without fully enrolling in it. Below are examples of completed Phase 3 TopLine results. The Plaintiffs cannot find an example of Topline results from a self-terminated Phase 3 trial.

- *https://www.pfizer.com/news/press-release/press-release-detail/pfizer-announces-positive-topline-results-phase-3-study*
- *https://news.abbvie.com/2024-09-26-AbbVie-Announces-Positive-Topline-Results-from-Phase-3-TEMPO-1-Trial-Evaluating-Tavapadon-as-a-Monotherapy-for-Parkinsons-Disease*
- *https://www.novocure.com/novocure-announces-positive-topline-results-from-phase-3-panova-3-clinical-trial-of-tumor-treating-fields-ttfields-therapy-for-pancreatic-cancer/*
- *https://ir.lenz-tx.com/news-events/press-releases/detail/11/lenz-therapeutics-announces-positive-topline-data-from-phase-3-clarity-presbyopia-trials*
- *https://www.vistagen.com/news-releases/news-release-details/vistagen-announces-topline-results-PALISADE-1-phase-3-clinical*

74. The pump and dump was so effective in fooling investors that even professional fund managers were fooled.

**Commodore Capital Was Duped $30 Million Dollars**

75. Vistagen, CEO Singh, and the Board knew immediately that investors misunderstood the news. Vistagen's fraudulent and misleading press release fooled not only average investors but also sophisticated investors. An example is the billion-dollar hedge fund Commodore Capital (herein "Commodore").

76. On August 7th, 2023, **Commodore immediately bought into the Vistagen's pump and dump scheme based on the misleading press release. Commodore purchased 1,575,000 shares at an average price of $23.15 for $36,461,250, or 19.74 percent of Vistagen's outstanding stock.** The Plaintiffs searched for Commodore's past 13D filings with the SEC. They could not find a single instance where Commodore purchased a 19% stake in any company, let alone risked allocating over 5% of its entire capital in one stock. Generally, fund managers do not want to have a 5% or more stake in a public company because of the increased reporting requirements. According to Commodore's filings with the SEC, it appears Commodore sold those sold those shares at a staggering loss before the quarter ended, but purchased a new offering of Vistagen's stock through Jefferies.

From [2]Yahoo financial news;

> On August 7, 2023, COMMODORE CAPITAL LP (Trades, Portfolio) purchased 1,575,000 shares of Vistagen Therapeutics Inc at a price of $23.15 per share. This new holding now represents 5.26% of the firm's portfolio and 19.74% of the total shares of Vistagen Therapeutics Inc. The transaction is significant as it indicates the firm's confidence in the potential growth and profitability of Vistagen Therapeutics Inc.s reported On August 7, 2023, Commodore Capital LP purchased **1,575,000** shares of Vistagen Therapeutics Inc at a price of $23.15 per share. This new holding now represents 5.26% of the firm's portfolio and **19.74%** of the total shares of Vistagen Therapeutics Inc. The transaction is significant as it indicates the firm's confidence in the potential growth and profitability of Vistagen Therapeutics Inc.

Vistagen's Rewards Jefferies With A Sweetheart Deal For Partnering In The Pump and Dump

77. After being duped by Vistagen's pump and dump, Commodore owned a sizable controlling interest in Vistagen that it did not want. Jefferies and Vistagen made it up to Commodore by allowing Commodore to participate in a sweetheart deal for Jefferies's clients. To recap, Jefferies and William Blair were co-book runners on a 100,000,000 dollar financing in December of 2000 based on Vistagen's based a prospectus that violated securities laws due to

---

[2] *See, https://finance.yahoo.com/news/commodore-capital-lp-acquires-stake-143138185.html*

misrepresentations and material ommissions. **The 2020 funding was done at [3]27.60** per share with NO warrants attached. The funding was also done before Vistagen falsely claimed to have conducted the first successful Phase 3 for social anxiety disorder.

78. As previously detailed, before the ink could dry on the Vistagen/Jefferies illegal pump and dump scheme, they were preparing to sell another $100,000,000 of Vistagen's equity through a [4]prospectus filed with the SEC on October 3rd 2023. While cleverly packaged, t**he funding allowed Jefferies to sell common stock to institutions at $5.38 a share with warrants. The first pre-funded warrant was priced at $0.01, the second pre-funded warrant was priced at $5.38, and the third warrant was priced at $8.88.** The offering was packaged this way to (a) confuse the public and (b) to keep the institutions from owning less than 5% of the common stock for reporting purposes. As [5]Commodore's 13D filing with the SEC proves, Commodore participated in this offering. This sweetheart deal was only offered to institutional clients and not to the general public, whom Jefferies and Vistagem made bagholders through the illegal pump and dump scheme.

79. Right on cue, the three firms that have benefited, Jefferies, William Blair, and Stiefel's analyst issue price targets between $12 and $15 to pump the stock price higher. Pumping the stock higher allowed liquidity for the institutions that bought the deal to sell their stock and have tremendous risk-free upside potential if Vistagen falsely announces another false and misleading press release.

80. Vistagen followed up the pump and dump with a prospectus to sell up to $100 million in equity from Vistagen. The prospectus once again referenced the Phase 2 trial and told another half-truth. Page S-5

https://www.sec.gov/Archives/edgar/data/1411685/000143774923027529/vtgn20230921_424b5.htm

---

[3] Price has been adjusted for the 1/30 reverse split of Vistagen's common stock in 2023

[4] See;
https://www.sec.gov/Archives/edgar/data/1411685/000143774923027529/vtgn20230921_424b5.htm

[5] *See; Commodore's 13D filing*

*https://www.streetinsider.com/SEC+Filings/Form+4+Vistagen+Therapeutics%2C+For%3A+Oct+04+Filed+by%3A+COMMODORE+CAPITAL+LP/22249426.html*

> "which was inconsistent with positive placebo-controlled Phase 2 studies and the statistically significant results of our PALISADE-2 Phase 3 clinical trial, may have been due to the extraordinary multifaceted impact of the acute phase of the COVID-19 pandemic, which introduced into the typical study dynamic significant and unprecedented logistical challenges and systemic variability"

81. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

82. On June 13th, 2024, Vistagen finally submitted the results of the PALISADE-1, PALISADE-2, and PALISADE open-label trials to ClinicalTrials.gov. However, Vistagen did not submit the results for the COVID-19 Phase 2 anxiety disorder trial.

83. On August 13th, 2024, ClinicalTrials.gov returned the PALISADE-1, PALISADE-2, and PALISADE open-label trials UNPUBLISHED due to quality control issues.

PALISADE-1
*https://clinicaltrials.gov/study/NCT04754802?cond=Social%20Anxiety%20Disease&term=PH94B&rank=5&page=1&limit=10&tab=history*

PALISADE-2 Terminated
*https://clinicaltrials.gov/study/NCT05011396?cond=Social%20Anxiety%20Disease&term=PH94B&rank=4&page=1&limit=10&tab=history&a=6#version-content-panel*

PALISADE Open Label Terminated
*https://clinicaltrials.gov/study/NCT05030350?cond=Social%20Anxiety%20Disease&term=PH94B&limit=10&intr=open%20label&rank=1&tab=history*

**** ClinicalTrials.gov rejected ALL five PH94B clinical trials after a quality control review. Vistagen, Singh, and the other Director Defendants failed to disclose these material facts to the investing public and Vistagen stakeholders.**

84. Plaintiff Cesario sent the Vistagen Directors a letter (EXHIBIT A) dated October 2nd, 2023, accusing Vistagen of committing fraud and violating security laws by failing to disclose that ClinicalTrials.gov rejected publishing the PH94B trials after they did a limited quality control review.

85. On October 3rd, 2023, Vistagen filed a prospectus with the SEC to raise another $100 million through an equity sale. Page S-5 made this statement *"We believe the unexpected outcome in PALISADE-1, which was inconsistent with positive placebo-controlled Phase 2*

*studies and the statistically significant results of our PALISADE-2 Phase 3 clinical trial, may have been due to the extraordinary multifaceted impact of the acute phase of the COVID-19 pandemic,"*

86. Defendants McPartland and Singh stated that they took every precaution for COVID-19 before beginning the trial. However, the statement in the failed prospectus and statements made to Cesario after PALISADE-1 indicate that Vistagen did not take the proper precautions for COVID-19 and was reckless and grossly negligent beginning the trial. Moreover, again, Vistagen told a half-truth and committed fraud by failing to disclose that ClinicalTrials.gov rejected publishing the trials due to quality control issues.

**<u>Vistagen Sends a Response Letter To Cesario</u>**

87. On November 23rd, 2023, Attorney Colleen Smith from Latham & Watkins responded. Latham and Watkins was engaged as Vistagen's outside law firm, handling SEC matters. (**See, EXHIBIT - B Vistagen's response letter).** Paragraph 1 confirms that the Director Defendants read the Plaintiffs' letters;

> We represent the Board of Directors (the "Board") of Vistagen Therapeutics, Inc. ("Vistagen" or the "Company") and the Company in connection with the September 6, 2023 and October 2, 2023 shareholder letters sent by you to the Company (the "Letters"). In correspondence dated September 25, 2023, and October 16, 2023, **the Board acknowledged receipt of your Letters...**

Vistagen's Response Letter either intentionally or mistakenly misstates facts and never addresses that Vistagen intentionally concealed disclosing that ClinicalTrials.gov rejected publishing the Phase 2 trial of PH94B for quality control reasons. Vistagen also failed to explain why they didn't disclose that;

- Vistagen submitted the Pilot Phase 3 trial twice, including in 2022, and was rejected twice.
- Vistagen submitted the Phase 2 trial 3 times, including in 2022, and it was rejected twice.

88. Vistagen's Response Letter does not address why Vistagen has not submitted the results of its COVID-19 anxiety disorder study to clinicaltrials.gov since the trial concluded in 2022 and it is now 2025.

Vistagen's letter falsely stated that PALISADE-2 was a Phase 3 trial and directed the Plaintiff to this paragraph.

"As an initial matter, the FDA allows wide latitude in clinical trial design, and a **Phase 3 trial should include sufficient numbers of study participants** "to demonstrate whether or not a product offers a treatment benefit to a specific population." See, e.g., "Step 3. Clinical Research" on the FDA's website. **FDA guidelines contemplate that an interim analysis may be conducted "prior to formal completion of a trial.**" See "Guidance for Industry, E9 Statistical Principles for Clinical Trials" at p. 25 (FDA, September 1998). Early termination of clinical trials is not uncommon or forbidden, whether based on reasons of safety, efficacy, futility, or other concerns. **And a trial's completion date is when the "final subject was examined or received an intervention for the purposes of final collection of data for the primary outcome, whether the clinical trial concluded according to the pre-specified protocol or was terminated**." 42 C.F.R. § 11.10(a)."

89. The FDA rules specifically state that "*a Phase 3 trial should include sufficient numbers of study participants*". Vistagen terminated the PALISADE-2 trial without sufficient study participants per the design they presented to the FDA. PALISADE-2 was a Phase-2 trial. Further, the half enrolled terminated PALISADE-2 trial was rejected for publication by clinicaltrials.gov after a quality control review because of Vistagen's negligence.

90. FDA rules state that trials must adhere to a design protocol. Vistagen chose to terminate the trial; worse, Vistagen terminated PALISADE-2 because it did not have the funds to complete it. See; https://www.fda.gov/patients/drug-development-process/step-3-clinical-research

**Allegations Against Vistagen's Directors and Officers**

CEO Singh and The Board

91. The Director Defendants, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, and Curley, were signatories on Vistagen's 2021 annual report filed with the SEC on June 29th, 2021. Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, and Curley knew that the 2020 annual report contained material misleading statements and material omissions.

92. According to McPartland, the Defendant Directors Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, and Curley reviewed and approved every press release, SEC filing, and corporate presentation that contained the material misleading statements and omissions. Each director's biographies show they are experienced in public markets and biotech companies so that they would be familiar with ClinicalTrials.gov.

93. Vistagen's Board of Directors, whether independent or active in the day-to-day business, has a responsibility to the stakeholders. As such, they are accountable for their fraudulent acts, executing two illegal pump and dumps, signing off on annual reports they knew were dishonest, and omitting material facts. The Board was negligent for failing to file Form 8-K informing the public and stakeholders that social anxiety studies PALISADE 1 and 2 trials and open-label study were rejected for publication by clinicaltrials.gov after a limited quality control review. The Board knew that the Palidade-2 trial was terminated because they didn't have proper control over the budget.

- Singh, Saxe, Gin, Snodgrass, Cunningham, and Dotson knowingly approved and were signatories Vistagen's noncompliant audited annual reports for the years ending 2019 and 2020. **The report was noncompliant due to material misstatements and omissions regarding PH94B's Phase 2 trials.**
- Singh, Saxe, Gin, Snodgrass, Cunningham, and Curley, knowingly approved Vistagen's noncompliant audited annual reports for the years ending 2021. **The report was noncompliant due to material misstatements and omissions regarding PH94B's Phase 2 trials.**
- Singh, Saxe, Gin, Snodgrass, Cunningham, Curley, Rotundo, and Fitzpatrick, approved and were signatories Vistagen's noncompliant audited annual reports for the years ending 2022 and 2023. **The report was noncompliant due to material misstatements and omissions regarding PH94B's Phase 2 trials.**
- Singh, Saxe, Gin, Snodgrass, Cunningham, JoAnne Curley, Rotundo, and Fitzpatrick knowingly signed off on Vistagen's noncompliant audited annual reports for the year ending 2024. **The report was noncompliant due to material misstatements and omissions regarding PH94B's Phase 3 trials.**

94. Mark McPartland and Mark Flather are executives at Vistage. Their knowledge made them aware that the public disclosures were concealing material facts. They were legally obligated to report the fraud. By their silence, they active participants in common law fraud claims, breached their fiduciary duties, aided and abetted board members in breaching their fiduciary duties, committed negligent misrepresentation, and violated California Corporation Codes § 25400 and § 25401. Before PALISADE-1 failed, McPartland was constantly on the

phone with investors, giving investors, including Cesario, glowing reports on how great the previous Phase 2 and Pilot Phase 3 trials were on PH94B while deliberately, maliciously, and knowingly omitting the material facts known

McPartland and Cesario communicated frequently. McPartland always embellished PH94B's Phase 2 trials while concealing that Clinica;lTrials.gov rejected publishing the trial for quality control deficiencies. McPartland induced Cesario to convert warrants into common stock and induced Cesario to hold the stock.

95. By the foregoing, Vistagen's Director Defendants (i) violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (ii) committed common law fraud (iii) were reckless and grossly negligent beginning the Phase 3 trial during pek COVID-19 while concealing that ClinmicalTrials rejected the Phase 3 trials for publication, (iv) committed constructive fraud, committed Intentional Misrepresentation and Deciet, and (v) violated their fiduciary duties.

96. By the foregoing, Vistagen's executive Defendants, McPartland and Flather (i) were secondary actors and violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (ii) committed common law fraud (iii) aided and abetted the Director Defendants in fraud, (iv) committed constructive fraud, committed Intentional Misrepresentation and Deciet, and (v) violated their fiduciary duties.

**<u>Allegations Against Dr. Ralph Snodgrass, Mark A. Smith, and Louis Monti</u>**

97. <u>Dr. Ralph Snodgrass</u> was Vistagen's founder and President until he was terminated by Vistagen in 2022. According to McPartland, Snodgrass was abruptly terminated for sexual harassment and deviancy. Before the termination of Snodgrass, he was a key actor in Vistagen's first pump and dump scheme, violated federal and state securities laws due to concealing material facts that PH94B Phase 2 and Pilot Phase 3 trials were rejected for publication by clinicaltrials.gov, breached his fiduciary duties, and violated California Corporation Codes § 25400 and § 25401.

98. <u>Mark A. Smith, M.D., Ph.D</u>, was formerly Vistagen's Chief Medical Officer from 2016 to 2022. Mcpartland stated Smith was terminated for his failed Phase -2 AV-101 trial design. Before the termination of Snodgrass, he was a key actor in Vistagen's first pump and dump scheme,

violated federal and state securities laws due to concealing material facts that PH94B Phase 2 and and Pilot Phase 3 trials were rejected for publication by clinicaltrials.gov, breached his fiduciary duties, and violated California Corporation Codes § 25400 and § 25401.

99. Louis Monti M.D. PHD serves as Vistagen's Senior Vice President of Translational Neuroscience. Monti was one of the people who signed off on the questionable peer-reviewed PH94B papers. Like Smith and Snodgrass, Monti is a doctor familiar with the NLM and the website clinicaltrials.gov. Monti, in both dump schemes, as he knew the COVID-19 pump and dump scheme concealed material facts, Before the termination of Snodgrass, he was a key actor in Vistagen's both pump and dump scheme, violated federal and state securities laws due to concealing material facts that PH94B Phase 2 and and Pilot Phase 3 trials were rejected for publication by clinicaltrials.gov, breached his fiduciary duties, and violated California Corporation Codes § 25400 and § 25401.

**Allegations Against Withum**

100. Specifically, Withum refused to see or even investigate the fraudulent nature of Vistagen's disclosures in quarterly and annual reports, prospectus filings, proxy filings, and corporate updates relating to (1) the PH94B trials described herein being rejected for publication by clinicaltrials.gov; (2) Vistagen and its Directors lying in SEC disclosures, making definitive statements that they were going to resume PALISADE-2 to complete enrollment; (3) Vistagen and its Directors making misleading statements and lying in SEC disclosures as to why they terminated PALISADE-2; and (4) Vistagen and its Directors perpetrating a massive pump and dump beginning on August 7th 2023, issuing a false and misleading press release which defrauded duped purchasers of Vistagen stock hundreds of millions to 1 billion dollars. Withum intentionally and recklessly violated the standards and rules set forth by the PCAOB, the SEC, the PSLRA Act passed by Congress, and California fraud statutes. Further, Withum aided and abetted Vistagen's Directors and executives in breaching their fiduciary duties, committing fraud, violating the Exchange Act, and violating the California Corporations Codes § 25400 and § 25401.

101. Withum's standing silent on Vistagen's quarterly reports, misleading SEC disclosures, and issuing clean audit opinions propped up Vistagen's house of cards, causing enormous harm to Plaintiffs and investors.

THE ROLE OF THE INDEPENDENT EXTERNAL AUDITOR

102. Withum's duty when discovering fraud and/or violations of security laws, whether done mistakenly or intentionally, is straightforward. Withum had a duty to inform Vistagen's audit team and issue a do not rely on the previous noncompliant financial reports, at which point Vistagen had a duty to correct the record. If Vistage failed to correct the mistakes, Withum had a duty to resign and cite the reasons. In the case of securities fraud, they would report the fraud to the SEC and report it under PCAOB rules.

103. Withum either negligently or intentionally refused to see the red flags and investigate the repeated fraud and violations of security laws in Vistagen's disclosures, including press releases, quarterly and annual reports, prospectus filings, proxy filings, and corporate updates relating to PH94B.

Withum should have known that.

(1) the PH94B trials described herein being rejected for publication by clinicaltrials.gov;

(2) Vistagen and its Directors lying in SEC disclosures, making definitive statements that they were going to resume PALISADE-2 to complete enrollment;

(3) Vistagen and its Directors making misleading statements and lying in SEC disclosures as to why they terminated PALISADE-2;

(4) Vistagen and its Directors perpetrated a massive pump and dump beginning on August 7th, 2023, by issuing a false and misleading press release, which defrauded duped purchasers of Vistagen stock hundreds of millions to 1 billion dollars.119. Because Vistagen's management prepares and is responsible for a company's financial statements and disclosure, Withum should have had a high degree of skepticism regarding the claims Vistagen was making regarding PH94B, including raising questions regarding the **reliability of those financial statements**, which may reflect on the competence and stewardship of management or affect management's compensation. Public companies

engage independent certified public accountants (herein "auditors") to address the credibility of a company's financial statements. Auditors, in turn, are required to review quarterly filings with the SEC and issue qualified opinions on a company's annual report. Independent certified public auditors opine on whether a company's financial statements are prepared in accordance with GAAP, the rules of the American Institute of Certified Public Accountants (herein"AICPA") and the PCAOB, as well as the laws SEC and the PSLRA that was passed by Congress in 1994. Part of the financial statements include what is referred to as Notes. Notes include checking the accuracy of disclosures to the public, including but not limited to disclosures in quarterly reports, press releases, prospectuses, purchase agreements, license agreements, etc. That is why publicly traded companies must obtain financial statement audits and provide those audited financial statements to the investing public. An audit is conducted for the benefit of the company's stakeholders. An independent auditor adds credibility to financial statements by **verifying the numbers and disclosures.** The objective of an audit is to provide the users of the financial statements with reasonable assurance that the financial statements are presented correctly. Audit reports contain the words reasonable assurance.

104. Financial statements include notes, reviews of quarterly filings, material agreements, licenses, and the like. Auditors review budgeting forecasts for twelve months out and give audit opinions in the annual report. Auditors also review public disclosures, including 8-K filings, press releases, etc. They are classified under financial notes. Vistagen's internal accounting department handles the everyday booking tasks every business has. While Vistagen had expenses that needed to be accounted for, they did not have any sales revenue, nor was sales revenue anticipated for years. The AV-101 depression drug trial that failed was paid for and administered by NIH. What Vistagen did have, especially after AV-101 failed, was PH94B.

105. While investors shouldn't expect auditors to be bloodhounds, auditors must maintain high skepticism when performing audits. The red flags regarding Vistagen's PH94B disclosures should have been evident to an independent auditor having just a modicum of skepticism. Vistagen's cash was down to $6.4 million on December 31st. 2018, and they were burning over $4 million monthly. Vistagen's capital needs were met by constantly selling stock to the investing public.

106. Withum's ten-year-long engagement as Vistagen's auditor gave Withum plenty of time to understand Vistagen's business. Vistagen did not have revenue. **Vistagen's first press release involving PH94B should have raised red flags. PH94B became so crucial to Vistagen that the company's survival depended on it.** The goal and objective of the audit is to provide the users of the financial statements with reasonable assurance that the financial statements are presented correctly. Audit reports contain the words reasonable assurance.

107. PCAOB rules required Withum to understand Vistagen's business, including identifying and responding to risks of material misstatements and obtaining sufficient, appropriate audit evidence that public and SEC disclosures were accurate. Withum's website states that they are experts in the Life Science Pharmaceutical Industry. Therefore, Withum's audit team should have known about the National Library of Medicine website, ClinicalTrials.gov.

> *https://pcaobus.org/oversight/standards/archived-standards/pre-reorganized-auditing-standards-interpretations/details/AU316_13#:~:text=Because%20of%20the%20characteristics%20of,critical%20assessment%20of%20audit%20evidence.*
>
> Due professional care requires the auditor to exercise professional skepticism. See section 230, *Due Professional Care in the Performance of Work*, paragraphs .07 through .09. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. **The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggest that a material misstatement due to fraud has occurred.** In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

108. PCAOB Standards note, "Risks of material misstatement at the financial statement level relate pervasively to the financial statements and potentially affect many assertions. Risks of

material misstatement at the financial statement level may be especially relevant to the auditor's consideration of the risk of material misstatement due to fraud. For example, an ineffective control environment, a lack of sufficient capital to continue operations, and declining conditions affecting the company's industry might create pressures or opportunities for management to manipulate the financial statements, leading to a higher risk of material misstatement." *See*;

https://pcaobus.org/oversight/standards/archived-standards/pre-reorganized-auditing-standards-interpretations/details/auditing-standard-no-8_




**<u>Withum Knew Or Should Have Known About Cesario's Letter Detailing The Fraud and Violations Of Federal and State Securities laws</u>**

109. Vistagen's investors understood that after AV-101's Phase 2 failure, Vistagen needed PH94B to be successful. Investing in small-cap biotechs is risky. Investors depend on honest disclosures in press releases and SEC filings. At times after the AV-101 failure, Vistagen's cash position dropped to as low as a little over $1 million, but the Plaintiffs believed in the company based on Vistagen's disclosures. From the beginning of Vistagen's acquisition of PH94B, because of Vistagen's perilous financial situation, Withum should have been aware of the glaring

red flags in Vistagen's press releases and SEC filings, which included press releases, quarterly and annual reports, corporate updates, and prospectuses. Red flags include;

- Vistagen concealed the Phase 2 and Pilot Phase 3 trials, which were rejected for publication on clinicaltrials.gov after ClinicalTrials.gov conducted a limited quality control review.
- Failing to disclose that Dr. Michael R. Liebowitz stood to benefit from PH94B financially.
- Vistagen's conflict of interest is having Dr. Michael R. Liebowitz, the Primary Investigator after the previous two trials he conducted on PH94B failed clincaltrials.gov quality review.
- Linking Dr. Michael R. Liebowitz's purported peer-reviewed paper on the Phase 2 PH94B trial, knowing that the trial was rejected for publication.
- Dr. Michael R. Liebowitz took four years to complete the simple 88-subject, one-dose Phase 2 trial. Dr. Michael R. Liebowitz took 3 years after the Phase 2 trial to submit the results to clinicaltrials.gov
- Vistagen's intentionally misleading April Fools Day, April 1st, 2019 press release that falsely stated that "
- Citing Dr. Michael R. Liebowitz's peer-reviewed publications without disclosing the and Pilot Phase 3 study was rejected for publication by clinicaltrials.gov or linking to the study results submitted to clinicaltrials.gov.
- Vistagen bald-faced lies that they were going to resume PALISADE-2 to complete enrollment and have Topline data in the first half of 2023, which can be found in the title of the September 8th, 2022, press release and quarterly report filed with the SEC on November 10th, 2022.
- Vistagen did not have the funds to complete PALISADE-2
- The Phase 2 trial for Adjustment Disorder was completed in December of 2022, and Vistagen has still not submitted the results to clinicaltrials.gov.
- Vistagen did not have any new findings. Vistagen issued a false and misleading press release stating that on April 1st. 2019, "New Findings Presented at the 2019 Anxiety and Depression Association of America Annual Conference."

110. Withum should have recognized that Vistagen's positioning of PH94B as a COVID-19-related therapy was a major red flag, primarily because Vistagen used the COVID-19

angle to raise desperately needed capital. As stated above, on May 20th, 2020, Vistagen filed an 8-K with the SEC and issued the following press release with the title;

***VistaGen Submits PH94B Phase 2A Study Protocol for Treatment of Adjustment Disorder with Anxiety Related to the COVID-19 Pandemic through U.S. FDA's Coronavirus Treatment Acceleration Program (CTAP)***

*https://www.vistagen.com/news-releases/news-release-details/vistagen-submits-ph94b-phase-2a-study-protocol-treatment*

111. At the time of the press release, Vistagen was heading towards potential bankruptcy. Vistagen raised $ money a few months earlier at $0.43, the actual price ($13.00 adjusted for the 1/30 reverse split). Despite the COVID-19 pandemic, press releases mentioning COVID-19 often caused a company's stock to increase significantly. The press release made this false and misleading statement;

*"With successful Phase 2 development of PH94B for social anxiety disorder completed,"*

112. Vistagen's stock price quickly doubled to nearly $1.00 based on this nonsensical COVID-19 press release. Because of that hyped-up press release, Vistagen raised $12.5 million through Maxim in August 2020 and $100 million through Jefferies and William Blair in December 2020. Both financings did not contain warrants. Notably, the prospectus for both financings did not mention the Phase 2 PH94B trials, unlike the 2021 Prospectus.

*https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/look-out-coronavirus-related-investment-scams-investor-alert#:~:text=Be%20cautious%20of%20claims%20that,%2Dand%2Ddump%E2%80%9D%20schemes.*

***Withum should have been aware that Vistagen did not link any of its disclosures to the clinicaltrials.gov Phase 2 and Pilot Phase 3 trials rejected after quality control reviews.***

Because Singh and Vistagen's Board positioned Vistagen as a potential COVID-19 anxiety-related therapy, Vistagen's stock price began rising. Vistagen's stock price more than doubled, leading to Vistagen raising $125 million through selling its stock. After Vistagen had pumped the stock higher with the COVID-19 press release, Vistagen issued a prospectus in which Jefferies and William Bair were the co-book runners. The banking firms of Maxim, Jefferies, and Willaim Bair knew that PH94B's trials, the Phase 2 and Pilot Phase 3 trial, were

rejected for publication by clinicaltrials.gov. The prospectus violated fraud statutes and federal securities laws due to material omissions. While not germane in this matter, it also violated Rule

113. Once loaded with cash, Vistagen and the executive management team rewarded themselves with raises and bonuses.

*https://pcaobus.org/oversight/standards/archived-standards/pre-reorganized-auditing-sta n dards-interpretations/details/auditing-standard-no-8_*

Withum Lacked Independence

114. By certifying the public disclosures that Vistagen issued, Withum assumed a public responsibility transcending any employment relationship with Vistagen. Withum's lack of independence, in both mind and appearance, resulted in Withum repeatedly certifying the five years of fraudulent financials. Auditors function as critical gatekeepers in the area of issuer reporting and disclosure. Comprehensive, accurate, and reliable financial reporting is the bedrock upon which our markets are based and is essential to ensuring public confidence in them. Auditors play a crucial role in public company financial reporting by serving a "public watchdog function" that demands "total independence from the client at all times and requires complete fidelity to the public trust." U.S. v. Arthur Young & Co., 465 U.S. 805, 818 (1984).

To recap, (i) Vistagen did not have any revenue, (ii) the PCAOB requires auditors to have an understanding of a client's business, and have a healthy skepticism of management's representations so that they can detect errors and fraud; (ii) Withum's website states it services life sciences companies and is puts itself out as an expert; (iv) the FDA mandates the results of clinical trials be published on clinicaltrials.gov, and not biased peer reviewed publications to magazines; (v) Withum knew Vistagen was legally obligated to disclose the clincaltrials.gov results; (vi) Withum knew or should have known that Vistagen's SEC filings concealed information that was material to investors and that Vistagen was legally obligated to disclose, and Withum issued Vistagen clean audit reports for the years 2019-2024; (vii) Withum knew that Vistagen committed an illegal pump and dump on in 2020 and on August 7th 2023 and failed to report despite being legally obligated to under SEC rules and the PSLRA. One of the steps auditors are legally obligated to do is to discuss the fraud with the audit committee. Jon Saxe was

the longstanding chair. If the situation is not resolved, auditors must resign and state why, which would be public in a Form 8-K. Also see Department of Justice;

https://www.ojp.gov/ncjrs/virtual-library/abstracts/auditors-responsibility-detection-management-fraud-selected-cases

115. Withum failed to evaluate Vistagen's disclosures related to PH94B.

As part of an auditor's duties, Withum would have met with Vistagen to discuss yearly budgets, including the PALISADE-1 and PALISADE-2 trials. As previously stated, Sihngh and Mcpartland assured Cesario that they had plenty of funding for the PALISADE trials and enough capital to run simultaneous studies. Withum knew that Vistagen lied regarding why PALISADE -2 was terminated, yet stood silent in its audit report for Vistagen and gave Vistagen a clean audit report on June 28th, 2023. On June 28, 2023, Vistagen was down to $9.6 million in cash with $4 million in liabilities, including nearly $2 million in payables. Vistagen expenditures were $7 million in the quarter ending June 30th. 2023.

Withums's annual audited reports are addressed to the directors of Vistagen and the stakeholders and declare that the Rules of the PCAOB have performed the audit; below is the wording from Vistagen's 2023 annual report, pages 103 and 104

**Stockholders and Board of Directors**
Vistagen Therapeutics, Inc.
South San Francisco, California
Opinion on the Consolidated Financial Statements

We have audited the accompanying consolidated balance sheets of Vistagen Therapeutics, Inc. (the "Company") as of March 31, 2023, and 2022, the related consolidated statements of operations and comprehensive loss, cash flows, and stockholders' equity for each of the two years in the period ended March 31, 2023, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of March 31, 2023, and 2022, and the results of its operations and its cash flows for each of the two years in the period ended March 31, 2023, in conformity with accounting principles generally accepted in the United States of America.

Substantial Doubt Regarding Going Concern

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company has suffered negative cash flows from operations and recurring losses from operations since inception, **resulting in an accumulated deficit of $326.9 million as of March 31, 2023, that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2**. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Basis for Opinion

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

**We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud**. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to understand internal control over financial reporting but not to express an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

**Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and *disclosures* in the consolidated financial statements.** Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

116. After the auditors report states that it is doubtful that Vistagen had the capital to last a year, it refers readers to Note 2 of the annual report. The auditors' report states refers to Notes 2 of the annual report, which is found on page 8 and makes this statement regarding financing;

> When necessary and advantageous, we will seek additional financial resources to fund our planned operations through (i) sales of our equity and/or debt securities in one or more public offerings and/or private placements, including sales of our securities under the Sales Agreement, (ii) non-dilutive government grants and research awards and (iii) non-dilutive strategic partnering collaborations to advance development and commercialization of our product candidates. However, no assurance can be provided that any such sales of our securities, awards, agreements or collaborations will occur in the future. Subject to certain restrictions, our Registration Statement on Form S-3 (the *S-3 Shelf Registration Statement*) remains available for future sales of our equity securities in one or more public offerings from time to time. **While we may make additional sales of our equity securities under the S-3 Shelf Registration Statement and/or under the Sales Agreement, we do not have an obligation to do so**.

117. Withum knew that;

- Vistagen stated it would continue the PALISADE-2 trial to full enrollment.
- Vistagen could not obtain regular financing in March of 2023.
- Vistagen did not have the capital to finish PALISADE-2 and failed to disclose it.

- Vistagen's claim that it had the first successful Phase 3 trial was false.
- Knew that Vistagen's August 7th press release was false and that Vistagen was engaging in a pump and dump scheme.

118. Accordingly, Withum's quarterly reviews and noncompliant audit reports on Vistagen and Vistagen's disclosures and internal control over financial reporting as of June 28th, 2018, 2019, 2020, 2021, 2022, and 2023, respectively, were knowingly or recklessly false and misleading when made.

119. By the foregoing, (i) violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (ii) aided and abetted Vistagen and its Directors defrauding the Plaintiffs by perpetrating common law fraud; (iii) aided and abetted Vistagen's Directors in defrauding the Plaintiff's through common law fraud, and constructive fraud, violating their fiduciary duties, became an active participant in the scheme to defraud the Plaintiff's and investors. (iv.) Withum was legally obligated to report the fraudulent acts to Vistagen's audit committee. They didn't.

**Allegations Against Jefferies and Tsai**

120. Jefferies conspired with and aided and abetted Vistagen in Vistagen's long-running fraud on the market scheme. As described herein, Jefferies knew that Vistagen's statements in the December 2020 prospectus were half-truths and misleading. The Jefferies banking division knew that Vistagen intentionally concealed that ClinicalTrials.gov rejected the Phase 2 trials for quality control reasons.

121. In 2021, Tsai also knew that Vistagen intentionally concealed the fact that ClinicalTrials.gov rejected the Phase 2 trials for quality control reasons. Tsai's research reports did not disclose this. Tsai issued $6.00 price targets on Vistagen to induce the investing public to buy Vistagen's stock.

122. In 2023, Jefferies conspired with and actively partnered with Vistagen in an illegal pump-and-dump scheme that caused investors in Vistagen's stock to lose upwards of 1 billion dollars.

Jefferies knew that;

- Vistagen's PALISADE-2 trial was an terminated unsuccessful Phase-2 trial, and the results were interim.

- The investing public misunderstood the August 7th, 2023, press release and that they should not have facilitated stock sales for Vistagen until Vistagen clarified that the trial would not count as a completed Phase 3 with the FDA.
- Knew that the October 2023 prospectus contained false and misleading statements and incorporated an "unclean" annual report.

The Vistagen Jefferies Pump and Dump Was Pre-Planned

123. Before Vistagen and Jefferies could execute an illegal pump and dump, they needed to complete the set foundation by taking the steps that have been previously described in more detail. The steps included;

1. Terminate the PALISADE-2 trial.
2. Reverse split Vistagen's stock 1/30.
3. Issue a prospectus to sell $10,500,00, the maximum they could sell due to the limits of General Instruction I.B.6 of Form S-3.
4. Issue a second supplemental prospectus to be ready for the pump.
5. Wait for the interim study results, which they knew would be positive based on the biostatisticians' recommendation.
6. Issue a false and misleading headline on August 7th, 2023, stating that the Phase 3 PH94B was the first successful Phase 3 trial for social anxiety disorder to pump the stock price higher and then dump $10,500,000 of stock.
7. On August 8th, 2023, before the markets opened, another supplemental prospectus was issued stating that the limits on Vistagen to sell stock under General Instruction I.B.6 of Form no longer apply from the S-3 filing.
8. Dump another $20 million of stock.

124. Jefferies wasn't satisfied with the million-plus dollars they made in commissions illegally dumping $38 million of Vistagen's stock on the public. Jefferies, Singh, and the Vistagen Board of Directors wanted more, so they proposed a plan to dump another $100 million of Vistagen's stock onto the public. Vistagen filed a prospectus with the SEC that Vistagen's board of directors, executive management team, and Jefferies knew contained FRAUDULENT MATERIAL OMISSIONS incorporated a NONCOMPLIANT AUDITED ANNUAL REPORT. The offering turned out to be a sweetheart deal for Jefferies' clients as they generated a minimum

of $6,000,000 in fees. The pricing of the $100,000,000 was also a scam on shareholders, as detailed in the Commodore section of the complaint.

125. The 2020 equity offering did not include [6]warrants. As a reminder, the pricing of the 2020 offering was before Vistagen stated the PALISADE-2 results. The 2023 Jefferies pricing was set at $5.36 (or $0.17 adjusted for the 1/30 reverse split) and offered an equal pre-funded warrant at $0.01, additional warrants at an exercise price of $5.36, and additional warrants at an exercise price of $8.88. Jefferies Andrew Lin Tsai, as well as Maxim and William Blair analysts, issue $12.00 price targets so the institutions can sell their stock but have the ability to buy up to 3 times the shares of the offering at low prices if the trials turn out to be positive. See the [7]Commodore SEC filing.



FUTUBULL Investing Markets News & Community Pricing Promotions Blog About Us Supp

Jefferies Upgrades Vistagen Therapeutics to Buy, Raises Price Target to $15

Benzinga · Dec 7, 2023 05:35

VTGN -1.01%

Jefferies analyst Andrew Tsai upgrades Vistagen Therapeutics (NASDAQ:VTGN) from Hold to Buy and raises the price target from $0.2 to $15.

The above content is for informational or educational purposes only and does not constitute any investment advice related to Futu. Although we strive to ensure the truthfulness, accuracy, and originality of all such content, we cannot guarantee it.

[6] *Warrants are attached to many microcap stocks as an inducement. Warrants gives the purchaser the right to buy more shares at a predetermined price.*

[7] *See;* *https://www.streetinsider.com/SEC+Filings/Form+4+Vistagen+Therapeutics%2C+For%3A+Oct+04+Filed+by%3A+COMMODORE+CAPITAL+LP/22249426.html*

126. Singh's deceptive practices continued on Vistagen's August 13th, 2024 earnings call. Singh did not disclose that ClinicalTrials.gov rejected PALISADE-1, PALISADE-2, and the open-label trial for quality control reasons. Singh did not disclose that ClinicalTrials.gov rejected the three latest PH94B trials even after he was asked a direct question.

**Lin Tsai;** Great. Last question is, what's the latest on the PALISADE-2 publication as well as a potential Breakthrough Designation filing?

**Shawn Singh;** Andrew, look, we know obviously what we achieved in PALISADE-2 is historic. No one's ever done it. And so that's given rise to interest in terms of manuscript that we will be **submitting to a journal that we believe is the best fit for that.** That's in a very nice, mature stage of development. The other part of it is, look, as you know, we've achieved Fast Track designation already. That's a serious and life-threatening indication. There's no question about that. What we achieved in PALISADE-2 is a very significant differentiator. So -- and we'll see how it goes. There's never any guarantee you can make about any activity with the agency, but I like the chances that we have in fitting the profile that's typically associated with moving beyond Fast Track.

127. Singh, also made this statement on the call after clinicaltrials.gov rejected publishing the PALISADE-2 trial;

> "Last year with our PALISADE-2 Phase III trial of fasedienol, we reported the **first ever positive Phase III trial of a drug candidate for the acute treatment of SAD."**

See the August 2024 earnings call transcript: *https://capedge.com/transcript/1411685/2025Q1/VTGN*

128. The Plaintiffs have provided evidence that Vistagen, Singh, Vistagen's Board of Directors and executive management team lied in SEC filings and earnings calls as to why Vistagen terminated the PALISADE-2 trial; the evidence provided includes (i) Vistagen's cash position, (ii) Vistagen's unsuccessful attempts to raise capital, a have enough money to complete PALISADE-2; and finally, he Plaintiffs believe Singh's words during Vistagen's latest

conference call are additional incontrovertible evidence. Singh states that because Vistagen is fully funded, PALISADE-4 will continue even if PALISADE-3 fails.

**Lin Tsai:** Makes sense. **And in the unfortunate circumstance should PALISADE-3 not hit stats, do you still -- would you still plan to move forward and complete PALISADE-4**, just given the turn of events that happened last time with PALISADE-1 and 2?

**Shawn Singh:** Yes, 100%. No question about it, Andrew. The whole program continues. **That's what's the benefit of having a fully-funded program.**

So we're in a spot now where in the very short order here, we will have initiated everything in '24 that we think we need to read out in '25 and that if positive, would support our NDA in the early part of '26 for fasedienol.

**So yes, absolutely 100%, regardless, both studies will be run to completion.**

**See Vistagen's Code of Ethics**

129. CEO Singh, Vistagen's Board members executive management team intentionally, willingly knowingly and maliciously violated Vistagen's Code Of Business Conduct; section Code of Integrity requiring Compliance with the Law and Regulations to obtain financial benefits.

See; *https://www.vistagen.com/static-files/42c25675-489e-42c2-adb9-9c405464a90f*

130. By the foregoing, these executives (i) committed common law fraud; (ii) aided and abetted Vistagen and its Directors in defrauding the Plaintiffs by perpetrating common law fraud; (iii) aided and abetted Vistagen's Directors in defrauding the Plaintiff's through common law fraud, and constructive fraud, violating their fiduciary duties; (iv) breached their fiduciary responsibilities, (v) were negligent by initiating PALISADE PH94B trials and having adequate controls on the trials. Due to quality control issues, all three PALISADE PH94B trials Vistagen ran were rejected for publication by clincaltrials.gov.

## V. INAPPLICABILITY OF SAFE HARBOR

131. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any false or misleading statements pleaded in this Complaint.

FRAUD vitiates everything. The Defendants in this lawsuit either directly committed fraud or aided and abetted in fraud. The fraudulent acts continue to this day. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. For example;

- (i) Vistagen was legally obligated to disclose the 2009 and 2014 PH94B trials rejected for publication by clinicaltrials.gov after a limiter quality control check was done;
- (ii) Vistagen was required to disclose the sentence mentioned above in the 2021 prospectus
- (iii) Vistagen was legally obligated to file a Form 8-K disclosing that the PALISADE-1 and PALISADE-2 trials and Open Label study for social anxiety disease were rejected for publication by clinicaltrials.gov with negative comments after a limited quality review was done;
- (iv) Vistagen lied in the April 1st, 2019 press release stating that they had new findings regarding PH94B;
- (v) Vistagen falsely stated that PALISADE-2 was a successful Phase 3 trial when it was terminated;
- (vi) Vistagen filed multiple prospectuses with the SEC with material omissions Vistagen was legally obligated to disclose;
- (vii) Vistagen filed roughly a dozen Form 8-K's with the SEC with an attached press release making material omissions of fact that Vistagen was legally obligated to disclose;
- (viii) Vistagen filed four annual reports and 12 quarterly reports with the SEC with material omissions of fact that they were legally obligated to disclose;
- (viv) Vistagen failed to disclose that clinicaltrials.gov rejected publishing PALISADE-1. PALISADE-2 and the TERMINATED PALISADE open-label trial were rejected for publication after a limited quality review, with attached negative comments on the study.

## VI. PRESUMPTION OF RELIANCE

132. The Plaintiffs are entitled to a presumption of reliance under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose. The Defendants have provided proof that the Defendants committed fraud. The Plaintiffs are also

entitled to a presumption of reliance based on the Defendants' material misrepresentations and omissions under the fraud-on-the-market doctrine because Vistagen's common stock was actively traded on the NASDAQ Exchange. Vistagen is a regulated issuer and is subject to filing periodic public disclosures and reports with the SEC, including but not limited to quarterly and annual reports, Form 8-K's, Registration statements, and prospectuses.

133. Vistagen communicated regularly with the general public and its investors regarding PH94B. Many of Vistagen's communications regarding PH94B were reported and broadcast to the public, financial news services, and stock message boards. Moreover, Cesario spoke with McPartland and Singh, and they never disclosed that the Phase 2 and Pilot Phase 3 PH94 trials were rejected for publication. Jefferies price targets reports were similarly reported and broadcasted to the public financial news services and message boards. McPartland shared other analyst reports with Vistagen shareholders. The market reacted promptly to public information disseminated by Vistagen and Jefferies price targets.

134. Singh's and McPartland's glowing statements on PH94B, the widespread distribution of Vistegen's press releases, which were publicly available and entered the public marketplace, and the material misrepresentations and omissions alleged herein **induced** the Plaintiffs to misjudge the value of PH94B trials. Because the Plaintiffs did not have knowledge of the fraud and misrepresented or omitted material facts alleged herein, the Plaintiffs were **induced** to buy or otherwise not sell their Vistagen positions after the stock price hit a high of $105.00. Plaintiffs would have sold their stock holdings before Vistage, recklessly initiating PALISADE-1.

## VII. STATUTE OF LIMITATIONS

135. The Plaintiff's claims arising from the Exchange Act have been filed within five years of the alleged acts and two years of discovery.

The Plaintiff's negligence claims are within the statutory 5 years and 3 years of discovery.

The Plaintiff's state fraud-based claims were discovered within three years.

## VIII. SCIENTER

136. Plaintiff's fraud, negligent misrepresentation, aiding and abetting of fraud allegations establish "the who, what, when, where, and how of the misconduct charged" as to the Vistagen's

CEO Singh, Vistagen's Board members and executives, Liebowitz, Snodgrass, Tsai and Jefferies, therefore meet the heightened pleading standard applicable to all of Plaintiff's fraud-based claims. *See Fed. R. Civ. P. 9(b); Vess, 317 F.3d at 1106, 1124; Swartz, 476 F.3d at 764; Bank Hapoalim B.M. v. Bank of Am. Corp., 2012 U.S. Dist. LEXIS 184540, at *8 (C.D. Cal. Dec. 21, 2012) ("Claims based on fraud must meet the heightened pleading standard of particularity.)* The Plaintiffs complaint has over a half dozen examples examples of press releases, reports and prospectuses that are dated with material misstatements and omissions regarding the Phase 2 PH94B trials. The Plaintiffs have detailed additional examples of Vistagen and its executives concealing that Vistagen three latest PH94B trial results were concealed from investors.

137. On January 15th, 2025, Vistagen issued another false press release announcing a Phase 2a study PH94B for cancer cachexia. Clinical Trials does not show a recent trial for PH94B.

138. Additionally, after the Plaintiffs notified Vistagen Directors that they concealed disclosing ClinicalTrials.gov rejected publishing the PH94B Phase 2 studies they did not take any action to correct the omissions, and still continue making the same material misstatements and omissions.

139. Vistagen's Singh, Saxe, Gin, Snodgrass, Cunningham, Curley, Rotundo, and Fitzpatrick, Liebowitz and Snodgrass knew that;

1. The Phase 2 and Pilot Phase 3 studies were rejected for publication.
2. Vistagen attempted to publish the Phase 2 study in 2019 and then tried to publish both the Pilot Phase 3 and Phase 2 studies on clinicaltrials.gov in 2022 before announcing that the PALISADE-1 trials failed. Vistagen, CEO Singh, and Vistagen's Board of Directors and executives knew that clinicaltrials.gov rejecting publishing Vistagen's PH94B trials after the trials failed a limited quality control review was a material fact they were legally obligated to disclose to the public.
3. Vistagen concealed and committed fraud by omission when it filed the 2021 and 2023 prospectuses with the SEC.

4. Vistagen's PALISADE-2 was not a successful Phase 3 trial. Not only was it deemed an unsuccessful Phase 3 trial by the [8]FDA, but clincaltrials.gov rejected publishing the results after conducting a limited quality review. The primary and secondary endpoints received negative [9]comments, proving that Vistagen does not know how to run clinical trials.
5. Vistagen's motive for omitting material facts in the pump-and-dump schemes was to raise money because it was going broke. During the 2020 and 2023 pump-and-dump schemes, Vistagen had one foot on a banana peel and the other in bankruptcy court, so corrupt CEO Singh, former Chairman Saxe, and the rest of the Board chose to defraud investors.
6. Vistagen's CEO Singh, Board members, and executives Liebowitz and Snodgrass knew that the prospectus for the 2021 pump and dump omitted material facts, including that clinivaltrials.gov rejected the previous Phase 2 and Pilot Phase 3 trials after a quality review of the studies.
7. The reason why anxiety and depression drugs are so difficult to get approved is the placebo effect. Vistagen knew and concealed that not one anxiety or depression drug was ever approved by the FDA using the SUDS scale.

140. Jefferies knew that Vistagen's Phase 2 studies were rejected for publication, yet issued unrealistic price targets on Vistagen. When viewed holistically, it is clear that Vistagen's Directors and executives worked with Jefferies to defraud the Plaintiffs and other investors.

## X. PUNITIVE DAMAGE DEMANDS

141. The extensive punitive damage awards the plaintiffs seek will put micro-cap CEOs, board members, bankers, and auditors on notice that they could occasionally incur severe penalties for violating securities laws and defrauding investors. The evidence contained in this complaint demonstrates a very long history of fraud, fiduciary breaches, and violations of federal and state

---

[8] Vistagen was not given any credit for the terminated Phase 3 trial by the FDA. The PALISADE-3 and PALISADE-4 trials contains the same number of enrollees as PALISADE-1 and PALISADE-2.

[9] *See*; https://clinicaltrials.gov/study/NCT05011396?a=5&tab=history

securities laws, whether through intentional misrepresentation or material omissions. Vistagen raised over $250 million through fraud and securities law violations. Despite being notified, they have not corrected the securities law violations. They continue the violations to this day. Investors trading in Vistagen's stock have lost over 1 billion dollars based on their intentional fraud and violations of security laws.

142. The defendant's conduct was egregious, self-serving, and heinous. The defendants exploited and knowingly and maliciously exploited the public for their self-enrichment. California does not limit the amount a jury could award punitive damages for fraud and the other state claims in this complaint. While the Exchange Act generally limits punitive damages paid to Plaintiffs, it does not restrict punitive damages federal courts can impose on the defendants. For example, punitive damage may be possible if the defendants are found guilty after a jury trial.

143. The Defendants continue to violate securities laws; Vistagen has not disclosed that the three PALISADE trials were rejected for publication by ClinicalTrials.gov in 2024 after a QC review.

144. As previously evidenced herein, during an earnings call, Singh Tsai asked Singh a direct question regarding when the trial results would be published. At the time of the November 2023 earnings call, Singh knew that ClinicalTrials.gov rejected all three PALISADE trials performed by Vistagen for publication after a limited quality review.

145. As previously evidenced herein, Vistagen, Vistagen's board members, and the executive management team failed to disclose that in July 2024, ClinicalTrials.gov rejected the three PALISADE PH94B trials after a limited quality review. Vistagen did not adjust its 2024 [10]corporate presentation filed with the SEC to reflect that all the PALISADE PH94B trials were rejected for publication by clinicaltrialsgov.

146. Recently, to pump Vistagen's stock price higher, Vistagen has expanded its violations of securities laws to misleading statements regarding potential cancer treatments. On January 14th, 2025, Vistagen filed an obscene, misleading Form 8-K with the SEC, which stated;

---

[10] *https://www.sec.gov/Archives/edgar/data/1411685/000143774924000902/vtgn20240108_8k.htm*

- *On January 14, 2025, Vistagen Therapeutics, Inc. (the "Company") issued a press release **to announce positive results from an exploratory Phase 2A study of its investigational pherine nasal spray, PH284, in cancer cachexia**. In the study, PH284 demonstrated higher mean subjective feeling of hunger as compared to placebo and appeared safe and well-tolerated with an adverse event profile similar to placebo in a population compromised by terminal cancer. A copy of the press release is attached to this Current Report on Form 8-K as Exhibit 99.1.*
- A search of clinicaltrials.com for PH284 and ***cancer cachexia*** does not show a recent Phase 2A or any published study by Vistagen or Pherin for cancer cachexia.
- Vistagen makes similar claims for PH10 Itruvone for the management of Major Depressive Disorder. Vistagen's press releases, corporate presentations, and annual reports make identical claims about PH10's successful Phase 2 studies. A search on clinicaltrial.gov does not support Vistagen's claims.
- Vistagen makes similar claims for PH80 Intranasal PH80 Spray for Acute Management of the Symptoms of Premenstrual Dysphoric Disorder. A search of PH80 brings up this one trial that was not submitted.
  - See, *https://ClinicalTrials.gov/study/NCT01217775?cond=depression&term=PH80&rank=1&tab=results*

147. The 2024 Corporate Presentation is laughable because ClinicalTrials.gov any of Vistagen's claims below. The only experience Vistagen's neuroscience team has is having a record number of trials rejected for publication after a quality review, including the following trials;

- The Phase 2 PH94B
- The Pilot Phase
- The PALISADE open-label study
- The PALISADE-1
- The PALISADE-2 - it appears that the Vistagen Covid scam adjustment disorder trial completed in 2022 has never been submitted to ClinicalTrials.gov.




148. Plaintiffs are not drawing legal conclusions; the law is clear. Vistagen, Vistagen's directors and the executive management team had an absolute duty to disclose all of the results relating to the PH94B trials they attempted to publish on ClinicalTrials.gov, and they intentionally did not.

- CEO Singh, the Board, and the Executives of Vistagen could be ordered to pay Vistagen back all the salaries, stipends, and benefits from Vistagen from 2019 to date.
- Jefferies could be ordered to pay Vistagen back all the commissions from Vistagen's ATM sales and fees from the two $100,000,000 financings, which would be well over 10 million dollars.
- Withum could be ordered to pay Vistagen back all the fees it collected from Vistagen from 2019 to 2024.

149. The SEC fined accounting firms $100,000,000 for a cheating scandal involving tests that did not cause a penny of financial damage. Here, Vistagen's Directors, executive management team, and Jefferies defrauded investors up to $1 billion, not once, but on three premeditated occasions.

150. Plaintiffs do not think a jury will consider the punitive damage requests. Considering some of the defendant's extraordinarily high revenues, a jury might find the plaintiff's damage requests low, given the number of years and the amount of money the defendant scammed the public.

151. Regarding punitive damages against Vistagen, Singh and McPartland have stated that when PH94B is approved, Vistagen would be worth over $2 billion.

## XI. LOSS CAUSATION

152. Plaintiff Cesario wired Vistagen $159,000 to convert warrants in 2021. Between 2020 and 2022 Plaintiff Cesario purchased approximately $795,000 in stock and sold stock between 2021 and 2022 for a net loss of over $430,000. If Plaintiff Cesario knew that Vistagen was engaged in concealing naterial facts he would never have purchased shares in Vistagen. Plaintiff Cesario excludes the losses incurred prior to Vistagen acquiring PH94B in the amended complaint.

153. Plaintiff Preka purchased over $1,000,000 in stock between 2019 and 2023 and has actual losses from stock sales of approximately $450,000 from stock sales between 2022 and 2023. Plaintiff Preke would never have purchased Vistagen stock if he had known Vistagen was engaged in a fraudulent scheme making material omissions regarding the PH94B trials.

154. Before purchasing Vistagen shares, and when the Plaintiffs held Vistagen's shares, the Plaintiffs relied on the integrity of the markets and Vistagen's public disclosures. The Plaintiffs paid artificially high prices for Vistagen's stock. For example, in early 2020, before Vistagen's directors and executive management team positioned Vistagen as a "COVID-19" therapy, the total number of shares outstanding stood at 49,938,042 (actual count as of 2020). Vistagen's common stock was trading at a low of **$0.23** a share (actual price as of 2020), which put a market cap value of Vistagen's stock at about **$12 million**. As previously evidenced, in May 2020, Vistagen issued a false and misleading press release that announced that Vistagen positioned PH94B as a potential therapy for COVID-19 anxiety relief. As previously described, Vistagen raised $25 million through Maxim and $100 million through Jefferies and William Blair, which brought Vistagen's total number of shares outstanding to slightly over 200 million. Shortly after

those financings, Vistagen's share price rose to **$3.50**, and Vistagen's market **cap was $750 million**.

155. As the complaint alleges, by their positions, the capital markets team and analysts at Maxim, Jefferies, and William Blair knew that Vistagen's previous PH94B trials failed the ClinicalTrials.gov quality review. Those firms pumped higher stock prices to lay the stock purchased for clients onto the public. Broker-dealers like Maxim, Jefferies, and William Blair tend to sell issuers' stock offerings to institutions, who then resell the stock to the public as a means of insulating themselves from Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, and 15 U.S. Code § 77q - Fraudulent interstate transactions lawsuits.

156. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Vistagen's securities; and without knowledge of the misrepresented or omitted material facts alleged herein, the Plaintiff s and the investing public would have sold Vistagen's shares when they announced that they were initiating the Phase 3 trial named PALISADE-1, or in the alternative, would not have purchased the securities at all.

## XII. CAUSES OF ACTION

157. Plaintiff incorporates by reference every preceding paragraph as

though fully set forth herein into the following section called Counts

### Count I. Common Law Fraud California Civil Code CIV § 1572

**Fraud - California Civil Code CIV § 1572** states in part that actual fraud is defined as any act intended to deceive, such as making a false statement and suppressing a true statement;

158. *See; Hardisty v. Moore, 6 F.Supp. 3d 1044, 1052 (S.D. Cal. 2014) (quoting Small v. Fritz Cos., Inc., 30 Cal.4th 167, 173, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (Cal.2003)), as well as constructive fraud, which arises on a breach of a duty by one in a confidential or fiduciary relationship to another and which induces justifiable reliance by the latter to his prejudice. See Tyler v. Children's Home Soc'y, 29 Cal.App.4th 511, 548, 35 Cal.Rptr.2d 291 (Cal.Ct.App.1994); In re Harmon, 250 F.3d 1240, 1249 (9th Cir.2001)*

159. *Greenfield V. Fritz Companies, Inc*, *Court of Appeal, First District, Division 4, California, "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose."*

160. The Plaintiffs allege that the Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Flather, Snodgrass, Dotson, Smith, Monti, Leibowitz, Jefferies, Tsai, knowingly and intentionally defrauded the Plaintiffs by their actions described herein, including the following;

(1) disseminating misleading statements

(ii) omitting material facts

(iii) artificially inflating the price of Vistagen's stock price

(iv) inducing the Plaintiffs not to sell Vistagen's stock

(v) induce Plaintiff Cesario directly wire Vistagen funds to convert warrants to common stock

161. The Defendants Vistagen, Singh, Saxe, Gin, Dotson, Leibowitz, and McPartland intentionally disseminated (1) material misrepresentations about the PH94B Phase 2 trials ' success, and (2) made intentional material omissions that the ClinicalTrials.gov returned the trials as unpublished due to quality control issues. The Plaintiffs were induced to buy and hold Vistagen stock.

**Count II. DECEIT § 1709 Deceit is** (i) One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage he suffers. **§ 1710 defines Deceit as** *A deceit, within the meaning of the last section, is either: 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,4. A promise, made without any intention of performing it.*

162. The Defendants, Vistagen, Singh, Saxe, Gin, Dotson, Leibowitz, and McPartland intentionally disseminated (1) material misrepresentations about the PH94B Phase 2 claiming the

PH94B trials were successful and (2) intentionally concealed the material fact that ClinicalTrials.gov returned the trials as unpublished due to quality control issues. The Plaintiffs were induced to buy and hold Vistagen stock.

**Count III. Ca. Civ. Code § 1711 Ca. Civ. Code § 1709 Deceit -** One who practices a deceit with intent to defraud the public. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (ii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Plaintiffs.

163. The Defendants, Vistagen, Singh, Saxe, Gin, Dotson, Smith, and McPartland intentionally disseminated (1) material misrepresentations about the PH94B Phase 2 claiming the PH94B trials were successful and (2) intentionally concealed the material fact that ClinicalTrials.gov returned the trials as unpublished due to quality control issues. The Plaintiffs were induced to buy and hold Vistagen stock.

**Count III. Constructive Fraud Civ. Code, § 1573**

*"In its generic sense, constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust, or confidence, and resulting in damages to another. [Citations.] Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated - that is, in which such conduct is a constructive or quasi fraud, having all the actual consequences and all the legal effects of actual fraud."(Prakashpalan, supra, 223 Cal.App.4th at p. 1131.)*

164. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, and Leibowitz perpetrated constructive fraud against the Plaintiffs through their actions described herein.

**Count IV. Concealment. Civil Code section 1710**

. *[T]he rule has long been settled in this state that although one may be under no duty to speak as to a matter, "if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure." ' " (Marketing West, Inc. v. Sanyo Fisher (USA) Corp. (1992) 6Cal.App.4th 603, 613 [7 Cal.Rptr.2d 859 " '*

165. *[F]alse representations made recklessly and without regard for their truth to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered.' " (Engalla, supra, 15 Cal.4th at p. 974, quoting Yellow Creek Logging Corp. v. Dare (1963) 216 Cal.App.2d 50, 55 [30Cal.Rptr. 629].*

166. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti,, Leibowitz, Jefferies, Tsai, knowingly and intentionally concealed adverse material facts from the Plaintiffs relating to the ClinicalTrials.gov PH94B trials.

**Count V. Intentional Misrepresentation. Civil Code section 1710(1)**

167. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Leibowitz, Jefferies, Tsai, William Blair, Lugo, Minter, Maxim, McCarthy, Latham & Watkins, Withum and Smith intentionally misrepresented material facts that were publicly disseminated and relied upon by the Plaintiffs and ultimately harmed the Plaintiffs

**Count VI. Civil Conspiracy**

*Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share withthe immediate tortfeasors a common plan or design in its perpetration. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." (Applied Equipment Corp. v. Litton Saudi Arabia Ltd. (1994) 7Cal.4th 503, 510-511 [28 Cal.Rptr.2d 475, 869 P.2d 454],*

168. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Leibowitz, Jefferies, Tsai, their actions described herein, conspired to defraud the Plaintiffs, violated federal and state disclosure laws by making intentionally misleading statements or material omissions. The conspiracy allegations are against all defendants, as they were active actors or stood silent while having a legal obligation to disclose or halt the wrongdoing, which continues to this day. The motive for all was self-enrichment and financial gain.

**Count VII. Aiding and Abetting**

*"As noted, some cases suggest that a plaintiff also must plead specific intent to facilitate the underlying tort. We need not decide whether specific intent is a required element because, read liberally, the fifth amended complaint alleges that defendant] intended to assist the Association in breaching its fiduciary duties. In particular, plaintiffs allege that, with knowledge of the Association's breaches, [defendant] 'gave substantial encouragement and assistance to [the Association] to breach its fiduciary duties.' Fairly read, that allegation indicates intent to participate in tortious activity." (Nasrawi, supra, 231 Cal.App.4th at p. 345, original italics, internal citations omitted.)*

168. *Persons who aid and abet the above violations are equally at fault if they know that other person's conduct breached a duty and the person rendered encouragement or substantial assistance. See. eg., Schultz v. Neovi Data Corp., 152 Cal.App.4th 86, 93, 60 Cal.Rptr.3d 810 (2007).*

169. Defendants McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, Leibowitz, Jefferies, Tsai, aided and abetted the Director Defendants in;

1. Committing fraud upon the Plaintiffs
2. Committing constructive fraud upon the Plaintiffs,
3. Committing Intentional Misrepresentation upon the Plaintiffs
4. Violating federal disclosure laws
5. Violating California Corporation Codes

**Count VIII. Non-Fraud Gross Negligence Claims**

170. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, Leibowitz, and Snodgrass were grossly negligent and reckless initiating the PH94B trials during peak COVID-19. The Defendants knew that;

1. The WHO declared a worldwide pandemic, mask wearing and social distancing were the norm
2. Pharmaceutical companies suspended existing drug trials or postponed initiating new trials except for COVID-19 indications for vaccines, therapies, and medical devices.
3. PH94B's social anxiety indication was not COVID-19 related. As Singh stated numerous times, an example of acute social anxiety would be someone about to give a speech. None of Vistagen's SEC disclosures or press releases positioned the Phase 3 trial as COVID-19-related.
4. PH94 was delivered intranasally, and COVID-19 was known to have adverse effects in the nasal passageways
5. Vistagen had never conducted a Phase 3 trial

6. The previous PH94B trolls were rejected after a QC review

171. The following exchange is from Vistagen's November 2023 [11]earnings call. It is a question from Tsai about the trials' quality control. CEO Singh and VP Prince answer with a few differences between conducting a trial during and post COVID-19.

**Lin Tsai;**

"Maybe a tangential question from before that was just asked. But for these Phase III studies, both of them that are underway, what are you seeing on the front lines that gives you the confidence it's definitely different this time for fasedienol? Maybe talk about how sites are operating, the rigor of these study protocols, whether public speaking challenge is being done correctly and so forth."

**Shawn Singh;**

"Thanks, Andrew. Appreciate the question. One thing, of course, is significantly different now than where we were even during PALISADE-2, let alone earlier than that during the pandemic is just the ability to have person-to-person contact, to have in-person training, like Josh mentioned. In-person investigators meetings mean a tremendous amount to be able to regularly and predictably have site visits and also have subjects schedule each phase and each visit during their challenge sequence.

**It is all different. It is just fundamentally different**. The attrition rates that we typically saw before at sites with site staff, we're just not seeing. Same thing with CROs.

You're not seeing the kinds of things that would have been frustrating variability coming into a protocol that the recipe is pretty clear. And when it's followed, it helps tremendously.

So that plus things that you -- that we've talked about before, right? **No masks involved, no COVID-related potential with the subjects in the study.**

[11] *See; https://capedge.com/transcript/1411685/2025Q2/VTGN*

So there's just fundamental things that are different on a macro basis and then site by site on a micro basis. **And just having the ability for the protocol to not be novel.** This is something, of course, now that's on the third and the fourth lapse within the research community. So the study design isn't new, the endpoint isn't new."

***Joshua Prince;***

"Sure. We could add to what you said, and it kind of builds on the in-person piece. In addition to the in-person investigator meetings, we've had an in-person site initiation visit for every site, right? So it's kind of the double reinforcement of training at an investigator meeting and then a good 3 to 4 hours with the study staff in their site location, again, hitting all the key details and pieces and components of what it takes to properly execute a public speaking challenge.

And then through the monitoring that Shawn mentioned, there have been specific examples where we've identified something that wasn't being done quite right. And the next day, there's an intervention or a discussion or a retraining or a reminder.

So those are the kinds of things that could not happen in our prior PALISADE studies and are happening now, which gives us, again, that confidence that we're getting the right patients and that we're reducing variability as much as possible across sites for the public speaking challenge."

**Count IX. Violations of California Corporation Code § 25400**

*"Corporations Code section 25400 provides that it is unlawful in [California] to make false statements or engage in specified fraudulent transactions which affect the market for a security when done [for specified purposes]." Diamond Multimedia Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036, 1040, 80 Cal.Rptr.2d 828, 968 P.2d 539. "In short, it prohibits market manipulation." Id. Section 25500, in turn, "creates a civil remedy for buyers or sellers of stock the price of which has been affected by the forms of market manipulation proscribed by section 25400." Id. A more general prohibition exits under 25400 (d), which provides that it is unlawful for a person selling or offering for sale securities "to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact." Proving actual reliance and privity to*

*establish liability under 25400 is not required. Colman v. Theranos, Inc., 325 F.R.D. 629, 647 (N.D. Cal. 2018) (citing RLI Ins. Co., 94 Cal. App. 4th 102, 109, 113 Cal.Rptr.2d 915 (2001).*

172. During the Period, Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Flather, Snodgrass, Smith, Monti, and Leibowitz, (i) disseminated or approved the false statements and (ii) concealed the material facts set forth above which they knew or deliberately disregarded were false andmisleading in that they contained misrepresentations and (iii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases.

173. By virtue of their positions, the Defendants named above knew of the false and misleading statements and material omissions alleged herein. They intended to deceive the Plaintiffs, or, alternatively, they acted with reckless disregard for the truth in failing or refusing to ascertain and disclose such facts.

174. The Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive the Plaintiffs and the public, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made. However, such facts were readily available to the Defendants. The said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control; each defendant was knowledgable regarding SEC laws and rules.

**Count X. Violations of California Corporation Code § 25401**

*California Corporations Code Section 25401 replicates the provisions of Rule 10b-5, 17C.F.R. 240.10b-5. However, unlike Rule 10b-5, a plaintiff need not prove reliance or that the misrepresentation or omission caused plaintiffs loss under this provision of the California Corporations Code. Lynch v. Cook, 148 Cal. App. 3d 1072, 1087-88 (1983).*

175. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Flather, Snodgrass, Dotson, Smith, Monti, by their actions described herein (i) disseminated or approved the false statements and (ii) concealed the material facts set forth above which they knew or deliberately disregarded were false andmisleading in that they contained misrepresentations and (iii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases.

176. By virtue of their positions, the Defendants named above knew of the false and misleading statements and material omissions alleged herein. They intended to deceive the Plaintiffs, or, alternatively, the Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts.

177. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive the Plaintiffs and the public, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control; each defendant was knowledgable regarding SEC laws and rules.

**Count XI. Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**Fraud On The Market**

178. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Flather, Snodgrass, Jefferies, and Tsai by their actions described herein (i) disseminated or approved the false statements and (ii) concealed the material facts set forth above which they knew or deliberately disregarded were false andmisleading in that they contained misrepresentations, and (iii) Engaged in acts, practices, and a course of business that

operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases. Jefferies and Tsai were active participants in the fraud on the market scheme

179. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive the Plaintiffs and the public, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made. However, such facts were readily available to the Defendants. The said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control; each defendant was knowledgable regarding SEC laws and rules.

**Non-Fraud Claims Against Withum**

180. Defendant Withum recklessly conducted audits for 2020, 2021, 2022, 2023, and 2024 in violation of the PCAOB standards. Withum ignored glaring red flags and failed to train and supervise its auditing team in Rotundo, Cunningham.

**Count XII Breach of Fiduciary Duties**

181. During the Period, Defendants Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Flather, Snodgrass, and Monti, owed a fiduciary duty to the Plaintiffs and investing public. By the foregoing acts described herein, including making material misleading statements, concealing material facts, or standing silent while having a duty to act to correct, expose, or stop the unlawful conduct, the individual Defendants named above breached their Fiduciary duties, which harmed the Plaintiffs and investing public financially.

**XIII. PRAYER FOR RELIEF**

**WHEREFORE, the Plaintiffs pray for judgment as follows:**

A. Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be

proven at trial, including pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

B. Awarding the Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and the Plaintiffs recover all costs of this suit, including reasonable future attorney's fees, as provided by law;

C. Awarding the Plaintiffs punitive damages in this action against each defendant in the following amounts, or the alternative, whatever amount a jury determines after a trial;

1. Punitive damages against Vistagen; $100,000,000
2. Punitive damages against Jefferies: $100,000,000
3. Punitive damages against Withum: $20,000,000
4. Punitive damages against CEO Singh: $30,000,000
5. Punitive damages against Saxe: $5,000,000
6. Punitive damages against Leibowitz: $5,000,000
7. Punitive damages against Monti: $5,000,000
8. Punitive damages against Gin: $5,000,000
9. Punitive damages against Rotundo: $5,000,000
10. Punitive damages against Fitzpatrick: $5,000,000
11. Punitive damages against Curley: $5,000,000
12. Punitive damages against Cunningham: $5,000,000
13. Punitive damages against McPartland: $5,000,000
14. Punitive damages against Tsai: $5,000,000

D. Vistagen, its respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on its behalf be permanently enjoined and restrained from continuing and maintaining the conduct alleged herein;

E. Vistagen must amend its deceitful 8-K's, quarterly reports, annual reports, and corporate updates filed with the SEC to conform with the law.

F. Vistagen's respective officers and directors, defendants in this matter, be restrained and enjoined from squandering Vistgaen's cash position on legal fees defending the allegations herein. The allegations, including fraud and breach of fiduciary duties, are exempt from indemnification according to Vistagen's Charter; or, in the alternative, Vistagen's respective officers and directors named as defendants be ordered to pay Vistagen back any fees paid to attorneys if the defendants are found guilty of violating the terms of said indemnification agreement.

G. Because of the extraordinary financial damages caused to the public, the Plaintiffs seek additional punitive damages against Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Snodgrass, Monti, Leibowitz be imposed to include disgorgement of all equity and option grants, salaries, bonuses and stipends paid during the period of the alleged violations; with the disgorgement to be returned to Vistagen.

## XIX. Jury Trial Demand

The Plaintiffs respectfully demand a jury trial.

The Plaintiffs are planning to retain legal counsel in the future.

Respectfully submitted, this 3rdth day of March 2025.

3/3/2025

John Cesario Pro Se

15 Darrows Ridge East Lyme, CT 06333

Mailing Address PO BX 655 East Lyme CT 063333

Phone 860-333-4300

johncesario9@gmail.com

3/3/2025

David Preka Pro Se

298 Boston Post Road East Lyme, CT 06333

Mailing Address PO BX 297 Waterford CT 06385

Phone 860-365-9041

david@advimpllc.com