**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN CESARIO Pro Se and
DAVID PREKA Pro Se
Plaintiffs

Vs.

VISTAGEN THERAPEUTICS, INC., SHAWN S. SINGH, JOHN S. SAXE, JERRY GIN, MARY ROTUNDO, ANN CUNNINGHAM, MAGGIE FITZPATRICK, JOANNE CURLEY, MARK McPARTLAND, WITHUM SMITH & BROWN PC, JEFFERIES LLC. ANDREW TSAI, RALPH SNODGRASS, MARK A. SMITH, LOUIS MONTI, MICHAEL LEIBOWITZ

Defendants.

Case No. 3:25-cv-01510-TLT

Judge: Hon. Trina Thompson

Place: Courtroom 9, 19th Floor

Jury Trial Requested

# SECOND AMENDED COMPLAINT

## I. NATURE OF COMPLAINT

1. Plaintiffs John Cesario and David Preka, individually bring this second amended federal action against Defendants Vistagen, Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, Mark McPartland, Withum Smith + Brown, PC, Jefferies LLC, Andrew Tsai, Dr. Ralph Snodgrass, Mark A. Smith, Louis Monti, and Michael Leibowitz. The Plaintiffs purchased, acquired, or otherwise held, or sold, the publicly traded securities of Vistagen between January 2017 and December 2024. The Plaintiffs each suffered financial damages of over $75,000.00 due to the defendant's wrongful conduct alleged in this complaint. The Plaintiffs fell victim to Vistagen's breathtaking multi-year fraud on the market scheme.

2. The genesis of the complaint arises from violations of federal laws and state laws and statues; including but not limited to violations of (i) Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5 (a), (b) and (c) promulgated thereunder,, and Section 17(a)(1)-(3) of the Securities Act.1 and , as well as violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), (herein "The Exchange Act"); (ii) The Private Securities Litigation Reform Act (herein ("PSLRA"). State violations include certain (iii) common law fraud; (v) constructive fraud; (iv) violations of California Corporations Code § 25400 and § 25401; (v) Negligence; (vi) Negligent Misrepresentation; (vii) aiding and abetting; (viii) conspiracy, (ix) intentional misrepresentation, ~~(x)~~ fraudulent concealment; (xi) breach of fiduciary duty; (xii) breach of the implied covenant of good faith and fair dealing; and (xiii) violations and the reckless and intentional abandonment of audits being performed to Public Company Accounting Oversight Board standards ("PCAOB") rules standards and Security and Exchange (herein "SEC") rules and laws.

3. Plaintiffs allegations are based on incontrovertible evidence acquired after an extensive and lengthy investigation which included, among other things, the review and analysis of: (i) Vistagen's public quarterly reports filed with the Securities and Exchange Commission (herein "SEC"); (ii) Form 8-K's filed with the SEC with attached press releases (iii) research reports issued by financial analysts concerning Vistagen stock; (iv) Form 8-K corporate updates filed with the SEC; (v) prospectuses filed with the SEC; (vi) quarterly and Form 8-K's with attached press releases and corporate presentations reports signed CEO Singh; (vii) annual reports signed CEO Singh current and former Vistagen board members and ; (viii) news articles about Vistagen; (ix) text messages and phone calls with Vistagen's CEO Shawn K. Singh and Senior Vice-President Mark McPartland; (x) personal meetings with Vistagen's CEO Shawn K. Singh and Senior Vice-President Mark McPartland; (xi) records from the National Library of Medicine (herein "NLM") and its website clinicaltrials.gov; (xii) and a letter dated November 27th 2023 from Vistagen's outside counsel SEC, Latham & Watkins LLP.

## II. NATURE OF THE ALLEGATIONS

4. Vistagen, a failing penny stock biotech company headquartered in San Francisco that has squandered over 350 million dollars without having one of their drug compounds approved by the FDA. **Shawn Singh** ("Singh"), a purported attorney who told plaintiff Cesario he once worked for the Securities and Exchange Commission (herein "SEC"), has been Vistagen's current CEO for all relevant times in this complaint. This complaint shows that Singh has proven to be the stereotypical narcissistic penny-stock CEO who lies, commits fraud, and has no conscience, defrauding the general public out of billions of dollars while engorging himself with higher-than-median pay and huge stock awards. Notably, in addition to numerous civil torts alleged in this complaint, the Plaintiffs urge the court to take judicial notice of the criminal acts

committed by Singh. Singh knew that Vistagen's quarterly and annual reports, and 8-Ks with attached press releases, contained intentionally misleading statements and material omissions. By knowingly signing Vistagen's misleading reports Singh violated 18 U.S. Code § 1350, section 960 requires a "written statement by the CEO and CFO (or equivalent thereof) of the issuer, i] that the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934. and [ii] that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer." (Emphasis added). The astounding number of felonies committed by Singh should shock the court. When weighing whether a Court should refer potential felonies discovered during a civil proceeding, the court should weigh the seriousness of the crime. The person described herein is not someone, out of desperation, stealing several thousand dollars' worth of food to feed loved ones. Indeed, Singh, along with the Vistagen board of directors, knowingly defrauded investors for years, including perpetrating an unlawful criminal pump and dump scheme beginning on August 7th, 2023.

**Rule 8 and Rule 9 Compliance**

Violations of the Exchange Act 10b-5 Sections a, b, and c and PSLRA Act - making intentional misstatements and material omissions in SEC disclosures and statements to plaintiff Cesario

**10b-5 (b) Violationsand Violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)**

5. Vistagen, CEO Shawn K. Singh, and its board members John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Dr. Ralph Snodgrass, Mark A. Smith, and Dr. Michael Leibowitz, Maggie Fitzpatrick, JoAnne Curley, and Mark McPartland, violated the Exchange Act 10b-5 Sections making intentional misstatements and material omissions in SEC disclosures and statements to plaintiff Cesario. Those misstatements and omissions include the above named

defendants intentionally concealing that the purported PH94B Phase 2 trial(s) for SAD were (i) submitted to clinicaltrials.gov and were rejected for publication after a quality control review, (ii) failing to disclose the patent expiration of PH94B for SAD, (iii) failing to disclose the date of the PH94B trial(s), failing to disclose where the purported PH94B trials for SAD were held, (iv) failing to disclose where the PH94B trials for SAD were held and who conducted the trial(s), (v) failing to disclose or link to where the purported peer reviewed published article was located, and that Dr. Liebowitz and Dr. Monti had a financial interest in Phase 3 PH94B trials for SAD were held (vi) intentionally failing to disclose that the 88-person Phase 2 trial only included women, (vii) intentionally failing to disclose, (viii) intentionally failing to disclose that Vistagen did not have any experience or administered a Phase 3 trial, (ix) intentionally failing that the FDA had never approved a social anxiety drug based on a SUDS trial design, (x) fraudulently calling the Phase 2 PH94 SAD Phase 2 trial(s) successful when the trials were rejected for publication by clinicaltrials.gov after a quality control review, (xi) intentionally failing to disclose why the PH94B Phase 2 SAD were rejected for publication by clinicaltrials.gov, (xii) intentionally failing to disclose that Vistagen resubmitted the Phase 2 PH94B SAD trial for publication to clinocaltrials.gov and it was rejected a second time, (xiii) intentionally failing to disclose that Vistagen resubmitted the Phase 2 PH94B (ix) intentionally failing to disclose that Pherin did the purported PH10 phase 2 trial, (xx) intentionally failing to disclose where the purported PH10 Phase 2 trial was done and (xxi) Vistagen intentionally concealed in their Risk section of its 2020 and 2021 quarterly and annual reports that PH94B was binding to receptors of peripheral neurons in the nasal passages. Considering COVID-19 effected the nasal passages this fact was material.

**<u>10b-5 Section (a and c ) Violations Scheme Liability and Fraud on the Market and Violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)</u>**

6. Vistagen, CEO Shawn K. Singh, and its board John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Dr. Ralph Snodgrass, Maggie Fitzpatrick, JoAnne Curley, and Mark A. Smith, and Dr. Michael Leibowitz, and Mark McPartland violated the Exchange Act 10b-5 Sections A

and C by making intentional misstatements and material omissions in SEC disclosures and statements to plaintiff Cesario. The fraud-on-the-market scheme began in 2019 and continues to this day. The defendants made intentional misstatements in quarterly and annual reports, Form 8-K filings, press releases, corporate presentations, earnings calls, and statements made to plaintiff Cesario. This long-running scheme, which continues to this day, was motivated to prop up Vistagen's stock price and raise capital. ~~Cesario was introduced to Singh in the summer of 2016, and helped Vistagen raise capital over the years by introducing Vistagen to investors. Many who may join this suit suit or file an independent action against the defendants. Vistagen has been on the verge of bankruptcy several times, including after the AV-101 and PALISADE-1 trial(s) failed.~~ Notably, the U.S Supreme Court's holding in *Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 260 (2024)* controls 10b-5 (b) claims, not 10b-5 (a and c) claims.

> *"Half-truths, on the other hand, are "representations that state the truth only so far as it goes, while omitting critical qualifying information." Universal Health Services, Inc. v. United States ex rel. Escobar, 579 U.S. 176, 188. Rule 10b–5(b) requires disclosure of information necessary to ensure that statements already made are clear and complete."*

> *"A classic example of an actionable half-truth in contract law is the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property." Universal Health Services, 579 U. S., at 188–189. In other words, the difference between a pure omission and a half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert.'*

7. Misrepresentations constitute an act, practice or course of business under Rule 10b-5, regardless of who was the maker. Lorenzo v. SEC, 138 S.Ct. 2650, 201 L.Ed 2d 484 (2019) (*"dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5, as well as the relevant statutory provisions, ... even if the disseminator did not "make" the statements")* Vistagen's price was artificially after manipulated by Vistagen's misleading statements and material omissions it disclosed that AV-101 failed. *See, The term "manipulation," "'connotes intentional or willful conduct designed*

*to deceive or defraud investors by controlling or artificially affecting the price of securities.'" Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer, No. C 09-03529 JSW, 2011 WL 1152568, at *5 (N.D. Cal. Mar. 28, 2011). Deception arises when an investor is erroneously led to believe that the price for the security in question is driven or rigged by manipulators, rather than by the natural interplay of supply and demand for the stock. The "manipulative or deceptive device" requirement may be satisfied by any of the following: a device, scheme, or artifice to defraud; a material misstatement or omission; or any act, practice or course of business which operates or would operate as a fraud. Burnett v. Rowzee, 561 F. Supp. 2d 1120, 1125 (C.D. Cal. 2008). Importanlty, manipulative or deceptive conduct includes pump and dump schemes. See e.g., In re Galena Biopharma, Inc. Sec. Litig., 117 F. Supp. 3d 1145, 1196 (D. Or. 2015); U.S. v. Curshen, 567 Fed.Appx. 815, 816 (11th Cir.2014); U.S. v. Curshen, 567 Fed.Appx. 815, 816 (11th Cir.2014).*

8. The fact that the Phase 2 PH94B SAD trial(s) were rejected for publication by clinicaltrials.gov after a quality review, and that Vistagen attempted to correct the issue that clinicaltrials.gov before starting the Phase 3 PH94B SAD trials evidences that Vistagen knew the import of getting the trials published. Vistagen's nonsensical argument that they did not have to disclose the clinicaltrials.gov because it is a public website has no basis in law. First, the Supreme Court's holding in Macquarie Infrastructure mandates full disclosure. Second, Supreme Court and Circuit Court holdings do require investors that put their money on the line do reasonable research, but that is defined as reviewing quarterly and annual reports filed with the SEC. Investors are not required to become Sherlock Holmes.Vistagen did not disclose that the trial was registered with clinicaltrials.gov , they did not provide a link to the trial, yet they promoted a purported peer reviewed published paper in over a dozen quarterly and annual reports and press releases. Notably, Vistagen did not provide a link to the purported "peer reviewed published paper". Third, and extremely noteworthy, Vistagen's 2025 audited annual report omits referencing that the Phase 2 PH94B SAD trials were successful, and any reference

to the purported "peer reviewed published paper on the Phase 2 PH94B SAD trial that was notable in over a dozen quarterly reports 4 annual reports. Indeed, the report deleted all references to the purported peer reviewed published paper. Moreover, the report now states that other exploratory trials were done by Pherin, and they were done in Mexico. The plaintiff's complaint is responsible for those disclosure changes. If those disclosures are material now, they were material before.

**Violations of the Exchange Act - Illegal Pump and Dump Scheme and Violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)**

Vistagen's Pump and Dump Scheme Defrauded the Public Over $1 Billion

9. On August 7th, 2023, Vistagen, CEO Singh, and the board of directors, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, and JoAnne Curley, knowingly and intentionally planned a pump-and-dump scheme to raise needed capital for Vistagen. Vistagen filed a Form 8-K with an attached press release with the SEC. The press release headlines were blatantly fraudulent. First, Vistagen's press release headline disclosed its topline results for the Phase 3 PH94B SAD trial WITHOUT revealing that the results were INTERIM. Vistagen quit the Phase 3 trial because it lacked the funds to complete it. Second, Vistagen's headline fraudulently stated that the trial was the first successful phase 3 study in social anxiety in 15 years. As detailed here, the trial was designed as a Phase 3 trial, but the trial was not a Phase 3 trial because Vistagen quit the trial before enrolling the subjects they had agreed with the FDA. Vistagen's stock price surged from $1.80 to $71, and then began dumping stock. As the truth became known, Vistagen's stock price collapsed all the way back to the $2 range.

10. On August 7th, 2023, Vistagen, CEO Singh, and the board of directors, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, and JoAnne Curley, knowingly and intentionally planned a pump-and-dump scheme to raise needed capital for Vistagen. Vistagen filed a Form 8-K with an attached press release with the SEC. The press release headlines were blatantly fraudulent. First, Vistagen's press release headline disclosed its topline results for the Phase 3 PH94B SAD trial WITHOUT revealing that the results were INTERIM. Vistagen quit the Phase 3 trial because it lacked the funds to complete it. Second, Vistagen's headline fraudulently stated that the trial was the first successful phase 3 study in social anxiety in 15 years. As detailed here, the trial was designed as a Phase 3 trial, but the trial was not a Phase 3 trial because Vistagen quit the trial before enrolling the subjects they had agreed with the FDA. Vistagen's stock price surged from $1.80 to $71 and then began to dump stock. As the truth became known, Vistagen's stock price collapsed all the way back to the $2 range. The illegal pump and dump lasted several days, and based on the trading volume and share price publicly available the duped general public was defrauded out of over $1 billion. Vistagen ill-gotten gains were over $60 million, as further discussed below.

**The Relationship Between the FDA and clinicaltrials.gov**

11. Vistagen, Vistagen's CEO Singh, Vistagen's Board of Directors and defendant McPartland would have the court believe that (i) they have no responsibility for disclosing that the Phase 2 PH94B trials because clinicaltrials.gov is a public database and (ii) that clinicaltrials.gov is only clerical in nature. In researching prior to filing this lawsuit the plaintiffs discovered that it is law that all clinical Phase 2 and 3 trials be registered with clinicaltrials.gov and the results be published. The fact that Vistagen called the Phase 2 trials successful after knowing that clinicaltrials.gov rejected for quality control issues obviously reeks of fraud with

intent. As noted above, failing to disclose material facts, making misleading statements and material omissions has already been addressed, as acts violate the Exchange Act, the PSLRA, Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 260 (2024). Moreover, clinicaltrials.gov rejecting publishing Vistagen's two Phase 2 trials and the Pilot Phase 3 trial is historical information that a reasonable investor would want to consider before putting their money on the line. Common reasons for clinicaltrials.gov rejecting publishing a trial are;

- Incomplete outcome measures because not all data for pre-specified primary and/or secondary outcomes are reported.
- Data inconsistencies.
- Inaccurate or inconsistent data.
- Incomplete results.
- Formatting issues.

12. As noted above, in addition to the two Phase 2 trials and Pilot Phase 3 trials being rejected by clinicaltrials.gov, the Phase 3 PH94B PALISADE 1 trial, the Phase 3 PH94B PALISADE 2 trial, the PH94B open label trial, the PH94B COVID scam trial was rejected by clinicaltrials.gov after a quality control review. Newly discovered evidence shows that the AV-101 trial recently completed by Vistagen was also rejected for publication by clinicaltrials.gov after a quality control review.

Contrary to Vistagen's claims regarding clinicaltrials.gov, here is an accurate summary of the relationship it has with the FDA despite them being different federal government organizations.

- ClinicalTrials.gov is managed by the National Library of Medicine (NLM) at the National Institutes of Health (NIH).
- The FDA is a separate government agency under the U.S. Department of Health and Human Services responsible for regulating food, drugs, medical devices, and more.
- They have a shared purpose: Transparency and Oversight
- Both entities contribute to ensuring transparency and accountability in clinical research, especially studies involving drugs, biologics, and medical devices.

- ClinicalTrials.gov is a public registry and results database for clinical studies.
- The FDA regulates clinical trials to ensure safety, ethics, and scientific validity, especially for trials supporting approval of new medical product

The FDA Requirements Drive ClinicalTrials.gov Reporting

- The FDA requires certain clinical trials to be registered and have their results posted on ClinicalTrials.gov.
  - Under U.S. Law:
    - The FDA Amendments Act of 2007 (FDAAA 801) requires that applicable clinical trials be registered and report results to ClinicalTrials.gov

The FDA Uses ClinicalTrials.gov Data

- The FDA can access and use ClinicalTrials.gov data for:
  - Monitoring trial compliance.
  - Informing regulatory decisions.
  - Enhancing transparency in clinical development

13. The plaintiffs include the following quarterly and annual reports, as well as the links to publicly available information from government websites provided below. Vistagen made a material omission in the Risk Factor sections of its quarterly and annual reports. Vistagen and the defendants named above were aware that PH94B binds to the nasal receptors and that COVID-19 not only spreads through breathing but also severely affects the nasal passageways. In addition, the following false and misleading statement was made in the quarterly and annual reports linked below.

> *"In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz, the creator of the Liebowitz Social Anxiety Scale (LSAS), as principal investigator, PH94B was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using patient-reported anxiety ratings*

*on the Subjective Units of Distress Scale (SUDS) within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B".*

6/29 2020 Annual Report Filed with the SEC page 4

https://www.sec.gov/Archives/edgar/data/1411685/000165495420007107/vtgn10k_mar312020.htm

6/29/ 2021 Annual Report Filed with the SEC Page 5

https://www.sec.gov/Archives/edgar/data/1411685/000165495421007380/vtgn_10k.htm

6/23/2022 Annual Report Filed with the SEC Page 3

https://www.sec.gov/Archives/edgar/data/1411685/000185173422000349/vtgn20220331_10k.htm

6/23/2023 Annual Report Filed with the SEC brazenly made this false and misleading statement;

https://www.sec.gov/Archives/edgar/data/1411685/000143774923018793/vtgn20230331_10k.htm

***SAD Phase 2 Studies***

*Positive Phase 2 Results in Public Speaking and Social Interaction-Induced Stressors in a Clinical Setting. Phase 2 development of fasedienol began with a two-part public speaking and social interaction challenge study. In this published randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91) conducted at three clinical sites, 91 adult female subjects diagnosed with SAD underwent a placebo-only baseline public speaking and social interaction challenges in a clinical setting followed a week later by a randomized placebo-controlled treatment period and intranasal administration of fasedienol. Fasedienol (1.6 µg) was administered intranasally 15 minutes prior to both the public speaking and social interaction challenge simulations. The two challenges were separated by a 30-minute rest period. The primary outcome measure was the Subjective Units of Distress Scale (SUDS). Peer-reviewed results published in the American Journal of Psychiatry (Monti, et al., Am. J. Psychiatry (2014) 171:675-682) showed statistically significant results for reducing anxiety during a public speaking performance and during social interactions in a clinical setting. During the public speaking challenge, subjects randomized to treatment with fasedienol (n = 45) showed a 26.7-point improvement in mean SUDS scores following the treatment visit with fasedienol as compared to the SUDS scores during the baseline visit (placebo treatment). In comparison, subjects randomized to treatment with placebo (n = 46) showed an improvement of only 14.0 points in mean SUDS scores compared to baseline. The fasedienol treatment group's improvement in the public speaking challenge significantly exceeded that of the placebo group's improvement (t = 3.16, p = 0.002).*

*Mild or moderate adverse events were infrequent and did not differ significantly between the fasedienol and placebo groups. No severe or serious adverse events were reported.*

*Positive Phase 2 Results in a Real-World Setting. A second peer-reviewed Phase 2 study of fasedienol in SAD was published in the Journal of Depression and Anxiety (Monti, et al., Depress Anxiety (2016); 33: 1081–1089). In the randomized, double-blind, placebo-controlled crossover study that included*

*both adult males and females 18 to 65 years of age, subjects self-administered fasedienol or placebo nasal spray on an as-needed basis, just prior to stressful, anxiety-provoking encounters in their daily lives, up to four times a day. Following two weeks of treatment, the subjects were crossed over to the other nasal spray for another two weeks. The primary efficacy measure in the study was the SUDS and the secondary efficacy measure was the Liebowitz Social Anxiety Scale (LSAS). The LSAS was created by Dr. Michael Liebowitz and was the primary efficacy endpoint in all Phase 3 registration trials for the three antidepressants approved by the FDA for treatment of SAD. Dr. Liebowitz was the Principal Investigator of this Phase 2 study of fasedienol.*

14. Vistagen also made the below false and misleading statement with material omissions in the quarterly filings linked below,

*"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B neuroactive nasal spray was significantly more effective than placebo in reducing both public-speaking (performance) anxiety ($p=0.002$) and social interaction anxiety ($p=0.009$) in laboratory challenges of individuals with SAD within 10 to 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B. Based on its novel mechanism of pharmacological action, rapid-onset of therapeutic effects and exceptional safety and tolerability profile in Phase 2 and pilot Phase 3 clinical trials to date, we are preparing to begin Phase 3 development of PH94B."*

Vistagen's quarterly report filed with the SEC 11/17/2019 Pp 5
https://www.sec.gov/Archives/edgar/data/1411685/000165495419012431/vtgn10q_sep302019.htm

Vistagen's quarterly report filed with the SEC 02/13/2020 Page 4
https://www.sec.gov/Archives/edgar/data/1411685/000165495420001517/vtgn10q_dec312019.htm

Vistagen's quarterly report filed with the SEC 08/30/2020 Page 5
https://www.sec.gov/Archives/edgar/data/1411685/000165495420001517/vtgn10q_dec312019.htm

Vistagen's quarterly report filed with the SEC 11/12/2020
https://www.sec.gov/Archives/edgar/data/1411685/000165495420012266/vtgn10q_sep302020.htm

*"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B neuroactive nasal spray was significantly more effective than placebo in reducing both public-speaking (performance) anxiety ($p=0.002$) and social interaction anxiety ($p=0.009$) in laboratory challenges of individuals with SAD within 10 to 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B. Based on its novel mechanism of pharmacological action, rapid-onset of therapeutic effects and exceptional safety and tolerability profile in Phase 2 and pilot Phase 3 clinical trials to date, we are preparing to begin Phase 3 development of PH94B."*

**Vistagen's Gross Negligence and Recklessness**

15. [1]Vistagen was grossly reckless, beginning PALISADE-1 during the peak of COVID-19. Vistagen proceeded with a reckless gamble, initiating the Palisade-2 trials during the peak of the COVID-19 pandemic. Vistagen did so despite being aware of the risk factors. See Vistagen's 2020 annual report filed with the SEC on June 29th, 2020. See page 40.

*https://www.sec.gov/Archives/edgar/data/1411685/000165495420007107/vtgn10k_mar312020.htm*

Vistagen modeled the Phase 3 SAD trials after the Phase 2 SAD trials that Vistagen modeled the Phase 3 SAD trials on were rejected for publication by clinicaltrials.gov after a quality control review, and Vistagen attempted to correct the quality control deficiency only to have clinicaltrials.gov reject publishing the trial a second time. Vistagen knew that when they recklessly initiated enrolling patients in the Phase 3 PALISADE SAD trials, that;

- The public was forced to wear a mask
- COVID-19 was highly contagious
- Rapid tests were not 100% reliable
- COVID-19 virus was an airborne virus
- VistaGen reported new *in vitro* electrophysiology data demonstrating that the mechanism of action of PH94B does not involve direct activation of GABA-A receptors, in distinct contrast to the mechanism of action of benzodiazepines, which act as direct positive modulators of GABA-A receptors
- The Phase 2 PH94B SAD trial that the Phase 3 PH94B SAD trials were modeled after was rejected for publication by clinicaltrials.gov after a quality control review.
    - They resubmitted the Phase 2 PH94B SAD trial to clinicaltrials.gov, and it was rejected for quality control reasons before initiating the Phase 3 PALISADE trials.
- A second Phase 2 PH94B SAD trial was rejected for publication by clinicaltrials.gov after a quality control review before initiating the Phase 3 PALISADE trials.
- That a Pilot Phase 3 PH94B SAD trial was rejected for publication by clinicaltrials.gov after a quality control review before initiating the Phase 3 PALISADE trials.

---

[1] Vistagns board of directors gross negligence claims, fiduciary breach claims and accounting negligence claims do not fall under Rule 9 pleading requirements

- That Dr. Liebowitz was the lead investigator of the two Phase 2 PH94B trials and the pilot Phase 3 PH94B that were rejected for publication by clinicaltrials.gov, and hired him to be the lead investigator of the Phase 3 trials.
  - Liebowitz was the lead investigator on the two PH94B PALISADE Phase 3 trials, the PH94B open-label trial, and the PH94B adjustment disorder trial, which were all submitted to clinicaltrials.gov. and rejected for publication by clinicaltrials.gov (Emphasis Added)

**WithumSmith+Brown's Gross Negligence through violations and the reckless and intentional abandonment of audits being performed to Public Company Accounting Oversight Board standards ("PCAOB") rules standards and Security and Exchange (herein "SEC") rules and laws.**

16. Between 2019 and 2023, WithumSmith+Brown was grossly negligent in performing its auditing duties during its long, multi-year engagement with Vitagen. After Vistagen's AV-101 trial failed, it was nearing bankruptcy, and Vistagen's leading drug candidate then became PH94B indication for SAD. As noted above, Vistagen intentionally failed to disclose that two PH94B trials and a Phase 3 Pilot trial were rejected for publication by clinicaltrials.gov after a quality control review. Various Vistagen disclosures described the PH94B SAD Phase 2 trial as successful despite being rejected for publication by clinicaltrials.gov. WithumSmith+Brown's website states that they are experts in providing auditing services for biotech companies.

17. WithumSmith+Brown was legally required to maintain a high degree of skepticism when performing its audit duties and would have known that all clinicaltrials.gov are legally required to be registered on clinicaltrials.gov and the results published. It is the law. Despite that, and knowing that Vistagen desperately needed to raise funds WithumSmith+Brown turned a blind eye to Vistagen hyping the two Phase 2 PH94B SAD trials and the Pilot Phase 3 PH94B trial despite the misleading statements and material omissions which not only include clinicaltrials.gov rejecting the three trials, but also include clinicaltrials.gov rejecting the

resubmission, and Vistagen's failure to provide the date of the trial(s), where the trials were done, or even publish a link to the purported peer reviewed publication Vistagen touted in press releases, quarterly and annual reports, earnings calls, S-1 registrations, and prospectuses. Moreover, WithumSmith+Brown turned a blind eye to Vistagen misleading statements in dozens of SEC disclosures regarding Vistagen's latest drug candidate they are hyping called PH10. Vistagen repeatedly states that its exploratory Phase 2a trial for PH120 was successful. Vistagen was legally required to register PH10 with clinicaltrials.gov, but searches do not show that that trial was registered. WithumSmith+Brown is legally required to comply with laws passed by Congress, as well as the rules and regulations enacted by the SEC and PCAOB. The U.S Supreme Court has stated that auditors are the gatekeepers to protect the public. WithumSmith+Brown failed spectacularly.

**California Corporations Code § 25400 Allegations**

18. Between 2019 and 2023, Vistagen, Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, Mark McPartland, and Dr. Ralph Snodgrass knowingly and intentionally violated § 25400 of the California Corporations Code by making and or approving quarterly and annual reports, press releases, corporate presentations making the misleading statements and material omissions, including intentionally concealing that the purported PH94B Phase 2 trial(s) for SAD were (i) submitted to clinicaltrials.gov and were rejected for publication after a quality control review, (ii) failing to disclose the patent expiration of PH94B for SAD, (iii) failing to disclose the date of the PH94B trial(s), failing to disclose where the purported PH94B trials for SAD were held, (iv) failing to disclose where the PH94B trials for SAD were held and who conducted the trial(s), (v) failing to disclose or link to where the purported peer reviewed published article was located, and that Dr.

Liebowitz and Dr. Monti had a financial interest in Phase 3 PH94B trials for SAD were held (vi) intentionally failing to disclose that the 88-person Phase 2 trial only included women, (vii) intentionally failing to disclose, (viii) intentionally failing to disclose that Vistagen did not have any experience or administered a Phase 3 trial, (ix) intentionally failing that the FDA had never approved a social anxiety drug based on a SUDS trial design, (x) fraudulently calling the Phase 2 PH94 SAD Phase 2 trial(s) successful when the trials were rejected for publication by clinicaltrials.gov after a quality control review, (xi) intentionally failing to disclose why the PH94B Phase 2 SAD were rejected for publication by clinicaltrials.gov, (xii) intentionally failing to disclose that Vistagen resubmitted the Phase 2 PH94B SAD trial for publication to clinocaltrials.gov and it was rejected a second time, (xiii) intentionally failing to disclose that Vistagen resubmitted the Phase 2 PH94B (ix) intentionally failing to disclose that Pherin did the purported PH10 phase 2 trial, (xx) intentionally failing to disclose where the purported PH10 phase 2 trial was done. "Corporations Code section 25400 provides that it is unlawful in [California] to make false statements or engage in specified fraudulent transactions which affect the market for a security when done [for specified purposes]." Diamond Multimedia Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036, 1040, 80 Cal.Rptr.2d 828, 968 P.2d 539. "In short, it prohibits market manipulation." Id. Section 25500, in turn, "creates a civil remedy for buyers or sellers of stock the price of which has been affected by the forms of market manipulation proscribed by section 25400." Id. A more general prohibition exits under 25400 (d), which provides that it is unlawful for a person selling or offering for sale securities "to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact." Proving actual reliance

and privity to establish liability under 25400 is not required. Colman v. Theranos, Inc., 325 F.R.D. 629, 647 (N.D. Cal. 2018) (citing RLI Ins. Co., 94 Cal. App. 4th 102, 109, 113 Cal.Rptr.2d 915 (2001). Between 2019 and 2023, Defendants McPartland and Singh informed Cesario on numerous occasions that the Phase 2 trial on which PALISADE 1 was modeled was highly successful, without disclosing the aforementioned material omissions. **Dr. Michael Leibowitz and Dr. Louis Monti** conspired with and aided and abetted Vistagen, its board of directors and McPartland in violating California Corporations Code Section 25400.

19. Jefferies and Tsai and Tsai aided and abetted Vistagen in committing California Corporations Code § 25400 torts throughout 2020 through 2023 by knowingly issuing research reports and price targets whild knowing that (1) Vistagen its directors and management were violating the Exchange Act and PSLRA, (2) Vistagen, its directors and management were committing fraud, (3) Vistagen's prospectuses contained fasle and misleading statements and material omissions.

**California Corporations Code § 25401 Allegations**

20-. Between 2019 and 2023, Vistagen, Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, Mark McPartland, and Dr. Ralph Snodgrass knowingly and intentionally violated California Corporations Code Section 25401 by and through their acts in the preceding paragraph (1) through (xi) California Corporations Code Section 25401 replicates the provisions of Rule 10b-5, 17 C.F.R. 240.10b-5. However, unlike Rule 10b-5, a plaintiff need not prove reliance or that the misrepresentation or omission caused the plaintiff's loss under this provision of the California Corporations Code. Lynch v. Cook, 148 Cal. App. 3d 1072, 1087-88 (1983). Persons who aid and abet the above

violations are equally at fault if they knew that other person's conduct breached a duty and the person rendered encouragement or substantial assistance. See. eg., Schultz v. Neovi Data Corp., 152 Cal.App.4th 86, 93, 60 Cal.Rptr.3d 810 (2007). Between 2019 and 2023, Defendants McPartland and Singh informed Cesario on numerous occasions that the Phase 2 trial on which PALISADE 1 was modeled was highly successful, without disclosing the aforementioned material omissions. Dr. Liebowitz and Dr. Monti conspired with and aided and abetted Vistagen, its board of directors and McPartland in violating California Corporations Code Section 25401.

21. Jefferies and Tsai and Tsai aided and abetted Vistagen in committing California Corporations Code § 25401 torts throughout 2020 through 2023 by knowingly issuing research reports and price targets whild knowing that (1) Vistagen its directors and management were violating the Exchange Act and PSLRA, (2) Vistagen, its directors and management were committing fraud, (3) Vistagen's prospectuses contained fasle and misleading statements and material omissions.

**Common Law Fraud Violations**

22. Between 2019 and 2023, Vistagen, CEO Shawn K. Singh, current and former board members, John S. Saxe, Jerry Gin, Mary L. Rotundo, Dr. Ralph Snodgrass, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, and Sr Vice President Mark McPartland, engaged in common law by concealing that the Phase SAD 2 trial which the PALISADE Phase 3 PH94B SAD trials were modeled after was rejected for publication by clinicaltrials.gov after a quality control review, and that Vistagen attempted to correct and resubmit the trial and it was denied again. Vistagen, the above-named board members had a legal obligation to disclose these material facts. Public companies, their board members, and executive management team are required to comply with all federal laws and regulations. The Exchange Act, passed by Congress,

required disclosure. The PSLRA, passed by Congress, requires disclosure. SEC Regulation FD requires disclosure. Furthermore, the U.S Supreme Court has long settled the issue of materiality in securities; TSC Industries, Inc. v. Northway, Inc., 426 U. S. 438, ***whereby an omitted fact is material if there is a substantial likelihood that its disclosure would have been considered significant by a reasonable investor***, is expressly adopted for the § 10(b) and Rule 10b-5 context. Pp. 485 U. S. 230-232. clinicaltrials.gov did not just reject the one Phase study; it received two Phase 2 studies and a Pilot Phase 3 study after a quality review check. The defendants mentioned earlier concealed disclosing why the trial was rejected, what they did to try to cure it, and why it was denied a second time. As noted above, not only did Vistagen's two Phase 2 and one Pilot Phase 3 PH94B trials get rejected by clinicaltrials.gov, but Vistagen's open-label SAD PH94B trial, its PH94B adjustment disorder trial, and the two PH94B Phase 3 SAD trials called PALISADE 1 and PALISADE 2 were rejected for publication. Vistagen has continued to conceal these facts from investors in an unlawful manner. Vistagen also conducted its own AV-101 trial after the NIH-funded and administered AV-101 trial failed. This trial was also rejected for publication by clinicaltrials.gov. In addition to the defendants having a legal obligation to disclose that the trials were rejected, the plaintiffs would not have bought as much stock or sold their stock when it was over $3.00 ($90 adjusted for the split)because they would have been forewarned that Vistagen and Leibowitz were incompetent in running trials See, *Hardisty v. Moore, 6 F. Supp. 3d 1044, 1052 (S.D. Cal. 2014) (quoting Small v. Fritz Cos., Inc., 30 Cal.4th 167, 173, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (Cal.2003)), as well as constructive fraud, which arises on a breach of a duty by one in a confidential or fiduciary relationship to another and which induces justifiable reliance by the latter to his prejudice. See Tyler v.*

*Children's Home Soc'y 29; Cal.App.4th 511, 548, 35 Cal.Rptr.2d 291 (Cal.Ct.App.1994); In re Harmon, 250 F.3d 1240, 1249 (9th Cir.2001).*

23. Singh and McPartland also committed common law fraud by inducing Cesario to hold his stock. See California's appellate courts holding in Greenfield vs Fritz Court of Appeal, First District, Division 4, California.

https://caselaw.findlaw.com/court/ca-court-of-appeal/1402732.html

> *"Plaintiff demonstrated cause and effect-defendants' misrepresentations induced plaintiff not to sell his stock, "when [he] otherwise would have done so," and he suffered "damage by virtue of the wrongfully induced decision to hold Fritz stock."  For pleading purposes that is sufficient. (E.g., Commonwealth Mortgage Assurance Co. v. Superior Court (1989) 211 Cal.App.3d 508, 518, 259 Cal.Rptr. 425; Woodson v. Winchester (1911) 16 Cal.App. 472, 476-477, 117 P. 565.)"*

Had the Plaintiffs sold their stock at or near the $3.00 (which was not the historical high) the plaintiffs would have netted nearly $5 million dollars. Moreover, in violation of federal interstate laws McPartland induced Cesario to wire Vistagen funds to exercise warrants from private placements and hold the stock because he continually stated to Cesario that Vistagen expected better results from the Phase 3 trials than the Phase 2 trial. McPartland also induced friends and family of Cesario to exercise warrants by wiring millions of dollars and holding the stock through the Phase 3 trials. Jefferies and Tsai and Tsai aided and abetted Vistagen in committing common law torts throughout 2020 through 2023 by knowingly issuing research reports and price targets whild knowing that (1) Vistagen its directors and management were violating the Exchange Act and PSLRA, (2) Vistagen, its directors and management were committing fraud, (3) Vistagen's prospectuses contained fasle and misleading statements and material omissions.

**Constructive Fraud Claims**

24. Plaintiffs Cesario and Preka suffered substantial financial losses due to the defendants Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, Dr. Ralph Snodgrass, Mark A. Smith, Louis Monti, and Michael

Leibowitz. CEO Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Dr. Ralph Snodgrass, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, and Sr Vice President Mark McPartland, intentional and willful violation of federal and state securities laws, fiduciary breaches, common law fraud, deceit, deliberate misrepresentation gross negligence, and violations of California Corporation Codes § 25401 and § 25400. The above defendants are current or former board members of Vistagen or are Sr. vice presidents who owed a fiduciary duty to the Plaintiffs. The defendants named above harmed the plaintiffs. As noted above, not only did Vistagen's two Phase 2 and one Pilot Phase 3 PH94B trials get rejected by clinicaltrials.gov, but Vistagen's open-label SAD PH94B trial, its PH94B adjustment disorder trial, and the two PH94B Phase 3 SAD trials called PALISADE 1 and PALISADE 2 were rejected for publication. Vistagen has continued to conceal these facts from investors unlawfully. Vistagen also conducted its own AV-101 trial after the NIH-funded and administered AV-101 trial failed. This trial was also rejected for publication by clinicaltrials.gov. The defendants issued a false and misleading press release on August 7th 2023 to facilitate an illegal pump-and-dump scheme, as described herein. The defendant's press release intentionally omitted that the "Top Line" results were interim. The defendants also fraudulently stated in a sub headline in the press release that their PALISADE 2 trial was the "first successful Phase 3 study In addition to the defendants having a legal obligation to disclose that the trials were rejected, the plaintiffs would not have bought as much stock or sold their stock when it was over $3.00 ($90 adjusted for the split.) because they would have been forewarned that Vistagen and Leibowitz were incompetent in running trials. See,

> *"A fiduciary must tell its principal of all information it possesses that is material to the principal's interests. A fiduciary's failure to share material information with the principal is constructive fraud, a term of art obviating actual fraudulent intent." (Michel v. Moore & Associates, Inc. (2007) 156 Cal.App.4th 756, 762 [67 Cal.Rptr.3d 797],*

*"In its generic sense, constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust, or confidence, and resulting in damages to another. [Citations.] Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated - that is, in which such conduct is a constructive or quasi fraud, having all the actual consequences and all the legal effects of actual fraud." (Prakashpalan, supra, 223 Cal.App.4th at p. 1131.)*

*"This rebuttable presumption implements the long recognized public policy of imposing fiduciary duties upon partners in their relationship to one another. Indeed, this policy is lodged in the statutory and case law of this state. It is more than the simple shifting of the burden of proof to facilitate the determination of a particular action. Consequently, [defendant] had the burden of proving by substantial evidence that [plaintiff] did not rely on the alleged false statement." (Edmunds, supra, 16 Cal.App.4th at p. 1302.*

See Vistagen's Code of Business Conduct, page 2 Sections Conducting Business with Integrity and Compliance with Laws and Regulations

https://www.vistagen.com/static-files/42c25675-489e-42c2-adb9-9c405464a90f

25. Jefferies and Tsai and Tsai aided and abetted Vistagen in committing constructive fraud torts throughout 2020 through 2023 by knowingly issuing research reports and price targets whild knowing that (1) Vistagen its directors and management were violating the Exchange Act and PSLRA, (2) Vistagen, its directors and management were committing fraud, (3) Vistagen's prospectuses contained fasle and misleading statements and material omissions.

**<u>Breach of Fiduciary Duty and Breach of Implied Covenant of Good Faith and Fair Dealing</u>**

Plaintiffs Cesario and Preka suffered substantial financial losses due to the defendants Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, Dr. Ralph Snodgrass, Mark A. Smith, Louis Monti, and Michael Leibowitz. CEO Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Dr. Ralph Snodgrass, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, and Sr Vice President Mark McPartland, intentional and willful violation of federal and state securities laws, fiduciary breaches, common law fraud, deceit, deliberate misrepresentation gross negligence, and violations of California

Corporation Codes § 25401 and § 25400. The above defendants are current or former board members of Vistagen or are Sr. vice presidents who owed a fiduciary duty to the Plaintiffs. The defendants named above harmed the plaintiffs. As noted above, not only did Vistagen's two Phase 2 and one Pilot Phase 3 PH94B trials get rejected by clinicaltrials.gov, but Vistagen's open-label SAD PH94B trial, its PH94B adjustment disorder trial, and the two PH94B Phase 3 SAD trials called PALISADE 1 and PALISADE 2 were rejected for publication. Vistagen has continued to conceal these facts from investors unlawfully. Vistagen also conducted its own AV-101 trial after the NIH-funded and administered AV-101 trial failed. This trial was also rejected for publication by clinicaltrials.gov. The defendants issued a false and misleading press release on August 7th 2023 to facilitate an illegal pump-and-dump scheme, as described herein. The defendant's press release intentionally omitted that the "Top Line" results were interim. The defendants also fraudulently stated in a sub headline in the press release that their PALISADE 2 trial was the "first successful Phase 3 study In addition to the defendants having a legal obligation to disclose that the trials were rejected, the plaintiffs would not have bought as much stock or sold their stock when it was over $3.00 ($90 adjusted for the split.) because they would have been forewarned that Vistagen and Leibowitz were incompetent in running trials.

*"A fiduciary relationship is ' " 'any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. . . .' " ' " (Wolf v. Superior Court (2003) 107 Cal.App.4th 25, 29 [130Cal.Rptr.2d 860], internal citations omitted.)*

*"Recovery for damages based upon breach of fiduciary duty is controlled by Civil Code section 3333, the traditional tort recovery. This is actually broader in some instances than damages which may be recovered for fraud.* ***Also, punitive damages are appropriate for a***

***breach of fiduciary duty."*** *(Michelson v. Hamada(1994) 29 Cal.App.4th 1566, 1582 [36 Cal.Rptr.2d 343], internal citations omitted.*

*"An act such as breach of fiduciary duty may be both a breach of contract and a tort." (Kangarlou v. Progressive Title Co., Inc. (2005) 128 Cal.App.4th 1174, 1178 [27 Cal.Rptr.3d 754], internal citation omitted.)*

Jefferies and Tsai and Tsai aided and abetted Vistagen directors and executives in committing fiduciary breaches throughout 2020 through 2023 by knowingly issuing research reports and price targets whild knowing that (1) Vistagen its directors and management were violating the Exchange Act and PSLRA, (2) Vistagen, its directors and management were committing fraud, (3) Vistagen's prospectuses contained fasle and misleading statements and material omissions. in committing intentional misrepsresntaion torts throughout 2020 through 2023 by knowingly issuing research reports and price targets whild knowing that (1) Vistagen its directors and management were violating the Exchange Act and PSLRA, (2) Vistagen, its directors and management were committing fraud, (3) Vistagen's prospectuses contained fasle and misleading statements and material omissions.

## Intentional Misrepresentation

26. Plaintiffs Cesario and Preka suffered substantial financial losses due to the defendants Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, Dr. Ralph Snodgrass, Mark A. Smith, Louis Monti, and Michael Leibowitz. CEO Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Dr. Ralph Snodgrass, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, and Sr Vice President Mark McPartland, intentional and willful violation of federal and state securities laws, fiduciary breaches, common law fraud, deceit, deliberate misrepresentation gross negligence, and violations of California Corporation Codes § 25401 and § 25400. The above defendants are

current or former board members of Vistagen or are Sr. vice presidents who owed a fiduciary duty to the Plaintiffs. The defendants named above harmed the plaintiffs. As noted above, not only did Vistagen's two Phase 2 and one Pilot Phase 3 PH94B trials get rejected by clinicaltrials.gov, but Vistagen's open-label SAD PH94B trial, its PH94B adjustment disorder trial, and the two PH94B Phase 3 SAD trials called PALISADE 1 and PALISADE 2 were rejected for publication. Vistagen has continued to conceal these facts from investors unlawfully. Vistagen also conducted its own AV-101 trial after the NIH-funded and administered AV-101 trial failed. This trial was also rejected for publication by clinicaltrials.gov. The defendants issued a false and misleading press release on August 7th 2023 to facilitate an illegal pump-and-dump scheme, as described herein. The defendant's press release intentionally omitted that the "Top Line" results were interim. The defendants also fraudulently stated in a sub headline in the press release that their PALISADE 2 trial was the "first successful Phase 3 study In addition to the defendants having a legal obligation to disclose that the trials were rejected, the plaintiffs would not have bought as much stock or sold their stock when it was over $3.00 ($90 adjusted for the split.) because they would have been forewarned that Vistagen and Leibowitz were incompetent in running trials. See;

*" '[F]alse representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered.' " (Engalla, supra, 15 Cal.4th at p. 974, quoting Yellow Creek Logging Corp. v. Dare (1963) 216 Cal.App.2d 50, 55 [30 Cal.Rptr. 629].*

26. Jefferies and Tsai and Tsai aided and abetted Vistagen in committing intentional misrepsresntaion torts throughout 2020 through 2023 by knowingly issuing research reports and price targets whild knowing that (1) Vistagen its directors and management were violating the

Exchange Act and PSLRA, (2) Vistagen, its directors and management were committing fraud, (3) Vistagen's prospectuses contained fasle and misleading statements and material omissions.

**Conspiracy Claims**

27. Plaintiffs Cesario and Preka suffered substantial financial losses due to the defendants Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, Dr. Ralph Snodgrass, Mark A. Smith, Louis Monti, and Michael Leibowitz. CEO Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Dr. Ralph Snodgrass, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, and Sr Vice President Mark McPartland, Jefferies and Andrew Tsai conspiracy to manipulate Vistagen's share price through false and misleading statements and omissions detailed above. Jefferies and Tsai were conspired with the Vistagen throughout 2020 through 2023 by knowingly issuing research reports and price targets whild knowing that (1) Vistagen its directors and management were violating the Exchange Act and PSLRA, (2) Vistagen, its directors and management were committing fraud, (3) Vistagen's prospectuses contained fasle and misleading statements and material omissions.

28.. Plaintiff Cesario met Singh in Watch Hill, RI, in the summer of 2016. Plaintiff Cesario, his family members, and friends also supported financing Vistagen by purchasing private placements. At that time, Vistagen had just achieved a NASDAQ listing. They had one drug candidate that was in a Phase 2 trial called AV-101 for the treatment of Depressive Disorder ("MMD"). The Phase 2 trial was funded and administered by the National Institutes of Health (NIH). Between 2016 and 2021, Cesario introduced Vistagen to many investors, who either invested in Vistagen's private placements or became large shareholders. Cesario hosted several

**III. JURIDICTION AND VENUE**

13. **Jurisdiction** - This Court has jurisdiction over the subject of this action under 28 U.S.C. §1331, §27 of the Exchange Act, and § 22 of the Securities Act. The claims asserted herein arise under, but are not limited to; §§10(b), 20(a), 20(b), and 20A of the Exchange Act (15 U.S.C. §78j(b), §78t(a) and §78t(b)), and 78t-l, Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R. §240.10b-5) and California tort violations including CA Civ Code § 3294_ Cal. Civ. Pro. Code § 338(d) common law fraud, aiding and abetting and breach of fiduciary responsibility; Cal. Civ. Pro. Code § 343 Cal. Corp. Code § 25506 securities law violations Catchall Provision, California fraud, conspiracy, and aiding and abetting causes of action allowed in the State of California.

14. **Venue** - This Court has jurisdiction under *28 U.S.C.A.* § 1332 applies to civil actions with an amount over $75,000 and involves people from different states. Both Plaintiffs in this matter have realized losses in excess of $75,000.00

## IV. PARTIES

Plaintiffs

A. **John Cesario** ("Cesario") was an investor in Vistagen between 2016 and 2023. Cesario resides in Connecticut. He intrioduced Singh and McPartlend to high net with individuals to assist Vistagen in raising capital. He was a consultant for a short time.

B. **David Preka** ("Preka") is a businessman who owns construction companies, hotels, and restaurants. Preka resides in Connecticut.

Defendants

C. **Vistagen Therapeutics Inc.** (hereinafter also "Vistagen") is a late clinical-stage neuroscience-focused biopharmaceutical company incorporated in Nevada. Vistagen's primary headquarters is at 343 Allerton Avenue, South San Francisco, CA 94080. Vistagen common stock is publicly traded on the NASDAQ exchange under the symbol VTGN. Vistagen is a penny stock with accumulated losses of approximately $338.5 million, as reported in its 10-Q filing for September 30th 2024.

D. **Shawn K. Singh** ( "Singh" ) is Vistagen's long-standing CEO. He is also a long-standing member of Vistagen's Board of Directors.

E. **John S. Saxe** ("Saxe") is a long-standing member of Vistagen's Board of Directors. Saxe's bio states that he "served as Chair of our Board of Directors from 2000 until October 2023". Saxe is a member of the Audit Committee.

F. **Jerry Gin** ("Gin") is a long-standing member of Vistagen's Board of Directors. Gin is a member of the Audit Committee.

G. **Mary L. Rotundo** ("Rotundo") serves on Vistagen's Board of Directors, appointed in 2021. Rotundo is an attorney and is a member of the Audit Committee

H. **Ann Cunningham** ("Cunningham") Serves on Vistagen's Board of Directors and was appointed in 2019. Her Bio states that Cunningham brings over 25 years of commercial experience in the pharmaceutical industry.

I. **Maggie Fitzpatrick** ("Fitzpatrick") is a Vistagen Board of Directors appointed in 2021. Fitzpatrick sits on the Corporate Governance Committee.

J. **JoAnne Curley** ("Curley") is a Vistagen Board of Directors appointed in 2021. Curley sits on the Corporate Governance Committee.

K. **Mark McPartland** ("McPartland") joined Vistagen in September 2016 as Senior Vice President of Investor Relations. Mr. McPartland has over 28 years of corporate development, investor relations, and capital markets experience working with private and public biotechnology, healthcare, and technology companies.

L. **Mark Flather** ("Flather") serves as Senior Vice President of Corporate Strategy and Capital Markets. Mr. Flather has more than 25 years of capital markets experience in various capacities on both the buy-side and sell-side. Before joining Vistagen in March 2021.

M. **Withum Smith + Brown PC** ( "Withum") is a professional corporation headquartered in Princeton, New Jersey. Withum is licensed by the New Jersey State Board of Accountancy (License No. 20CB00149600) and several other states. Withum is, and at all relevant times was, registered with the PCAOB, pursuant to Section 102 of the Act and PCAOB rules. Withum served as Vistagen's auditor between 2019 and 2024.

N. **Jefferies LLC** ("Jefferies") is one of the world's leading full-service investment banking and capital markets firms. Jefferies facilitated trading for two Vistagen 100 million dollar financings and the August 7th, 2023, pump and dump.

O. **Andrew Lin Tsai** ("CEO Tsai") is an analyst at Jefferies that provides price targets and researche reports on Vistagen stock.

P. **Ralph Snodgrass** (hereinafter also ("Snodgrass") was the founder of Vistagen and remained as Vistagen's President until 202,2 when he purportedly was fired.

Q. **Michael Liebowitz** ("Liebowitz") is on Vistagen's Board of Advisors and was the Primary Investigator on all five PH94B trials that were rejected for publication by the National Library of Medicines website, clinicaltrials.gov after a quality review of the trials were done.

R. **Louis Monti** ("Monti") joined Vistagen as Vice President, Translational Medicine in December 2020. Prior to joining Vistagen, Monti served in multiple leadership roles at Pherin Pharmaceuticals since its founding in 1991, including President and CEO from July 2018 through November 2020

## V. HISTORY

29. At some point in late 2018, Vistagen acquired the license for two additional compounds, called PH10 for treating major depressive disorder and PH94B for treating Social Anxiety Disorder (herein "SAD"). Although Vistagen stated that PH94B, they believed that PH94B may treat several symptoms, SAD was the indication with the most significant market potential. See Vistagen's press release filed with the SEC as an exhibit to a Form 8-K filing. See the sec.gov link below.

*https://www.sec.gov/Archives/edgar/data/1411685/000165495418010158/vtgn8k_sep112018.htm*

30. On November 13th, 2019, Vistagen announced that its flagship drug, AV-101, failed to meet its primary endpoint in a Phase 2 trial funded and administered by the NIH. Vistagen's stock price collapsed nearly 80% to $0.34 (real-time prices, adjusted for the 1/30 reverse split; today, the price per share would be $10.20). Despite this setback, plaintiff Cesario still supported Vistagen, primarily because Singh and McPartland explained that not enough of the drug AV-101 passed through the blood-brain barrier. They believed that if the AV-101 were combined with a generic drug, Provedicide, AV-101 would be effective. Another company combined Provedicide

with their drug and had great success. Indeed, both Vistagen and were trading at $1.00 a share, and the share price catapulted to $130 after several achievements.

31. In March 2020, the World Health Organization declared COVID-19 a worldwide pandemic. Businesses were shut down, schools were closed, people had to wear masks and social distance, and were not allowed to see loved ones in the hospital or nursing homes. Most pharmaceutical companies (a) suspended ongoing drug trials and/or (b) canceled initiating new trials to raise funds. Most financings for public companies, especially failing biotechs, ceased to exist unless they were COVID-19-related. Many scam penny stock companies attempted to exploit the pandemic. Vistagen saw an opportunity to capitalize on the COVID-19 pandemic to raise capital and boost its share price. Vistagen's precarious financial position over the past several years is like a mouse running on a hamster wheel.

32. On April 28th, 2020, Vistagen filed a Form 8-K with the SEC, accompanied by an attached press release. The filing stated that Vistagen "plans to submit its proposed protocol for a Phase 2 study of PH94B for treatment of adjustment disorder to the U.S. Food and Drug Administration (FDA) through all practicable purposes, a ruse to raise money for the PH94B SAD trial. After the SAD trial failed, McPartland confided to plaintiff Cesario that the press release was intended to generate market interest so they could raise funds to conduct the SAD trial. Cesario's conversation with McPartland occurred sometime in the latter half of 2022. Vistagen had failed the first leg of their SAD trial, and McPartland was concerned he was going to have to find another job because Vista*gen's financial condition was once again worsening. See sec.gov link below.*

*https://www.sec.gov/Archives/edgar/data/1411685/000165495420004559/ex99-1.htm*

33. Like clockwork, on May 20th, Vistagen filed an S-3 registration with the SEC to sell shares and raise capital. Vistagen made an intentionally false and misleading statement on page 2020, e 1-2 of the registration statement, and also made a material omission.

> *" In* ***Phase 2 and pilot Phase 3 clinical studies to date,*** *PH94B has not shown psychological side effects (such as dissociation or hallucinations), systemic exposure, sedation or other side effects and safety concerns that may be caused by the current ADs approved by the FDA for treatment of SAD, as well as by benzodiazepines and beta blockers, which are not approved by the FDA to treat SAD but which may be prescribed by psychiatrists and physicians for treatment of SAD on an off-label basis.* ***"In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz****, the creator of the Liebowitz Social Anxiety Scale (LSAS), as principal investigator, PH94B was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using subjective anxiety ratings on the Subjective Units of Distress Scale (SUDS) within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B."*

See sec.gov link below *https://www.vistagen.com/node/7611/html*

> *"Our common stock is currently listed on The Nasdaq Capital Market under the symbol "VTGN". On April 30, 2020, the last reported sale price of our common stock on The Nasdaq Capital Market was $0.44 per share."*

Vistagen further made additional intentionally false and misleading statements regarding the drug PH10.

> *"****Based on positive results from this exploratory Phase 2a study,*** *we are preparing for Phase 2b clinical development of PH10 in MDD. With its exceptional safety profile during clinical development to date, we believe PH10, as a convenient at-home therapy, has potential for multiple applications in global depression markets,..."34.* On June 29th, 2019, Vistagen issued its audited annual report. The audited annual report contains this statement on page 1,

> *"In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz, the creator of the Liebowitz Social Anxiety Scale (LSAS), as principal investigator, PH94B was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using subjective anxiety ratings on the Subjective Units of Distress Scale (SUDS) within 15 minutes of*

*self-administration of a non-systemic 1.6 microgram dose of PH94B."35.* Vistagen incorporated the misleading slide below of its pipeline on page 3, which is directly from Vistagen's corporate presentation filed with the SEC. The slide below intentionally and fraudulently states that PH94B has successfully completed the Phase 2 program. Additionally, Vistagen makes this intentionally misleading statement on page 7 of the audited annual report regarding PH10;

*"With its potential for rapid-onset activity at a microgram dose that does not require systemic uptake to achieve sustained antidepressant effects, and,* ***as demonstrated in the PH10 Phase 2A program for MDD****, an exceptional safety profile that is not expected to require administration in a clinical setting, we believe PH10 has transformative potential in the treatment paradigm for multiple applications in global depression markets. Based on positive results from the PH10 Phase 2A program, we are preparing to conduct two nonclinical studies necessary to support submission of our Investigational New Drug (IND) application to the FDA for Phase 2B clinical development of PH10 for rapid-onset treatment of MDD."*




See sec.gov link below *https://www.vistagen.com/node/7611/html*

34. Vistagen's fraud-on-the-market scheme continued after it issued the misleading 2020 audited annual report. As noted above, Vistagen used the government's COVID-19 angle to raise over $120 million. The bulk of the financing, approximately $100 million, was completed by Jefferies Inc. at $1.00 a share, real-time price, or $30 per share post-Vistagen's 1/30 reverse split. Vistagen put minimal effort into the PH94B trial for adjustment disorder to help people who have anxiety due to the COVID-19 pandemic. Rather than proceed with the small COVID-19 trial adjustment disorder, Vistagen was grossly negligent and prioritized the Phase 3 PH94B SAD trial. Indeed, during the peak of the COVID-19 pandemic, Vistagen began enrolling patients in the Phase 3 PH94B SAD trials before the adjustment disorder trial. Vistagen's SEC quarterly and annual reports even acknowledged the risks of proceeding with a drug trial during COVID-19. In addition to the apparent dangers that Vistagen identified in its filings, it was common knowledge that COVID-19 adversely affected nasal passageways, that COVID-19 testing was suspect at best, and that trial participants were forced to wear masks, which were most likely not sanitary due to being put on and taken off. Most drug trials were suspended during the peak of COVID-19, except those related to COVID-19, including testing devices, therapies, and vaccines. The Phase 3 PH94B SAD trial was recklessly initiated; even if successful, it had an extremely short cure period. In fact, Vistagen has described the SAD indication as a temporary cure and has given examples of a person nervous before a speaking engagement.

35. On July 24th, 2020, Vistagen filed another corporate presentation with the SEC that fraudulently stated that it had completed a successful Phase 2 trial, while omitting to disclose that the Phase 2 trials were rejected for publication on clinicaltrials.gov due to quality control concerns. See Page 6 *https://www.sec.gov/Archives/edgar/data/1411685/000165495420007962/ex99-2.htm*

36. On August 13th, 2020, Vistagen filed a press release with the SEC. Singh was quoted in the press release. The press release once again failed to disclose that the Phase 2 trials were

rejected for publication by clinicaltrials.gov after a quality control review, that the trial was resubmitted and rejected again for quality control reasons, and the date of the Phase 2 trials. See;

https://www.sec.gov/Archives/edgar/data/1411685/000165495420009204/ex99-1.htm

> *"We accomplished several meaningful milestones thus far this fiscal year that positively impact our clinical development programs, including our PH94B Phase 3 program in social anxiety disorder. We reached consensus with the FDA on the key aspects of the design of our pivotal Phase 3 clinical studies of PH94B for the acute treatment of anxiety in adults with social anxiety disorder. This design is similar to the design of the highly statistically significant Phase 2 study of PH94B in social anxiety disorder," said Shawn Singh, Chief Executive Officer of VistaGen.*

On October 14th, 2021, Vistagen filed a Form 8-K with the SEC with an attached press release; Singh was quoted as saying;

> *"There has been a significant shift in mental health since early last year. Emotional stress and impaired functioning as a result of anxiety-provoking stressors brought on by sudden changes in health, safety, economic and social circumstances, including the* ***diverse impacts of the COVID-19 pandemic, have directly or indirectly affected hundreds of millions of individuals around the world and may have led to a considerable increase in the prevalence of Adjustment Disorder with Anxiety****. We believe the impact of the pandemic on mental health will be long-term and varied across a wide range of anxiety disorders, and we are committed to becoming part of the solution for people who need to find help. Expanding on our ongoing efforts to address the alarming prevalence of Social Anxiety Disorder, the initiation of this exploratory Phase 2A study in Adjustment* Disorder *with Anxiety is an exciting next step toward our goal."*

37. On November 12th 2020 Vistagen filed a press release with the SEC with material misleading statements and omissions previously described above. See,

https://www.sec.gov/Archives/edgar/data/1411685/000165495420012380/ex99-2.htm

38. On December 1st, 2020, Vistagen issued a press release announcing that Dr. Monti had been hired as a consultant for Vistagen's PH94B studies. Dr. Monti was one of the authors of the peer-reviewed study for the PH94B Phase 2 study. Dr. Monti knew that clinicaltrials.gov rejected publishing the Phase 2 trial after a quality control review. Vistagen's press release knowingly and intentionally made the following misleading statement. misleading statement;

***About PH94B***

*PH94B is an innovative odorless investigational synthetic neuroactive steroid nasal spray with therapeutic potential in multiple mental health disorders involving anxiety or phobia and is designed to have rapid onset. Self-administered in microgram-level doses, in Phase 2 studies for the treatment of social anxiety disorder (SAD), PH94B produced rapid-onset (within approximately 15 minutes) anti-anxiety effects without sedation or systemic uptake and distribution.*

See, https://www.sec.gov/Archives/edgar/data/1411685/000165495420013104/ex99-1.htm

39. On December 12th, 2020, Vistagen filed a Form 8-K with the SEC announcing a $100 million stock offering. The lead underwriters were Jefferies, William Blair Inc., and Maxim Group LLC, which was an advisor. Jefferies, William Blair Inc., and Maxim Group LLC previously had a history with Vistagen, as all three companies employed analysts who issued research reports with high stock price targets based on Vistagen's previous failed AV-101 trial run by the NIH. Exhibit 1.01 Entry into a Material Definitive Agreement signed by Shawn K. Singh. See press release; Exhibit 99.2 See;

https://www.sec.gov/Archives/edgar/data/1411685/000165495420013839/ex99-1.htm

40. Vistagen indemnified Jefferies and William Blair for Exchange Act violations. However, despite the indemnification, Jefferies, William Blair Inc., and Maxim Group LLC knew that Vistagen's Registration statement and prospectus had intentionally misleading statements and material omissions. While Maxim Group is a smaller investment firm that has faced SEC violations, the plaintiffs are surprised that large banking firms like Jefferies and William Blair actively participated in this market fraud scheme. One possible motive is that investment banks generate a large percentage of their fees through underwritings. The world was in flux during 2020 and 2021 due to the COVID-19 pandemic. Moreover, it was easy to manipulate the stock prices of penny stock companies if they claimed they were doing something COVID-19 related.

41. During 2020 and 2021, the SEC and DOJ issued warnings about penny-stock company scams. The above-referenced underwriting was sold only to institutional clients, who would then dump stock on the public after positive news releases. See Exhibit 1.1 Underwriting Agreement Entry into a Material Definitive Agreement signed by Shawn K. Singh and the press release filed with the SEC. See the Indemnification section, see page 22

https://www.sec.gov/Archives/edgar/data/1411685/000165495420013839/ex1-1.htm

42. On February 11th, 2021, Vistagen filed a Form 8-K with an attached press release. Singh was quoted in the press release stating;

> *"Mr. Singh continued, "We believe we have sufficient capital to fund all of our currently planned nonclinical and clinical studies across our pipeline. As a result, we expect to launch several clinical studies this calendar year, notably our pivotal Phase 3 clinical studies of PH94B as a potential acute treatment of anxiety in adults with social anxiety disorder, as well several small exploratory PH94B Phase 2 studies in adult patients experiencing additional anxiety-related disorders. This year, we will also complete preparations to launch Phase 2B clinical development of PH10 as a potential rapid-onset stand-alone treatment for major depressive disorder in early 2022."*

44. Singh's statement evidenced that Singh prioritized the SAD trial, which did not have anything to do with COVID-19, over the small adjustment disorder study, which was designed to assist people with COVID-19 anxiety. At the time this press release was issued, the plaintiffs did not have any knowledge that Vistagen, Vistagen's board of directors, CEO Singh, or executive management were (i) violating federal and state securities laws, (ii) committing common law fraud, (iii) constructive fraud, (iv) intentional misrepresentation, or (v) deceit. Additionally, the plaintiffs did not know that Vistagen's board of directors and executive management team were intentionally violating their fiduciary duties or that CEO Singh was knowingly signing Vistagen's quarterly reports with misleading statements and material omissions in violation of 18 U.S. Code § 1350, section 960 or that Singh was quarterbacking a multi-year RICO fraud on the market liability scheme that continues to this day.

45. On November 12, 2021, VistaGen Therapeutics filed a Form 8-K titled;

"VistaGen Therapeutics Reports Fiscal 2021 Second Quarter Financial Results and Provides Highlights on its CNS Pipeline and Business Progress."

The Phase 2 PH94B trials were once again cited, without disclosing the misleading statements and material omissions noted above.

https://www.sec.gov/Archives/edgar/data/1411685/000165495420012380/ex99-1.htm

Moreover, Vistagen failed to disclose that PH94B's mechanism binds to receptors in the **nasal passages,** activating a neural pathway that ultimately regulates GABAergic neurons in the central amygdala. ("emphasis added")

46. On May 13th, 2021, Vistagen filed a Form 8-K with the SEC with an accompanying press release announcing that PALISADE-2 was initiated. Singh made this misleading statement in the press release;

> *"Following the successful initiation of PALISADE-1 last quarter, we are excited to be further advancing our PALISADE Phase 3 Program this quarter with the initiation of PALISADE-2,* ***an essential next step in our efforts to further demonstrate the reduction in anxiety observed in PH94B's Phase 2 clinical trials to date,*** *" stated Shawn Singh, Chief Executive Officer of VistaGen. "*

47. On May 18th, 2021, Vistagen filed a false and misleading Form 8-K with an accompanying press release titled; "VistaGen Submits PH94B Phase 2A Study Protocol for Treatment of Adjustment Disorder with Anxiety Related to the COVID-19 Pandemic through U.S. FDA's Coronavirus Treatment Acceleration Program (CTAP)"

The press release made this intentional fraudulent statement attributed to Singh;

> *"With* ***successful Phase 2 development*** *of PH94B for social anxiety disorder completed and preparations for Phase 3 development underway, we now look forward to Phase 2 development of PH94B for adjustment order"*

48. On May 26th, 2021, Vistagen announced it had commenced Palisade 1, which was the first leg of the Phase 3 trial. Vistagen was grossly negligent in initiating a Phase 3 trial during the peak of the COVID-19 pandemic. Vistagen knew that the PH94B mechanism binds to receptors

in the nasal passages, and COVID-19 adversely affected the nasal passages. Moreover, Vistagen continued to fail to disclose that the previous PH94B trials were rejected by clinicaltrials.gov. Vistagen failed to disclose why the trials were rejected by clinicaltrials.gov or what measures they took to remedy the rejections. Vistagen hired Dr. Liebowitz to run the Phase 2 trials. Liebowitz was the principal investigator of the two Phase 2 PH94B trials and the Pilot Phase 3 PH94B trial that clinicaltrials.gov rejected for publication. See,

*https://www.sec.gov/Archives/edgar/data/1411685/000165495421006329/ex99-1.htm*

49. On June 14th, 2021, Vistagen filed a Form 8-K with the SEC, attaching a new corporate presentation as an exhibit. Notably, the new presentation deleted the wording that the Phase 2 trials were successful. However, the corporate presentation still reflected misleading statements and material omissions about the Phase 2 trials while making the above-referenced misrepresentations.

50. On September 13, 2021, VistaGen Therapeutics, Inc. (the "*Company*") issued a press release announcing the initiation of PALISADE-2, the Company's second U.S. Phase 3 clinical study to evaluate the efficacy and safety of PH94B for the acute treatment of anxiety in adults with Social Anxiety Disorder. A copy of the press release is attached to this Current Report on Form 8-K as Exhibit 99.1.

*https://www.sec.gov/Archives/edgar/data/1411685/000165495421009957/vtgn_8k.htm*

WithumSmith+Brown's timing of their resignation is notable, as they had been Vistagen's auditor since 2006, agreed to be put on Vistagen's annual proxy and was approved by shareholders. In fact, Vistagen announced that shareholders approved WithumSmith + Brown's appointment as auditor after they resigned. See;

*https://www.sec.gov/Archives/edgar/data/1411685/000165495421010193/vtgn_8k.htm*

51. On June 22nd, 2022, Vistagen filed a Form 8-K with the SEC, announcing the termination of their Snodgrass. According to a conversation Cesario had with McPartland, Snodgrass was terminated for sexual misconduct. See;

*https://www.sec.gov/Archives/edgar/data/1411685/000185173422000341/vtgn20220622_8k.htm*

On July 22, 2022, Vistagen filed a Form 8-K and press release announcing that the first leg of the PH94B Phase 3 trial named PALISADE 1 failed to reach its endpoint. See,

*https://www.sec.gov/Archives/edgar/data/1411685/000185173422000390/ex_398345.htm*

52. Vistagen's stock price dropped from 90% after the announcement, and closed at $0.15 (real-time price, or $4.50 adjusted for the 1/30 reverse split). Vistagen made misleading statements and material omissions regarding the Phase 2 studies.

> "While the results of PALISADE-1 are not consistent with prior positive results from Phase 2 trials of PH94B in social anxiety disorder, we remain committed to transforming the treatment landscape for those living with anxiety, depression, and other central nervous system disorders," said Shawn Singh, Chief Executive Officer of VistaGen. "

On August 11th, 2022, Vistagen filed a Form 8-K and press release with the SEC. The press release was titled, *"VistaGen Therapeutics Reports First Quarter Financial Results and Provides Corporate Update."* The press release made a misleading statement.

> *"Given these data, along with* ***positive indications from the prior Phase 2 studies****, the Company believes that continued Phase 3 clinical development of PH94B as a potential treatment for SAD is appropriate, particularly with repeated and longer-term use of PH94B evaluated by multiple administration assessments using the LSAS as the primary endpoint and SUDS as the secondary endpoint."*

*See, https://www.sec.gov/Archives/edgar/data/1411685/000185173422000435/vtgn20220810_8k.htm*

On August 17th, 2022, Vistagen filed a Form 8-K with the earnings call transcript from August 11th, 2022. See;

*https://www.sec.gov/Archives/edgar/data/1411685/000185173422000465/ex_412033.htm*

Singh made the following misleading statements and material omissions;

*"Notably, we continue to see data showing PH94B's favorable safety profile, which has been consistent through all PH94B clinical studies conducted to date. PH94B is designed to reduce anxiety acutely as needed. Importantly, the findings from the multiple-use Phase 2 study, which was conducted, again, in a real-world environment rather than in a clinical setting, suggests that once a person with SAD experiences a benefit from PH94B, they may gain confidence in their ability to function in stressful situations, and that confidence can persist. That's our paramount goal for PH94B, and we're seeing similar results in a substantial percentage of subjects in the PALISADE open-label study."*

53. In the statement below, Singh again references the Phase 2 trials without disclosing that they were rejected for publication by clinicaltrials.gov. He also references using a different study design, using LSAS as opposed to an SUDS-based design. Singh once again made the material omission that the FDA had never approved a social anxiety drug based on the SUDS method.

*"Accordingly, we plan to meet with the FDA later this year to pursue consensus around a clearly defined development plan for further Phase 3 development of PH94B in SAD. This development plan will ideally maintain an emphasis on a multiple-use assessment study design, with the LSAS as a primary efficacy endpoint as it was for the three antidepressants previously approved by the FDA for the treatment of SAD, and with SUDS as a secondary end point."*

54. On September 6, 2022, Vistagen Therapeutics, Inc. from the Listing Qualifications Staff of The Nasdaq Stock Market, LLC indicating that, based upon the closing bid price of the Company's common stock, par value $0.001 per share, for the last 30 consecutive business days, the Company is not currently in compliance with the requirement to maintain a minimum bid price of $1.00 per share for continued listing on the Nasdaq Capital Market, as set forth Nasdaq Listing Rule 5550(a)(2). This was the third time in 5 years that penny stock Vistagen had received a delisting notice. See;

*https://www.sec.gov/Archives/edgar/data/1411685/000185173422000545/vtgn20220906_8k.htm*

55. On September 8, 2022, Vistagen filed a Form 8-K with the SEC, including an attached press release. The press release was false and misleading because the headline of the press release stated;

**Vistagen to Proceed with PALISADE-2 Phase 3 Clinical Trial of PH94B in Social Anxiety Disorder following Interim Analysis**

*https://www.sec.gov/Archives/edgar/data/1411685/000185173422000549/ex_421373.htm*

56. Based on the biostatisticians' recommendation to proceed with the PALISADE 2 trial as designed, a reasonable person would conclude that they believed the results were positive. However, PALISADE 2 was an incomplete trial at this point. The headline in the press release was a definitive statement, not covered by Safe Harbor laws. Vistagen could not proceed with PALISADE-2 because it lacked the capital to complete the trial. The court should take note of the word INTERIM in the headline because that word is integral to the plaintiff's claims that Vistagen, Singh, and the board of directors, Saxe, Cunningham, Gin,

Vistagen did not finish PALISADE-2.

57. On July 28th, 2022, Six months after this announcement, Vistagen terminated the trial and used the interim results as the basis for an illegal pump-and-dump. On July 28th, 2022, Vistagen filed a Corporate update with the SEC with an attached press release. The release referenced the Pilot Phase 3 trial and intentionally failed to disclose that ClinicalTrials.gov rejected it for publication due to quality control failures. See;

58. In conversations Cesario had with defendant McPartland, after this press release, McPartland stated that both he and Singh were despondent. They hoped and expected that the September 8th press release would prompt investors to buy the stock, pushing it above $1.00 a share. However, the opposite happened. Vistagen's stock price dropped another 40 percent over the following days. Indeed, Vistagen's stock price eventually settled at $0.06. Per share (or $1.80 adjusted for the future 1/30 reverse split). McPartland also stated that, over the next several months and into the first half of 2023, Singh and he believed the press release would help Vistagen raise capital. Eventually, McPartland confided to Cesario that Vistagen did not have the

funds to complete the PALISADE 2 trial because it could not obtain the necessary financing. Eventually began confiding to Cesario that he was worried about his job, Singh was cutting expenses everywhere he could. When Cesario asked about the adjustment disorder trial to help people coping with COVID-19 anxiety McPartland stated that Singh just used that to raise money to take advantage of COVID-19 and that that trial was only an insignificant Phase 2 trial. The big trial for PH94B was the SAD trials.

**Augusst 7th 2023 Illegal Pump and Dump Scheme**

59. Because Vistagen could not raise enough capital to finish the PALISADE-2 trial, Singh and the Director Defendants schemed a plan to release the interim results as a successful Phase 3 trial. Vistagen's CEO Singh and the board of directors put in motion a plan to raise capital through an illegal pump and scheme. As noted above, Vistagen's stock price collapsed to $0.06, its cash reserves were dwindling, and they were unable to raise money. Vistagen knew that the in order for the biostatisticians to advise Vistagen to proceed with PALISADE 2 unchanged, that they had positive results. Singh, and the Vistagen board members knew that if they issued a misleading press release it would have a positive effect on the share price and that they could potentially raise capital. First, Vistagen needed to reverse split the stock price to get it over $1.00 and avoid a NASDAQ delisting. Vistagen reversed spilt the stock and waited for the interim results to be released.

60. On August 7th, 2023, Vistagen filed a Form 8-K with a misleading press release. The press release was titled;

> **Vistagen Announces Positive Top-Line Results from Phase 3 PALISADE-2 Trial of Fasedienol (PH94B) Nasal Spray in Social Anxiety Disorder**
>
> ***First positive U.S. Phase 3*** ***study of an investigational therapy for social anxiety disorder in over 15 years***

61. The heading and subheading of the press release were so misleading that they caused **Vistagen's stock price to explode from $1.83 to a high of $71** before 9:30 AM. Vistagen's daily dollar volume of shares traded saw a once-in-a-lifetime surge from $250,000 the previous day **to $1 billion!** Vistagen's daily share count also exploded, from 146,000 on Friday, August 4th, to 53,900,000 on Monday, August 7th, 2023, an approximately 400-fold increase {emphasis added}. Adjusted for the 2023 1/30 reverse split, $1.83 was the equivalent of $0.06 a share, and $71 was the equivalent of $2.36.

62. Vistagen intentionally used misleading information in the press to dupe the public into thinking the PALISADE-2 trial was a successful Phase 3 trial. Singh knew that trading algorithms and early-morning stock market traders would react quickly to words and phrases such as "positive topline results from Phase 3 trials" and the "first positive U.S. Phase 3 study." The trial was neither a Phase 3 trial nor successful. Singh was quoted in the press release making this misleading statement and material omission.

> *"We are thrilled that these compelling top-line results from the Phase 3 PALISADE-2 trial confirm what was seen in the* ***Phase 2 studies in social anxiety disorder and highlight the potential for fasedienol,*** *with its novel and unique proposed mechanism of action, to transform what is possible for more than 25 million people living with social anxiety in the U.S. and millions more affected worldwide," stated Shawn Singh, Chief Executive Officer of Vistagen.*

63. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review. Singh, the Director Defendants, and Jefferies schemed the pump and dump in advance. To accomplish the pump and dump, Vistagen needed to do the following: (i) do a 1/30 reverse split, (ii) issue a prospectus to sell shares, (iii) issue a fraudulent press release announcing

Vistagen had a successful Phase 3 trial, (iv) instruct Jefferies to start dumping Vistagen's shares on the news.

64. On August 7th, 2023, at 9:30 AM, Jefferies started dumping millions of dollars of Vistagen's shares, and the stock price immediately dropped to $25.00. Jefferies knew the press release was misleading, but it continued to dump shares.

65. On August 8th. 2023, Vistagen issued another prospectus, which informed investors that it could sell the balance of the 75 million dollars without issuing any further prospectuses. The prospectus further disclosed that;

> *"Through August 7, 2023, we have sold 1,373,318 shares of our common stock for aggregate gross proceeds of approximately **$16.1 million** in accordance with the Sale Agreement under the Prospectus".*

The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

66. Vistagen continued to dump another $20 million of shares between August 8th and August 10th. 2023, further driving the stock price down to the $7.00 and $8.00 range (approximately $0.25 adjusted for the 1/30 reverse split). The 20 million dollar figure is based on Vistagen's 2024 annual report states that $ 35.9 million was raised through Vistagen's pump-and-dump via their Open Market Sales, which is the ATM. This statement can be found on page 89 of the audited annual report, under the Financing Activities section.

See; *https://www.vistagen.com/node/13656/html*

66. The S-3 Registration Statement Vistagen filed to sell shares into the pump-and-dump contained this false and misleading statement, once again omitting the material fact that the Phase 2 trials were rejected for quality control reasons.

> The proposed MOA of PH94B is fundamentally differentiated from all currently approved anti-anxiety medications, including the three antidepressants approved by the FDA for the treatment of SAD, as well as all benzodiazepines and beta blockers, which, although not FDA-approved for treatment of SAD, are prescribed for treatment of SAD on an off-label basis. Pre-clinical and **Phase 2 clinical data to date suggest that PH94B has the potential to achieve rapid-onset anti-anxiety effects** without systemic uptake or transport into the brain, significantly reducing the risk of side effects and other safety concerns such as potential abuse, misuse, and addiction associated with certain other pharmaceuticals that act directly on the CNS and are sometimes prescribed for anxiety disorders.

67. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

68. Moreover, the Top-Line results were only from **an interim trial.** Vistagen identified the trial as interim in the September 8th, 2022, press release. Vistagen's stock price went down after the September 8th, 2022, press release was issued. Vistagen intentionally included the word 'interim' in the press release's headline to give investors the impression that the trial was completed. Moreover, Vistagen's subheadline states that they had the "*First positive U.S. Phase 3 study of an investigational therapy for social anxiety disorder in over 15 years*". Both headlines in the press release were intentionally designed to defraud the general public and maximize Vistagen's share price and trading volume, enabling it to dump its stock and raise capital through intentional fraud. See Vistagen's September 8th, 2022 press release with the headline;

**Vistagen to Proceed with PALISADE-2 Phase 3 Clinical Trial of PH94B in Social Anxiety Disorder following Interim Analysis**

https://www.sec.gov/Archives/edgar/data/1411685/000185173422000549/ex_421373.htm

The Plaintiffs cannot find an example of Topline results from a self-terminated Phase 3 trial. The Plaintiff can find example after example of Phase 3 Topline results for completed Phase 3 trials.

- https://www.pfizer.com/news/press-release/press-release-detail/pfizer-announces-positive-topline-results-phase-3-study
- https://news.abbvie.com/2024-09-26-AbbVie-Announces-Positive-Topline-Results-from-Phase-3-TEMPO-1-Trial-Evaluating-Tavapadon-as-a-Monotherapy-for-Parkinsons-Disease
- https://www.novocure.com/novocure-announces-positive-topline-results-from-phase-3-panova-3-clinical-trial-of-tumor-treating-fields-ttfields-therapy-for-pancreatic-cancer/
- https://ir.lenz-tx.com/news-events/press-releases/detail/11/lenz-therapeutics-announces-positive-topline-data-from-phase-3-clarity-presbyopia-trials
- https://www.vistagen.com/news-releases/news-release-details/vistagen-announces-topline-results-PALISADE-1-phase-3-clinical

70. Vistagen's illegal pump and dump scheme was so effective in fooling investors that even professional fund managers were fooled.

**Commodore Capital Was Duped $30 Million Dollars.**

71. Vistagen, CEO Singh, and the Board knew immediately that investors misunderstood the news. Vistagen's fraudulent and misleading press release fooled not only average investors but also sophisticated investors. An example is the billion-dollar hedge fund Commodore Capital (herein "Commodore").

72. On August 7th. 2023, **Commodore immediately bought into Vistagen's pump and dump scheme based on the misleading press release. Commodore purchased 1,575,000 shares at an average price of $23.15 for $36,461,250, or 19.74 percent of Vistagen's outstanding stock.** The Plaintiffs searched for Commodore's past 13D filings with the SEC. They could not find a single instance in which Commodore purchased a 19% stake in any company, let alone risk allocating over 5% of its entire capital to a single stock. Generally, fund managers do not want to hold a 5% or more stake in a public company due to the increased

reporting requirements. According to Commodore's filings with the SEC, it appears Commodore sold those shares at a staggering loss before the quarter ended, but purchased a new offering of Vistagen's stock through Jefferies.

*See,* *https://finance.yahoo.com/news/commodore-capital-lp-acquires-stake-143138185.html*

From [2]Yahoo financial news;

> On August 7, 2023, COMMODORE CAPITAL LP (Trades, Portfolio) purchased 1,575,000 shares of Vistagen Therapeutics Inc at a price of $23.15 per share. This new holding now represents 5.26% of the firm's portfolio and 19.74% of the total shares of Vistagen Therapeutics Inc. The transaction is significant as it indicates the firm's confidence in the potential growth and profitability of Vistagen Therapeutics Inc.s reported On August 7, 2023, Commodore Capital LP purchased **1,575,000** shares of Vistagen Therapeutics Inc at a price of $23.15 per share. This new holding now represents 5.26% of the firm's portfolio and **19.74%** of the total shares of Vistagen Therapeutics Inc. The transaction is significant as it indicates the firm's confidence in the potential growth and profitability of Vistagen Therapeutics Inc.

Vistagen's Rewards Jefferies With A Sweetheart Deal For Partnering In The Pump and Dump

73. After being duped by Vistagen's pump and dump, Commodore owned a sizable controlling interest in Vistagen that it did not want. Jefferies and Vistagen made it up to Commodore by allowing Commodore to participate in a sweetheart deal for Jefferies's clients. To recap, Jefferies and William Blair were co-book runners on a $100,000,000 financing in December of 2000 based on Vistagen's prospectus that violated securities laws due to misrepresentations and material omissions. [3]**The 2020 funding was done at 27.60** per share with NO warrants attached. The funding was also done before Vistagen falsely claimed to have conducted the first successful Phase 3 trial for social anxiety disorder.

74. As previously detailed, before the ink could dry on the Vistagen/Jefferies illegal pump and dump scheme, they were preparing to sell another $100,000,000 of Vistagen's equity through

---

[2]*See, https://finance.yahoo.com/news/commodore-capital-lp-acquires-stake-143138185.html*

[3] Price has been adjusted for the 1/30 reverse split of Vistagen's common stock in 2023

a [4]prospectus filed with the SEC on October 3rd, 2023. While cleverly packaged, t**he funding enabled Jefferies to sell common stock to institutions at $5.38 per share, with warrants. The first pre-funded warrant was priced at $0.01, the second at $5.38, and the third at $8.88.** The offering was packaged this way to (a) confuse the public and (b) to keep the institutions from owning less than 5% of the common stock for reporting purposes. [5]As Commodore's 13D filing with the SEC proves, Commodore participated in this offering. This sweetheart deal was offered only to institutional clients, not to the general public, whom Jefferies and Vistagem made bagholders through an illegal pump-and-dump scheme.

75. Right on cue, the three firms that have benefited, Jefferies, William Blair, and Stiefel's analysts, issue price targets between $12 and $15 to pump the stock price higher. Pumping the stock higher provided liquidity for the institutions that bought the deal to sell their stock, and they would have tremendous risk-free upside if Vistagen falsely announces another false and misleading press release. Vistagen followed up the pump-and-dump with a prospectus to sell up to $100 million in Vistagen equity. The prospectus once again referenced the Phase 2 trial and told another half-truth. Page S-5

https://www.sec.gov/Archives/edgar/data/1411685/000143774923027529/vtgn20230921_424b5.htm

> "which was inconsistent with positive placebo-controlled Phase 2 studies and the statistically significant results of our PALISADE-2 Phase 3 clinical trial, may have been due to the extraordinary multifaceted impact of the acute phase of the COVID-19 pandemic, which introduced into the typical study dynamic significant and unprecedented logistical challenges and systemic variability"

The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

---

[4] https://www.sec.gov/Archives/edgar/data/1411685/000143774923027529/vtgn20230921_424b5.htm

[5] *https://www.streetinsider.com/SEC+Filings/Form+4+Vistagen+Therapeutics%2C+For%3A+Oct+04+Filed+by%3A+COMMODORE+CAPITAL+LP/22249426.html*

76. On June 13th, 2024, Vistagen finally submitted the results of the PALISADE-1, PALISADE-2, and PALISADE open-label trials to ClinicalTrials.gov. However, Vistagen did not submit the results for the COVID-19 Phase 2 anxiety disorder trial.

77. On August 13th, 2024, ClinicalTrials.gov returned the PALISADE-1, PALISADE-2, and PALISADE open-label trials UNPUBLISHED due to quality control issues.

PALISADE-1

https://clinicaltrials.gov/study/NCT04754802?cond=Social%20Anxiety%20Disease&term=PH94B&rank=5&page=1&limit=10&tab=history

PALISADE-2 Terminated

https://clinicaltrials.gov/study/NCT05011396?cond=Social%20Anxiety%20Disease&term=PH94B&rank=4&page=1&limit=10&tab=history&a=6#version-content-panel

PALISADE Open Label Terminated

https://clinicaltrials.gov/study/NCT05030350?cond=Social%20Anxiety%20Disease&term=PH94B&limit=10&intr=open%20label&rank=1&tab=history

**** ClinicalTrials.gov rejected ALL six PH94B clinical trials after a quality control review. Vistagen, Singh, and the other Director Defendants failed to disclose these material facts to the investing public and Vistagen stakeholders.**

78. Plaintiff Cesario sent the Vistagen Directors a letter (EXHIBIT A) dated October 2nd, 2023, accusing Vistagen of committing fraud and violating security laws by failing to disclose that ClinicalTrials.gov rejected publishing the PH94B trials after they did a limited quality control review.

79. On October 3rd, 2023, Vistagen filed a prospectus with the SEC to raise another $100 million through an equity sale. Page S-5 made this false and misleading statement;

> *"We believe the unexpected outcome in PALISADE-1, which was inconsistent with positive placebo-controlled Phase 2 studies and the statistically significant results of our PALISADE-2 Phase 3 clinical trial, may have been due to the extraordinary multifaceted impact of the acute phase of the COVID-19 pandemic."*

80. Cesario bought stock after the Vistagen issued the fraudulent statement in the August 7th 2023 press release and sold it for another loss. As previously noted, McPartland called Cesario to inform him of the press release within seconds of the release hitting the news wires. McPartland told Cesario that he was the first call. McPartland had been telling Cesario that he believed that if the PALISADE-2 results were good the FDA could deem that it was a successful Phase 3. This was a lie, but the press release stated "first successful Phase 3 study. Cesario sold his stock purchased after the misleading press release at a small loss.

81. As Vistagen continued perpetrating the illegal pump and dump, Cesario began fielding calls and messages from friends he introduced to Vistagen that had bought stock, either through private placements or open market buys. Cesario and Preka started investigating and soon discovered the press release was false and misleading and Vistagen dumped stock. As the Supreme Court has noted, price per share ofttimes dictates the extent of the fraud. Before long Vistagen's stock price was trading below $5.00 ($0.15 adjusted for the reverse split). Moreover, Vistagen not only dumped $50 million of its own shares, Vistagen had Jefferies do another funding at $5.35 a share with up to 3 warrants to buy more at that price. Vistagen's initial raise was done at $30.00 with no warrants.

82. On August 18th 2023, plaintiff Preka called defendant McPartland and read him the riot act for committing fraud. Mchave the money to complete PALISADE -2. The following statement given in SEC filing for terminating PALISADE-2 were misleading. A seventh grader would realize that finishing PALISADE-2 Vistagen stated in SEC filings partland told Preka that they did not Immediately after that call Mcpartland texted Cesario. failed Phase 2 trial that ClinicalTrials rejected. The first leg of the Phase 3 trial failed, causing Vistagen's stock price to drop dranmatically. Vistagen terminated the second leg of the trial because they did not have the funds to continue the trial.

86. Plaintiff Cesario incurred over $600,000 in losses from stock purchases and sales made from 2020 to 2022. McPartland indfurther induced Cesario to exercise nearly $200,000 of warrants and hold them until the Phase 3 trial results were published. Plaintiff Preka has over $700,000 in losses from purchases from 2020 on. The Plaintiffs would have never purchased Vistagen's stock had they known the Vistagen directors and executive management team were running this long term scam.

86. Plaintiff Preka bought over $800,000.00 of stock beginning in late 2019 after Vistagen announced that PH94B was Phase 3 ready and had successful Phase 2 trials. Plaintiff Preka has incurred financial losses over $500,000 based on Vistagen's long running fraudulent scheme.

87. Vistagen has been a failed biotech company, primarily run by Shawn Singh and former Chairman and current director Jon Saxe. As noted above, Cesario met Singh in 2016 and was impressed with the potential of AV-101, possibly having ketamine-like improvements for people suffering from depression. Again, as noted, the NIH funded and administered that trial. The trial failed. Beginning in 2020, Vistagen was facing potential bankruptcy. Vistagen's CEO, Shawn Singh, and its board of directors engaged in a long-running fraud-on-the-market scheme to inflate Vistagen's stock price and raise capital through intentionally misleading statements, material omissions, and fraud. At the beginning of 2020, the Vistagen leadership that perpetuated this long-running scheme consisted of CEO Singh, former Chairman Saxe, former President Snoddgrass, and board member Gin. Vistagen financed its massive deficits, which totaled hundreds of millions of dollars, by selling equity. Vistagen common shares are publicly traded on NASDAQ under the symbol VTGN. A review on ClinicalTrials.gov indicates that Vistagen has never run a successful drug trial. Pharmaceutical companies are legally required to post the results of their trials on ClinicalTrials.gov.

88. As noted above, COVID-19 became a worldwide pandemic and Vistagen exploited it.

89. On May 18th, 2020, Vistagen filed a false and misleading Form 8-K with an accompanying press release titled;

> **VistaGen Submits PH94B Phase 2A Study Protocol for Treatment of Adjustment Disorder with Anxiety Related to the COVID-19 Pandemic through U.S. FDA's Coronavirus Treatment Acceleration Program (CTAP)**

The press release made this intentional fraudulent statement attributed to Singh;

> *"With* ***successful Phase 2 development*** *of PH94B for social anxiety disorder completed and preparations for Phase 3 development underway, we now look forward to Phase 2 development of PH94B for adjustment order"*

90. ClinicalTrials.gov records have two registered Phase 2 PH94B trials. Both trials failed to pass ClinicalTrials.gov's limited quality review and were not published. Vistagen CEO Singh intentionally committed fraud by stating that the Phase 2 trials were successful.

See; https://www.sec.gov/Archives/edgar/data/1411685/000165495420005728/vtgn8k_may182020.htm

https://www.sec.gov/Archives/edgar/data/1411685/000165495420005728/ex99-1.htm

91. On July 31st and August 4th, Maxim did two financings for Vistagen, each worth $12,500,00. Page 3 of each prospectus **intentionally omitted disclosing material facts** that the Phase 2 trials were rejected for publication by ClinicalTrials.gov after a limited quality control review. Page 3 of the prospectus stated;

> *"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B neuroactive nasal spray was significantly more effective than placebo in reducing public-speaking and social interaction anxiety on laboratory challenges of individuals with SAD within 10 to 15 minutes of self-administration".*

While Vistagen repeatedly made intentional misleading statements in prospectuses, the plaintiffs were not harmed by the offerings, but they speak to scienter.

92. After Maxim funded Vistagen, analyst Jason McCarthy, knowing that Vistagen was violating the Exchange Act and committing fraud, issued a price target of $6.00 on Vistagen. Maxim's banking division and analyst Jason McCarthy knew the Phase 2 trials were rejected for quality control issues. Maxim's funding and McCarthy's price target induced the Plaintiffs to buy and hold Vistagen stock. See Page 3, Vistagen's August 4th prospectus.

https://www.sec.gov/Archives/edgar/data/1411685/000165495420008335/vtgn424b5_082020.htm

93. On December 21st 2020, Jeffereies and William Blair were joint book runners on a $100,000,000 financing for Vistagen. On Page 3 of the Prospectus, Vistagen again **intentionally omitted disclosing material facts.** As the court knows, this is a violation of Item 303 of SEC Regulation S–K.

*"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B neuroactive nasal spray was significantly more effective than placebo in reducing public-speaking and social interaction anxiety on laboratory challenges of individuals with SAD within 10 to 15 minutes of self-administration".*

The above statement was a half-truth and fraudulent because it concealed the fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-announces-pricing-underwritten-public

94. In the first quarter of 2021, William Blair and Jeffereies analysts and Andrew Tsai issued reports with $6 price targets on Vistagen's stock, which was trading at roughly $1.00.

95. On March 31st, 2021, page 3 of Vistagegan's annual report made this intentionally misleading statement and omitted disclosing that ClinicalTrials.gov rejected the Phase 2 trials.

> **In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz**, the creator of the Liebowitz Social Anxiety Scale (*LSAS*), as principal investigator, PH94B was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using patient-reported anxiety ratings on the Subjective Units of Distress Scale (*SUDS*) within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B.

96.. The above statement was a half-truth and was fraudulent because it concealed the fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review. The bBiased Defendants Leibowitz and Monti appeared to have published the peer-reviewed paper. The Plaintiffs issued the peer-reviewed paper irrelevant to clinical trials and the FDA.

97. On May 26th, 2021, Vistagen filed a Form 8-K with a press release. Defendant Singh was quoted in the press release;

> *"The trial is an essential next step in our efforts to confirm the positive efficacy and safety results we have seen in all PH94B Phase 2 trials to date," stated Shawn Singh, Chief Executive Officer of VistaGen.*

99. On May 13th, 2020, Vistagen filed a Form 8-K with the SEC with an accompanying press release announcing that PALISADE-2 was initiated. Singh was quoted as making this misleading statement in the press release;

> *"Following the successful initiation of PALISADE-1 last quarter, we are excited to be further advancing our PALISADE Phase 3 Program this quarter with the initiation of*

*PALISADE-2,* ***an essential next step in our efforts to further demonstrate the reduction in anxiety observed in PH94B's Phase 2 clinical trials to date,*** *" stated Shawn Singh, Chief Executive Officer of VistaGen. "If successful, these Phase 3 clinical trials, along with the other planned clinical trials in our PALISADE Phase 3 Program, are intended to support the potential submission of a New Drug Application to the FDA in 2023. Our team continues to make progress towards that core objective. PH94B has the potential to be a life-changing acute, as-needed treatment of anxiety for adults with SAD, similar to how a rescue inhaler is used on demand to acutely treat an asthma attack."*

100. The above statement was a half-truth and was fraudulent because it concealed the fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

101. Vistagen registered an open-label study with ClinicalTrials.gov on August 26th, 2021, and terminated the trial in September 2022. ClinicalTrials.gov rejected publishing the trial's results for quality control reasons. Vistagen intentionally failed to announce that they had terminated the trial.

102. On February 10th, 2022, and on June 23rd, Vistagen filed a Form 8-K Corporate Update with the SEC with an attached press release;

*Both studies are structured in a manner substantially similar to the public speaking component of a* *<u>statistically significant peer-reviewed published Phase 2 study of PH94B</u>* *in which researchers observed a rapid reduction in anxiety in individuals (within 15 minutes) in response to a public speaking challenge (p=0.002).*

Once again, in both Corporate updates, Vistagen fraudulently concealed that clinicaltrials.gov rejected the Phase 2 trials for publication.

103. On April 4th, 2022, Vistagen resubmitted the Phase 2 trial to ClinicalTrials.gov, but it was once again rejected for quality control reasons. See;

*https://clinicaltrials.gov/study/NCT01217788?a=2&tab=results*

**Results Submitted - Not Posted on ClinicalTrials.gov**

Results information has been submitted to ClinicalTrials.gov by the sponsor or investigator, but is not yet publicly available (or "posted") on ClinicalTrials.gov. The submitted information may not be available if it is pending Quality Control (QC) Review by the National Library of Medicine (NLM) or if issues identified during QC review are being addressed or corrected by the sponsor or investigator. NLM's limited QC review assesses for apparent errors, deficiencies, or inconsistencies. NLM staff do not verify the scientific validity or relevance of the submitted information.

Vistagen Resubmits the trial on April ,4th 2022 and it was rejected for Quality Control Reasons Again!

| Recruitment Status | Actual Primary Completion Date | Actual Study Completion Date |
|---|---|---|
| Completed | 2011-02 | 2011-03 |

| Submission Cycle | Results Submitted to ClinicalTrials.gov | Results Returned After Quality Control Review |
|---|---|---|
| 1 | 2015-12-29 | 2016-02-01 |
| 2 | 2019-08-27<br>(Canceled on 2019-08-27)<br>2022-04-04 | 2022-05-02 |

104. On June 6th, 2022, Vistagen filed its annual report. On page 8, the report contained this following paragraph;

> In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz, the innovator of the "Liebowitz Social Anxiety Scale (*LSAS*), as principal investigator, PH94B was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using patient-reported anxiety ratings on the Subjective Units of Distress Scale (*SUDS*) within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B."

The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review. See Page 8. https://www.sec.gov/Archives/edgar/data/1411685/000185173422000349/vtgn20220331_10k.htm

105. On June 9th, 2022, Vistagen filed an 8-K for its updated Corporate Presentation. Pages 19-22 were dedicated to the Phase 2 PH94B SAD trials. Vistagen fraudulently concealed that the Phase 2 trials were rejected for publication by ClinicalTrials.gov. See;

https://www.sec.gov/Archives/edgar/data/1411685/000185173422000316/ex_385260.htm

106. On June 23rd, 2022, Vistagen filed a Corporate Update with the SEC with an attached press release. Vistagen intentionally concealed disclosing that the Phase 2 trials failed quality control reviews. The press release stated;

> "Both Phase 3 studies are structured in a manner substantially similar to the public speaking component of a peer-reviewed Phase 2 study of PH94B in which researchers observed a statistically significant, rapid reduction in anxiety in individuals (within 15 minutes) in response to a public speaking challenge (p=0.002)."

The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

https://www.vistagen.com/news-releases/news-release-details/vistagen-therapeutics-reports-fiscal-year-2022-financial-results

107. On July 22nd, 2022, Vistagen filed a Form 8-K with the SEC with an attached press release. Once again, Vistagen intentionally concealed disclosing that the Phase 2 trials failed quality control reviews. Singh was quoted in the press release;

> *"While the results of PALISADE-1 are not consistent with prior positive results from Phase 2 trials of PH94B in social anxiety disorder, we remain committed to transforming the treatment landscape for those living with anxiety, depression, and other central nervous system disorders," said Shawn Singh, Chief Executive Officer of VistaGen."*

The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

108. On January 10th, 2023, Vistagen filed a Form 8-K with the SEC with an attached press release titled;

> Vistagen Announces Completion of Last Patient, Last Visit in Phase 2 Clinical Trial of PH94B for the Treatment of Adjustment Disorder with Anxiety

The heading in the press release stated;

> ***"Topline results of the exploratory Phase 2 clinical study anticipated in Q1 2023"***

109. As previously stated, the Director Defendants and Singh did not release the top-line results of the trial in Q1 2023 and have not submitted them to ClinicalTrials.gov. Indeed, they have gone silent on this small 40-participant trial.

110. On August 7th, 2023, at 9:30 AM, Jefferies started dumping millions of dollars of Vistagen's shares, and the stock price immediately dropped to $25.00. Jefferies knew the press release was misleading, but it continued to dump shares.

On August 8th, 2023, Vistagen issued another prospectus, which informed investors that it could sell the balance of the 75 million dollars without issuing any further prospectuses. The prospectus further disclosed that;

> *"Through August 7, 2023, we have sold 1,373,318 shares of our common stock for aggregate gross proceeds of approximately **$16.1 million** in accordance with the Sale Agreement under the Prospectus".*

The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

111. Vistagen continued to dump another $20 million of shares between August 8th and August 10th, 2023, further driving the stock price down to the $7.00 and $8.00 range (approximately $0.25 adjusted for the 1/30 reverse split). The additional 20 million dollar figure is based on [6]Vistagen's 2024 annual report, stating that **35.9 million dollars** were sold in the pump and dump via their Open Market Sales, which is the ATM. This statement can be found on page 89 of the audited annual report under the section called Financing Activities;

[6] *See*; https://www.sec.gov/ix?doc=/Archives/edgar/data/0001411685/000141168524000022/vtgn-20240331.htm

See; https://www.vistagen.com/node/13656/html

> In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz, the innovator of the Liebowitz Social Anxiety Scale (*LSAS*), as principal investigator, PH94B was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using patient-reported anxiety ratings on the Subjective Units of Distress Scale (*SUDS*) within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B.

The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

112. Vistagen continued its intentional deceptive pattern of failing to disclose that ClinicalTrials.gov rejected both PH94B trials after a quality control review.

113. On August 11th, 2022, Vistagen filed a Form 8-K with the SEC with an attached press release; the press release contained the following statement;

> *"Given these data, along with positive indications from the prior Phase 2 studies, the Company believes that continued Phase 3 clinical development of PH94B as a potential treatment for SAD is appropriate."*

114. Vistagen also announced that it was pausing PALISADE-2 and hiring a team of biostatisticians to evaluate the data and recommend a course of action.

115. On September 22nd, 2022, Vistagen filed a Form 8-K with the SEC with an attached press release, which made a [7]definitive statement that they would proceed with Palisade-2. Singh was quoted in the press release;

> *"We are encouraged by the recommendation to continue PALISADE-2 to full enrollment as originally planned," said Shawn Singh, Chief Executive Officer of Vistagen.*

116. Vistagen did not finish PALISADE-2. Six months after this announcement, Vistagen terminated the trial and used the interim results as the basis for an illegal pump-and-dump. Vistagen did not have the funds to finish the PALISADE-2 trial. McPartland informed both

[7] Definitive statements and historical facts are not Safe Harbor protected

Plaintiffs that Vistagen did not have the money to finish the trial. McPartland told Cesario that Vistagen was desperately trying to raise funds, and according to McPartland, they could not.

117. On July 28th, 2022, Vistagen filed a Corporate update with the SEC with an attached press release. The release referenced the Pilot Phase 3 trial and intentionally failed to disclose that ClinicalTrials.gov rejected it for publication due to quality control failures. See;

*https://clinicaltrials.gov/study/NCT02622958?tab=results*

118. Since Vistagen could not raise enough capital to finish the PALISADE-2 trial, Singh and the Director Defendants schemed a plan to release the interim results as a successful Phase 3 trial. On August 7th, 2023, Vistagen filed a Form 8-K with a misleading press release. The press release was titled;

**Vistagen Announces Positive Top-Line Results from Phase 3 PALISADE-2 Trial of Fasedienol (PH94B) Nasal Spray in Social Anxiety Disorder**

***First positive U.S. Phase 3* study of an investigational therapy for social anxiety disorder in over 15 years**

119. The heading and subheading of the press release were so misleading that they caused **Vistagen's stock price to explode from $1.83 to a high of $71** before 9:30 AM. Vistagen's daily dollar volume of shares traded experienced a once-in-a-lifetime surge from $250,000 on the previous day's trading to $1 billion. Vistagen's daily number of shares also exploded, from **146,000 on Friday, August 4th, to 53,900,000** on Monday, August 7th, 2023, which was approximately a 400-fold increase {emphasis added}. Adjusted for the 2023 1/30 reverse split, $1.83 was the equivalent of $0.06 a share, and $71 was the equivalent of $2.36.

120. Vistagen intentionally used misleading information in the press to dupe the public into thinking the PALISADE-2 trial was a successful Phase 3 trial. Singh knew that trading

algorithms and early morning stock market traders would react quickly to words and phrases such as positive topline results from Phase 3 trials and the first positive U.S. Phase 3 study. The trial was neither a Phase 3 trial nor a successful trial. Once again, Singh was quoted in the press release;

> *"We are thrilled that these compelling top-line results from the Phase 3 PALISADE-2 trial confirm what was seen in the* ***Phase 2 studies in social anxiety disorder and highlight the potential for fasedienol,*** *with its novel and unique proposed mechanism of action, to transform what is possible for more than 25 million people living with social anxiety in the U.S. and millions more affected worldwide," stated Shawn Singh, Chief Executive Officer of Vistagen.*

121. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review. Singh, the Director Defendants, and Jefferies schemed the pump and dump in advance. To accomplish the pump and dump, Vistagen needed to do the following: (i) do a 1/30 reverse split, (ii) issue a prospectus to sell shares, (iii) issue a fraudulent press release announcing Vistagen had a successful Phase 3 trial, and (iv) instruct Jefferies to start dumping Vistagen's shares on the news.

122. On August 7th, 2023, at 9:30 AM, Jefferies started dumping millions of dollars of Vistagen's shares, and the stock price immediately dropped to $25.00. Jefferies knew the press release was misleading, but it continued to dump shares.

123. On August 8th. 2023, Vistagen issued another prospectus, which informed investors that it could sell the balance of the 75 million dollars without issuing any further prospectuses. The prospectus further disclosed that;

> *"Through August 7, 2023, we have sold 1,373,318 shares of our common stock for aggregate gross proceeds of approximately* ***$16.1 million*** *in accordance with the Sale Agreement under the Prospectus".*

124. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

125. Vistagen continued to dump another $20 million of shares between August 8th and August 10th, 2023, further driving the stock price down to the $7.00 and $8.00 range (approximately $0.25 adjusted for the 1/30 reverse split). The 20 million dollar figure is based on

126. Vistagen's 2024 annual report, stating that **35.9 million dollars** were 0 through Vistagen's pump and dump via their Open Market Sales, which is the ATM. This statement can be found on page 89 of the audited annual report under the section called Financing Activities. See; *https://www.vistagen.com/node/13656/html* The S-3 Registration Statement Vistagen filed to sell shares into the pump-and-dump contained this false and misleading statement, once again omitting the material fact that the Phase 2 trials were rejected for quality control reasons.

> The proposed MOA of PH94B is fundamentally differentiated from all currently approved anti-anxiety medications, including the three antidepressants approved by the FDA for the treatment of SAD, as well as all benzodiazepines and beta blockers, which, although not FDA-approved for treatment of SAD, are prescribed for treatment of SAD on an off-label basis. Pre-clinical and **Phase 2 clinical data to date suggest that PH94B has the potential to achieve rapid-onset anti-anxiety effects** without systemic uptake or transport into the brain, significantly reducing the risk of side effects and other safety concerns such as potential abuse, misuse and addiction associated with certain other pharmaceuticals that act directly on the CNS and are sometimes prescribed for anxiety disorders.

127. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review. Moreover, the Top-Line results were only from **an interim trial.** Vistagen self-terminated the trial without fully enrolling in it. Below are examples of completed Phase 3 TopLine results. The Plaintiffs cannot find an example of Topline results from a self-terminated Phase 3 trial.

- https://www.pfizer.com/news/press-release/press-release-detail/pfizer-announces-positive-topline-results-phase-3-study
- https://news.abbvie.com/2024-09-26-AbbVie-Announces-Positive-Topline-Results-from-Phase-3-TEMPO-1-Trial-Evaluating-Tavapadon-as-a-Monotherapy-for-Parkinsons-Disease
- https://www.novocure.com/novocure-announces-positive-topline-results-from-phase-3-panova-3-clinical-trial-of-tumor-treating-fields-ttfields-therapy-for-pancreatic-cancer/
- https://ir.lenz-tx.com/news-events/press-releases/detail/11/lenz-therapeutics-announces-positive-topline-data-from-phase-3-clarity-presbyopia-trials
- https://www.vistagen.com/news-releases/news-release-details/vistagen-announces-topline-results-PALISADE-1-phase-3-clinical

128. The pump and dump was so effective in fooling investors that even professional fund managers were fooled. **Commodore Capital Was Duped $30 Million Dollars**

129. Vistagen, CEO Singh, and the Board knew immediately that investors misunderstood the news. Vistagen's fraudulent and misleading press release fooled not only average investors but also sophisticated investors. An example is the billion-dollar hedge fund Commodore Capital (herein "Commodore").

130.. On August 7th, 2023, **Commodore immediately bought into the Vistagen's pump and dump scheme based on the misleading press release. Commodore purchased 1,575,000 shares at an average price of $23.15 for $36,461,250, or 19.74 percent of Vistagen's outstanding stock.** The Plaintiffs searched for Commodore's past 13D filings with the SEC. They could not find a single instance where Commodore purchased a 19% stake in any company, let alone risked allocating over 5% of its entire capital in one stock. Generally, fund managers do not want to have a 5% or more stake in a public company because of the increased reporting requirements. According to Commodore's filings with the SEC, it appears Commodore sold those sold those shares at a staggering loss before the quarter ended, but purchased a new offering of Vistagen's stock through Jefferies.

From [8]Yahoo financial news;

> On August 7, 2023, COMMODORE CAPITAL LP (Trades, Portfolio) purchased 1,575,000 shares of Vistagen Therapeutics Inc at a price of $23.15 per share. This new holding now represents 5.26% of the firm's portfolio and 19.74% of the total shares of Vistagen Therapeutics Inc. The transaction is significant as it indicates the firm's confidence in the potential growth and profitability of Vistagen Therapeutics Inc.s reported On August 7, 2023,

[8] *See*, https://finance.yahoo.com/news/commodore-capital-lp-acquires-stake-143138185.html

> Commodore Capital LP purchased **1,575,000** shares of Vistagen Therapeutics Inc at a price of $23.15 per share. This new holding now represents 5.26% of the firm's portfolio and **19.74%** of the total shares of Vistagen Therapeutics Inc. The transaction is significant as it indicates the firm's confidence in the potential growth and profitability of Vistagen Therapeutics Inc.

Vistagen's Rewards Jefferies With A Sweetheart Deal For Partnering In The Pump and Dump

131. After being duped by Vistagen's pump-and-dump scheme, Commodore owned a sizable controlling interest in Vistagen that it did not want. Jefferies and Vistagen reached a deal with Commodore, allowing Commodore to participate in a sweetheart deal for Jefferies's clients. To recap, Jefferies and William Blair were co-bookrunners on a $ 100 million financing in December 2000, based on Vistagen's prospectus, which violated securities laws due to misrepresentations and material omissions. **The 2020 funding was done at $27.60** per share with NO warrants attached. The funding was also done before Vistagen falsely claimed to have conducted the first successful Phase 3 trial for social anxiety disorder.

132 As previously detailed, before the ink could dry on the Vistagen/Jefferies illegal pump and dump scheme, they were preparing to sell another $100,000,000 of Vistagen's equity through a prospectus filed with the SEC on October 3rd 2023. While cleverly packaged, **the funding allowed Jefferies to sell common stock to institutions at $5.38 a share with warrants. The first pre-funded warrant was priced at $0.01, the second pre-funded warrant was priced at $5.38, and the third warrant was priced at $8.88.** The offering was packaged this way to (a) confuse the public and (b) to keep the institutions from owning less than 5% of the common stock for reporting purposes. As Commodore's 13D filing with the SEC proves, Commodore participated in this offering. This sweetheart deal was only offered to institutional clients and not to the general public, whom Jefferies and Vistagem made bagholders through the illegal pump and dump scheme.

133. Right on cue, the three firms that have benefited, Jefferies, William Blair, and Stiefel's analysts issue price targets between $12 and $15 to pump the stock price higher. Pumping the stock higher allowed liquidity for the institutions that bought the deal to sell their stock and have

tremendous risk-free upside potential if Vistagen falsely announces another false and misleading press release.

134.. Vistagen followed up the pump and dump with a prospectus to sell up to $100 million in equity from Vistagen. The prospectus once again referenced the Phase 2 trial and told another half-truth. Page S-5 The subheading of the press release was so misleading that it caused **Vistagen's stock price to explode from $1.83 to a high of $71** before 9:30 AM. Vistagen's daily dollar volume of shares traded experienced a once-in-a-lifetime surge from $250,000 on the previous day's trading to $1 billion. Vistagen's daily number of shares also exploded, from **146,000 on Friday, August 4th, to 53,900,000** on Monday, August 7th, 2023, which was approximately a 400-fold increase {emphasis added}. Adjusted for the 2023 1/30 reverse split, $1.83 was the equivalent of $0.06 a share, and $71 was the equivalent of $2.36.

135. Vistagen intentionally used misleading information in the press to dupe the public into thinking the PALISADE-2 trial was a successful Phase 3 trial. Singh knew that trading algorithms and early morning stock market traders would react quickly to words and phrases such as positive topline results from Phase 3 trials and the first positive U.S. Phase 3 study. The trial was neither a Phase 3 trial nor a successful trial.

Once again, Singh was quoted in the press release;

*"We are thrilled that these compelling top-line results from the Phase 3 PALISADE-2 trial confirm what was seen in the* ***Phase 2 studies in social anxiety disorder and highlight the potential for fasedienol,*** *with its novel and unique proposed mechanism of action, to transform what is possible for more than 25 million people living with social anxiety in the U.S. and millions more affected worldwide," stated Shawn Singh, Chief Executive Officer of Vistagen.*

136. The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control

review. Singh, the Director Defendants, and Jefferies schemed the pump and dump in advance. To accomplish the pump and dump, Vistagen needed to do the following: (i) do a 1/30 reverse split, (ii) issue a prospectus to sell shares, (iii) issue a fraudulent press release announcing Vistagen had a successful Phase 3 trial, and (iv) instruct Jefferies to start dumping Vistagen's shares on the news.

https://www.sec.gov/Archives/edgar/data/1411685/000143774923027529/vtgn20230921_424b5.htm

> "which was inconsistent with positive placebo-controlled Phase 2 studies and the statistically significant results of our PALISADE-2 Phase 3 clinical trial, may have been due to the extraordinary multifaceted impact of the acute phase of the COVID-19 pandemic, which introduced into the typical study dynamic significant and unprecedented logistical challenges and systemic variability"

The above statement was a half-truth and was fraudulent because it concealed the material fact that ClinicalTrials.gov rejected publishing the trial results after a quality control review.

137. On June 13th, 2024, Vistagen finally submitted the results of the PALISADE-1, PALISADE-2, and PALISADE open-label trials to ClinicalTrials.gov. However, Vistagen did not submit the results for the COVID-19 Phase 2 anxiety disorder trial.

138. On August 13th, 2024, ClinicalTrials.gov returned the PALISADE-1, PALISADE-2, and PALISADE open-label trials UNPUBLISHED due to quality control issues.

PALISADE-1
*https://clinicaltrials.gov/study/NCT04754802?cond=Social%20Anxiety%20Disease&term=PH94B&rank=5&page=1&limit=10&tab=history*

PALISADE-2 Terminated
*https://clinicaltrials.gov/study/NCT05011396?cond=Social%20Anxiety%20Disease&term=PH94B&rank=4&page=1&limit=10&tab=history&a=6#version-content-panel*

PALISADE Open Label Terminated
*https://clinicaltrials.gov/study/NCT05030350?cond=Social%20Anxiety%20Disease&term=PH94B&limit=10&intr=open%20label&rank=1&tab=history*

** ClinicalTrials.gov rejected ALL five PH94B clinical trials after a quality control review. Vistagen, Singh, and the other Director Defendants failed to disclose these material facts to the investing public and Vistagen stakeholders.

139. Plaintiff Cesario sent the Vistagen Directors a letter dated October 2nd, 2023, accusing Vistagen of committing fraud and violating security laws by failing to disclose that ClinicalTrials.gov rejected publishing the PH94B trials after they did a limited quality control review.

139. On October 3rd, 2023, Vistagen filed a prospectus with the SEC to raise another $100 million through an equity sale. Page S-5 made this statement *"We believe the unexpected outcome in PALISADE-1, which was inconsistent with positive placebo-controlled Phase 2 studies and the statistically significant results of our PALISADE-2 Phase 3 clinical trial, may have been due to the extraordinary multifaceted impact of the acute phase of the COVID-19 pandemic,"*

Vistagen Sends a Response Letter To Cesario

140. On November 23rd, 2023, Attorney Colleen Smith from Latham & Watkins responded. Latham and Watkins was engaged as Vistagen's outside law firm, handling SEC matters. Paragraph 1 confirms that the Director Defendants read Cesario's letters;

> We represent the Board of Directors (the "Board") of Vistagen Therapeutics, Inc. ("Vistagen" or the "Company") and the Company in connection with the September 6, 2023, and October 2, 2023 shareholder letters sent by you to the Company (the "Letters"). In correspondence dated September 25, 2023, and October 16, 2023, the Board acknowledged receipt of your Letters…

Vistagen's Response Letter was intentionally unresponsive. It failed to address that Vistagen failed to disclose that the Phase 2 trial results were rejected for publication by clinicaltrials.gov. was either intentionally or mistakenly misstates facts and never addresses that Vistagen intentionally concealed, disclosing that ClinicalTrials.gov rejected publishing the Phase 2 trial of

PH94B for quality control reasons, and the letter intentionally misinterprets what a completed Phase 3 trial is according to the FDA. Smith was Vistagen's SEC lawyer, and according to McPartland, Latham and Watkins advised and approved Vistagen's SEC filings. It appears that they aided and abetted Vistagen and Singh in committing felonies, so it is not surprising that the response letter was nonsensical. Smith knew that the FDA rules specifically state that "*a Phase 3 trial should include sufficient numbers of study participants*". Vistagen terminated the PALISADE-2 trial without sufficient study participants, as per the design presented to the FDA. PALISADE-2 was a Phase 2 trial. Furthermore, the half-enrolled, terminated PALISADE-2 trial was rejected for publication by clinicaltrials.gov after a quality control review due to Vistagen's negligence. FDA rules state that trials must adhere to a design protocol. Vistagen chose to terminate the trial; worse still, Vistagen terminated PALISADE-2 because it lacked the funds to complete it. See;

**https://www.fda.gov/patients/drug-development-process/step-3-clinical-research**

**Allegations Against Vistagen's Directors and Officers**

CEO Singh and The Board

141. The Director Defendants, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, and Curley, were signatories on Vistagen's 2021 annual report filed with the SEC on June 29th, 2021. Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, and Curley knew that the 2020 annual report contained misleading statements and material omissions.

142. According to McPartland, the Defendant Directors Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, and Curley reviewed and approved every press release, SEC filing, and corporate presentation that contained the materially misleading statements and omissions.

Each director's biography indicates that they are experienced in public markets and biotech companies, so they would be familiar with ClinicalTrials.gov.

143. Vistagen's Board of Directors, whether independent or active in the day-to-day business, has a responsibility to the stakeholders. As such, they are accountable for their fraudulent acts, including executing two illegal pump-and-dump schemes, signing off on annual reports they knew were dishonest, and omitting material facts. The Board was negligent for failing to file Form 8-K, informing the public and stakeholders that the social anxiety studies, PALISADE 1 and 2 trials, and the open-label study were rejected for publication by clinicaltrials.gov after a limited quality control review. The Board knew that the Palidade-2 trial was terminated because they didn't have proper control over the budget.

- Singh, Saxe, Gin, Snodgrass, Cunningham, and Dotson knowingly approved and were signatories to Vistagen's noncompliant audited annual reports for the years ending 2019 and 2020. **The report was noncompliant due to material misstatements and omissions regarding PH94B's Phase 2 trials.**
- Singh, Saxe, Gin, Snodgrass, Cunningham, and Curley knowingly approved Vistagen's noncompliant audited annual reports for the year ending 2021. **The report was noncompliant due to material misstatements and omissions regarding PH94B's Phase 2 trials.**
- Singh, Saxe, Gin, Snodgrass, Cunningham, Curley, Rotundo, and Fitzpatrick, approved and were signatories to Vistagen's noncompliant audited annual reports for the years ending 2022 and 2023. **The report was noncompliant due to material misstatements and omissions regarding PH94B's Phase 2 trials.**
- Singh, Saxe, Gin, Snodgrass, Cunningham, JoAnne Curley, Rotundo, and Fitzpatrick knowingly signed off on Vistagen's noncompliant audited annual reports for the year ending 2024. **The report was noncompliant due to material misstatements and omissions regarding PH94B's Phase 3 trials.**

144. Mark McPartland and Mark Flather are executives at Vistage. Their knowledge made them aware that the public disclosures were concealing material facts. They were legally

obligated to report the fraud. By their silence, they are active participants in common law fraud claims, breached their fiduciary duties, aided and abetted board members in breaching their fiduciary duties, committed negligent misrepresentation, and violated California Corporation Codes § 25400 and § 25401. Before PALISADE-1 failed, McPartland was constantly on the phone with investors, giving investors, including Cesario, glowing reports on how great the previous Phase 2 and Pilot Phase 3  trials were on PH94B while deliberately, maliciously, and knowingly omitting the material facts. McPartland and Cesario communicated frequently. McPartland always embellished PH94B's Phase 2 trials while concealing that ClinicalTrials.gov rejected publishing the trial for quality control deficiencies. McPartland induced Cesario to convert warrants into common stock and induced Cesario to hold the stock.

145. By the foregoing, Vistagen's Director Defendants (i) violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (ii) committed common law fraud (iii) were reckless and grossly negligent beginning the Phase 3 trial during pek COVID-19 while concealing that ClinmicalTrials rejected the Phase 3 trials for publication, (iv) committed constructive fraud, committed Intentional Misrepresentation and Deciet, and (v) violated their fiduciary duties.

146. By the foregoing, Vistagen's executive Defendants, McPartland and Flather (i) were secondary actors and violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (ii) committed common law fraud (iii) aided and abetted the Director Defendants in fraud, (iv) committed constructive fraud, committed Intentional Misrepresentation and Deceit, and (v) violated their fiduciary duties.

**Allegations Against Dr. Ralph Snodgrass, Mark A. Smith, and Louis Monti**

147. Dr. Ralph Snodgrass was Vistagen's founder and President until he was terminated by Vistagen in 2022. According to McPartland, Snodgrass was abruptly terminated for sexual harassment and deviancy. Before the termination of Snodgrass, he was a key actor in Vistagen's first pump and dump scheme, violated federal and state securities laws due to concealing material facts that PH94B Phase 2 and Pilot Phase 3 trials were rejected for publication by clinicaltrials.gov, breached his fiduciary duties, and violated California Corporation Codes § 25400 and § 25401.

148. Mark A. Smith, M.D., Ph.D, was formerly Vistagen's Chief Medical Officer from 2016 to 2022. McPartland stated that Smith was terminated for his failed Phase 2 AV-101 trial design. Before the termination of Snodgrass, he was a key actor in Vistagen's first pump and dump scheme, violated federal and state securities laws due to concealing material facts that PH94B Phase 2 and Pilot Phase 3 trials were rejected for publication by clinicaltrials.gov, breached his fiduciary duties, and violated California Corporation Codes § 25400 and § 25401.

149. Louis Monti, M.D. PHD serves as Vistagen's Senior Vice President of Translational Neuroscience. Monti was one of the people who signed off on the questionable peer-reviewed PH94B papers. Like Smith and Snodgrass, Monti is a doctor familiar with the NLM and the website clinicaltrials.gov. Monti, in both dump schemes, as he knew the COVID-19 pump and dump scheme concealed material facts, Before the termination of Snodgrass, he was a key actor in Vistagen's both pump and dump scheme, violated federal and state securities laws due to concealing material facts that PH94B Phase 2 and and Pilot Phase 3 trials were rejected for publication by clinicaltrials.gov, breached his fiduciary duties, and violated California Corporation Codes § 25400 and § 25401.

**Allegations Against Withum**

150. Withum refused to see or even investigate the fraudulent nature of Vistagen's disclosures in quarterly and annual reports, prospectus filings, proxy filings, and corporate updates relating to (1) the PH94B trials described herein being rejected for publication by clinicaltrials.gov; (2) Vistagen and its Directors lying in SEC disclosures, making definitive statements that they were going to resume PALISADE-2 to complete enrollment; (3) Vistagen and its Directors making misleading statements and lying in SEC disclosures as to why they terminated PALISADE-2; and (4) Vistagen and its Directors perpetrating a massive pump and dump beginning on August 7th 2023, issuing a false and misleading press release which defrauded duped purchasers of Vistagen stock hundreds of millions to 1 billion dollars. Withum intentionally and recklessly violated the standards and rules set forth by the PCAOB, the SEC, the PSLRA Act passed by Congress, and California fraud statutes. Further, Withum aided and abetted Vistagen's Directors and executives in breaching their fiduciary duties, committing fraud, violating the Exchange Act, and violating the California Corporations Codes § 25400 and § 25401.

151. Withum's silence on Vistagen's quarterly reports, misleading SEC disclosures, and issuance of clean audit opinions propped up Vistagen's house of cards, causing enormous harm to Plaintiffs and investors.

THE ROLE OF THE INDEPENDENT EXTERNAL AUDITOR

152. Withum's duty when discovering fraud and/or violations of security laws, whether committed intentionally or unintentionally, is straightforward. Withum had a duty to inform Vistagen's audit team and issue a "do not rely" notice regarding the previous noncompliant financial reports, at which point Vistagen had a duty to correct the record. If Vistage failed to

correct the mistakes, Withum had a duty to resign and cite the reasons. In the case of securities fraud, they would report the fraud to the SEC and report it under PCAOB rules.

153. Withum either negligently or intentionally refused to see the red flags and investigate the repeated fraud and violations of security laws in Vistagen's disclosures, including press releases, quarterly and annual reports, prospectus filings, proxy filings, and corporate updates relating to PH94B. Withum should have known that.

(1) the PH94B trials described herein were rejected for publication by clinicaltrials.gov;

(2) Vistagen and its Directors lied in SEC disclosures, making definitive statements that they were going to resume PALISADE-2 to complete enrollment;

(3) Vistagen and its Directors made misleading statements and lied in SEC disclosures as to why they terminated PALISADE-2;

(4) Vistagen and its Directors perpetrated a massive pump and dump beginning on August 7th, 2023, by issuing a false and misleading press release, which defrauded and duped purchasers of Vistagen stock hundreds of millions to 1 billion dollars. Because Vistagen's management prepares and is responsible for the company's financial statements and disclosure, Withum should have had a high degree of skepticism regarding the claims Vistagen was making regarding PH94B, including raising questions regarding the **reliability of those financial statements**, which may reflect on the competence and stewardship of management or affect management's compensation. Public companies engage independent certified public accountants (herein "auditors") to address the credibility of a company's financial statements. Auditors, in turn, are required to review quarterly filings with the SEC and issue qualified opinions on a company's annual report. Independent certified public auditors opine on whether a company's financial statements are prepared in accordance with GAAP, the rules of the American Institute of Certified Public Accountants (herein" AICPA"), and the PCAOB, as well as the laws of the SEC and the PSLRA that was passed by Congress in 1994. Part of the financial statements includes what is referred to as Notes. Notes include verifying the accuracy of disclosures to the public, including but not limited to those in quarterly

reports, press releases, prospectuses, purchase agreements, and license agreements. That is why publicly traded companies must obtain financial statement audits and provide those audited financial statements to the investing public. An audit is conducted for the benefit of the company's stakeholders. An independent auditor adds credibility to financial statements by **verifying the numbers and disclosures.** The objective of an audit is to provide the users of the financial statements with reasonable assurance that the financial statements are presented correctly. Audit reports contain the words reasonable assurance.

154. Financial statements typically include notes, reviews of quarterly filings, material agreements, licenses, and similar documents. Auditors review budgeting forecasts for the next twelve months and provide audit opinions in the annual report. Auditors also review public disclosures, including 8-K filings and press releases. They are classified under financial notes. Vistagen's internal accounting department handles the everyday booking tasks every business has. While Vistagen had expenses that needed to be accounted for, they did not have any sales revenue, nor was sales revenue anticipated for years. The AV-101 depression drug trial that failed was paid for and administered by NIH. What Vistagen did have, especially after AV-101 failed, was PH94B.

155. While investors shouldn't expect auditors to be bloodhounds, auditors must maintain a high level of skepticism when performing audits. The red flags regarding Vistagen's PH94B disclosures should have been evident to an independent auditor having just a modicum of skepticism. Vistagen's cash balance was down to $6.4 million as of December 31, 2018, and they were burning through over $4 million per month. Vistagen's capital needs were met by constantly selling stock to the investing public.




## Withum Knew Or Should Have Known About Cesario's Letter Detailing The Fraud and Violations Of Federal and State Securities laws

156. Vistagen's investors understood that after AV-101's Phase 2 failure, Vistagen needed PH94B to be successful. Investing in small-cap biotechs is risky. Investors depend on honest disclosures in press releases and SEC filings. At times after the AV-101 failure, Vistagen's cash position dropped to as low as a little over $1 million, but the Plaintiffs believed in the company based on Vistagen's disclosures. From the beginning of Vistagen's acquisition of PH94B, due to Vistagen's perilous financial situation, Withum should have been aware of the glaring red flags in Vistagen's press releases and SEC filings, which included quarterly and annual reports, corporate updates, and prospectuses. Red flags include;

- Vistagen concealed the Phase 2 and Pilot Phase 3 trials, which were rejected for publication on clinicaltrials.gov after ClinicalTrials.gov conducted a limited quality control review.
- Failing to disclose that Dr. Michael R. Liebowitz stood to benefit from PH94B financially.

- Vistagen's conflict of interest is having Dr. Michael R. Liebowitz, the Primary Investigator, after the previous two trials he conducted on PH94B failed the clinicaltrials.gov quality review.
- Linking Dr. Michael R. Liebowitz's purported peer-reviewed paper on the Phase 2 PH94B trial, knowing that the trial was rejected for publication.
- Dr. Michael R. Liebowitz took four years to complete the simple 88-subject, one-dose Phase 2 trial. Dr. Michael R. Liebowitz took 3 years after the Phase 2 trial to submit the results to clinicaltrials.gov
- Vistagen's intentionally misleading April Fools Day, April 1st, 2019 press release that falsely stated that "
- Citing Dr. Michael R. Liebowitz's peer-reviewed publications without disclosing the and Pilot Phase 3 study was rejected for publication by clinicaltrials.gov or linking to the study results submitted to clinicaltrials.gov.
- Vistagen bald-faced lies that they were going to resume PALISADE-2 to complete enrollment and have Topline data in the first half of 2023, which can be found in the title of the September 8th, 2022, press release and quarterly report filed with the SEC on November 10th, 2022.
- Vistagen did not have the funds to complete PALISADE-2
- The Phase 2 trial for Adjustment Disorder was completed in December of 2022, and Vistagen has still not submitted the results to clinicaltrials.gov.
- Vistagen did not have any new findings. Vistagen issued a false and misleading press release stating that on April 1st, 2019, "New Findings Presented at the 2019 Anxiety and Depression Association of America Annual Conference."

157. Withum should have recognized that Vistagen's positioning of PH94B as a COVID-19-related therapy was a major red flag, primarily because Vistagen used the COVID-19 angle to raise desperately needed capital. As stated above, on May 20th, 2020, Vistagen filed an 8-K with the SEC and issued the following press release with the title;

**VistaGen Submits PH94B Phase 2A Study Protocol for Treatment of Adjustment Disorder with Anxiety Related to the <u>COVID-19 Pandemic</u> through U.S. FDA's Coronavirus Treatment Acceleration Program (CTAP)**

https://www.vistagen.com/news-releases/news-release-details/vistagen-submits-ph94b-phase-2a-study-protocol-treatment

158. At the time of the press release, Vistagen was heading towards potential bankruptcy. Vistagen raised $ money a few months earlier at $0.43, the actual price ($13.00 adjusted for the 1/30 reverse split). Despite the COVID-19 pandemic, press releases mentioning COVID-19 often

caused a company's stock to increase significantly. The press release made this false and misleading statement.

"With successful Phase 2 development of PH94B for social anxiety disorder completed."

159. Vistagen's stock price quickly doubled to nearly $1.00 based on this nonsensical COVID-19 press release. Following the hyped-up press release, Vistagen raised $12.5 million through Maxim in August 2020 and $100 million through Jefferies and William Blair in December 2020. Neither financing contained warrants. Notably, the prospectus for both financings did not mention the Phase 2 PH94B trials, unlike the 2021 Prospectus.

> https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/look-out-coronavirus-related-investment-scams-investor-alert#:~:text=Be%20cautious%20of%20claims%20that,%2Dand%2Ddump%E2%80%9D%20schemes.

**Withum should have been aware that Vistagen did not link any of its disclosures to the clinicaltrials.gov Phase 2 and Pilot Phase 3 trials rejected after quality control reviews.**

160. Because Singh and Vistagen's Board positioned Vistagen as a potential COVID-19 anxiety-related therapy, Vistagen's stock price began rising. Vistagen's stock price more than doubled, leading to Vistagen raising $125 million through the sale of its stock. After Vistagen had pumped the stock higher with the COVID-19 press release, Vistagen issued a prospectus in which Jefferies and William Bair were the co-book runners. The banking firms of Maxim, Jefferies, and William Bair knew that PH94B's trials, the Phase 2 and Pilot Phase 3 trial, were rejected for publication by clinicaltrials.gov. The prospectus violated fraud statutes and federal securities laws due to material omissions. While not germane in this matter, it also violated Rule

160. Once loaded with cash, Vistagen and the executive management team rewarded themselves with raises and bonuses.

https://pcaobus.org/oversight/standards/archived-standards/pre-reorganized-auditing-standards-interpretations/details/auditing-standard-no-8_

Withum Lacked Independence

161. By certifying the public disclosures issued by Vistagen, Withum assumed a public responsibility that transcended any employment relationship with Vistagen. Withum's lack of independence, both in mind and appearance, resulted in Withum repeatedly certifying the five years of fraudulent financial statements. Auditors function as critical gatekeepers in the area of issuer reporting and disclosure. Comprehensive, accurate, and reliable financial reporting is the bedrock upon which our markets are based and is essential to ensuring public confidence in them. Auditors play a crucial role in public company financial reporting by serving a "public watchdog function" that demands "total independence from the client at all times and requires complete fidelity to the public trust." U.S. v. Arthur Young & Co., 465 U.S. 805, 818 (1984). To recap, (i) Vistagen did not have any revenue, (ii) the PCAOB requires auditors to have an understanding of a client's business, and have a healthy skepticism of management's representations so that they can detect errors and fraud; (ii) Withum's website states it services life sciences companies and is puts itself out as an expert; (iv) the FDA mandates the results of clinical trials be published on clinicaltrials.gov, and not biased peer reviewed publications to magazines; (v) Withum knew Vistagen was legally obligated to disclose the clincaltrials.gov results; (vi) Withum knew or should have known that Vistagen's SEC filings concealed information that was material to investors and that Vistagen was legally obligated to disclose, and Withum issued Vistagen clean audit reports for the years 2019-2024; (vii) Withum knew that Vistagen committed an illegal pump and dump on in 2020 and on August 7th 2023 and failed to report despite being legally obligated to under SEC rules and the PSLRA. One of the steps auditors are legally obligated to do is to discuss the fraud with the audit committee. Jon Saxe was

the longstanding chair. If the situation is not resolved, auditors must resign and state the reason, which would be disclosed in a Form 8-K. Also see Department of Justice.

https://www.ojp.gov/ncjrs/virtual-library/abstracts/auditors-responsibility-detection-management-fraud-selected-cases

162. Withum failed to evaluate Vistagen's disclosures related to PH94B.

As part of an auditor's duties, Withum would have met with Vistagen to discuss yearly budgets, including the PALISADE-1 and PALISADE-2 trials. As previously stated, Sihngh and Mcpartland assured Cesario that they had plenty of funding for the PALISADE trials and enough capital to run simultaneous studies. Withum knew that Vistagen lied regarding why PALISADE -2 was terminated, yet stood silent in its audit report for Vistagen and gave Vistagen a clean audit report on June 28th, 2023. On June 28, 2023, Vistagen was down to $9.6 million in cash with $4 million in liabilities, including nearly $2 million in payables. Vistagen expenditures were $7 million in the quarter ending June 30th, 2023.

Withums's annual audited reports are addressed to the directors of Vistagen and the stakeholders and declare that the Rules of the PCAOB have performed the audit; below is the wording from Vistagen's 2023 annual report, pages 103 and 104

> **Stockholders and Board of Directors**
> Vistagen Therapeutics, Inc.
> South San Francisco, California
> Opinion on the Consolidated Financial Statements
>
> We have audited the accompanying consolidated balance sheets of Vistagen Therapeutics, Inc. (the "Company") as of March 31, 2023, and 2022, the related consolidated statements of operations and comprehensive loss, cash flows, and stockholders' equity for each of the two years in the period ended March 31, 2023, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of March 31, 2023, and 2022, and the results of its operations and its cash flows for each of the two years in the period ended March 31, 2023, in conformity with accounting principles generally accepted in the United States of America.
>
> Substantial Doubt Regarding Going Concern

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company has suffered negative cash flows from operations and recurring losses from operations since inception, **resulting in an accumulated deficit of $326.9 million as of March 31, 2023, that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2**. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Basis for Opinion

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We **conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud**. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to understand internal control over financial reporting but not to express an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

**Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and *disclosures* in the consolidated financial statements.** Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

163. After the auditors report states that it is doubtful that Vistagen had the capital to last a year, it refers readers to Note 2 of the annual report. The auditors' report states refers to Notes 2 of the annual report, which is found on page 8 and makes this statement regarding financing;

When necessary and advantageous, we will seek additional financial resources to fund our planned operations through (i) sales of our equity and/or debt securities in one or more public offerings and/or private placements, including sales of our securities under the Sales Agreement, (ii) non-dilutive government grants and research awards and (iii) non-dilutive strategic partnering collaborations to advance development and commercialization of our product candidates. However, no assurance can be provided that any such sales of our securities, awards, agreements or collaborations will occur in the future. Subject to certain restrictions, our Registration Statement on Form S-3 (the *S-3 Shelf Registration Statement*) remains available for future sales of our equity securities in one or more public offerings from time to

time. **While we may make additional sales of our equity securities under the S-3 Shelf Registration Statement and/or under the Sales Agreement, we do not have an obligation to do so.**

164. Withum knew that;

- Vistagen stated it would continue the PALISADE-2 trial to full enrollment.
- Vistagen could not obtain regular financing in March of 2023.
- Vistagen did not have the capital to finish PALISADE-2 and failed to disclose it.
- Vistagen's claim that it had the first successful Phase 3 trial was false.
- Knew that Vistagen's August 7th press release was false and that Vistagen was engaging in a pump and dump scheme.

165. Accordingly, Withum's quarterly reviews and noncompliant audit reports on Vistagen and Vistagen's disclosures and internal control over financial reporting as of June 28th, 2018, 2019, 2020, 2021, 2022, and 2023, respectively, were knowingly or recklessly false and misleading when made.

166. By the foregoing, (i) violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (ii) aided and abetted Vistagen and its Directors defrauding the Plaintiffs by perpetrating common law fraud; (iii) aided and abetted Vistagen's Directors in defrauding the Plaintiff's through common law fraud, and constructive fraud, violating their fiduciary duties, became an active participant in the scheme to defraud the Plaintiff's and investors. (iv.) Withum was legally obligated to report the fraudulent acts to Vistagen's audit committee. They didn't.

**<u>Allegations Against Jefferies and Tsai</u>**

167. Jefferies conspired with and aided and abetted Vistagen in Vistagen's long-running fraud on the market scheme. As described herein, Jefferies knew that Vistagen's statements in the December 2020 prospectus were half-truths and misleading. The Jefferies banking division was aware that Vistagen intentionally concealed the fact that ClinicalTrials.gov rejected the Phase 2 trials due to quality control reasons.

168. In 2021, Tsai also knew that Vistagen had intentionally concealed the fact that ClinicalTrials.gov had rejected the Phase 2 trials due to quality control reasons. Tsai's research

reports did not disclose this. Tsai issued $6.00 price targets on Vistagen to induce the investing public to buy Vistagen's stock.

169. In 2023, Jefferies conspired with and actively partnered with Vistagen in an illegal pump-and-dump scheme, causing investors in Vistagen's stock to lose upwards of $1 billion. Jefferies knew that.

- Vistagen's PALISADE-2 trial was an unsuccessful Phase-2 trial, and the results were interim.
- The investing public misunderstood the August 7th, 2023, press release, and that they should not have facilitated stock sales for Vistagen until Vistagen clarified that the trial would not count as a completed Phase 3 with the FDA.
- Knew that the October 2023 prospectus contained false and misleading statements and incorporated an "unclean" annual report.

<u>The Vistagen Jefferies Pump and Dump Was Pre-Planned</u>

170.. Before Vistagen and Jefferies could execute an illegal pump and dump, they needed to complete the set foundation by taking the steps that have been previously described in more detail. The steps included;

1. Terminate the PALISADE-2 trial.
2. Reverse split Vistagen's stock 1/30.
3. Issue a prospectus to sell $10,500,00, the maximum they could sell due to the limits of General Instruction I.B.6 of Form S-3.
4. Issue a second supplemental prospectus to be ready for the pump.
5. Wait for the interim study results, which they knew would be positive based on the biostatisticians' recommendation.
6. Issue a false and misleading headline on August 7th, 2023, stating that the Phase 3 PH94B was the first successful Phase 3 trial for social anxiety disorder to pump the stock price higher and then dump $10,500,000 of stock.

7. On August 8th, 2023, before the markets opened, another supplemental prospectus was issued stating that the limits on Vistagen to sell stock under General Instruction I.B.6 of Form no longer apply from the S-3 filing.
8. Dump another $20 million of stock.

171. Jefferies wasn't satisfied with the million-plus dollars they made in commissions, illegally dumping $38 million of Vistagen's stock on the public. Jefferies, Singh, and the Vistagen Board of Directors wanted more, so they proposed a plan to dump another $100 million of Vistagen's stock onto the public. Vistagen filed a prospectus with the SEC that Vistagen's board of directors, executive management team, and Jefferies knew contained FRAUDULENT MATERIAL OMISSIONS, incorporated a NONCOMPLIANT AUDITED ANNUAL REPORT. The offering turned out to be a sweetheart deal for Jefferies' clients as they generated a minimum of $6,000,000 in fees. The pricing of the $100,000,000 was also a scam on shareholders, as detailed in the Commodore section of the complaint.

172. The 2020 equity offering did not include warrants. The pricing of the 2020 offering was before Vistagen stated the PALISADE-2 results. The 2023 Jefferies pricing was set at $5.36 (or $0.17 adjusted for the 1/30 reverse split) and offered an equal pre-funded warrant at $0.01, additional warrants at an exercise price of $5.36, and additional warrants at an exercise price of $8.88. Jefferies' Andrew Lin Tsai, as well as Maxim and William Blair analysts, issue $12.00 price targets, allowing institutions to sell their stock but also can buy up to three times the shares of the offering at low prices if the trials turn out to be positive. See the Commodore SEC filing.

# Jefferies Upgrades Vistagen Therapeutics to Buy, Raises Price Target to $15

Benzinga Dec 7, 2023 05:35

US VTGN -1.01%

Jefferies analyst Andrew Tsai upgrades Vistagen Therapeutics (NASDAQ:VTGN) from Hold to Buy and raises the price target from $0.2 to $15.

The above content is for informational or educational purposes only and does not constitute any investment advice related to Futu. Although we strive to ensure the truthfulness, accuracy, and originality of all such content, we cannot guarantee it.

173. Singh's deceptive practices continued on Vistagen's August 13th, 2024 earnings call. Singh did not disclose that ClinicalTrials.gov rejected PALISADE-1, PALISADE-2, and the open-label trial for quality control reasons. Singh did not disclose that ClinicalTrials.gov rejected the three latest PH94B trials even after he was asked a direct question.

| | |
|---|---|
| **Lin Tsai;** | Great. Last question is, what's the latest on the PALISADE-2 publication as well as a potential Breakthrough Designation filing? |
| **Shawn Singh;** | Andrew, look, we know obviously what we achieved in PALISADE-2 is historic. No one's ever done it. And so that's given rise to interest in terms of manuscript that we will be **submitting to a journal that we believe is the best fit for that.** That's in a very nice, mature stage of development. The other part of it is, look, as you know, we've achieved Fast Track designation already. That's a serious and life-threatening indication. There's no question about that. What we achieved in PALISADE-2 is a |

very significant differentiator. So -- and we'll see how it goes. There's never any guarantee you can make about any activity with the agency, but I like the chances that we have in fitting the profile that's typically associated with moving beyond Fast Track.

174. Singh, also made this statement on the call after clinicaltrials.gov rejected publishing the PALISADE-2 trial;

> "Last year with our PALISADE-2 Phase III trial of fasedienol, we reported the **first ever positive Phase III trial of a drug candidate for the acute treatment of SAD."**

See the August 2024 earnings call transcript: *https://capedge.com/transcript/1411685/2025Q1/VTGN*

175. The Plaintiffs have provided evidence that Vistagen, Singh, Vistagen's Board of Directors and executive management team lied in SEC filings and earnings calls as to why Vistagen terminated the PALISADE-2 trial; the evidence provided includes (i) Vistagen's cash position, (ii) Vistagen's unsuccessful attempts to raise capital, a have enough money to complete PALISADE-2; and finally, the Plaintiffs believe Singh's words during Vistagen's latest conference call are additional incontrovertible evidence. Singh states that because Vistagen is fully funded, PALISADE-4 will continue even if PALISADE-3 fails.

**Lin Tsai:** Makes sense. **And in the unfortunate circumstance should PALISADE-3 not hit stats, do you still -- would you still plan to move forward and complete PALISADE-4**, just given the turn of events that happened last time with PALISADE-1 and 2?

**Shawn Singh:** Yes, 100%. No question about it, Andrew. The whole program continues. **That's what's the benefit of having a fully-funded program.**

So we're in a spot now where in the very short order here, we will have initiated everything in '24 that we think we need to read out in '25 and that if positive, would support our NDA in the early part of '26 for fasedienol.

> **So yes, absolutely 100%, regardless, both studies will be run to completion.**

**See Vistagen's Code of Ethics**

176. CEO Singh, Vistagen's Board members, and executive management team intentionally, willingly, knowingly, and maliciously violated Vistagen's Code of Business Conduct, specifically the Code of Integrity, which requires compliance with the Law and Regulations to obtain financial benefits.

See; *https://www.vistagen.com/static-files/42c25675-489e-42c2-adb9-9c405464a90f*

17. By the foregoing, these executives (i) committed common law fraud; (ii) aided and abetted Vistagen and its Directors in defrauding the Plaintiffs by perpetrating common law fraud; (iii) aided and abetted Vistagen's Directors in defrauding the Plaintiff's through common law fraud, and constructive fraud, violating their fiduciary duties; (iv) breached their fiduciary responsibilities, (v) were negligent by initiating PALISADE PH94B trials and having adequate controls on the trials. Due to quality control issues, all three PALISADE PH94B trials Vistagen ran were rejected for publication by clinicaltrials.gov.

## V. INAPPLICABILITY OF SAFE HARBOR

178. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any false or misleading statements pleaded in this Complaint. Simply stated, the claims made herein are historical facts. FRAUD vitiates everything. The Defendants in this lawsuit either directly committed fraud or aided and abetted in fraud. The fraudulent acts continue to this day. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. For example;

- (i) Vistagen was legally obligated to disclose the 2009 and 2014 PH94B trials rejected for publication by clinicaltrials.gov after a limiter quality control check was done;
- (ii) Vistagen was required to disclose the sentence mentioned above in the 2021 prospectus

- (iii) Vistagen was legally obligated to file a Form 8-K disclosing that the PALISADE-1 and PALISADE-2 trials and Open Label study for social anxiety disease were rejected for publication by clinicaltrials.gov with negative comments after a limited quality review was done;
- (iv) Vistagen lied in the April 1st, 2019 press release stating that they had new findings regarding PH94B;
- (v) Vistagen falsely stated that PALISADE-2 was a successful Phase 3 trial when it was terminated;
- (vi) Vistagen filed multiple prospectuses with the SEC with material omissions Vistagen was legally obligated to disclose;
- (vii) Vistagen filed roughly a dozen Form 8-K's with the SEC with an attached press release making material omissions of fact that Vistagen was legally obligated to disclose;
- (viii) Vistagen filed four annual reports and 12 quarterly reports with the SEC with material omissions of fact that they were legally obligated to disclose;
- (viv) Vistagen failed to disclose that clinicaltrials.gov rejected publishing PALISADE-1. PALISADE-2 and the TERMINATED PALISADE open-label trial were rejected for publication after a limited quality review, with attached negative comments on the study.

## VI. PRESUMPTION OF RELIANCE

179. The Plaintiffs are entitled to a presumption of reliance under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose. The Defendants have provided proof that the Defendants committed fraud. The Plaintiffs are also entitled to a presumption of reliance based on the Defendants' material misrepresentations and omissions under the fraud-on-the-market doctrine because Vistagen's common stock was actively traded on the NASDAQ Exchange. Vistagen is a regulated issuer and is subject to filing periodic public disclosures and reports with the SEC, including but not limited to quarterly and annual reports, Form 8-K's, Registration statements, and prospectuses.

180. Vistagen communicated regularly with the general public and its investors regarding PH94B. Many of Vistagen's communications regarding PH94B were reported and broadcast to

the public, financial news services, and stock message boards. Moreover, Cesario spoke with McPartland and Singh, and they never disclosed that the Phase 2 and Pilot Phase 3 PH94 trials were rejected for publication. Jefferies price targets reports were similarly reported and broadcasted to the public financial news services and message boards. McPartland shared other analyst reports with Vistagen shareholders. The market reacted promptly to public information disseminated by Vistagen and Jefferies price targets.

181. Singh's and McPartland's glowing statements on PH94B, the widespread distribution of Vistegen's press releases, which were publicly available and entered the public marketplace, and the material misrepresentations and omissions alleged herein **induced** the Plaintiffs to misjudge the value of PH94B trials. Because the Plaintiffs did not have knowledge of the fraud and misrepresented or omitted material facts alleged herein, the Plaintiffs were **induced** to buy or otherwise not sell their Vistagen positions after the stock price hit a high of $105.00. Plaintiffs would have sold their stock holdings before Vistage, recklessly initiating PALISADE-1.

## VI. STATUTE OF LIMITATIONS

182. The Plaintiff's claims arising from the Exchange Act have been filed within five years of the alleged acts and two years of discovery. The Plaintiff's negligence claims are within the statutory 5 years and 3 years of discovery. The Plaintiff's state fraud-based claims were discovered within three years. The second amended complaint relates back to the original filing date.

## VII. SCIENTER

183. Plaintiff's fraud, negligent misrepresentation, aiding and abetting of fraud allegations establish "the who, what, when, where, and how of the misconduct charged" as to the Vistagen's CEO Singh, Vistagen's Board members and executives, Liebowitz, Snodgrass, Tsai and Jefferies, therefore meet the heightened pleading standard applicable to all of Plaintiff's fraud-based claims. *See Fed. R. Civ. P. 9(b); Vess, 317 F.3d at 1106, 1124; Swartz, 476 F.3d at 764; Bank*

*Hapoalim B.M. v. Bank of Am. Corp., 2012 U.S. Dist. LEXIS 184540, at *8 (C.D. Cal. Dec. 21, 2012) ("Claims based on fraud must meet the heightened pleading standard of particularity.)*
The Plaintiffs complaint has over a half dozen examples examples of press releases, reports and prospectuses that are dated with material misstatements and omissions regarding the Phase 2 PH94B trials. The Plaintiffs have detailed additional examples of Vistagen and its executives concealing that Vistagen three latest PH94B trial results were concealed from investors.
The plaintiffs have laid out in detail not only the fraudulent acts that caused their losses, but that controlling persons, including the directors of Vistagen, individually and collectively, by virtue of their positions and experience, knew they were engaging in fraudulent acts alleged herein. Acts being the operative word. This scheme has been multi year and continues to today. The Vistagen directors and former directors that perpetrated this scheme are Shawn K. Singh, John S. Saxe, Jerry Gin, Mary L. Rotundo, Ann Cunningham, Maggie Fitzpatrick, JoAnne Curley, and, Dr. Ralph Snodgrass

184. Notably, after the Plaintiffs notified Vistagen Directors that they concealed disclosing ClinicalTrials.gov rejected publishing the PH94B Phase 2 studies they did not take any action to correct the omissions, and still continue making the same material misstatements and omissions. Vistagen's Singh, Saxe, Gin, Snodgrass, Cunningham, Curley, Rotundo, and Fitzpatrick, Liebowitz and Snodgrass knew that;

1. The Phase 2 and Pilot Phase 3 studies were rejected for publication.
2. Vistagen attempted to publish the Phase 2 study in 2019 and then tried to publish both the Pilot Phase 3 and Phase 2 studies on clinicaltrials.gov in 2022 before announcing that the PALISADE-1 trials failed. Vistagen, CEO Singh, and Vistagen's Board of Directors and executives knew that clinicaltrials.gov rejecting publishing Vistagen's PH94B trials after the trials failed a limited quality control review was a material fact they were legally obligated to disclose to the public.

3. Vistagen concealed and committed fraud by omission when it filed the 2021 and 2023 prospectuses with the SEC.
4. Vistagen's PALISADE-2 was not a successful Phase 3 trial. Not only was it deemed an unsuccessful Phase 3 trial by the [9]FDA, but clincaltrials.gov rejected publishing the results after conducting a limited quality review. The primary and secondary endpoints received negative [10]comments, proving that Vistagen does not know how to run clinical trials.
5. Vistagen's motive for omitting material facts in the pump-and-dump schemes was to raise money because it was going broke. During the 2020 and 2023 pump-and-dump schemes, Vistagen had one foot on a banana peel and the other in bankruptcy court, so corrupt CEO Singh, former Chairman Saxe, and the rest of the Board chose to defraud investors.
6. Vistagen's CEO Singh, Board members, and executives Liebowitz and Snodgrass knew that the prospectus for the 2021 pump and dump omitted material facts, including that clinivaltrials.gov rejected the previous Phase 2 and Pilot Phase 3 trials after a quality review of the studies.
7. The reason why anxiety and depression drugs are so difficult to get approved is the placebo effect. Vistagen knew and concealed that not one anxiety or depression drug was ever approved by the FDA using the SUDS scale.

185. Jefferies and Tsai knew that Vistagen's Phase 2 studies were rejected for publication, yet issued unrealistic price targets on Vistagen. When viewed holistically, it is clear that Vistagen's Directors and executives worked with Jefferies to defraud the Plaintiffs and other investors.

## VIII PUNITIVE DAMAGE DEMANDS

---

[9] Vistagen was not given any credit for the terminated Phase 3 trial by the FDA. The PALISADE-3 and PALISADE-4 trials contains the same number of enrollees as PALISADE-1 and PALISADE-2.

[10] *See*; https://clinicaltrials.gov/study/NCT05011396?a=5&tab=history

186. Punitive damages are warranted based on the defendants multi-year fraud scheme that not only defrauded the plaintiffs, but defrauded the general public out of over $1 billion dollars. Vistagen has not corrected its past SEC disclosures despite being legally obligated to. The defendant's past and current conduct was egregious, self-serving, and heinous and should shock the court.

## IX. LOSS CAUSATION

187. Plaintiff Cesario suffered losses totalling nearly $500,000 from stock bought between 2020 and 2022. Additionally, he was induced to hold that Vistagen stock that if he had knowledge of the fraud committed by the defendants he would have sold for several million dollars. Further, Ceasrio lost millions of dollars in lost opportunities. If Plaintiff Cesario knew that Vistagen was engaged in concealing naterial facts he would never have purchased shares in Vistagen. Plaintiff Cesario excludes the losses incurred prior to Vistagen acquiring PH94B in the amended complaint.

188. Plaintiff Preka purchased over $1,000,000 in stock between 2019 and 2023 and has actual losses from stock sales of approximately $450,000 from stock sales between 2022 and 2023. Plaintiff Preka would never have purchased Vistagen stock if he had known Vistagen was engaged in a fraudulent scheme making material omissions regarding the PH94B trials.

## X. CAUSES OF ACTION

157. Plaintiff incorporates by reference every preceding paragraph as though fully set forth herein into the following section called Counts

**Count I. Common Law Fraud California Civil Code CIV § 1572**

**Fraud - California Civil Code CIV § 1572** states in part that actual fraud is defined as any act intended to deceive, such as making a false statement and suppressing a true statement;

158. *See; Hardisty v. Moore, 6 F.Supp. 3d 1044, 1052 (S.D. Cal. 2014) (quoting Small v. Fritz Cos., Inc., 30 Cal.4th 167, 173, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (Cal.2003)), as well as constructive fraud, which arises on a breach of a duty by one in a confidential or fiduciary relationship to another and which induces justifiable reliance by the latter to his prejudice. See Tyler v. Children's Home Soc'y, 29 Cal.App.4th 511, 548, 35 Cal.Rptr.2d 291 (Cal.Ct.App.1994); In re Harmon, 250 F.3d 1240, 1249 (9th Cir.2001)*

159. *Greenfield V. Fritz Companies, Inc*, *Court of Appeal, First District, Division 4, California, "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose."*

160. The Plaintiffs allege that the Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Flather, Snodgrass, Dotson, Smith, Monti, Leibowitz, Jefferies, Tsai, knowingly and intentionally defrauded the Plaintiffs by their actions described herein, including the following;

(1) disseminating misleading statements

(ii) omitting material facts

(iii) artificially inflating the price of Vistagen's stock price

(iv) inducing the Plaintiffs not to sell Vistagen's stock

(v) induce Plaintiff Cesario directly wire Vistagen funds to convert warrants to common stock

161. The Defendants Vistagen, Singh, Saxe, Gin, Dotson, Leibowitz, and McPartland intentionally disseminated (1) material misrepresentations about the PH94B Phase 2 trials ' success, and (2) made intentional material omissions that the ClinicalTrials.gov returned the trials as unpublished due to quality control issues. The Plaintiffs were induced to buy and hold Vistagen stock.

**Count II. DECEIT § 1709 Deceit is** (i) One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage he suffers. **§ 1710 defines Deceit as** *A deceit, within the meaning of the last section, is either: 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,4. A promise, made without any intention of performing it.*

162. The Defendants, Vistagen, Singh, Saxe, Gin, Dotson, Leibowitz, and McPartland intentionally disseminated (1) material misrepresentations about the PH94B Phase 2 claiming the PH94B trials were successful and (2) intentionally concealed the material fact that ClinicalTrials.gov returned the trials as unpublished due to quality control issues. The Plaintiffs were induced to buy and hold Vistagen stock.

**Count III. Ca. Civ. Code § 1711 Ca. Civ. Code § 1709 Deceit -** One who practices a deceit with intent to defraud the public. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (ii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Plaintiffs.

163. The Defendants, Vistagen, Singh, Saxe, Gin, Dotson, Smith, and McPartland intentionally disseminated (1) material misrepresentations about the PH94B Phase 2 claiming the PH94B trials were successful and (2) intentionally concealed the material fact that ClinicalTrials.gov returned the trials as unpublished due to quality control issues. The Plaintiffs were induced to buy and hold Vistagen stock.

**Count III. Constructive Fraud Civ. Code, § 1573**

*"In its generic sense, constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust, or confidence, and resulting in damages to another. [Citations.] Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated - that is, in which such conduct is a constructive or quasi*

*fraud, having all the actual consequences and all the legal effects of actual fraud."(Prakashpalan, supra, 223 Cal.App.4th at p. 1131.)*

164. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, and Leibowitz perpetrated constructive fraud against the Plaintiffs through their actions described herein.

**Count IV. Concealment. Civil Code section 1710**

. *[T]he rule has long been settled in this state that although one may be under no duty to speak as to a matter, "if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure." ' " (Marketing West, Inc. v. Sanyo Fisher (USA) Corp. (1992) 6Cal.App.4th 603, 613 [7 Cal.Rptr.2d 859 " '*

165. *[F]alse representations made recklessly and without regard for their truth to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered.' " (Engalla, supra, 15 Cal.4th at p. 974, quoting Yellow Creek Logging Corp. v. Dare (1963) 216 Cal.App.2d 50, 55 [30Cal.Rptr. 629].*

166. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti,, Leibowitz, Jefferies, Tsai, knowingly and intentionally concealed adverse material facts from the Plaintiffs relating to the ClinicalTrials.gov PH94B trials.

**Count V. Intentional Misrepresentation. Civil Code section 1710(1)**

167. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Leibowitz, Jefferies, Tsai, William Blair, Lugo, Minter, Maxim, McCarthy, Latham & Watkins, Withum and Smith intentionally misrepresented material facts that were publicly disseminated and relied upon by the Plaintiffs and ultimately harmed the Plaintiffs

**Count VI. Civil Conspiracy**

*Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share withthe immediate tortfeasors a*

*common plan or design in its perpetration. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." (Applied Equipment Corp. v. Litton Saudi Arabia Ltd. (1994) 7Cal.4th 503, 510-511 [28 Cal.Rptr.2d 475, 869 P.2d 454],*

168. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Leibowitz, Jefferies, Tsai, their actions described herein, conspired to defraud the Plaintiffs, violated federal and state disclosure laws by making intentionally misleading statements or material omissions. The conspiracy allegations are against all defendants, as they were active actors or stood silent while having a legal obligation to disclose or halt the wrongdoing, which continues to this day. The motive for all was self-enrichment and financial gain.

**Count VII. Aiding and Abetting**

*"As noted, some cases suggest that a plaintiff also must plead specific intent to facilitate the underlying tort. We need not decide whether specific intent is a required element because, read liberally, the fifth amended complaint alleges that defendant] intended to assist the Association in breaching its fiduciary duties. In particular, plaintiffs allege that, with knowledge of the Association's breaches, [defendant] 'gave substantial encouragement and assistance to [the Association] to breach its fiduciary duties.' Fairly read, that allegation indicates intent to participate in tortious activity." (Nasrawi, supra, 231 Cal.App.4th at p. 345, original italics, internal citations omitted.)*

168. *Persons who aid and abet the above violations are equally at fault if they know that other person's conduct breached a duty and the person rendered encouragement or substantial assistance. See. eg., Schultz v. Neovi Data Corp., 152 Cal.App.4th 86, 93, 60 Cal.Rptr.3d 810 (2007).*

169. Defendants McPartland, Adler, Prince, Flather, Snodgrass, Dotson, Smith, Monti, Anderson, Leibowitz, Jefferies, Tsai, aided and abetted the Director Defendants in;

1. Committing fraud upon the Plaintiffs
2. Committing constructive fraud upon the Plaintiffs,
3. Committing Intentional Misrepresentation upon the Plaintiffs
4. Violating federal disclosure laws
5. Violating California Corporation Codes

**Count VIII. Non-Fraud Gross Negligence Claims**

170. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, Leibowitz, and Snodgrass were grossly negligent and reckless initiating the PH94B trials during peak COVID-19. The Defendants knew that;

1. The WHO declared a worldwide pandemic, mask wearing and social distancing were the norm
2. Pharmaceutical companies suspended existing drug trials or postponed initiating new trials except for COVID-19 indications for vaccines, therapies, and medical devices.
3. PH94B's social anxiety indication was not COVID-19 related. As Singh stated numerous times, an example of acute social anxiety would be someone about to give a speech. None of Vistagen's SEC disclosures or press releases positioned the Phase 3 trial as COVID-19-related.
4. PH94 was delivered intranasally, and COVID-19 was known to have adverse effects in the nasal passageways
5. Vistagen had never conducted a Phase 3 trial
6. The previous PH94B trolls were rejected after a QC review

171. The following exchange is from Vistagen's November 2023 [11]earnings call. It is a question from Tsai about the trials' quality control. CEO Singh and VP Prince answer with a few differences between conducting a trial during and post COVID-19.

**Lin Tsai;**

"Maybe a tangential question from before that was just asked. But for these Phase III studies, both of them that are underway, what are you seeing on the front lines that gives you the confidence it's definitely different this time for fasedienol? Maybe talk about how sites are operating, the rigor of these study protocols, whether public speaking challenge is being done correctly and so forth."

**Shawn Singh;**

"Thanks, Andrew. Appreciate the question. One thing, of course, is significantly different now than where we were even during PALISADE-2, let alone earlier than that during the pandemic is just the ability to have person-to-person contact, to have in-person

[11] *See;* https://capedge.com/transcript/1411685/2025Q2/VTGN

training, like Josh mentioned. In-person investigators meetings mean a tremendous amount to be able to regularly and predictably have site visits and also have subjects schedule each phase and each visit during their challenge sequence.

**It is all different. It is just fundamentally different**. The attrition rates that we typically saw before at sites with site staff, we're just not seeing. Same thing with CROs.

You're not seeing the kinds of things that would have been frustrating variability coming into a protocol that the recipe is pretty clear. And when it's followed, it helps tremendously.

So that plus things that you -- that we've talked about before, right? **No masks involved, no COVID-related potential with the subjects in the study.**

So there's just fundamental things that are different on a macro basis and then site by site on a micro basis. **And just having the ability for the protocol to not be novel.** This is something, of course, now that's on the third and the fourth lapse within the research community. So the study design isn't new, the endpoint isn't new."

***Joshua Prince;***

"Sure. We could add to what you said, and it kind of builds on the in-person piece. In addition to the in-person investigator meetings, we've had an in-person site initiation visit for every site, right? So it's kind of the double reinforcement of training at an investigator meeting and then a good 3 to 4 hours with the study staff in their site location, again, hitting all the key details and pieces and components of what it takes to properly execute a public speaking challenge.

And then through the monitoring that Shawn mentioned, there have been specific examples where we've identified something that wasn't being done quite right. And the next day, there's an intervention or a discussion or a retraining or a reminder.

So those are the kinds of things that could not happen in our prior PALISADE studies and are happening now, which gives us, again, that confidence that we're getting the right

patients and that we're reducing variability as much as possible across sites for the public speaking challenge."

**Count IX. Violations of California Corporation Code § 25400**

*"Corporations Code section 25400 provides that it is unlawful in [California] to make false statements or engage in specified fraudulent transactions which affect the market for a security when done [for specified purposes]." Diamond Multimedia Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036, 1040, 80 Cal.Rptr.2d 828, 968 P.2d 539. "In short, it prohibits market manipulation." Id. Section 25500, in turn, "creates a civil remedy for buyers or sellers of stock the price of which has been affected by the forms of market manipulation proscribed by section 25400." Id. A more general prohibition exits under 25400 (d), which provides that it is unlawful for a person selling or offering for sale securities "to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact." Proving actual reliance and privity to establish liability under 25400 is not required. Colman v. Theranos, Inc., 325 F.R.D. 629, 647 (N.D. Cal. 2018) (citing RLI Ins. Co., 94 Cal. App. 4th 102, 109, 113 Cal.Rptr.2d 915 (2001).*

172. During the Period, Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Flather, Snodgrass, Smith, Monti, and Leibowitz, (i) disseminated or approved the false statements and (ii) concealed the material facts set forth above which they knew or deliberately disregarded were false andmisleading in that they contained misrepresentations and (iii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases.

173. By virtue of their positions, the Defendants named above knew of the false and misleading statements and material omissions alleged herein. They intended to deceive the Plaintiffs, or, alternatively, they acted with reckless disregard for the truth in failing or refusing to ascertain and disclose such facts.

174. The Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive the Plaintiffs and the public, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and

misleading nature of the statements made. However, such facts were readily available to the Defendants. The said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control; each defendant was knowledgable regarding SEC laws and rules.

**Count X. Violations of California Corporation Code § 25401**

*California Corporations Code Section 25401 replicates the provisions of Rule 10b-5, 17C.F.R. 240.10b-5. However, unlike Rule 10b-5, a plaintiff need not prove reliance or that the misrepresentation or omission caused plaintiffs loss under this provision of the California Corporations Code. Lynch v. Cook, 148 Cal. App. 3d 1072, 1087-88 (1983).*

175. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Flather, Snodgrass, Dotson, Smith, Monti, by their actions described herein (i) disseminated or approved the false statements and (ii) concealed the material facts set forth above which they knew or deliberately disregarded were false andmisleading in that they contained misrepresentations and (iii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases.

176. By virtue of their positions, the Defendants named above knew of the false and misleading statements and material omissions alleged herein. They intended to deceive the Plaintiffs, or, alternatively, the Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts.

177. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive the Plaintiffs and the public, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the

truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control; each defendant was knowledgable regarding SEC laws and rules.

**Count XI. Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**Fraud On The Market**

178. Defendants Vistagen, Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Flather, Snodgrass, Jefferies, and Tsai by their actions described herein (i) disseminated or approved the false statements and (ii) concealed the material facts set forth above which they knew or deliberately disregarded were false andmisleading in that they contained misrepresentations, and (iii) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases. Jefferies and Tsai were active participants in the fraud on the market scheme

179. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive the Plaintiffs and the public, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made. However, such facts were readily available to the Defendants. The said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control; each defendant was knowledgable regarding SEC laws and rules.

**Non-Fraud Claims Against Withum**

180. Defendant Withum recklessly conducted audits for 2020, 2021, 2022, 2023, and 2024 in violation of the PCAOB standards. Withum ignored glaring red flags and failed to train and supervise its auditing team in Rotundo, Cunningham.

**Count XII Breach of Fiduciary Duties**

181. During the Period, Defendants Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Flather, Snodgrass, and Monti, owed a fiduciary duty to the Plaintiffs and investing public. By the foregoing acts described herein, including making material misleading statements, concealing material facts, or standing silent while having a duty to act to correct, expose, or stop the unlawful conduct, the individual Defendants named above breached their Fiduciary duties, which harmed the Plaintiffs and investing public financially.

**XIII. PRAYER FOR RELIEF**

**WHEREFORE, the Plaintiffs pray for judgment as follows:**

A. Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

B. Awarding the Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and the Plaintiffs recover all costs of this suit, including reasonable future attorney's fees, as provided by law;

C. Awarding the Plaintiffs punitive damages in this action against each defendant in the following amounts, or the alternative, whatever amount a jury determines after a trial;

1. Punitive damages against Vistagen; $100,000,000
2. Punitive damages against Jefferies: $100,000,000
3. Punitive damages against Withum: $20,000,000
4. Punitive damages against CEO Singh: $30,000,000
5. Punitive damages against Saxe: $5,000,000
6. Punitive damages against Leibowitz: $5,000,000
7. Punitive damages against Monti: $5,000,000

8. Punitive damages against Gin: $5,000,000

9. Punitive damages against Rotundo: $5,000,000

10. Punitive damages against Fitzpatrick: $5,000,000

11. Punitive damages against Curley: $5,000,000

12. Punitive damages against Cunningham: $5,000,000

13. Punitive damages against McPartland: $5,000,000

14. Punitive damages against Tsai: $5,000,000

D. Vistagen, its respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on its behalf be permanently enjoined and restrained from continuing and maintaining the conduct alleged herein;

E. Vistagen must amend its deceitful 8-K's, quarterly reports, annual reports, and corporate updates filed with the SEC to conform with the law.

F. Vistagen's respective officers and directors, defendants in this matter, be restrained and enjoined from squandering Vistgaen's cash position on legal fees defending the allegations herein. The allegations, including fraud and breach of fiduciary duties, are exempt from indemnification according to Vistagen's Charter; or, in the alternative, Vistagen's respective officers and directors named as defendants be ordered to pay Vistagen back any fees paid to attorneys if the defendants are found guilty of violating the terms of said indemnification agreement.

G. Because of the extraordinary financial damages caused to the public, the Plaintiffs seek additional punitive damages against Singh, Saxe, Gin, Rotundo, Cunningham, Fitzpatrick, Curley, McPartland, Snodgrass, Monti, Leibowitz be imposed to include disgorgement of all equity and option grants, salaries, bonuses and stipends paid during the period of the alleged violations; with the disgorgement to be returned to Vistagen.

## XI. Jury Trial Demand

The Plaintiffs respectfully demand a jury trial.

Respectfully submitted, this 31st day of October 2025.

John Cesario Pro Se

15 Darrows Ridge East Lyme, CT 06333

Mailing Address PO BX 655 East Lyme CT 063333

Phone 860-333-4300

johncesario9@gmail.com

David Preka Pro Se

298 Boston Post Road East Lyme, CT 06333

Mailing Address PO BX 297 Waterford CT 06385

Phone 860-365-9041

david@advimpllc.com