**UNITED STATES DISTRICT COURT OF**
**NORTHERN DISTRICT OF CALIFORNIA**

FILED
SEP 04 2026
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JOHN CESARIO, pro se, and
DAVID PREKA, pro Se

Plaintiffs

Vs.

VISTAGEN THERAPEUTICS, INC., SHAWN S. SINGH, JOHN S. SAXE, JERRY GIN, MARY ROTUNDO, ANN CUNNINGHAM, MAGGIE FITZPATRICK, JOANNE CURLEY, MARK MCPARTLAND, WITHUM SMITH & BROWN PC, JEFFERIES LLC. ANDREW TSAI, RALPH SNODGRASS, MARK A. SMITH, LOUIS MONTI, MICHAEL LEIBOWITZ

Defendants.

Case No. 3:25-cv-01510-TLT

**Judge: Hon. Trina Thompson**

Place: Courtroom 9, 19th Floor

**Plaintiffs Motion For Reconsideration Of Dismaissal With Prejudice Of The Second Amended Complaint**

## Plaintiffs Motion For Reconsideration Of Dismaissal With Prejudice Of The Second Amended Complaint

Plaintiffs respectfully submit this timely Motion for Reconsideration of the Court's Order dismissing Plaintiffs' Second Amended Complaint with prejudice. This motion is brought on the good-faith belief that the Order rests on reversible legal errors and fails to comport with binding Ninth Circuit and United States Supreme Court precedent. Specifically, the Court erred in concluding that Defendants committed no actionable falsity, and further erred by dismissing the action without providing the requisite notice of specific pleading deficiencies or demonstrating on the record why amendment by a *pro se* litigant would be futile.

**I.**

The Plaintiffs believe that the California District Court's order dismissing the *pro se* Plaintiff's complaint with prejudice constitutes reversible error and conflicts directly with controlling Ninth Circuit precedent. Under established circuit law, a court may not dismiss a *pro se* complaint without notifying the plaintiff of the pleading's specific deficiencies and providing an opportunity to amend. To justify a dismissal on the ground of futility, the court must articulate why the defects are incurable. The District Court failed to provide this required explanation. Furthermore, Plaintiffs explained during the Hearing for the Defendants' Motion to Dismiss that the Defendants' intentional concealment of the operative Phase 2 trial protocol from the Phase 3 trials effectively meant that Vistagen recklessly proceeded with a Phase 3 trial without doing a Phase 2 trial with the same variables and failed to disclose those risk factors. Additionally, as set forth below, the Plaintiffs have included numerous false and misleading statements made by Vistagen in SEC filings and press releases falsely claiming that the Phase 2 trials were successful and that the Phase 3 trial was substantially similar to the Phase 3 trial; it was not. Amending the complaint would not be futile. In the Ninth Circuit, an amendment is deemed futile only when it is "absolutely clear that the deficiencies of the

complaint could not be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

The primary legal barriers that establish futility include:

**1. Absolute Legal Immunity:** When the defendant is immune from civil damages as a matter of law, no additional factual allegations can make the claim viable.

**2. Non-Existent or Inapplicable Legal Causes of Action:** When the plaintiff attempts to sue under a statute or legal theory that does not provide a private right of action.

**3. Incurable Jurisdictional Defects:** When the federal court completely lacks authority over the subject matter.

**4. Clear Statute of Limitations Bars** When the running of the statute of limitations is apparent on the face of the complaint, and the plaintiff's own timeline or facts eliminate any possibility of statutory or equitable tolling (*Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034).

**6. Preclusion Doctrines**

- ***Res Judicata* (Claim Preclusion):** The identical claims between the same parties were already resolved by a final judgment on the merits in a prior action.
- **Collateral Estoppel (Issue Preclusion):** The specific issue was already fully litigated and necessarily decided in earlier proceedings.

**7. Repeated Failure to Cure** If the court has already provided detailed instructions on how to correct specific deficiencies and the plaintiff files multiple amended complaints without fixing those defects, the court may conclude that further attempts would be futile (*Ferdik v. Bonzelet*, 963 F.2d 1258). See also; ***Eldridge v. Block*, 832 F.2d 1132, 1136–37 (9th Cir. 1987):** Held that *pro se* litigants must be afforded wide latitude to amend when their complaint merely lacks specific facts or clarity, ruling that Federal Rule of Civil Procedure 15's policy of favoring amendments must be applied with **"extreme liberality"** when a *pro se* plaintiff might state a claim if given the chance to add necessary details. See also ***Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986):** The Ninth Circuit ruled that if the district court dismisses a complaint without leave to amend, it must identify the basis for concluding that the complaint could not possibly be cured by amendment. Failing to articulate reasons why an amendment would be futile constitutes reversible error.

The Plaintiffs articulated to the Court during a hearing on the Defendants' Motion to Dismiss that the concealment that the operative Phase 2 trial was all female, 50 percent of the cohort was female,

and 50% of the trial was performed in Mexico was misleading because it changed the material protocols between the Phase 2 trial and Phase 3 trial.

The court has taken judicial notice of the Plaintiffs' exhibits, including quarterly and annual reports and Form 8-K's with attached press releases and corporate investor presentations. The Plaintiffs have taken the Defendants' misleading statements directly from a sample of the exhibits and explained why they were misleading.

**DEFENDANTS EXHIBIT 1**

- **Filing / Document:** Current Report on Form 8-K and Accompanying Press Release
  **Date:** May 18, 2020

- **Challenged Statement(s):**
  *"Following successful Phase 2 development, VistaGen is preparing for Phase 3 clinical development of PH94B for SAD and Phase 2A development for AjDA associated with the COVID-19 pandemic."*
  **Why the Statement is Materially False & Misleading:**

  1. **Affirmative Duty to Disclose:** Once Defendants chose to speak on the "success" and regulatory readiness of Phase 2 development to induce investor confidence, they incurred an absolute duty under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 to disclose the full truth and not omit material qualifying facts.
  2. **Concealment of Federal Non-Compliance and ClinicalTrials.gov Rejection:** Defendants knew, but concealed from the investing public, that the Phase 2 clinical trials failed to comply with basic federal reporting requirements under FDAAA / 42 U.S.C. § 282(j) and 42 C.F.R. Part 11. ClinicalTrials.gov repeatedly rejected publication of the Phase 2 study results due to severe quality control and data validation failures.
  3. **Misleading Characterization of "Success":** Touting a clinical development program as "successful" while actively concealing that regulatory repositories had rejected its datasets created a materially false impression of the scientific rigor and regulatory viability of advancing directly into Phase 3.

**DEFENDANTS EXHIBIT 2**

- **Filing / Document:** Quarterly Report on Form 10-Q for the Period Ended December 31, 2019

- **Date:** Filed February 2020

- **Challenged Statement(s):**
  *"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B*

*neuroactive nasal spray was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory challenges of individuals with SAD within 10 to 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B."*

- **Why the Statement is Materially False & Misleading:**
    1. **False Representation of Generalizable Efficacy:** Defendants presented the p-values (p=0.002 and p=0.009) as definitive evidence of universal efficacy in adult Social Anxiety Disorder (SAD) populations. However, Defendants concealed that this Phase 2 study was conducted exclusively on an all-female cohort (n=91).
    2. **Omission of Gender-Specific Response Rates:** Defendants possessed undisclosed internal and published trial data confirming that females responded up to 30% better and experienced faster drug onset than males. Presenting these results as representative of the broad SAD target population without disclosing that males were completely excluded was materially deceptive.
    3. **Concealment of Quality Control and Publication Rejections:** Defendants touted the trial as fully validated while concealing ongoing data rejection issues on ClinicalTrials.gov.

**DEFENDANTS EXHIBIT 3**

- **Filing / Document:** SEC Form S-3 Registration Statement (Under the Securities Act of 1933)
- **Date:** 2020
- **Challenged Statement(s):**
  *"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B neuroactive nasal spray was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory challenges of individuals with SAD within 15 minutes of self-administration of a*
  **DEFENDANTS EXHIBIT 2**
- **Filing / Document:** Quarterly Report on Form 10-Q for the Period Ended December 31, 2019
- **Date:** Filed February 2020
- **Challenged Statement(s):**
  *"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B neuroactive nasal spray was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory challenges of individuals with SAD within 10 to 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B."*

- **Why the Statement is Materially False & Misleading:**

    1. **False Representation of Generalizable Efficacy:** Defendants presented the p-values (p=0.002 and p=0.009) as definitive evidence of universal efficacy in adult Social Anxiety Disorder (SAD) populations. However, Defendants concealed that this Phase 2 study was conducted exclusively on an all-female cohort (n=91).

    2. **Omission of Gender-Specific Response Rates:** Defendants possessed undisclosed internal and published trial data confirming that females responded up to 30% better and experienced faster drug onset than males. Presenting these results as representative of the broad SAD target population without disclosing that males were completely excluded was materially deceptive.

    3. **Concealment of Quality Control and Publication Rejections:** Defendants touted the trial as fully validated while concealing ongoing data rejection issues on ClinicalTrials.gov.

**DEFENDANTS EXHIBIT 4**

- **Filing / Document:** Current Report on Form 8-K

- **Date:** May 18, 2020

- **Challenged Statement(s):**
  *"Following successful Phase 2 development, VistaGen is preparing for Phase 3 clinical development of PH94B for SAD…"*

- **Why the Statement is Materially False & Misleading:**

    1. **Unlawful Withholding of Clinical Integrity Failures:** Re-iterates the affirmative representation that Phase 2 was an unqualified "success" ready for Phase 3 conversion, while concealing regulatory non-compliance, ClinicalTrials.gov rejection notices, and fatal demographic discrepancies between the exploratory Phase 2 design and the proposed pivotal Phase 3 program.

**DEFENDANTS EXHIBIT 5**

- **Filing / Document:** SEC Registration / Proxy Disclosure (Corporate Presentation / Prospectus)

- **Date:** 2020

- **Challenged Statement(s):**
  *"In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz, the creator of the Liebowitz Social Anxiety Scale (LSAS), as principal investigator, PH94B was significantly more effective than placebo in reducing both public*

*speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using subjective anxiety ratings on the Subjective Units of Distress Scale (SUDS) within 15 minutes of self-administration of a nonsystemic 1.6 microgram dose of PH94B."*

- **Why the Statement is Materially False & Misleading:**
- **Prestige Borrowing to Mask Structural Trial Deficiencies:** Defendants leveraged Dr. Michael Liebowitz's stature as the creator of the LSAS to create an aura of unassailable scientific validity, while omitting that the n=91 trial enrolled exclusively female participants, half of whom were in Mexico.

  **Misleading Statistical Significance:** Touting definitive SUDS score improvements without disclosing that the study population was deliberately selected based on female-biased neuroactive steroid receptivity concealed the acute risk that the results would not replicate in a mixed-gender Phase 3 study.

**DEFENDANTS EXHIBIT 6**

- **Filing / Document:** Current Report on Form 8-K and Press Release
- **Date:** July 23, 2020
- **Challenged Statement(s):**
  *CEO Shawn Singh was quoted: "Notably, the FDA concurred that our initial pivotal Phase 3 efficacy study may be conducted in a manner substantially similar to the highly statistically significant Phase 2 study of PH94B, which study involved a single event, laboratory-simulated public speaking challenge in adult patients with SAD."*
- **Why the Statement is Materially False & Misleading:**
  1. **False Representation of Substantial Similarity:** Defendants falsely assured the market that the upcoming Phase 3 trial was "substantially similar" to the Phase 2 trial. In reality, the Phase 3 design introduced radical, undisclosed variables:
     - **Gender Composition:** Phase 2 was 100% female; Phase 3 enrolled both men and women (despite internal knowledge that males showed significantly reduced efficacy).
     - **Geographic/Cultural Setting:** Phase 2 was conducted 50% in Mexico; Phase 3 was conducted across multi-center U.S. sites.

2. **Regulatory Concealment:** Defendants concealed that the Phase 2 data they referenced had been rejected by ClinicalTrials.gov for publication due to quality control deficiencies. Representing that the FDA agreed to a design based on a trial whose regulatory standing was fundamentally compromised was fraudulent and materially misleading. Exhibits

**DEFENDANTS EXHIBIT 9**

- **Filing / Document:** Quarterly Report on Form 10-Q for the Period Ended June 30, 2020
- **Date:** August 2020
- **Challenged Statement(s):** *"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B neuroactive nasal spray was highly significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-simulated challenges of SAD patients within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B. Based on its novel mechanism of pharmacological action, rapid-onset of therapeutic effects and exceptional safety and tolerability profile in clinical trials to date, we are preparing for Phase 3 clinical development of PH94B for acute treatment of anxiety in adults with SAD.*
- **Why the Statement is Materially False & Misleading:**

  1. **Cumulative Deception:** Reiterates the identical materially false representations identified in Exhibit 6. Defendants concealed that the underlying Phase 2 data were skewed by an all-female, cross-border cohort and were affected by uncorrected defects in federal data reporting.

**DEFENDANTS EXHIBIT 10**

- **Filing / Document:** Current Report on Form 8-K
- **Date:** August 13, 2020

- *laboratory-simulated challenges of SAD patients within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B. Based on its novel mechanism of pharmacological action, rapid-onset of therapeutic effects and exceptional safety and tolerability profile in clinical trials to date, we are preparing for Phase 3 clinical development of PH94B for acute treatment of anxiety in adults with SAD.*

- **Why the Statement is Materially False & Misleading:**

    1. **Cumulative Deception:** Reiterates the identical materially false representations identified in Exhibit 6. Defendants concealed that the underlying Phase 2 data were skewed by an all-female, cross-border cohort and were affected by uncorrected defects in federal data reporting.

**DEFENDANTS EXHIBIT 10**

- **Filing / Document:** Current Report on Form 8-K

- **Date:** August 13, 2020

- **Challenged Statement(s):**
  *"We accomplished several meaningful milestones thus far this fiscal year that positively impact our clinical development programs, including our PH94B Phase 3 program in social anxiety disorder. We reached consensus with the FDA on the key aspects of the design of our pivotal Phase 3 clinical studies of PH94B for acute treatment of anxiety in adults with social anxiety disorder. This design is similar to the design of the highly statistically significant Phase 2 study of PH94B in social anxiety disorder," said Shawn Singh, Chief Executive Officer of VistaGen."*

- **Why the Statement is Materially False & Misleading:**

    1. **False Claim of Design Parity:** Stating that the FDA-aligned Phase 3 design was "similar" to the Phase 2 study was materially false and misleading because the two studies differed fundamentally in gender eligibility (Phase 2 excluded all males), geography (Phase 2 relied 50% on Mexican trial centers), and endpoint replication conditions.

    2. **Scienter and Omission:** Defendants possessed direct scientific knowledge that altering these specific demographic variables would dilute efficacy, yet omitted these known material risks from their disclosures to investors.

**DEFENDANTS EXHIBIT 11**

- **Filing / Document:** Quarterly Report on Form 10-Q for the Period Ended September 30, 2020
- **Date:** November 2020
- **Challenged Statement(s):**
*"In a peer-reviewed, published double-blind, placebo-controlled Phase 2 clinical trial, PH94B neuroactive nasal spray was highly statistically significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-simulated challenges of SAD patients, within 15 minutes of their self-administration of a non-systemic 1.6 microgram dose of PH94B. Based on the results of this highly statistically significant Phase 2 study and our recent consensus with the FDA that our initial pivotal Phase 3 study of PH94B may be conducted in a manner substantially similar to the public speaking anxiety component of such Phase 2 study, we are preparing for pivotal Phase 3 clinical development of PH94B as an acute treatment of anxiety in adults with SAD."*
- **Why the Statement is Materially False & Misleading:**
    1. **Perpetuation of False Regulatory Parity:** Continues the deceptive narrative that Phase 3 would replicate the "substantially similar" conditions of Phase 2, while continuing to conceal the material modifications in sex demographics, cross-cultural testing disparities, and unresolved ClinicalTrials.gov quality/reporting defects.

**DEFENDANTS EXHIBIT 12**

- **Filing / Document:** Current Report on Form 8-K / Press Release (Appointment of Dr. Louis Monti)
- **Date:** December 1, 2020
- **Challenged Statement(s):**
*"VistaGen Therapeutics Expands R&D Team with Appointment of Louis Monti, M.D., Ph.D., Pioneer in the Development of Neuroactive Steroids known as Pherines as Potential Treatments for Anxiety and Depression Disorders, as Vice President, Translational Medicine. Dr. Monti developed the innovative scientific platform that enabled the early research and development of VistaGen's PH94B and PH10, intranasal neuroactive steroid drug candidates (pherines) with potential for the rapid-onset treatment of anxiety and depression disorders, respectively."*
- **Why the Statement is Materially False & Misleading:**
    1. **Omission of Core Scientific Limitations Identified by the Drug's Inventor:** While publicly highlighting Dr. Monti's appointment to bolster market credibility around PH94B's mechanism of action, Defendants concealed that Dr. Monti's own underlying research and patent documentation confirmed that PH94B exhibited distinct, sex-differentiated neuroactive potency (substantially higher efficacy in females).

2. **Misrepresentation of Commercial Viability:** Defendants promoted the platform's translational viability for broad adult indications while concealing that the translational data did not support equal efficacy across mixed-gender Phase 3 populations.

**DEFENDANTS EXHIBIT 16**

- **Filing / Document:** Annual Report on Form 10-K for the Fiscal Year Ended March 31, 2021
- **Date:** June 2021
- **Challenged Statement(s):**
  *"In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz, the creator of the Liebowitz Social Anxiety Scale (LSAS), as principal investigator, PH94B was significantly more effective than placebo in reducing both publicspeaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using patient-reported anxiety ratings on the Subjective Units of Distress Scale (SUDS) within 15 minutes of self-administration of a nonsystemic 1.6 microgram dose of PH94B."*
- **Why the Statement is Materially False & Misleading:**
  1. **Misleading Baseline in Mandatory Annual Filing:** Reasserts the n=91 Phase 2 study as the foundational pillar for the company's valuation and Phase 3 readiness, while omitting the material facts that (i) the entire cohort was female, (ii) 50% were in Mexico, (iii) males demonstrated inferior pharmacodynamic response, and (iv) federal trial registry reporting was non-compliant.

**DEFENDANTS EXHIBIT 17**

- **Filing / Document:** Current Report on Form 8-K
- **Date:** September 13, 2021
- **Challenged Statement(s):**
  *Disclosures announcing operational milestones, clinical trial site initiations, and protocol rollouts for the Phase 3 PALISADE clinical program for PH94B.*
- **Why the Statement is Materially False & Misleading:**
  1. **Concealment of Flawed Trial Execution:** In advancing the PALISADE program into operational execution, Defendants failed to disclose that the multi-center U.S. protocol design departed materially from the single-gender, single-region exploratory Phase 2 study.

2. **Misleading Risk Factors:** The disclosures failed to disclose the known, specific scientific risks of gender-based efficacy dilution, presenting clinical progression as routine expansion rather than an unvalidated protocol divergence.

**DEFENDANTS EXHIBIT 18**

- **Filing / Document:** Current Report on Form 8-K
- **Date:** October 14, 2021
- **Challenged Statement(s):**
*"PALISADE-2 is a randomized, multi-center, double-blind, placebo-controlled clinical trial that is a replicate of VistaGen's ongoing PALISADE-1 trial of PH94B for the acute treatment of anxiety in adults with SAD. Both studies are designed in a manner that is substantially similar to the public speaking component of a peer-reviewed published Phase 2 study of PH94B for the acute treatment of anxiety in adults with SAD. In that Phase 2 study, PH94B was observed to have rapid reduction in anxiety (within 15 minutes) in response to a public speaking challenge (p=0.002). Following successful Phase 2 development, VistaGen has recently initiated two ongoing Phase 3 clinical trials of PH94B, PALISADE-1 and PALISADE-2, to assess the efficacy, safety and tolerability of PH94B for the acute treatment of anxiety in adults with SAD."*

- **Why the Statement is Materially False & Misleading:**

1. **False "Replicate" and "Substantially Similar" Claims:** Defendants represented that both PALISADE-1 and PALISADE-2 were "substantially similar" replicates of the Phase 2 trial. This was demonstrably false because the Phase 3 studies enrolled participants of mixed genders and were conducted across disparate U.S. clinical centers, whereas the Phase 2 trial was 100% female and 50% Mexican.

2. **Omission of Known Material Failure Modes:** Defendants assured investors that Phase 2 had established the efficacy baseline (p=0.002), while knowing that the structural differences in the Phase 3 trials created an undisclosed, high-probability risk of endpoint failure.

**DEFENDANTS EXHIBIT 20**

- **Filing / Document:** Current Report on Form 8-K
- **Date:** February 10, 2022
- **Challenged Statement(s):**
*"Ongoing advancement of PALISADE-1 and PALISADE-2 Phase 3 clinical trials in social anxiety disorder (SAD) - The Company's ongoing randomized, multi-center, double-blind, placebo-controlled PALISADE-1 and PALISADE-2 Phase 3 clinical trials in the U.S. are designed to*

*evaluate the efficacy, safety, and tolerability of PH94B for the acute treatment of anxiety in adults with SAD... Both studies are structured in a manner substantially similar to the public speaking component of a statistically significant peer-reviewed published Phase 2 study of PH94B in which researchers observed a rapid reduction in anxiety in individuals (within 15 minutes) in response to a public speaking challenge (p=0.002). The Company anticipates that topline data will be available in mid-2022 and in the second half of 2022 for PALISADE-1 and PALISADE-2, respectively."*

- **Why the Statement is Materially False & Misleading:**
    1. **Misleading Progress Reports:** Rebroadcasts the assertion of structural parity between PALISADE-1/2 and the Phase 2 trial within months of pivotal data readout, concealing the known fatal demographic, geographic, and regulatory publication discrepancies.

**DEFENDANTS EXHIBIT 21**

- **Filing / Document:** Current Report on Form 8-K (Corporate Presentation)
- **Date:** June 8, 2022
- **Challenged Statement(s):**
  *"In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz, the creator of the Liebowitz Social Anxiety Scale (LSAS), as principal investigator, PH94B was significantly more effective than placebo in reducing both publicspeaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using patient-reported anxiety ratings on the Subjective Units of Distress Scale (SUDS) within 15 minutes of self-administration of a nonsystemic 1.6 microgram dose of PH94B."*
- **Why the Statement is Materially False & Misleading:**
    1. **Pre-Readout Deception:** Weeks before revealing the catastrophic failure of PALISADE-1, Defendants distributed marketing slides to the investment community reiterating the unqualified "success" of the Phase 2 trial, while concealing that the Phase 2 data could not support the Phase 3 trial design due to gender and geographic confounding variables.

**DEFENDANTS EXHIBIT 22**

- **Filing / Document:** Annual Report on Form 10-K for the Fiscal Year Ended March 31, 2022 Pg 8
- **Date:** June 2022
- **Challenged Statement(s):**
  *"In a peer-reviewed, published, randomized, double-blind, placebo-controlled Phase 2 clinical trial (n=91), with Dr. Michael Liebowitz, the innovator of the Liebowitz Social Anxiety Scale (LSAS), as*

*principal investigator, PH94B was significantly more effective than placebo in reducing both public-speaking (performance) anxiety (p=0.002) and social interaction anxiety (p=0.009) in laboratory-induced challenges of individuals with SAD, as assessed using patient-reported anxiety ratings on the Subjective Units of Distress Scale (SUDS) within 15 minutes of self-administration of a non-systemic 1.6 microgram dose of PH94B."*

- **Why the Statement is Materially False & Misleading:**

    1. **False Annual Disclosures:** Perpetuated the misleading narrative regarding Phase 2 robustness in an SEC annual filing, masking the reality that the Phase 2 trial was unpublishable on ClinicalTrials.gov and scientifically inapposite to the ongoing PALISADE-1/2 trials.

**DEFENDANTS EXHIBIT 23**

- **Filing / Document:** Current Report on Form 8-K and Press Release (Fiscal Year 2022 Financial Results & Corporate Update)

- **Date:** June 23, 2022

- **Challenged Statement(s):**
  *"PALISADE Phase 3 Program for PH94B in Social Anxiety Disorder (SAD) reaches Last Patient Out Milestone in PALISADE-1 - VistaGen's PALISADE-1 and PALISADE-2 Phase 3 studies are randomized, multi-center, double-blind, placebo-controlled clinical trials in the U.S. designed to evaluate the efficacy, safety and tolerability of PH94B for the acute treatment of anxiety in adults with SAD… Both Phase 3 studies are structured in a manner substantially similar to the public speaking component of a peer-reviewed Phase 2 study of PH94B in which researchers observed a statistically significant, rapid reduction in anxiety in individuals (within 15 minutes) in response to a public speaking challenge (p=0.002)."*

- **Why the Statement is Materially False & Misleading:**

    1. **Misleading Milestone Tout:** Defendants celebrated the "Last Patient Out" milestone by reassuring investors that PALISADE-1 was structured "substantially similar" to the Phase 2 trial, while concealing that the known demographic and cultural divergences made the trial statistically and scientifically vulnerable to complete endpoint failure.

**DEFENDANTS EXHIBIT 24**

- **Filing / Document:** Current Report on Form 8-K and Press Release

- **Date:** July 22, 2022

- **Challenged Statement(s):**
*"VistaGen Therapeutics... today announced topline results from its PALISADE-1 Phase 3 clinical trial of PH94B for the acute treatment of anxiety in adults with social anxiety disorder. PH94B did not achieve its primary endpoint, as measured by change from baseline using the Subjective Units of Distress Scale (SUDS) compared to placebo... 'While the results of PALISADE-1 are not consistent with prior positive results from Phase 2 trials of PH94B in social anxiety disorder, we remain committed to transforming the treatment landscape... our team will continue to pursue PH94B's potential as a new treatment option for multiple anxiety disorders - including for both acute treatment for social anxiety disorder in our ongoing PALISADE-2 Phase 3 trial...'"*

- **Why the Statement is Materially False & Misleading:**

    1. **False Attribution of Inconsistency:** Defendants feigned surprise by stating that the PALISADE-1 failure was "not consistent with prior positive results from Phase 2 trials". In truth, the failure was the direct, predictable result of the material variables Defendants had concealed for years (male enrollment dilution and U.S. multi-center variations).

    2. **Misleading Viability of PALISADE-2:** Defendants told investors they would continue PALISADE-2 as a viable Phase 3 registration trial, despite knowing that PALISADE-2 suffered from the exact same structural protocol defects that doomed PALISADE-1.

**DEFENDANTS EXHIBIT 31**

- **Filing / Document:** Current Report on Form 8-K and Press Release

- **Date:** August 7, 2023

- **Challenged Statement(s):**
*Headline: "VistaGen Announces Positive Topline Results from Phase 3 PALISADE-2 Trial of PH94B for the Acute Treatment of Social Anxiety Disorder" / Touting the "First positive U.S. Phase 3 study of an investigational therapy for social anxiety disorder in over 15 years."*

- **Why the Statement is Materially False & Misleading:**

    1. **Material Mischaracterization of an Aborted/Truncated Trial:** Defendants falsely declared PALISADE-2 a "positive Phase 3 trial" when, in fact, Defendants had voluntarily halted and truncated the study. Under federal law and regulatory standards, an incomplete, truncated clinical trial is not a successful Phase 3 investigation.

    2. **Concealment of Sub-Therapeutic Efficacy:** On August 7, 2023, Defendants knew that the truncated PALISADE-2 data demonstrated less efficacy than the failed PALISADE-1 trial and more than 50% lower efficacy than the all-female Mexican Phase 2 study.

## II.

The Plaintiffs believe that the California District Court made reversible error holding that Vistagen and Vistagen's directors and executives did not commit falsity in concealing that the Phase 2 PH94B trials that Vistagen repeatedly touted as successful repeatedly failed to comply with federal law and/or were rejected for publication multiple times because of quality control issues. In fact, the Defendants' intentional concealment of Clinica Trials rejecting the operative peer-reviewed trial and the peer reviewed trial Phase 2 trial called the Pilot Phase 3 trial is fraud and a violation of federal and state securities laws. Under federal securities law (**SEC Rule 10b-5(b)**) and general fraud principles, a statement is not judged solely by whether its words are literally true in isolation. An actionable **half-truth** occurs when a company chooses to speak on a subject and presents positive highlights but omits material qualifying facts necessary to prevent the statement from being misleading. The Plaintiff's complaint stated that if they had known the PH94B Phase 2 trials were rejected by ClinicalTrials.gov for quality control issues, they would never have continued purchasing the stock. See also ***TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)):** An omitted fact is material if there is a substantial likelihood that a reasonable investor would view it as significantly altering the "total mix" of information.

- **The Duty to Disclose Once Speaking:** While a company does not always have a duty to disclose every internal operational detail, once it chooses to publicly tout a clinical trial as a "success," it assumes a legal duty to speak fully and candidly (*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011)).

- **Omission of Conflicting Facts (*Omnicare* Standard):** In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), the Supreme Court held that even expressions of opinion or success are actionable if they omit critical context or conflicting facts that a reasonable person would expect to know—especially facts showing the statement lacked a reliable factual or regulatory foundation.

- **Violation of Mandatory Federal Disclosure Requirements:** Under Section 801 of the Food and Drug Administration Amendments Act of 2007 (**FDAAA**, 42 U.S.C. § 282(j)) and **42 C.F.R. Part 11**,

sponsors of applicable clinical trials are legally mandated to submit summary results to the ClinicalTrials.gov database within 12 months of trial completion.

- **The Significance of a "Quality Control" (QC) Failure:** Submissions to ClinicalTrials.gov undergo a formal quality control review process by the National Institutes of Health (NIH) and the FDA to check for internal consistency, apparent protocol departures, and data validation errors. If trial results fail QC review and cannot be published, it signals significant data integrity issues, unverifiable endpoints, or unresolvable discrepancies in the underlying study.
- **Creating a False Impression of Regulatory Viability:** Describing a Phase 2 trial as a "success" creates the clear impression that the drug met its pre-specified scientific endpoints with reliable, regulatorily compliant data that can support a Phase 3 trial or FDA approval.
- **The Contradiction:** Concealing that the study's data was plagued by QC failures so severe that it could not satisfy statutory transparency and quality standards conceals the fact that the purported "success" rests on flawed, unverifiable, or non-compliant data.

**3. Key Legal Precedents**

- ***Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015):** An affirmative statement or statement of opinion is misleading by omission if the speaker fails to disclose material conflicting facts about the basis or inquiry behind that statement.
- ***Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011):** A pharmaceutical company cannot selectively disclose positive information about a product while concealing adverse data or regulatory concerns that substantially alter the total mix of available information.
- While truthful reporting of data is protected, companies remain liable when they conceal protocol deviations, misreport foundational data, or withhold critical scientific parameters that govern the validity of clinical results.
- ***Meyer v. JinkoSolar Holding Co.*, 761 F.3d 245 (2d Cir. 2014):** When a company makes positive representations about its performance or compliance, it must disclose any known material regulatory or operational failures that contradict those representations.

The plaintiff's complaint stated that had they known the risk factor and that Vistagen concealed the numerous ClinicalTrials.gov rejections of both Phase 2 trials for quality control reasons, they would not have bought the stock. Vistagen touted these trials as successful. The Plaintiffs briefed the Court as to

ClinicalTrials.gov's important role in clinical trials. The Court's legal reasoning that ClinicalTrials.gov does not ....

Moreover, Vistagen's directors and attorneys have intentionally misled the Court in their pleadings that because trial results are published on ClinicalTrials.gov, the Plaintiffs should have known about the risk factors. While the Plaintiffs have addressed this and the Court did not make a determination regarding it, the Court should be aware that Vistagen's directors and attorneys have repeatedly attempted to deceive the Court. The operative Phase 2 trial that Vistagen claimed the Phase 3 trials were modeled on is not easily searched on ClinicalTrials.gov's database. A search of the ClinicalTrials database entering PH94B and social anxiety disorder only shows one Phase 2 trial, the one called the Pilot Phase 3 trial.

## III.

The Plaintiffs believe that the California District Court made reversible error holding that Vistagen and Vistagen's directors and executives did not commit falsity on August 7, 2023, by issuing a press release with a headline stating that it had its first successful phase 3 trial in social anxiety in 15 years. The August 7, 2023, Pump-and-Dump Was Part of the Fraudulent Scheme

**The August 7, 2023 Press Release Was Materially Misleading Under Binding Precedent**

Defendants' August 7, 2023, press release was the catalyst for an immediate market surge from $1.60 to a high of $71.00, which Defendants capitalized on by dumping millions of newly issued shares into the market via an At-The-Market (ATM) offering through Defendant Jefferies. This release was materially misleading for three distinct reasons:

1. **Premature Truncation:** Defendants knew PALISADE-2 had been halted long before reaching the enrollment threshold established in the Phase 3 protocol submitted to the FDA.
2. **Concealed Efficacy Disparities:** Internal data known to Defendants demonstrated that PALISADE-2 produced efficacy results virtually indistinguishable from the failed PALISADE-1 trial, delivering approximately half the efficacy observed in the Phase 2 Mexico trial—a disparity Defendants did not disclose until their March 2026 Corporate Presentation.
3. **Misleading Half-Truths:** Defendants cannot escape liability by arguing that isolated statistical figures within the release were mathematically accurate. Under *Omnicare, Inc. v. Laborers District*

*Council Construction Industry Pension Fund*, 575 U.S. 175, 186–90 (2015), an issuer cannot avoid securities-fraud liability by "saying one thing and holding back another." Section 10(b) and Rule 10b-5(b) prohibit half-truths that project an inaccurate depiction of clinical success. *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

**An Aborted, Incomplete Phase 3 Study Is Neither Legally Nor Scientifically "Successful"**

Declaring a Phase 3 clinical trial "positive" or "successful" when enrollment was voluntarily abandoned before completion violates regulatory law and core biostatistical principles:

- **Destruction of Statistical Power:** Phase 3 trials rely on strict sample sizes to detect statistical significance ($p < 0.05$). Terminating enrollment prematurely undermines the statistical power necessary to rule out chance.
- **Deprivation of "Substantial Evidence":** Under the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 355(d), and 21 C.F.R. § 314.126, FDA approval requires "substantial evidence" derived from adequate and well-controlled investigations. An aborted trial that abandons predefined primary endpoints cannot satisfy this standard.
- **Impermissible Post-Hoc Justifications:** Halting an under-enrolled trial and attempting to salvage positive trends through subgroup or unblinded interim analyses constitutes unscientific data dredging, which both the FDA and federal courts reject as proof of efficacy.
- **Invalidation of Regulatory Agreements:** Voluntarily abandoning protocol specifications breaches the foundational understandings established with regulatory authorities, including Special Protocol Assessments (21 U.S.C. § 355-1(b)).

Listed below are leading Ninth Circuit and Supreme Court decisions directly analyzing misleading press releases followed by insider or corporate stock sales:

## Ninth Circuit Precedent

- ***Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004)**
  - **Facts:** Plaintiffs alleged that Oracle top executives (including CEO Larry Ellison) repeatedly issued overly optimistic public statements and press releases touting demand for their software suite and projecting strong quarterly results, even though internal data showed flagging sales and product defects. During the inflated window, Ellison sold approximately $900 million worth of stock shortly before the company missed its guidance and the price plummeted.
  - **Holding:** The Ninth Circuit reversed the dismissal of the complaint. The court held that the dramatic, suspicious timing and magnitude of the stock sales, paired with contemporaneous internal knowledge of product defects, created a strong inference of scienter under Section 10(b) and Rule 10b-5.

- ***In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006 (9th Cir. 2005)**
    - **Facts:** Corporate executives issued promotional press releases and reports boasting "strong growth" and "spectacular results" while actively engaging in improper revenue-recognition schemes (prematurely recognizing unearned revenue). During the inflated class period, company executives and family members offloaded roughly 2.5 million shares for over $54 million.
    - **Holding:** The Ninth Circuit reversed the district court's dismissal, establishing that insider sales executed at suspiciously timed intervals following materially misleading public announcements are strong circumstantial evidence that defendants acted with fraudulent intent.
- ***SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072 (9th Cir. 2010)**
    - **Facts:** A company Chairman/CEO caused the company to issue a glowing press release announcing that it had "unveiled" a revolutionary airborne cellular transmission system ("ARC System"), even though the company had no functioning prototype and lacked the funds to construct one. Immediately following the misleading release, millions of unregistered shares were transferred and dumped onto the public market.
    - **Holding:** The Ninth Circuit affirmed summary judgment against the CEO and the company for Section 10(b) fraud, confirming that issuing present-tense claims of success in a press release when development was incomplete constituted deliberate recklessness as a matter of law.
- ***In re Apple Computer Securities Litigation*, 886 F.2d 1109 (9th Cir. 1989)**
    - **Facts:** Apple officers issued promotional press releases heralding the "Lisa" computer and "Twiggy" disk drive (e.g., claiming "extensive testing and design verification") while internally knowing of severe technical failures, with insiders selling significant amounts of stock during the run-up.
    - **Rule:** The Ninth Circuit affirmed that *"insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter"* when paired with knowingly overly optimistic press statements.

**United States Supreme Court Precedent**

- ***Basic Inc. v. Levinson*, 485 U.S. 224 (1988)**
    - **Facts:** Company officers falsely denied ongoing merger negotiations by issuing misleading press releases to the financial media stating that "no negotiations were underway."
    - **Holding:** The Supreme Court adopted the **fraud-on-the-market theory**, holding that misleading press releases distort the market price of public shares, allowing injured investors who bought or sold in reliance on market integrity to bring Rule 10b-5 claims. The

Court affirmed that an issuer cannot issue public denials or partial truths that distort market reality.

- ***Lorenzo v. SEC*, 139 S. Ct. 1094 (2019)**
  - **Holding:** The Supreme Court held that individuals who knowingly disseminate false or misleading statements to potential investors—even if they did not technically "make" or author the statement—can be held primarily liable under Rule 10b-5(a) and (c) for participating in a fraudulent **"scheme to defraud."** This ruling is regularly cited when corporate executives or intermediaries pump a stock via promotional materials/press releases and offload shares under "scheme liability."
- ***Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015)**
  - **Holding:** While originating under Section 11, the Supreme Court established the bedrock rule against corporate "half-truths." The Court ruled that an issuer cannot insulate itself merely because individual words are literally true if the communication omits material facts necessary to prevent the overall impression from being misleading. **In the Ninth Circuit, this principle governs misleading public press releases under Section 10(b).**

The Defendants (i) knew the press release was misleading, (ii) knew the stock market buying was a direct result of the misleading statement, and (iii) continued to dump stock all the way back from approximately $30.00 to $4.00.

**Newly Discovered Evidence Regarding The August 7, 2023 Press Release.**

After the Plaintiffs Second Amended Complaint was filed, Vistagen filed a Form 8-K with the SEC with its attached Corporate Presentation. That Corporate Presentation contains a graph comparing the efficacy of the operative all-female Phase 2 trial, the operative PALISADAE-1, PALISADE-2 and PALISADE-3 trials. The graph shows that the PALISADE-2 efficacy was less than the failed PALISADE-1 trial, and had half the efficafacy of the all-female Phase 2 trial. The outlier was a lower placebo effect. Vistagen and its directors intentionally failed to disclose that the PALISADE-2 trial efficafacy was less than the failed PALISADE-1 trial and half of the efficafacy of the all-female Phase 2 trial.

## IV.

Plaintiffs believe the Court made a reversible error holding that Vistagen's failure to disclose that the FDA had never approved a drug soley based on a Subjective Units of Distress Scale ("SUD"S) trial. Under SEC disclosure rules, Vistagen's failure to disclose that the Phase 3 trials were using a clinical testing system called SUDS and that the FDA had never approved a drug soley based on a SUDS trial was a material risk factor that must be disclosed, especially because the company spoke affirmatively about its trial design, endpoint selection, or path to FDA approval.

Under federal securities laws, an issuer crosses the line from acceptable optimism into actionable omission when it touts a specific clinical endpoint or trial design without disclosing that regulatory authorities have never accepted that metric as a standalone basis for approval.

1. Legal Principles Governing Endpoint Disclosure

- Actionable Half-Truths (*Omnicare* & *Basic*):

  Under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015) and *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), once a company elects to speak on an issue—such as touting the Subjective Units of Distress Scale (SUDS) as its primary efficacy endpoint or expressing confidence in regulatory approval—it assumes a duty to disclose all material facts necessary to make that statement not misleading. Saying "our Phase 3 trial relies on the validated SUDS endpoint" while concealing that the FDA has never granted marketing approval for an SAD drug based solely on SUDS creates a materially misleading impression regarding the regulatory viability of the study.

- SEC Regulation S-K, Item 105 (Risk Factors):

  Item 105 requires issuers to provide a discussion of the "most significant factors that make an investment in the registrant or offering speculative or risky." In the biopharmaceutical sector, relying on a novel, unvalidated, or non-standard regulatory surrogate/endpoint is routinely treated as a

primary risk factor because it directly affects whether the FDA will accept the New Drug Application (NDA).

- Generic "Boilerplate" Warnings Are Insufficient:

  The Ninth Circuit has repeatedly held that generic, boilerplate warnings stating that "clinical trials may not succeed" or "the FDA may not approve our drug" do not insulate a company from liability if the company knows of a specific, existing regulatory hurdle (e.g., that the FDA requires clinician-rated endpoints like the Liebowitz Social Anxiety Scale [LSAS] rather than an isolated, acute patient-reported tool like SUDS for primary approval). *See, e.g., Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009); *In re Alphabet Securities Litigation*, 1 F.4th 687, 703 (9th Cir. 2021) (holding that risk disclosures warning that something *might* happen are misleading when the risk is already concrete or uniquely heightened).

2. Relevant Analogous Case Law

Courts have sustained securities-fraud claims when drug companies hid regulatory resistance to their choice of clinical trial endpoints:

- *In re Alkermes Securities Litigation*, 2020 WL 6586366 (D. Mass. 2020):

  Alkermes designed a clinical trial using a novel statistical design and endpoint methodology that the FDA had not previously accepted for major depressive disorder. The court held that Alkermes's failure to disclose the FDA's skepticism regarding the validity of that specific methodology—while assuring investors the trials were designed to support approval—constituted an actionable material omission under Rule 10b-5.

- *In re Atossa Genetics Inc. Securities Litigation*, 2014 WL 4983551 (W.D. Wash. 2014):

  The district court held that when a company makes representations regarding the commercialization and clearance of a diagnostic or medical method, failing to disclose that the FDA has not cleared or

recognized the underlying test method as adequate creates an actionable claim for material omission.

- *In re BioMarin Pharmaceutical Inc. Securities Litigation*, 2022 WL 16528178 (N.D. Cal. 2022): The court examined claims where the company touted Phase 3 clinical data using specific efficacy metrics without adequately warning investors of the FDA's evolving demands for different durability endpoints or trial designs. The court reaffirmed that when a sponsor chooses to speak about its endpoint data, it cannot omit critical regulatory headwinds regarding how the agency interprets those endpoints.

3. Application to SUDS (Subjective Units of Distress Scale) In psychiatric clinical development:

- The Traditional Regulatory Standard: The FDA has historically required multi-week, clinician-administered scales—predominantly the Liebowitz Social Anxiety Scale (LSAS)—as the primary efficacy endpoint for Social Anxiety Disorder (SAD) approval (as seen with historical approvals like Paxil, Zoloft, and Effexor XR).
- The SUDS Distraction: SUDS is typically an acute, self-reported, situational measure (e.g., measuring momentary anxiety during an artificial public-speaking challenge).
- The Actionable Omission: If Vistagen told the market that its Phase 3 trials were designed to achieve FDA approval, but failed to disclose that:
    1. The FDA had never approved a drug for SAD based solely on acute SUDS scores; and/or
    2. The FDA cautioned or warned the sponsor that SUDS alone would be insufficient without demonstrating broader, clinically meaningful functional improvement on standard scales (like the LSAS);

...then that failure to disclose is a material omission under Section 10(b) and Rule 10b-5. It directly conceals a structural regulatory defect that deprives the study of its ability to generate the "substantial evidence" of efficacy required by 21 U.S.C. § 355(d).

At the center of this action is Vistagen's PH94B clinical-development program for Social Anxiety Disorder. Vistagen repeatedly represented to shareholders, including through numerous SEC filings and public disclosures, that its PALISADE Phase 3 program was based upon and would be conducted in a manner **"substantially similar"** to a purportedly successful, peer-reviewed Phase 2 study. **There were two PH94B peer-reviewed trials, Vistagen and its directors knew which Phase 2 trial was the operative trial that was claimed to be substantially similar to it, but never disclosed it until after the first Phase 3 trial called PALISADE-1 failed and the stock price dropped 90%.** Vistagen's Phase 3 trials named PALISADE 1-4 were not substantially similar to the operative Phase 2 study in several material respects.

Specifically, the Phase 2 trial had a female-only population; 50% of the participants were in Mexico, and 50% of the trial was conducted there. The geographic and cultural composition of the operative Phase 2 study was particularly material because approximately 50% of its exclusively female participants were enrolled in Mexico. The primary efficacy assessment involved a simulated public-speaking challenge and a participant's subjective distress rating. Participants from Mexico might respond differently to a public-speaking challenge than participants from the United States due to cultural, linguistic, social, and environmental differences. Thus, geography and culture were potentially significant clinical variables that could affect the comparability and reproducibility of the Phase 2 results. Defendants nevertheless failed to disclose these differences while repeatedly representing that the U.S.-based PALISADE Phase 3 trials were "substantially similar" to the successful Phase 2 study. Nevertheless, Vistagen's directors and executives repeatedly promoted the Phase 2 results while allegedly concealing the material characteristics of the very Phase 2 study to which they claimed the PALISADE trials were substantially similar.

While the Ninth Circuit considered foreign clinical trial data in *In re Rigel Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869 (9th Cir. 2012), *Rigel* is readily distinguishable. Unlike the rheumatoid arthritis treatment at issue in *Rigel*, where efficacy did not vary across borders, a drug treating social anxiety disorder is inherently susceptible to significant cross-cultural variations in perceived efficacy. Vistagen's disclosures obscured this reality: as shown in Vistagen's 2026 investor presentation, the all-female Mexican Phase 2 trial—conducted exclusively in female subjects—demonstrated nearly double the efficacy observed in the failed PALISADE-1 and PALISADE-2 clinical trials.

Plaintiffs can state viable Section 10(b) claims and state based fraud claims by demonstrating that Vistagen deliberately altered material variables between the Phase 2 and Phase 3 trials. While actively concealing these foundational design disparities, Defendants simultaneously touted the success of the Phase 2 study and falsely assured investors that the Phase 3 trial was "substantially similar" in all material respects. See; *Eldridge v. Block*, 832 F.2d 1132 (9th Cir. 1987)

For these same reasons cited, Plaintiffs can successfully amend their state-law claims. The Court properly recognized Plaintiffs' allegations that Vistagen's officers and directors continue to perpetrate this fraud today. Erroneously finding no falsity shields an ongoing fraudulent scheme and enables Defendants to continue deceiving the market. Vistagen's 2026 Corporate Presentation filed in march continues to tout the Phase 2 trials and the PALISADE-2 trial as successful.

Respectfully submitted September 2, 2026

---------------------------------------
John Cesario Pro Se
15 Darrows Ridge
East Lyme, CT 06333
Phone 860-333-4300
johncesario9@gmail.com

---------------------------------------
David Preka Pro Se
298 Boston Post Road
East Lyme, CT 06333
Phone 860-365-9041
david@advimpllc.com

**CERTIFICATE OF SERVICE**

Plaintiffs certify that on September 2, 2026, a true and correct copy of the foregoing papers was mailed by US mail to the following defendant's attorney, Jordan Eth at Morrison & Foerster LLP, 425 Market Street, San Francisco, California 94105-2482

John Cesario Pro Se
15 Darrows Ridge
East Lyme, CT 06333
Phone 860-333-4300
johncesario9@gmail.com

David Preka Pro Se
298 Boston Post Road
East Lyme, CT 06333
Phone 860-365-9041
david@advimpllc.com